**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                Plaintiff,

                                       Case No. 3:17-cv-739

v.

WAL-MART STORES, INC. and
WAL-MART STORES EAST, LP,

                Defendants.

---

## DEFENDANTS' RESPONSE TO PLAINTIFF EEOC'S PROPOSED FINDINGS OF FACT IN OPPOSITION TO SUMMARY JUDGMENT

---

Defendants, Wal-Mart Stores, Inc. and Wal-Mart Stores East, LP (hereinafter "Defendants" or "Walmart"), submit the following response to Plaintiff EEOC's Proposed Findings of Fact submitted in opposition to Defendants' Motion for Summary Judgment. Any proposed finding of fact that Defendants have not disputed is undisputed only for the purpose of responding to Plaintiff EEOC's Opposition to Defendants' Motion for Summary Judgment. Walmart does not intend that matters herein be construed as an ultimate admission of the factual propositions they contain. Moreover, Walmart expressly retains the right to dispute any or all of undisputed facts below should this matter proceed to trial.

1.     Paul Reina is almost 40 years old. (Slaght Dep., 107:18-19.)

**RESPONSE:** Disputed but clarified. Defendants do not dispute that Mr. Reina is almost 40 years old at this time. However, during the most relevant time period of 2015, Mr. Reina was 36 years old. (Buliox Decl. at Ex H.) Regardless, this proposed fact is not material because it has

no bearing or relevance to the question of whether the Defendant failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

2.      He is intellectually disabled, deaf, and visually impaired. (EEOC Response to Def. PFOF 16; Slaght Dep. 306:25-307:1.)

**RESPONSE:**  Not disputed.

3.      He spent some or all of the first six years of his life in an institution. (Slaght Dep., 121:7-25.)

**RESPONSE:**  Not disputed.

4.      When he was six years old, Rose Slaght and her husband became his foster parents. (Slaght Dep., 139:7-19.)

**RESPONSE:**   Disputed in part. Defendants do not dispute that Rose Slaght and her husband became Mr. Reina's foster parents but dispute that the cited testimony supports that this event occurred when Mr. Reina was six years old. (Slaght Dep. at p. 139:7-19.)

5.      Slaght is his legal guardian. (Slaght Dep., 15:8-9)

**RESPONSE:**  Not disputed.

6.      Reina is nonverbal but his family and job coaches communicate with him using exact or home sign.  (Slaght Dep., 43:5-46:3; Polizzi Dep., 30:16-32:22; Coppernoll Dep., 38:1-19, 74:13-14.)

**RESPONSE:**   Disputed in part. Defendants do not dispute that Mr. Reina is nonverbal. However, Defendants dispute that Ms. Slaght uses "exact sign language" to communicate with Mr. Reina.  She testified that she communicates with Mr. Reina using a "home" sign language that is "**like** signing exact language." (Slaght Dep. at p. 43:5-46:3.)  Further, Defendants dispute that the cited testimony supports that Mr. Reina's job coaches, other than Ms. Slaght who is also family, communicated with Mr. Reina using exact or home sign.   (Polizzi Dep. at pp. 30:16-32:22; Coppernoll Dep. at p. 38:1-19.) Ms. Polizzi, a job coach, testified that most of her signing

2

communication with Mr. Reina is based on American Sign Language and that some of it is "just Rose [Slaght] and Paul's [Reina] signs." (Polizzi Dep. at pp. 30:16-32:22.) Ms. Polizzi further testified that the signing used by her is based on American Sign Language sign and that Mr. Reina's signing ability overall is primitive. (*Id.*)  Mr. Coppernoll, Mr. Reina's primary job coach, testified that he communicated with Mr. Reina through American Sign Language and that Mr. Reina knows American Sign Language.  (Coppernoll Dep. at p. 38:1-19.)

7.    ASL is a complete, unique language developed for deaf people, which has its own vocabulary and grammar that differs from English. Signed Exact English communicates in English through signs--including some ASL signs--and fingerspelling, and usually uses English grammar and sentence structure. (https://www.signingsavvy.com/blog/45/The+difference+between_ASL+and+English+signs.)

**RESPONSE:**  Defendants do not dispute that the cited material is contained within the referenced website. However, Defendants dispute that the website or the information contained therein is an inaccurate representation of Mr. Reina's primitive ability to communicate and method of any communication. Ms. Slaght communicates with Mr. Reina using a "home" sign language that is "**like** exact sign language." (Slaght Dep. 43:13-14; 45:14.) (Emphasis added.)

8.    Reina's receptive skills are better than his expressive skills. (Slaght Dep., 122:1-14; Polizzi Dep., 32:10-22.)

**RESPONSE:**  Not disputed.

9.    Reina dresses and grooms himself. (Slaght Dep., dressing 118:6-19; Coppernoll Dep., 98:11-18, 99:5-7 bathe, shower and dress.)

**RESPONSE:**   Disputed in part. Defendants do not dispute that Ms. Slaght and Mr. Coppernoll allege that Mr. Reina dresses and grooms himself to the extent that he is able and as the terms "dresses" and "grooms" are narrowly defined by the cited testimony. However, the inference that Mr. Reina can accomplish all tasks associated with dressing and grooming unassisted is disputed. Mr. Reina is incapable of learning how to adjust the bath water temperature

3

with a two-handle hot water and cold water control system. (Slaght Dep. at p. 118:6-112:3-23.) Mr. Reina would turn on the hot water only. (*Id*.) Because of this, approximately six months ago Ms. Slaght installed a one-handle water control system. (*Id*. at p. 112:3-23.)

10.     Reina could shop on his own. (Polizzi Dep., 89:18-23.)

     **RESPONSE:**  Defendants dispute the statement that Mr. Reina could shop on his own as an inaccurate characterization of his abilities. According to Ms. Slaght, Mr. Reina could do "some" shopping on his own. (Slaght Dep. at pp. 118:22-119:8.) The "some" is defined as Mr. Reina having picked out a pair of shoes and a jacket and as having purchased his own snack when working at Walmart. (*Id*.) However, Mr. Reina looked to Ms. Slaght to assist him with the purchase by giving him the correct amount of money for the purchase. (*Id*. at p. 120:4-5.)

11.     Reina can operate appliances like a vacuum, battery powered drill and the microwave. (Slaght Dep.,105:15-19; Polizzi, Dep., 72:16-73:6, 88:12-13.)

     **RESPONSE:**  Disputed in part. Defendants dispute that the cited testimony supports that Mr. Reina could use a vacuum. Defendants do not dispute that Ms. Slaght or Mr. Coppernoll alleged that Mr. Reina could operate a battery powered drill and the microwave. Regardless, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

12.     Reina [sic] can prepare his own microwave meals, and take his medications when directed. (Slaght Dep., 105:15-19; Polizzi Dep., 145:25-146:3.)

     **RESPONSE:**  Defendants dispute any inference that Mr. Reina is capable of being responsible for taking his own medications without prompting, direction or supervision. Ms. Polizzi has physically given Mr. Reina medication on occasion for him to take or has handed him a medication bottle for him to remove the lid and take out the pill under her supervision. (Polizzi

Dep. 146:1-3.) The remaining fact is not disputed inasmuch as it is not disputed that Ms. Slaght or Ms. Polizzi testified that Mr. Reina could microwave meals. Regardless, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

13.     Reina completed high school, getting a certificate of completion.  His high school education focused on his transition to work: getting a job and keeping a job. (Slaght Dep.,127:3-12, 131:2-16.)

**RESPONSE:**  Defendants dispute the statement to the extent that it infers that Mr. Reina completed the curriculum associated with a high school education. Mr. Reina received a certificate of completion of high school because, at age 21, he had completed his entitlement of educational resources and could no longer attend school. (Slaght Dep. 127:15-22.) Defendants further dispute the proposed fact that Mr. Reina's high school education focused on transitioning to work as a mischaracterization of testimony. Mr. Reina's Individualized Education Program included, in part, transition and getting and keeping a job. (Slaght Dep. 131:11-14.) Finally, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

14.     Reina got his first job in the community working in a laundromat.  He later worked in the delicatessen in Rockton, IL. (Slaght Dep.,128:17-131:1.)

**RESPONSE:**  Not disputed.

15.     He did well in his delicatessen job and worked there until 1998, when he got the job as a cart pusher at Walmart. (*Id.*)

**RESPONSE:**  Defendants dispute that the cited testimony supports the statement that Mr. Reina did well in his delicatessen job, as the cited testimony does not provide that he did well in

his delicatessen job. (Slaght Dep. at pp. 128:17-131:1 ) Further, even if that was not the case, the proposed fact that Mr. Reina "did well in his delicatessen job" presents as sheer speculation. Speculation cannot form the basis of a material fact and cannot be used to avoid summary judgment. *Karazanos v. Navistart Intl'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). The remaining fact is not disputed. Regardless, this proposed fact is not material because it has no bearing or relevance to the question of whether Mr. Reina was able to do his job at Walmart with or without reasonable accommodations, whether Walmart failed to reasonably accommodate Mr. Reina's disability or whether Walmart terminated his employment because of his disability.

16.     He had job coaches or aides in these positions. (*Id.*)

        **RESPONSE:** Defendants dispute the proposed fact as unsupported by the cited testimony, as the testimony cited does not specifically support the contention that Mr. Reina had a job coach at each of the positions referenced. For the Highlander position, Ms. Slaght testified that "Anne was the responsible party through the school." (Slaght Dep. at p. 130.) While Ms. Slaght testified that Anne Schilling was Mr. Reina's job coach at other positions, she did not specifically say as much in connection with the Highlander job. (*Id.* at pp. 128-131.)

        At any rate, Defendants object to this proposed fact on the grounds that it is vague and ambiguous in its entirety and as to what is contemplated by the term "job coaches." To the extent the term "job coach" has the meaning assigned to it under the EEOC's interpretative guidelines, Defendants dispute that Plaintiff has presented evidence to suggest that any of the individuals referenced were in fact job coaches because there is no evidence offered in the cited material that these individuals were professionally trained in that capacity, and there is further no evidence from the cited material that they provided job training or job placement services. (*Id.*)   There is no

indication from the testimony cited that he had job coaches or aides in each of the positions referenced. (*Id.*)

17.     Reina obtained his job at the Walmart in Beloit in October 1998 with the assistance of his high school program. (Slaght Dep.,131:2-16; Stroh Dep., 70:12-19.)

**RESPONSE:**  Not disputed.

18.     Walmart hired Reina into the cart pusher position, where he worked until June 12, 2015. (Slaght Dep.,33:19-34:18, 99:16-23.)

**RESPONSE:**  Not disputed.

19.     Soon after he was hired, Walmart agreed to provide Reina with the following accommodations: (1) he could work with his job aide; (2) he would not have to handle fragile merchandise; and (3) he would not be assigned to do tasks that he was incapable of handling. (Vance Decl., ¶26, Ex. 24; Repka Decl., ¶ 10, Ex. D; EEOC Resp. Def. PFOF 17, 18, 19.)

**RESPONSE:**  Not disputed.

20.     Reina worked with a job coach while employed at Walmart. (Coppernoll Dep.,7:9-13, Polizzi Dep., 9:9-11, Fallon Dep., 7:19-8:2, Slaght Dep.,8:19-23; EEOC Resp. Def. PFOF 19 (Reina worked with a job aide).)

**RESPONSE:**  Disputed in part. Defendants do not dispute that Mr. Reina worked with Mr. Coppernoll, Ms. Slaght, Ms. Polizzi and Mr. Fallon while on duty at Walmart and that Plaintiff labels these individuals as "job coaches."   Defendants, however, object to this proposed fact on the grounds that it is vague and ambiguous in its entirety and as to what is contemplated by the term "job coach." To the extent the term "job coach" has the meaning assigned to it under the EEOC's interpretative guidelines, Defendants dispute that Plaintiff has presented evidence to suggest that any of the individuals referenced were in fact job coaches because there is no evidence offered in the cited material that these individuals were professionally trained in that capacity, and there is further no evidence from the cited material that they provided job training or job placement services. (*See* Coppernoll Dep.,7:9-13, Polizzi Dep., 9:9-11, Fallon Dep., 7:19-8:2, Slaght

Dep.,8:19-23; EEOC Resp. Def. PFOF 19.) Rather, the evidence suggests that all four of these individuals were in fact not professionally trained job coaches. Mr. Coppernoll was not certified as a job coach nor otherwise a professionally trained "job coach," but has been a family friend for 45 years (Coppernoll Dep. at pp. 7, 74, and 82.) Ms. Slaght did not go through any orientation or training before working as Mr. Reina's "coach." (Slaght Dep. at p. 150.) Mr. Fallon does not have any training as a job coach. (Fallon Dep 15:3-14.) Ms. Polizzi did not have any training before working as Mr. Reina's job coach (Polizzi Dep. 46:23-48:10.)

21.   Reina's family paid for the job coach with funding support from a public agency. (Slaght Dep., 80:10-25; Matheny Dep. 47:17-48:12, 50:3-50:16.)

   **RESPONSE:**  Defendants dispute the proposed fact as a mischaracterization of testimony. Neither Mr. Reina nor his family ever paid for any of Mr. Reina's job coaches. Mr. Reina is a participant in the Medicaid waiver program and, as a part of the supports and services that are offered to him, the Medicaid waiver program pays Mr. Reina's job coaches directly. (Slaght Dep. 80:10-18; Matheny Dep. 51:21-22.)

22.   Persons who worked as Reina's job coach included Matt Coppernoll, Margie Polizzi, Mike Fallon, and Rose Slaght. (Coppernoll Dep.,7:9-13, Polizzi Dep., 9:9-11, Fallon Dep., 7:19-8:2, Slaght Dep.,8:19-23.)

   **RESPONSE:**  Not disputed.

23.   Reina's job coaches submitted to background checks and fingerprinting. (Polizzi Dep., 48:3-17.)

   **RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Ms. Polizzi. This inference is unsupported by the cited material. Ms. Polizzi submitted to a background check and fingerprinting as a job coach for Mr. Reina. Regardless, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants

failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

24.     Reina's primary task was to collect carts from the parking lot and put them in the bay. (Polizzi Dep., 142:8-19; Fallon Dep., 28:1-21 (Reina would maintain availability of and organize carts/flatbeds).)

**RESPONSE:** Not disputed.

25.     Cart retrieval was 95 percent of the job of a cart pusher. (Adamczyk Dep., 44:11-18.)

**RESPONSE:** Not disputed.

26.     Cart pushers could collect the carts manually or using a cart caddy. (Adamczyk Dep., 26:8-27:17; Stroh Dep., 46:5-47:19.)

**RESPONSE:** Defendants do not dispute that carts could be collected manually or through using a Cart Caddy. When more than 10 carts were pushed at a time, Defendants had a rule that required the use of a Cart Caddy. This fact is not in dispute. (*See* Defendants' Reply to EEOC Response to Proposed Fact 51.) Further, management has the right to direct Cart Attendants to use a Cart Caddy to transport carts in a particular situation. (Scheuerell Decl. at 10.)

27.     Walmart did not require cart pushers to use the cart caddy. (Adamczyk Dep., 26:8-27:17; Stroh Dep., 46:5-47:19.)

**RESPONSE:** Disputed. When more than 10 carts were pushed at a time, Defendants had a rule that required the use of a Cart Caddy. This fact is not in dispute. (*See* Defendants' Reply to EEOC Response to Proposed Fact 51.) Further, management has the right to direct Cart Attendants to use a Cart Caddy to transport carts in a particular situation. (Scheuerell Decl. at 10.)

28.     The cart caddy was not always available. (Adamczyk Dep., 27:18-23; Slaght Dep.,162:1-16; Coppernoll Dep., 90:25-91:9; Fallon Dep., 30:18-31:2 (cart caddy was broken or not charged every time he was there).)

**RESPONSE:** Not disputed.

29.     When Reina was retrieving carts, the job coach would watch for oncoming cars. (Coppernoll Dep., 137:17-138:2.)

**RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Mr. Coppernoll. This inference is unsupported by the cited material. The Defendants further dispute the statement to the extent it mischaracterizes the necessity of Mr. Coppernoll's direct involvement in the performance of the cart retrieval function. When Mr. Coppernoll was working with Mr. Reina, Mr. Reina would push the carts from behind and Mr. Coppernoll would steer the carts left or right. Mr. Coppernoll steered the carts because Mr. Reina did not have enough visual acuity to be able to see cars coming or anticipate where they might be in relation to him, could not determine which direction to go, and may not even know where the cart bay was located. (Coppernoll Dep. 137:22-138:20.)

30.     The job coach would direct Reina's attention to the location of carts as needed.  (Coppernoll Dep., 32:4-24.)

**RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Mr. Coppernoll. This inference is unsupported by the cited material. It is undisputed that Mr. Coppernoll directed Mr. Reina's attention to carts that he needed to retrieve from the parking lot.

31.     The job coach would make sure that Reina stayed focused on his job duties. (Coppernoll Dep., 8:3-6; Polizzi Dep., 136:14-18.)

**RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Mr. Coppernoll and Ms. Polizzi. This inference is unsupported by the cited material. It is undisputed that Mr. Coppernoll and Ms. Polizzi endeavored to keep Mr. Reina focused.

32.     Reina would collect the carts independent of the job coach. (Coppernoll Dep., 33:4-24.)

**RESPONSE:**  Defendants dispute this proposed fact to the extent it seeks to include job coaches other than Mr. Coppernoll. Such an inference would not be supported by the cited material, as only Mr. Coppernoll's testimony is cited. Defendants further dispute that the cited testimony supports the contention that Mr. Reina would collect carts completely independent of Mr. Coppernoll. While, according to Mr. Coppernoll, Mr. Reina would go over and "collect" carts, Mr. Coppernoll would need to direct Mr. Reina to the carts which needed to be collected. (Coppernoll Dep. at p. 33.) Notably, Mr. Coppernoll would "steer the carts as Paul [Reina] was collecting them." (*Id.*)  Also, Mr. Coppernoll would assist Mr. Reina in the actual collection of carts, as he would hold the lead cart as Mr. Reina pushed a cart into the pack nesting them. (*Id.* at pp. 32-33.) The EEOC does not dispute this fact. (*See* Defendants' Reply to EEOC Response to Proposed Fact 111.) "EEOC [also] does not dispute that Reina pushed the row of carts to the store bay doors while Coppernoll steered the row of carts." (*Id.*) In addition, Mr. Coppernoll and other job coaches would also collect carts or otherwise assist in the cart collection process. (*See* Coppernoll Dep. at p. 32-33; Slaght Dep. at p. 153-154; Fallon Dep. at p. 22; Polizzi Dep. at pp. 111-112.)

33.     If Reina was pushing a long line of carts, the coach would steer the front of the carts while Reina pushed the carts. (Polizzi Dep., 110:14-24.)

**RESPONSE:**  Not disputed.

34.     The carts could be steered by the coach with one finger on the front cart. (Polizzi Dep., 113:25-114:9; *see also* Fallon Dep., 22:12-13 (he would just grab the front cart to keep it in line).)

**RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Ms. Polizzi. Such an inference is unsupported by the cited material, as Mr. Fallon (whose testimony is referenced in this proposed fact) did not indicate that he steered carts by putting one finger on them. (Fallon Dep. at p. 22.) The remaining fact is not disputed.

35.     The coach would not have to have steered if Reina pushed fewer carts at one time. (Coppernoll Dep., 137:4-16; *see also* Fallon Dep., 23:7-14 (noting that he could have let Reina do it but he thought it would be safer if he was in front and could stop him if necessary).)

**RESPONSE:**  Defendants dispute the proposed fact to the extent that it infers that Mr. Reina would have been able to maneuver fewer carts without any assistance at all. Plaintiffs cite the testimony of Mr. Coppernoll and Mr. Fallon in support of this proposed fact. While Mr. Reina may have been able to physically push a small number of carts, according to Mr. Coppernoll, Mr. Reina was not able to determine which direction to go and required someone to steer the carts in the intended direction. (Coppernoll Dep. at p. 137.) Also, even if Mr. Reina were pushing only one or two carts, Mr. Coppernoll would still need to walk beside him or in front of him so that he would know where to go. (*Id.*) According to Mr. Fallon, if the workplace "was congested, [he] would always be in the front there to help steer them."  (Fallon Dep. at p. 23.) Defendants thus dispute that Mr. Reina could have steered carts alone.

36.     Reina worked harder, faster, and more efficiently than other cart pushers. (Polizzi Dep., 38:11-24, 75:3-22, 157:6-158:6; Slaght Dep., 305: 8:16.)

**RESPONSE:**  Defendants dispute the proposed fact as a mischaracterization of testimony and as speculative. Ms. Slaght considers Mr. Reina to have worked harder than other Cart Attendants because she would see other Cart Attendants on their phones, hanging out, taking their time, or talking with customers and Mr. Reina did not do these things. (Slaght Dep. at p. 305.) Ms. Polizzi thought that Mr. Reina collected more carts than other cart attendants because he did not waste time or use a phone. (Polizzi Dep. at p. 38:11-24.) Ms. Slaght and Ms. Polizzi's cited opinions in support of this fact constitute mere speculation and opinion as to what Defendants might or should consider as fast and more efficient work by a cart attendant. Speculation cannot

form the basis of a material fact and cannot be used to avoid summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991).

Notably, both Ms. Slaght and Ms. Polizzi worked as substitute job coaches and lack foundation to testify as to what was done on occasions when they were not working as a job coach/aide. Ms. Slaght estimates that she worked as a job coach for Mr. Reina on approximately 40 to 70 occasions through his 16 plus years with Walmart (Slaght Dep. at pp. 146-148) and Ms. Polizzi estimates that she worked as Mr. Reina's job coach between 25 to 30 times (Polizzi Dep. at p. 143).  This proposed fact is not supported by competent evidence.

At any rate, the proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

37.   Reina could clear the parking lot by continually sweeping the parking lot to move the carts manually while other cart pushers waited until there were 100 carts so that they could use the cart caddy. (Polizzi Dep., 75:3-22.)

**RESPONSE:**  Defendants object to this proposed fact as lacking in foundation. This proposed fact is based on the testimony of Ms. Polizzi. There is no evidence that would support that Ms. Polizzi possessed personal knowledge as to the efficiency or activities of other Cart Attendants over time given that she only served as a job "coach" on a limited basis.  Ms. Polizzi was present for only a very small, miniscule fraction of Mr. Reina's 16-plus years working at Walmart and does not have the foundation to testify as to what Mr. Reina or others were doing on the many occasions in which she was not working as his job aide.  (*See* Polizzi Dep. at p. 143 (providing that she was a job coach for Mr. Reina approximately 25 to 30 times).) This proposed fact is not supported by competent evidence.

38.    Reina worked more efficiently than other cart pushers because he did not goof off or chit chat or spend time on his phone. (Slaght Dep., 305:8-16, 318:21-319:19; Polizzi Dep., 38:11-24, 157:6-158:6.)

**RESPONSE:**  Defendants object to this proposed fact as lacking in foundation. This proposed fact is based on the testimony of Ms. Polizzi and Ms. Slaght. There is no evidence that would support that either possessed personal knowledge as to the efficiency or activities of other Cart Attendants over time given that they only served as a job "coaches" on a limited basis.  In other words, they lack foundation to testify as to what was done on occasions when they were not working as a job coach/aide. Ms. Slaght estimates that she worked as a job coach for Mr. Reina on approximately 40 to 70 occasions through his 16 plus years with Walmart (Slaght Dep. at pp. 146-148) and Ms. Polizzi estimates that she worked as Mr. Reina's job coach between 25 to 30 times (Polizzi Dep. at p. 143). The contention in this proposed fact that Mr. Reina worked more efficiently than others is speculative. Speculation cannot form the basis of a material fact and cannot be used to avoid summary judgment. *Karazanos v. Navistart Intl'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). This proposed fact is not supported by competent evidence.

It also bears mention that the cited testimony does not support the proposed fact that other Cart Attendants goofed off while they were supposed to be working.

39.    Reina worked most efficiently when he pushed carts manually. (*See* Polizzi Dep., 157:6-158:6.)

**RESPONSE:**  Defendants object to this proposed fact as lacking in foundation. This proposed fact is based on the testimony of Ms. Polizzi. There is no evidence that would support that Ms. Polizzi possessed personal knowledge as to Mr. Reina's overall performance in the Cart Pusher position given that she only served as a job "coach" for him on a limited basis.  Ms. Polizzi was present for only a very small, miniscule fraction of Mr. Reina's 16-plus years working at Walmart and does not have the foundation to testify as to what Mr. Reina or others were doing on

14

the many occasions in which she was not working as his job aide.  (*See* Polizzi Dep. at p. 143 (providing that she was a job coach for Mr. Reina approximately 25 to 30 times).) Further, there is no evidence that Ms. Polizzi ever used the Cart Cady when working with Mr. Reina as is substitute job coach. (See Polizzi Dep; 75: 11-21.) Hence, she would have no basis to state that Mr. Reina worked most efficiently manually pushing carts. Accordingly, the evidence proffered in this proposed fact is speculative. Speculation cannot form the basis of a material fact and cannot be used to avoid summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). This proposed fact is not supported by competent evidence.

Of note, use of the Cart Caddy is critical to the efficient and timely retrieval and management of shopping carts.  (Scheuerell Decl. at ¶ 8.) They are used to move heavy cart loads/high volumes of carts in a quick and efficient manner. (*Id*. at ¶ 9.) Where, for example, an associate may be able to push up to 10 carts at a time without using a motorized Cart Caddy, an employee can push up to 20 carts at a time with a Cart Caddy with minimal physical stress or strain to the body. (*Id*.)

Notably, according to Mr. Coppernoll, he and Mr. Reina used the Cart Caddy whenever there were more than just a few carts to be collected and as much as a dozen times or more per shift. (Coppernoll Dep. 93:4-19.) The suggestion that Mr. Reina was more efficient when pushing manually is not supported.

40.     Reina cleared carts manually more quickly than other cart pushers did when they used the cart caddy. (*Id*.)

**RESPONSE:**  Defendants object to this proposed fact as lacking in foundation. This proposed fact is based on the testimony of Ms. Polizzi. There is no evidence that would support that Ms. Polizzi possessed personal knowledge as to Mr. Reina's overall performance in the Cart

Pusher position or the performance of others given that she only served as a job "coach" for him on a limited basis.  Ms. Polizzi was present for only a very small, miniscule fraction of Mr. Reina's 16-plus years working at Walmart and does not have the foundation to testify as to what Mr. Reina or others were doing on the many occasions in which she was not working as his job aide.  (*See* Polizzi Dep. at p. 143 (providing that she was a job coach for Mr. Reina approximately 25 to 30 times).)  Accordingly, the evidence proffered in this proposed fact is speculative. Speculation cannot form the basis of a material fact and cannot be used to avoid summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). This proposed fact is not supported by competent evidence.

Of note, use of the Cart Caddy is critical to the efficient and timely retrieval and management of shopping carts.  (Scheuerell Decl. at ¶ 8.) They are used to move heavy cart loads/high volumes of carts in a quick and efficient manner. (*Id*. at ¶ 9.) Where, for example, an associate may be able to push up to 10 carts at a time without using a motorized Cart Caddy, an employee can push up to 20 carts at a time with a Cart Caddy with minimal physical stress or strain to the body. (*Id*.)

Notably, according to Mr. Coppernoll, he and Mr. Reina used the Cart Caddy whenever there were more than just a few carts to be collected and as much as a dozen times or more per shift. (Coppernoll Dep. 93:4-19.) The suggestion that Mr. Reina was more efficient when pushing manually is not supported.

41.    When Reina did use the cart caddy, he would physically collect and load the carts onto the caddy, with the job coach operating the mechanism to drive the machine where it needed to go next. (Coppernoll Dep., 93:20-25.)

**RESPONSE:**  Disputed in part. Defendants dispute this proposed fact to the extent it purports to suggest that Mr. Reina actually used or could use the Cart Caddy. The testimony cited

16

does not support such a conclusion. (Coppernoll Dep. at p. 93, 95:10-96:19.) Further, Mr. Coppernoll testified that Mr. Reina was unable to operate it in a safe manner given his inability to focus and the traffic conditions despite his attempts to teach him how to use the Cart Caddy. (*Id.* at pp. 95-96.) Mr. Reina also would not stop the Cart Caddy despite direction to do so. (*Id.* at 96.) The remaining portions of this proposed fact are not disputed.

42.   Although Reina received minimal training on operating the cart caddy, with the job coach training him only two or times for one-half hour, Reina could operate the cart caddy but had difficulty anticipating traffic. (Coppernoll Dep., 95:22-96:6, 97:14-98:1, 215:8-13.)

**RESPONSE:** Disputed in part. Defendants dispute the statement to the extent that it speculates that one hour to one and one-half hours would be considered "minimal" training on the Cart Caddy either by Walmart or its manufacturer. The evidence cited does not demonstrate that the amount of training Mr. Reina received on the Cart Caddy is considered minimal by either Walmart or the Cart Caddy manufacturer. (*See* Coppernoll Dep. at pp. 95:22-96:6, 97:14-98:1, 215:8-13.) Further, the proposed fact attempts to mischaracterize the totality of testimony and minimize the reason why Mr. Reina could not use the Cart Caddy. Mr. Reina did not operate the Cart Caddy because it was unsafe for him to do so, in part because he could not see or anticipate traffic and "would not follow instructions when to discontinue operating it." (Coppernoll Dep. 96:2-98:1). The remaining portions of this proposed fact are not disputed.

43.   When Reina gathered carts, the job coaches might hold the lead cart for Reina while he gathered and loaded other carts in the pack.  This was to prevent the cart from rolling away. (Coppernoll Dep., 33:4-7, p. 34:17-21.)

**RESPONSE:** Disputed in part. Defendants dispute the fact to the extent that it seeks to include job coaches other than Mr. Coppernoll. This inference is unsupported by the cited material. The remaining portions of this proposed fact are not disputed.

44.   Walmart never told Reina or his representatives that they did not want the job coach operating the cart caddy or steering the carts or holding the lead cart. (Slaght Dep.,308:2-15; Rule 30(b)(6) Dep., (Repka) September 10, 2018, 37:14-38:5.)

**RESPONSE:** Disputed in part. Defendants dispute the fact as a mischaracterization of the cited material. The cited testimony does not support the statement that Ms. Slaght was not told by Walmart that it did not want the job coach to operate the cart caddy. Ms. Repka testified unequivocally that she was not aware if a conversation ever took place with Mr. Reina or his job coach that they had to change the method by which the job coach was working with Mr. Reina. The Defendants further disputes the fact to the extent that it seeks to include job coaches other than Ms. Slaght. This inference is unsupported by the cited material. The remaining portions of this proposed fact are not disputed.

**(3)     Other duties**

45.   Reina also would remove trash from the parking lot and from shopping carts, and break down boxes and put them in the compactor.  (Slaght Dep., 154:14-155:25; Coppernoll Dep., 145:10-148:22.)

**RESPONSE:**  Disputed in part. Defendants do not dispute that Mr. Reina picked up trash and broke down boxes. However, the statement that Mr. Reina removed trash from shopping carts is a mischaracterization of the cited testimony. According to Ms. Slaght, she would show trash to Mr. Reina, instruct him to pick it up and put it in the shopping cart, and then take all trash collected out of the shopping cart and place it in a trash can. (Slaght Dep. at pp. 154-155.) The cited testimony also does not support the statement that the boxes broken down by Mr. Reina were then placed by him or his job coach in the compactor. (Slaght Dep., 154:14-155:25; Coppernoll Dep., 145:10-148:22.)

46.   Reina wiped down carts if they were wet. (Coppernoll Dep., 143:20-25.

**RESPONSE:**  Not disputed.

47.   He would greet customers with a wave. (Slaght Dep., 124:16-125:3; *See also* Polizzi Dep., 34:6-12 (customers would sign "hi" to Reina); Fallon Dep., 44:20-45:1 (Reina would communicate with customers using a gesture or a smile); *see also* Polizzi, Dep., 32:23-33:14, 34:6-17 (some customers would communicate "hi," "bye" and "thank you" with Reina using sign language).)

**RESPONSE:**   Disputed in part. Defendants dispute the statement to the extent that it mischaracterizes testimony by inferring that Mr. Reina regularly communicated with customers without prompting. According to Ms. Slaght, she would inform Mr. Reina when a customer would say "hi" and Mr. Reina might then wave in return. (Slaght Dep. 123:25-124:25.) The cited evidence does not support the implication that Mr. Reina generally or regularly waved or communicated with customers. Ms. Slaght was not a regular job coach and hence lacks foundation to give evidence as to how Mr. Reina generally interacted with customers, if at all, when she was not acting as his job coach. Ms. Slaght estimates that she worked as a job coach for Mr. Reina on approximately 40 to 70 occasions through his 16 plus years with Walmart (Slaght Dep. at pp. 146-148)

Defendants further dispute this proposed fact to the extent it purports to suggest that Mr. Reina was able to effectively communicate with customers. Mr. Reina has been treated/seen by Richard Deming, M.D. for 33 years. (Slaght Dep. at p. 57.) Dr. Deming testified that Mr. Reina is essentially noncommunicative and does not follow any directions without Ms. Slaght's intervention. (Deming Dep. at p. 22.) Further, even with Ms. Slaght present, communication with Mr. Reina is difficult and Dr. Deming never observed with Mr. Reina any ability to verbalize words. (*Id*. at pp. 14 and 19.) Plaintiff does not dispute these facts. (*See* Defendants' Reply to EEOC Response to Proposed Fact 73.) Dr. Deming does not understand how Mr. Reina would be able to communicate with customers in a work environment. (Deming Dep. at p. 68.) Evidence cited by Plaintiff elsewhere suggests that Mr. Reina's communication skills were primitive. (*See*

Dkt. # 51, EEOC Proposed Fact 6, *citing* Polizzi Dep. at p. 32.)   For further response, see Defendants' Reply to EEOC Response to Proposed Fact 74.

The remaining portions of this proposed fact are not disputed.

48.  He would get customers' carts and retrieve them when they were done. (Slaght Dep.,164:4-24; *see also* Polizzi Dep., 93:7-94:11 (Polizzi looked for opportunities for Paul to get carts and help someone put something heavy into their truck).)

**RESPONSE:**  Not disputed.

49.  Reina's job coaches encouraged him to interact with customers. (Polizzi Dep., 52:17-22, 93:20-94:11, Slaght Dep., 123:16-124:2.)

**RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Ms. Polizzi and Ms. Slaght. This inference is unsupported by the cited material. Defendants do not dispute that Ms. Polizzi stated that she encouraged interaction with Mr. Reina. However, Defendants dispute that Ms. Slaght encouraged such interaction as a mischaracterization of her testimony. Ms. Slaght would inform Mr. Reina if someone said hi to him and might tell him if a customer had asked her for assistance.

50.  Reina would help customers load items into cars. (Coppernoll Dep., 107:25-108:15.)

**RESPONSE:**  Not disputed.

51.  The coach would alert him if a customer needed help. (Slaght Dep., 123:16-124:2, pp. 163:7-166:21.)

**RESPONSE:**  Disputed in part. Defendants dispute this proposed fact to the extent that it seeks to include job coaches other than Ms. Slaght. This inference is unsupported by the cited material. Defendants also dispute that this proposed fact is supported by competent evidence. As noted above, Ms. Slaght served as Mr. Reina's job coach on very limited occasions and lacks personnel knowledge and foundation as to what would happen when she was not serving as his job coach. (*See* Defendants' Response to EEOC Fact 139.)

The remaining portion of this fact is not disputed.

52.   The job coach would tell him to follow the customer to his or her car, but Reina would do the loading of the cart. (Coppernoll Dep., 107:25-108:15.)

**RESPONSE:**  Defendants dispute the statement to the extent that it purports to include job coaches other than Mr. Coppernoll. This inference is not supported by the cited material. (*See* Coppernoll Dep. at pp. 107:25-108:15.) The remaining fact is not disputed.

53.   Reina was asked to help carry out customer groceries maybe about once a week. (Coppernoll Dep., 101:22-102:15.)

**RESPONSE:**  Not disputed.

54.   Other cart pushers had walkie talkies so that Walmart could alert them to the need for customer assistance. (*See* Polizzi Dep., 117:15-118:25.)

**RESPONSE:**  Disputed in part. Defendants dispute this proposed fact to the extent that it seeks to include job coaches other than Ms. Polizzi. This inference is unsupported by the cited material. Defendants also dispute that this proposed fact is supported by competent evidence. As noted above, Ms. Polizzi served as Mr. Reina's job coach on very limited occasions and lacks personal knowledge and foundation as to what would happen when she was not serving as his job coach. (*See* Defendants' Response to EEOC Fact 126.)

The remaining portion of this fact is not disputed.

55.   Walmart did not provide Reina or his job coach with a walkie talkie. (*Id.*)

**RESPONSE:**  Disputed in part. Defendants dispute this proposed fact to the extent that it seeks to include job coaches other than Ms. Polizzi. This inference is unsupported by the cited material. Defendants also dispute that this proposed fact is supported by competent evidence. As noted above, Ms. Polizzi served as Mr. Reina's job coach on very limited occasions and lacks personnel knowledge and foundation as to what would happen when she was not serving as his job coach. (*See* Defendants' Response to EEOC Fact 126.)

The remaining portion of this fact is not disputed.

56. Other positions at Walmart were able to provide customer assistance. (Adamczyk Dep., 47:6-26; *see also* Polizzi Dep., 91:3-25; Stroh Dep., 48:17-49:16 (any position can help a customer get an item from a tall shelf).)

**RESPONSE:** Not disputed generally. However, Cart Attendants are generally working in the parking lot and thus are the first associates (Walmart employees) customers encounter. (Supplemental Declaration of Jeff Scheuerell (October 22, 2018) at ¶ 5.)[1] Walmart needs Cart Attendants to provide customer assistance when needed. (*Id.*) Customer service is an essential function/element of the Cart Attendant role. (*Id.*; *also see* Repka Decl. at Exs. A-C: Scheuerell Decl. at Ex. A.)

57. Walmart has a "stocker" position, which can load and unload items for customers. (Fallon Dep., 36:7-21 (Walmart had stockers who transported televisions from the store to the customer's car).)

**RESPONSE:** Not disputed.

58. Walmart has a position that empties garbage that accumulates. (Polizzi Dep., 126:16-27:3.)

**RESPONSE:** Defendants dispute the inference in the statement that Walmart had a position that included the task of emptying the parking lot waste receptacles during the entirety of Mr. Reina's employment. The cited testimony does not support this inference. While working as job coach with Mr. Reina, Ms. Polizzi and Mr. Reina would empty the garbage receptacles in the parking area when they became full. (Polizzi Dep. at pp. 126-127.) After several years of not working with Mr. Reina, Ms. Polizzi returned as Mr. Reina's job coach and noted that there was a new job position that included that function as well as picking up trash in the parking lot. (*Id.*) Regardless, this proposed fact is not material because it has no bearing or relevance to the question

---

[1] Supplemental declarations are designated as such, and are being filed in connection with Defendants' Reply Brief filings. Record cites herein to other declarations are in reference to declarations filed with this Court prior to the date of Defendants' Reply Brief filings.

of whether the Defendants failed to accommodate Mr. Reina's disability by not allowing Mr. Reina to utilize a permanent job coach to perform the essential functions of his position.

59.    Walmart had a greeter position that could direct and assist customers. (Adamczyk Dep., 47:6-25.)

**RESPONSE:**  Not disputed generally. However, Cart Attendants are generally working in the parking lot and thus are the first associates (Walmart employees) customers encounter. (Scheuerell Supplemental Decl. at ¶ 5.) Walmart needs Cart Attendants to provide customer assistance when needed. (*Id.*) Customer service is an essential function/element of the Cart Attendant role. (*Id.*; *also see* Repka Decl. at ¶ 5, Ex. 5; Scheuerell Decl. at ¶ 5, Ex. A.)

60.    The job coaches sometimes would work alongside Reina, collecting carts or picking up trash. (Polizzi Dep., 111:8-112:16, 127:4-128:6.)

**RESPONSE:**  Not disputed, but clarified. Ms. Polizzi testified that she would "normally" work alongside Mr. Reina (as opposed to "sometimes"). (Polizzi Dep. at pp. 111:8-112:16, 127:4-128:6.)

61.    Occasionally they did it to model the job for Reina. (Polizzi Dep., 111:22-16, 127:4-128:6.)

**RESPONSE:**  Defendants dispute the fact to the extent that it seeks to include job coaches other than Ms. Polizzi. This inference is unsupported by the cited material. Defendants also dispute that this proposed fact is supported by competent admissible evidence. As noted above, Ms. Polizzi served as Mr. Reina's job coach on very limited occasions and lacks personal knowledge and foundation as to what would happen when she was not serving as his job coach. (*See* Defendants' Response to EEOC Fact 126.) In addition, the term "occasionally" is disputed as unsupported by the cited testimony.

62.   Frequently they did it rather than be inactive while Reina worked.  (Polizzi Dep., 129:6-130:17) (job coach did not need to regularly help Reina do the job after having modeled it for him, but she would help retrieve carts to be a good team player); Slaght Dep., 166:8-21 (she would occasionally load groceries with Reina because that "only seems like the polite thing to do.").)

   **RESPONSE:**  Disputed in part. Defendants do not dispute this proposed fact to the extent that the reference to "they" does not seek to include job coaches other than Ms. Polizzi and Ms. Slaght. This inclusion is not supported by the cited material. Defendants object to the remainder of this proposed fact as lacking in foundation, as this proposed fact is based on the testimony of Ms. Polizzi and Ms. Slaght. As noted above, Ms. Polizzi and Ms. Slaght served as Mr. Reina's job coach on very limited occasions and lack personnel knowledge and foundation as to what would happen when they were not serving as his job coach. (*See* Defendants' Response to EEOC Fact 126 and 139.) Accordingly, Defendants object to the remainder of this proposed fact as not supported by competent evidence.

63.   Walmart never told them that this was unacceptable. (Slaght Dep., 308:2-15; Rule 30(b)(6), (Repka), September 10, 2018, 36:6-38:5; *see also* Stroh Dep., 35:23-36:13, 41:5-12, 47:8-19 (never disciplined, coached, or reprimanded Reina); Vance Decl., ¶¶2-18, Ex. 1-17 (performance evaluations.)

   **RESPONSE:**  Defendants object to this proposed fact in that it is vague and ambiguous as to what is contemplated by the term "this." Subject to this objection, Defendants do not dispute the proposed fact to the extent that the use of the word "them" does not seek to include job coaches other than Ms. Polizzi and Ms. Slaght and to the extent that the word "this" is referring to working alongside Mr. Reina collecting carts or picking up trash. (*See* Defendants' Response to EEOC Fact 62.)

64.   Reina's job coaches did not perform Reina's job for him but assisted him so that Reina could do the job. (Coppernoll Dep., 7:25-8:6, 32:1-34:25, 93:20-25, 107:25-108:15, 147:24-150:9.)

**RESPONSE:** Disputed. Defendants dispute this proposed fact on the grounds that it seeks to include, without support cited from the record, job coaches other than Mr. Coppernoll. This inference is unsupported by the cited material. Defendants further dispute that the cited material supports the statement to the extent that the statement purports to be inclusive of all Mr. Reina's job duties as defined by Defendants. (See Repka Decl. at ¶ 5, Ex. A.) It is not. (*See Coppernoll Dep., 7:25-8:6, 32:1-34:25, 93:20-25, 107:25-108:15, 147:24-150:9.*)

Also, the proposed fact is inconsistent with the totality of the testimony on the scope of the functions of the Cart Attendant position, the expectations of the Defendants relative to that position, and the role of Mr. Reina's job coaches in performing those job duties. (*See* record cites provided in connection with Defendants' Statement of Proposed Material Facts (Dkt. # 23) ("DPFOFOF") at ¶¶ 46-47, 50-59, 94-98, 100-103, 108-125, 127-133, 135-138, 140-146.) Mr. Reina did not and could not perform necessary components of those functions alone and Mr. Reina's job coaches did tasks associated with Mr. Reina's job. (*See e.g.* Fellows Decl. at ¶¶ 6,7 (Mr. Reina could not greet customers or address customer issues without assistance); Coppernoll Dep. at p. 32-33 (Mr. Coppernoll assisted Mr. Reina with gathering stray carts, would help Mr. Reina nest carts and would steer carts for Mr. Reina); Coppernoll Dep. at pp. 93-94 (Mr. Coppernoll would operate the Cart Caddy remote control and steer carts); Fallon Dep. at pp. 33-35 (Mr. Fallon observed Mr. Reina pushing a line of nested carts with Mr. Coppernoll in the front steering them or Mr. Coppernoll operating the Cart Caddy with a row of carts and Mr. Reina following along and doing nothing with the carts);  Coppernoll Dep. at pp. 95-96 (Mr. Coppernoll could not teach Mr. Reina how to use the Cart Caddy); Polizzi Dep. at pp. 79-80 and 84 (Ms. Polizzi observed Mr. Coppernoll operating the Cart Caddy and Mr. Reina doing nothing except for walking behind him); Coppernoll Dep. at pp. 100-102 (According to Mr. Coppernoll, Mr. Reina

could not communicate with or assist customers who did not know some sign language and would require assistance from Mr. Coppernoll); Coppernoll Dep. at pp. 105-106 (from Mr. Coppernoll's experiences, there was never a time when Mr. Reina was able to transport customer groceries from the store and place them in the customer's automobile without assistance); Coppernoll Dep. at pp. 129 (Mr. Reina was not asked to carry furniture, TVs, fragile things, or expense things); Polizzi Dep. at pp. 110-111 (Ms. Polizzi and Mr. Reina would each take a side of the parking lot and collect carts); Polizzi Dep. at p. 122 (Ms. Polizzi would assist customers by taking items (such as dog food and water) out of customers' shopping carts and loading the same into customer vehicles); Fallon Dep. at p. 39 (Mr. Fallon would have to answer customer questions for Mr. Reina); Slaght Dep. at p. 160 (Ms. Slaght would "perform whatever activity" for which Mr. Reina needed help).). Notably, Mr. Reina's job coaches were performing his duties on the occasions in which they were steering carts for him. (Coppernoll Dep. at pp. 32-33; Slaght Dep. at pp. 153-154; Polizzi Dep. at pp. 110-111; Fallon Dep. at p. 22.)

65.     Walmart gave Reina consistently good evaluations for the entire period of his employment. (Vance Decl., ¶¶2-18, Ex. 1-17 (performance evaluations); *id*., ¶27, Ex. 25 (Defendants' responses to EEOC's Request for Admission, Requests 23-52.)

**RESPONSE:** Disputed in part. Defendants dispute any allegation or inference that Mr. Reina's job evaluations show that he performed (with or without a job aide) at satisfactory levels throughout the entirety of his employment at Walmart, as his last evaluation was in 2014 and he stopped coming to work in 2015. (Scheuerell Decl. at ¶ 28 (Mr. Reina did not return to work after June 2015); Vance Decl., ¶ 18, Ex. 17 (Mr. Reina's 2014 performance evaluation).

Defendants do not dispute that Mr. Reina's evaluations were generally positive during the periods in which he was evaluated. However, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed

the essential job functions of the Cart Attendant position. Such a characterization is inconsistent with the record. (*See* Defendants' Response to EEOC Fact 64 above.) Further, early in his employment, Mr. Reina was provided with a job aide to work with him. (*See* Defendants' Reply to EEOC Response to Proposed Fact 17-19.) Moreover, and as for at least Mr. Reina's 2013 and 2014 evaluations, evidence in the record indicates that he was evaluated based on the cumulative effort of him and his job coach as noted by two of his evaluating managers. (*See* DPFOFOF ¶ 102, and Defendants' reply to the same.)

Notably, Mr. Scheuerell never formally evaluated Mr. Reina. (Scheuerell Supplemental Decl. at ¶ 6.) Actually, from what he observed, Mr. Reina was not doing his job. (Scheuerell Dep. at p. 128; Scheuerell Decl. at ¶¶ 21 and 22.)

Importantly, any inference in this proposed fact that there were no criticisms of Mr. Reina's performance is disputed. Mr. Reina's evaluations contained criticisms of his performance and identified areas where improvement was needed at a minimum in the years 2001, 2005, 2006, 2007, 2008, 2009, 2013 and 2014 (*See* PPF ¶¶ 69, 73-77 and 79-80.)[2]

66.   Walmart noted his "honesty" and "integrity," that he worked well with his guardian, and did a good job in his 1998 evaluation. (Vance Decl., ¶ 2, Ex. 1.)

**RESPONSE:**   Disputed in part. Defendants do not dispute that Mr. Reina's performance evaluation contains the cited material. However, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. Mr. Reina's performance as identified on his annual performance evaluations was based on the cumulative effort of him and his job coach as noted by two of his evaluating managers. (DPFOFOF ¶ 102.)

---

[2] References to the Plaintiffs' Proposed Findings of Fact Submitted in Opposition to Summary Judgment are identified as "PPF" throughout.

67.    Walmart noted in his 1999 evaluation that he took "direction very well from job coach," "does his job to the best of his abilities," he "works very well with fellow associates." (Vance Decl., ¶ 3, Ex. 2.)

**RESPONSE:** Not disputed.

68.    In his 2000 evaluation, Walmart said that "Paul brightens everyone's day with his endearing personality." The manager wrote in that Reina "finds enjoyment in all he does," and "every person here finds Paul a very special young man." (Vance Decl., ¶ 4, Ex. 3.)

**RESPONSE:** Not disputed.

69.    In 2001, Walmart said that Reina is "always prompt with great attendance," he "steadily pushes carts" "keeps up well." He was to "keep up the good work." (Vance Decl., ¶ 5, Ex. 4.)

**RESPONSE:**   Disputed in part. Defendants dispute the statement to the extent that it misquotes cited material. Mr. Reina's 2001 Performance Appraisal states that Mr. Reina was "always prompt with good attendance," not "great" attendance. (Vance Decl. at Ex. 4.) Further, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.) Finally, Defendants dispute the inference in the proposed fact that there were no criticisms of Mr. Reina in his evaluation. It was identified as a goal that Mr. Reina "will continue to work to [the] best of ability and improve if possible." (Vance Decl. at Ex. 4.) The remaining portion of this fact is not disputed.

70.    In 2002, Walmart said that "Paul has been a great cart pusher." It noted that his "job coach has kept him more active which he seems to like.  Wants steady work always." Walmart told him to "keep up the good work." (Vance Decl., ¶ 6, Ex. 5.)

**RESPONSE:** Disputed in part. Defendants dispute this proposed fact to the extent that it misquotes cited material. Mr. Reina's 2002 Performance Appraisal states that Mr. Reina's "new coach has kept him more active which he seems to like-works steady always," not that he "wants steady work always." (Vance Decl. at Ex. 5.) Further, Defendants dispute the characterization of

the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.) The remaining portion of this fact is not disputed.

71.   In 2003, Walmart wrote that "Paul is very dependable and hard working.  Consistently maintaining carts in corrals," and that he "[l]oved to keep busy."  (Vance Decl., ¶ 7, Ex. 6.)

**RESPONSE:**  Disputed in part. Defendants dispute this proposed fact to the extent that it misquotes cited material. Mr. Reina's 2003 Performance Appraisal states that Mr. Reina is "constantly maintaining carts in corrals," not that he is "consistently maintaining carts in corrals." (Vance Decl. at Ex. 6.) Defendants further dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.) The remaining portion of this fact is not disputed.

72.   In 2004, Walmart wrote that Reina worked to the best of his ability," but advised him to "remember to push under 10 carts at a time" and to "constantly monitor carts." (Vance Decl., ¶ 8, Ex. 7.)

**RESPONSE:** Disputed in part. Defendants do not dispute that the cited material supports the proposed fact. However, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.)

73.   In 2005, Walmart rated Reina as a solid performer, but did not provide a narrative.  (Vance Decl., ¶ 9, Ex. 8.)

**RESPONSE:**  Disputed in part. Defendants dispute that the statement is supported by the cited material. In 2005, Mr. Reina was rated as "Meets Expectations" on his Performance Appraisal. (Vance Decl. at Ex. 8.)  Further, Defendants dispute the proposed fact to the extent that it infers that there were no criticisms of Mr. Reina in his evaluation. Mr. Reina was advised that

29

he needed to improve his attendance. (*Id.*) Finally, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.)

74.   Walmart wrote in 2006 that Reina was a "good worker" and that he "consistently stays productive and keeps up on an adequate supply of carts."  Walmart asked him also to look throughout the store for carts, and to empty carts with trash and maintain a clean outside appearance.  (Vance Decl., ¶ 10, Ex. 9.)

**RESPONSE:**  Defendants dispute the characterization that it "asked" on this evaluation that Mr. Reina look throughout the store for carts, to empty carts with trash, and to maintain a clean outside appearance. (Vance Decl. at Ex. 9.) These three job functions were identified as Areas for Improvement on Mr. Reina's 2006 Performance Appraisal. (*Id.*) Defendants also dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.)  The remaining portion of this proposed fact is not disputed.

75.   In 2007, Walmart wrote that "Paul does what is asked of him," he "brings in carts from the lot," and he "never calls in[,] is always at work." (Vance Decl., ¶ 11, Ex. 10.)

**RESPONSE:**  Disputed in part. Defendants do not dispute that the cited material supports the statement. However, Defendants dispute the proposed fact to the extent that it infers that there were no criticisms of Mr. Reina in his evaluation. In addition to the cited material, Mr. Reina was criticized for his tardiness and was advised that he needed to "make sure to get to work on time." (Vance Decl. at Ex. 10.) Further, Mr. Reina was rated as Below Expectations in the areas of: (1) answers all customer service calls from other associates; (2) helps with other projects as needed; and (3) provides customer carry outs when needed. (*Id.*) Defendants further dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord,

successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants'

Response to EEOC Fact 64 above.)

76.   In 2008, Walmart wrote in Reina's evaluation that he "does a good job keeping carts filled
inside the building"; he "[w]orks well with other Cart pushers"; and that he "[d]oes
anything asked from the CSM [Customer Support Manager]."  Walmart suggested that he
'[h]elp with carry outs more when possible." (Vance Decl., ¶ 12, Ex. 11.)

**RESPONSE:**   Disputed in part. Defendants dispute that Walmart "suggested" that Mr.

Reina help with carry outs more when possible. In Mr. Reina's 2008 Performance Appraisal, two

Areas for Improvement were identified as necessary for Mr. Reina: (1) "[h]elp with carry outs

more when possible;" and (2) [c]ontinue to work on being on time." (Vance Decl. at Ex. 11.)

Defendants further dispute the characterization of the proposed fact as inferring that Mr. Reina,

solely and of his own accord, successfully performed the essential job functions of the Cart

Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.) The remaining portion

of this proposed fact is not disputed.

77.   Reina received an overall evaluation of "solid performer" in 2009, 2010 and 2011, but
Walmart did not provide a narrative.  (Vance Decl., ¶¶ 13, 14, 15 Ex. 12, 13, 14.)

**RESPONSE:**   Disputed in part. Defendants do not dispute that Mr. Reina was generally

rated as a Solid Performer in evaluation years 2009, 2010, and 2011. However, Defendants dispute

the proposed fact to the extent that it infers that there were no criticisms of Mr. Reina in his

evaluations. In 2009, Mr. Reina was rated as Development Needed in the area of his job functions

involving the Front-End of the store. (Vance Decl. at Ex. 12.) For example, Mr. Reina needed to

improve his performance in following proper procedures to prevent inventory shrink, keeping the

front of the store clean, helping customers find purchases, and loading items in a timely manner.

(*Id*.) Finally, Defendants dispute the characterization of the proposed fact as inferring that Mr.

Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.)

78.    In the 2012 evaluation, Walmart again ranked him a solid performer and wrote that "he keeps up with the bays at all times.  Paul also willing to help out with other task[s] that are asked of him."  (Vance Decl., ¶ 16, Ex. 15.)

**RESPONSE:**  Disputed in part. Defendants do not dispute that the cited material supports the proposed fact generally. However, Defendants dispute that Plaintiff correctly quotes language in the evaluation. (Vance Decl. at Ex. 15.) Defendants also dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants'  Response to EEOC Fact 64 above.)

79.    Reina also received a "solid performer" in 2013, with the Walmart manager writing "Paul does well with making sure carts are full in the bay.  Paul is good at making sure that there are no stray carts all over and makes sure that all the carts are cleaned up around the building." (Vance Decl., ¶ 17, Ex. 16.)

**RESPONSE:**  Disputed in part. Defendants do not dispute that the cited material supports the proposed fact generally. However, Defendants dispute the proposed fact to the extent that it infers that there were no criticisms of Mr. Reina in his evaluation. (Vance Decl. at Ex. 16.) Areas of Opportunity were identified in Mr. Reina's Performance Appraisal. (*Id*.) Mr. Reina was informed that he was to "[k]eep making sure that when [he] bring[s] carts into the bay area that there isn[']t trash in them" and to "[p]lease keep making sure that we are clean around the bay areas and out front of vestibule entrances." (*Id*.) Mr. Reina was also directed to "[m]ake sure that we watch our times punching in for the day." (*Id*.)  Finally, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina, solely and of his own accord, successfully performed the essential job functions of the Cart Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.) Mr. Reina's performance as identified on his 2013 annual performance evaluation

was based on the cumulative effort of him and his job coach as noted by one of his evaluating

managers. (See DPFOF at ¶ 102, and Defendants' Reply to the same.)

80.     In 2014 Walmart again rated him as a solid performer, and wrote:

> Paul is a pleasure to work with. Paul knows his expectations and does his
> job. Paul gets along with his fellow associates as well is friendly to the
> customers. Paul's attendance is decent having not missed any of his shifts,
> which shows his dedication to the job. Paul is good about making sure the
> carts are cleaned out of garbage.
>
> Development for Paul would be to communicate with management when
> he is taking his break and to watch his tardies. Paul also needs to be aware
> that when he is not using the cart caddy, only 10 carts to be pushed at a time.

(Vance Decl., ¶ 18, Ex. 17.)

**RESPONSE:** Defendants do not dispute that the cited material supports the statement.

However, Defendants dispute the characterization of the proposed fact as inferring that Mr. Reina,

solely and of his own accord, successfully performed the essential job functions of the Cart

Attendant position. (*See* Defendants' Response to EEOC Fact 64 above.) Mr. Reina's performance

as identified on his 2014 annual performance evaluation was based on the cumulative effort of him

and his job coach as noted by one of his evaluating managers. (See DPFOFOF ¶ 102, and

Defendants' Reply to the same.)

81.     Reina's performance evaluations were executed by multiple layers of supervision.
        Nowhere in these evaluations is there any indication that Reina's job coach was doing the
        work rather than Reina, or that Reina's performance was inadequate. (*See* Vance, Decl.,
        ¶¶ 2-18, Ex 1-17.)

**RESPONSE:** Disputed in part. Defendants do not dispute that Mr. Reina's performance

evaluations were executed by multiple managers. However, the remainder of the fact is disputed

as inconsistent with the cited material. Several evaluations identify that Mr. Reina's job coaches

were working directly with him to perform the essential functions of the Cart Attendant position

as well as multiple areas where Mr. Reina was required to improve. (Vance Decl. at Exs. 1, 4, 8-14, and 16-17)

82.   On some of the evaluations, Walmart wrote N/A next to tasks on which it did not evaluate Reina.  Vance Decl., ¶¶4, 5, 6, 8, 10, 12, Ex. 3, 4, 5, 7, 9, 11 (copies of performance evaluations with N/A written by certain tasks).)  For example, Reina's 2008 performance evaluation did not evaluate him on helping customers find what they needed.  (*Id.*, ¶12, Ex. 11.)

**RESPONSE:**  Disputed in part. Defendants do not dispute that the cited material supports the statement. However, Defendants dispute any inference that not evaluating specific performance metrics in an assessment period implies that it was a job function not performed by Mr. Reina or essential to his position. (*See* record cites to DPFOF ¶¶ 46-47, 50-59, 94-98, 100-103, 108-125, 127-133, 135-138, 140-146.)

83.   From 1998 to June 12, 2015, Walmart never communicated with Reina or his representatives that there was any dissatisfaction with the accommodations that Walmart was providing. (Rule 30(b)(6) Dep. (Repka), September 10, 2018, 23:21-25, 32:23-33:5; 38:23-39:22; Slaght Dep., 308:2-15; *see also* Stroh Dep., 35:23-36:13, 41:5-12, 47:8-19 (never disciplined, coached, or reprimanded Reina); Vance Decl., ¶¶2-18, Ex. 1-17 (performance evaluations).)

**RESPONSE:**  Defendants do not dispute that the cited material supports the statement. However, Defendants dispute that Walmart never communicated its dissatisfaction with Mr. Reina's accommodations. Areas of concern were noted in Mr. Reina's annual performance appraisals, at a minimum. (*See* Vance Decl. at Exs. 1, 4, 8-14 and 16-17.)

84.   At no time from 1998 to June 12, 2015 did Walmart conclude that Reina was not a qualified person with a disability.  (Rule 30(b)(6) Dep. (Repka), September 10, 2018, 24:1-26:8.)

**RESPONSE:** Defendants object to this proposed fact to the extent it calls for the work product or mental impressions of legal counsel for Defendants, and on the grounds that this proposed fact is premised on and asserts a legal conclusion. Subject to these objections, Defendants do not dispute that its Rule 30(b)(6) deponent testified that she was unaware of any time prior to

June 12, 2015 that Defendant had concerns about whether Mr. Reina was a qualified individual with a disability.

85.     From 1998 to June 12, 2015, no Walmart manager deemed that the accommodations that Reina was receiving were unreasonable.  (*Id.*, 32:23-33:5, 35:16-36:4, 38:23-39:22; *see also* Slaght Dep., 308:2-15; Stroh Dep., 35:23-36:13, 41:5-12, 47:8-19 (never disciplined, coached, or reprimanded Reina); Vance Decl., Ex. ¶¶2-18, 1-17 (performance evaluations).)

**RESPONSE:**  Defendants object to this proposed fact to the extent it calls for the work product or mental impressions of legal counsel for Defendant, and on the grounds that this proposed fact is premised on and asserts a legal conclusion. Subject to these objections, Defendants dispute that the statement is fully supported by the cited material. The Defendants' Rule 30(b)(6) deponent is not aware if any manager deemed that Mr. Reina's accommodations were unreasonable.

86.     From 1998 to June 12, 2015, no Walmart manager told Reina that there were additional tasks or functions that he should be performing that he did not.  (Rule 30(b)(6) Dep. (Repka), Sept. 10, 2015, 26:10-19, 27:10-22.)

**RESPONSE:**  Defendants dispute that the cited testimony supports the statement. Defendants' Rule 30(b)(6) deponent testified that she did not have any knowledge of anyone discussing with Mr. Reina or anyone on his behalf that there were additional job functions that he should be performing. In addition, the proposed statement ignores Mr. Reina's Performance Appraisals where managers clearly instructed Mr. Reina that additional tasks were to be performed. (*See* Vance Decl. at Exs. 9, 11,12, 13, 14, 16.)

87.     Walmart's Rule 30(b)(6) deponent could not identify a single piece of evidence other than his job description to indicate that Reina was ever told to use the cart caddy.  (*Id.*, 29:24-30:2.)

**RESPONSE:**  Disputed. Defendants dispute that the Cart Attendant job description is the only evidence identified by Ms. Repka that Mr. Reina was advised that he needed to use the Cart

Caddy. (Rule 30(b)(6) Dep. at p. 29:24-30:2.) Ms. Repka also testified that it was Walmart protocol that management would have covered the essential job functions with Mr. Reina at the time of hire. (*Id*.) Further, this proposed fact ignores the uncontroverted evidence that Mr. Reina's primary job coach, Mr. Coppernoll, understood use of the Cart Caddy was a function of Mr. Reina's position and did in fact use the Cart Caddy. (*See* DPFOF ¶ 112, and Defendants' Reply in connection with the same.) Further, Ms. Slaght and Ms. Polizzi knew that the Cart Caddy was to be used but Ms. Slaght determined that Mr. Reina should not use it so that he would get needed physical exercise while at work to be more calm and relaxed at home since he did nothing there. (Polizzi Dep. at p. 76:21-77:24.)

88. From 1998 to June 12, 2015, no Walmart manager spoke to Reina about doing additional customer assistance tasks.  (*Id*., 30:3-31:6.)

**RESPONSE:**  Disputed. Defendants dispute that this proposed fact is supported by the cited material. Ms. Repka testified that she was aware that previous management did speak to Mr. Reina about different parts of the job that needed to be performed and that Mr. Reina's job coaches did, in fact, perform different functions such as customer service duties and use of the cart mule (the Cart Caddy). (Rule 30(b)(6) Dep. at pp. 30-31.) Further, Mr. Reina's management identified some of the different duties that he needed to be performing as a part of his job function on his Performance Appraisals. (*See* Vance Decl. at Exs. 9, 11-14 and 16.)

89. From 1998 to June 12, 2015, no Walmart manager spoke to Reina about handling fragile merchandise. (*Id*., 33:6-34:20.)

**RESPONSE:**  Disputed. Defendants dispute that the statement is supported by the cited material. The Defendants' Rule 30(b)(6) deponent testified that she was "not aware" of any discussion that Mr. Reina would have to "start" handling fragile merchandise. (Rule 30(b)(6) Dep. at pp. 33-34.)

90.  From 1998 to June 12, 2015, Walmart never questioned Reina's reasonable accommodations or told Reina that he could not work with a job coach or told the job coach to change the manner in which he or she worked with Reina.  (*Id.*, 35:16-38:4; *see also* Slaght Dep., 308:2-15.)

**RESPONSE:**  Defendants object to this proposed fact to the extent it calls for the work product or mental impressions of legal counsel for Defendants, and on the grounds that this proposed fact is premised on and asserts a legal conclusion. Subject to these objections, Defendants dispute that the cited testimony fully supports the statement. The Defendants' Rule 30(b)(6) deponent was not aware of any analysis of or discussions about Mr. Reina's accommodations although they may have occurred. (Rule 30(b)(6) Dep. at pp. 35-38.)   Further, the cited testimony is limited to Ms. Slaght stating that, as a job coach, she was not told to do things differently, to not steer the carts, to not pick up trash, or that she was doing anything wrong. As noted above, Ms. Slaght served as Mr. Reina's job coach on very limited occasions and lacks personnel knowledge and foundation as to what would happen when she was not serving as his job coach. (*See* Defendants' Response to EEOC Fact 139.)

91.  Reina's pay increased every year he worked at Walmart.  Vance Decl., ¶27, Ex. 25 (wage history in Response Nos. 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, and 52).)

**RESPONSE:**  Defendants do not dispute the statement however this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to accommodate Mr. Reina's disability by not allowing Mr. Reina to utilize a permanent job coach to perform the essential functions of his position.

92.  On or about June 10, 2015, Jeff Scheuerell began working as store manager at the Beloit, WI, store. (*See* Vance Decl., ¶20, Ex. 19 (Response to Request No. 4); *see also* Scheuerell Dep., 21:5-8 (started in early June 2015), 29:24-30:7 (Stroh came in on his first day in store), 196:22-197:22 (no reason to dispute June 10, 2015 start date).)

**RESPONSE:**  Not disputed but clarified that Mr. Scheuerell is listed as beginning as the Beloit Store Manager on or about May 30, 2015. (Repka Decl. at ¶ 14; Scheuerell Dep. at p. 21.)

93. There are no witness statements or videos of an altercation between Paul Reina and his job coach on June 9, 2015. (Scheuerell Dep., 24:25-25-6, 49:5-19; Stroh Dep., 30:15-17, 64:3-10.)

    **RESPONSE:** Defendants dispute the characterization that the cited testimony supports that there are no witness statements. Mr. Scheuerell is unaware of a statement obtained by the customer who reported that Mr. Coppernoll was physically assaulting Mr. Reina in the parking lot on June 9, 2015. (*See* Scheuerell Dep., 24:25-25-6, 49:5-19.) Further, Ms. Stroh is unaware of any written police reports about any incident in 2015 and has no knowledge relative to any potential video depicting the 2015 incident. (*See* Stroh Dep., 30:15-17, 64:3-10.)

94. No police report concerning the alleged June 9, 2015, incident exists. (Scheuerell Dep., 36:2-4; Stroh Dep., 30:11-14; Vance Decl., ¶21, Ex. 20 (email from Beloit Police Department).

    **RESPONSE:** Disputed in part. Defendants dispute that the cited testimony fully supports the statement. Mr. Scheuerell does not know if there are any police records related to the June 9, 2015 incident and Ms. Stroh is unaware if the police were called. (Scheuerell Dep. at p. 36:2-4; Stroh Dep. at p. 30:11-14.) Defendant also disputes that the belief that one law enforcement agency (the Beloit Police Department) does not have a police report for the June 9, 2015 referenced incident means that no other law enforcement agency has such a report. The remaining portion of the proposed fact is not disputed.

95. Walmart has produced no reports of interviews pursuant to its Workplace Violence policy of any alleged incident on June 9, 2015. (Vance Decl., ¶22.)

    **RESPONSE:** Not disputed.

96. There was an incident *three years earlier* in 2012, which was successfully resolved. In that case, a few customers complained that Reina and his job coach were fighting in the parking lot. (Stroh Decl., Ex. B; Vance Decl., ¶ 24, Ex. 22.)

    **RESPONSE:** The proposed fact includes statements and argument from counsel, and such statements and argument cannot form the basis of a material fact. *See e.g. Bordelon v. Chicago*

*Sch. Reform Bd. of Trustees,* 233 F. 3d. 524, 527-528 (7th Cir. 2000) (affirming district court decision to strike in their entirety statements made in connection with proposed material facts that were "full of argument"). The entire fact should be disregarded. Further, Defendants dispute that the cited testimony supports the proposed fact. In Ms. Stroh's December 26, 2012 email, she states that "three" customers complained that Mr. Reina's job aid was "physically abusing [Mr. Reina] in the parking lot." This proposed fact is disputed as stated.

97.   In December 2012, a Walmart manager, Leah Wampole (now Leah Stroh), reviewed a videotape of the interaction and became concerned that Reina's job coach might have been abusing him. (Stroh Decl., Ex. B; Vance Decl., ¶24, Ex. 22.)

**RESPONSE:** Disputed in part as stated. Defendants do not dispute that Ms. Stroh was concerned about Mr. Reina's job coach assaulting him in December 2012. Defendants, however, dispute the proposed fact as a mischaracterization of the cited testimony. According to Ms. Stroh's December 26, 2012 email, she was already concerned for the well-being of Mr. Reina based on the three customer complaints that Mr. Reina's job aid was physically abusing him. (Stroh Decl., Ex. B; Vance Decl., ¶24, Ex. 22.) In her email, Ms. Stroh identifies the matter as a "serious situation" and requests guidance from her superior. (*Id.*) Ms. Stroh further advises that she had reviewed the video of the parking lot and observed Mr. Reina's job coach physically restraining Mr. Reina, pushing and grabbing Mr. Reina, and raising his hand like he was hitting Mr. Reina, all matching the customer complaints. (*Id.*) The remaining portion of this proposed fact is not disputed.

98.   Wampole (not a customer) called the police, who investigated. ((Stroh Decl., Ex. B; Vance Decl., ¶24, Ex. 22*), see also* Vance Decl., ¶25, Ex. 23.)

**RESPONSE:**  Not disputed.

99.   The police reviewed the video and interviewed Reina's guardian and the job coach, and physically inspected Reina for injuries. (Stroh Decl., Ex. B; Vance Decl., ¶¶24-25, Ex. 22, 23); Slaght Dep., 168:25-171:6; Coppernoll Dep., 162:8-163:23.)

**RESPONSE:**  Defendants object to and dispute this proposed fact on the grounds that it is lacking in foundation, as there is no evidence that Ms. Stroh had personal knowledge of the facts alleged here. Defendants also object to and dispute this proposed fact to the extent it is based on a police report, which is inadmissible hearsay if offered for the truth of the matter asserted. Defendants further dispute that the cited testimony supports the statement that the police physically inspected Mr. Reina for injuries. Ms. Slaght states that during her interaction with the police, she said that Mr. Reina could be looked over and that there were no bruises, scrapes, or abrasions. (*See* Slaght Dep. at pp. 168:25-171:6.) Ms. Slaght did not testify that anyone, including herself or the police, ever conducted a full body physical examination of Mr. Reina. (*See* Slaght Dep. at pp. 168:25-171:6.) To the extent the police report is accepted as admissible evidence and not impermissible hearsay, based on the report, the police did not conduct a physical examination/strip search of Mr. Reina to identify any potential injury to any part of his body. (Vance at Ex. 23.) The remaining portion of this proposed fact is not disputed.

100.   The police concluded that, as the job coach and guardian had told them, no abuse had occurred, and the video reflected that the job coach was attempting to communicate and calm Reina down. (Stroh Decl., Ex. B; Vance Decl., ¶¶24-25, Ex. 22-23.)

**RESPONSE:**  Defendants object to and dispute this proposed fact on the grounds that it is lacking in foundation, as there is no evidence that Ms. Stroh had personal knowledge of the  police department's full review. Defendants also object to and dispute this proposed fact on the grounds that it is based on a police report and/or comments made by the police to Ms. Stroh, all of which is inadmissible hearsay. The police report is being offered for the truth of the matter asserted. Defendants also dispute that the police report supports the proposed fact, to the extent the police

report is accepted as admissible evidence and not impermissible hearsay. (Vance Decl. at Ex. 23.)
As a result of their investigation, the police concluded in its report that there was "an altercation
**between** Paul and his assistant." (*Id*.) The police did not offer an opinion as to whether Mr.
Coppernoll's actions were appropriate or abusive but stated that because there were "no injuries to
**either** party" the case would be unfounded. (*Id*.) Further, the police informed Ms. Stroh that from
the video they were unable to determine if it was a behavioral issue **or** actual abuse. (*Id*.)

101.   The police determined that Wampole's report of abuse was unfounded. Stroh Decl., Ex. B;
Vance Decl., ¶¶24-25, Ex. 22-23; Stroh Dep., 76:21-77:18.)

**RESPONSE:**  Defendants object to and dispute this proposed fact on the grounds that it is
lacking in foundation, as there is no evidence that Ms. Stroh had personal knowledge of the  police
department's full review. Defendants also object to and dispute this proposed fact on the grounds
that it is based on a police report and/or comments made by the police to Ms. Stroh, all of which
is inadmissible hearsay. The police report is being offered for the truth of the matter asserted.
Defendants do not dispute that the police determined that Ms. Wampole's report of "abuse" was
unfounded, however, this determination was made based on the belief of the police that there were
no injuries to either party. Further, the police determined that there was certainly an "altercation"
that took place between Mr. Reina and his job coach but that it could not be determined if it was a
behavioral issue **or** actual abuse. Regarding this incident, and regardless of what the police may
have believed, Ms. Wampole/Stroh specifically testified that:

> "So I know what I saw, I know what the police said, but I don't know if that's really
> what happened.
>
> When I watched the video, it made me sick because it was disturbing to see an
> altercation like that happen. So I don't know if what the police investigated actually
> is what happened or if something else happened in the parking lot.
>
> I wasn't in the parking lot. I saw the video and I know what the video showed me."

(Stroh Dep. 61-62.)

102. Wampole related the December 2012 incident to Scheuerell and Julie Repka, Walmart's Market Human Resource Manager, three years later in a June 10, 2015, meeting. (Scheuerell Dep., 29:24-40:16; Stroh Decl., Ex. B; Repka Decl., ¶2 (describing her position in 2015).)

**RESPONSE:** Defendants do not dispute that Ms. Wampole informed Mr. Scheuerell and Ms. Repka of the December 2012 incident in the June 2015 meeting. However, the Defendants do dispute any inference that Ms. Wampole should have informed them sooner. At the time of the December 2012 incident, Ms. Wampole properly informed her then management team of the event, kept them apprised, and requested guidance. (Stroh Decl., Exhibit B.)

103. Wampole told Scheuerell and Repka that Reina was disabled and worked with a job coach. (Stroh Dep., 22:10-26:12; Scheuerell Dep., 60:22-61:8.)

**RESPONSE:** Not disputed.

104. Wampole further told Scheuerell and Repka that the police had found that the abuse allegation was unfounded. (Stroh Dep., 28:17-29:3.)

**RESPONSE:** Disputed. Defendants object to and dispute this proposed fact to the extent it is based on what the police purportedly told or reported to Ms. Wampole/Stroh, which is inadmissible hearsay. Defendants further dispute this proposed fact as a mischaracterization of the cited material. Ms. Wampole did not inform Mr. Scheuerell or Ms. Repka that the police had found that the abuse allegation was unfounded. (Stroh Dep., 28:17-29:3.) Ms. Wampole informed them that the outcome of the police investigation concluded that the job coach was trying to prevent Mr. Reina from hurting himself. (*Id*.) For further response, see Defendants' Response to EEOC Proposed Fact 101.

105. On June 10, 2015, Wampole forwarded to emails to Scheuerell and Repka about the 2012 incident, which confirm that the police concluded that there was no basis for the concern that the job coach was abusing Reina. (Stroh Decl., Ex. B; Repka Decl., Ex. E.)

**RESPONSE:**   Disputed in part. Defendants do not dispute that on June 10, 2015, Ms. Wampole forwarded her email string related to the 2012 incident to Mr. Scheuerell and Ms. Repka. Defendants object to and dispute this proposed fact on the grounds that it is based on a police report and/or comments made by the police to Ms. Stroh, all of which is inadmissible hearsay. The police report is being offered for the truth of the matter asserted. Defendants also dispute the remainder of the proposed fact as unsupported by the cited material. The police concluded that it could not be determined from the video if there was a behavioral issue or "actual" abuse and that because there were no injuries to either party, the complaint of abuse was determined unfounded. (Stroh Decl., Ex. B; Repka Decl., Ex. E.)

106. Wampole's only recollection of a 2015 incident was some discussion in this meeting that "this has happened before."  (Stroh Dep., 22:10-26:12.)

**RESPONSE:**   Not disputed.

107. It is improbable that anyone ever would have seen Reina hanging on to the coach's belt loops since Reina has a documented aversion to being touched or physical contact. (Polizzi Dep., 143:15-17.)

**RESPONSE:**   Disputed. As noted above, Ms. Polizzi served as Mr. Reina's job coach on very limited occasions and lacks personnel knowledge and foundation as to what would happen when she was not serving as his job coach, which would include what Mr. Reina had aversions to in work settings over the full course of his 16-plus years working at Walmart. (*See* Defendants' Response to EEOC Fact 126.) This proposed fact is not based on competent evidence. Defendants dispute that the cited material supports the proposed fact.

Defendants further dispute the proposed fact as a wholly inaccurate recitation of the totality of the testimony on the subject matter. According to Ms. Polizzi, Mr. Reina has an aversion to

people touching him and she absolutely does touch Mr. Reina while they are working together to

redirect him. (Polizzi Dep. 143:18-20.)  Further, Mr. Coppernoll "bear hugs" Mr. Reina as a means

of controlling him. (Coppernoll Dep. 150:25-151:21.)  Moreover, Mr. Coppernoll wears pants with

belt loops while at work. (Coppernoll Dep. 158:13-15.)

108.    Reina's job coaches did not do Reina's work for him. (Coppernoll Dep., 7:25-8:6 (job
        coach was basically Reina's eyes and ears and helped him stay on track with his work),
        32:1-34:25, 93:20-25, 107:25-108:15, 147:24-150:9); *see also* Polizzi Dep., 142:8-19 (98
        percent of Reina's time was collecting and pushing carts); Fallon Dep., 28:1-21 (Reina
        would maintain availability of and organize carts/flatbeds).)

        **RESPONSE:**  Disputed. *See* Defendants' Response to EEOC Proposed Fact 64.

109.    In the early afternoon of June 11, 2015, after Reina's shift ended at noon, Scheuerell
        contacted Walmart's Global Ethics department.  (Scheuerell Decl., Ex. C; *see* Coppernoll
        Dep., 42:18-22 (worked until noon).)

        **RESPONSE:**  Not disputed.

110.    Walmart's contemporaneous record of the June 11, 2015, call states that Scheuerell
        reported Wampole had told him that "one day" (not yesterday or the day before) a customer
        had reported that he or she had seen the job coach "beating on" Reina.  (Scheuerell Decl.,
        Ex. C.)

        **RESPONSE:**  Disputed as stated. The proposed fact includes statements and argument

from counsel, and such statements and argument cannot form the basis of a material fact. *See e.g.*

*Bordelon,* 233 F. 3d. at 527-528 (affirming district court decision to strike in their entirety

statements made in connection with proposed material facts that were "full of argument"). The

entire fact should be disregarded.

At any rate, Defendants dispute this proposed fact on the grounds that it is not consistent

with the record, when taken in full context. Mr. Scheuerell, in his June 11, 2015 report to

Walmart's Global Ethics Hotline referenced in this proposed fact specifically reported that Mr.

Coppernoll assaulted Mr. Reina. (Scheuerell Decl. at Ex. C.)  To keep matters in context with

respect to the "one day" reference Plaintiff attempts to make an issue out of, it was noted in the

report that "[o]ne day, a customer reported that he or she saw Matt 'beating on' Paul. The customer thought Paul and Matt were fighting. Jeff said the police have been contacted, in the past, when an incident between Paul and Matt occurred." (*Id.*) From this, it is clear that Mr. Scheuerell was aware of a situation in which a customer reported that Mr. Coppernoll was beating on Mr. Reina and that Mr. Scheuerell believed that there had been another incident "in the past" between Mr. Reina and Mr. Coppernoll. In any event, the distinction Plaintiff attempts to make about the exact day of the customer report is immaterial, and it is not disputed that Mr. Scheuerell became aware of at least one alleged or reported incident of abuse by Mr. Coppernoll against Mr. Reina.

111.   The record also indicated that Scheuerell reported that the police had been called, in the past, but gave no report of police involvement in 2015. (*Id.*)

   **RESPONSE:**  Not disputed.

112.   Walmart's internal report also states that "Jeff was informed that [the job coach] is doing all the work for Paul instead of helping him," but it does not say that Scheuerell himself had observed the job coach doing the work. (*Id.*; *see also* Slaght Dep.,32:24-33:9 (Scheuerell said he was told by his managers that job coach was doing 80-90 percent of the work).)

   **RESPONSE:**  Not disputed but clarified. Mr. Scheuerell testified that he observed Mr. Reina at work, and that he observed Mr. Coppernoll completing work for Mr. Reina. (Scheuerell Dep. at p. 128.) This fact is supported by Ms. Repka. (Repka Decl. at ¶ 18.)  Mr. Scheuerell also testified that "[b]ased on my observations with my own eyes, the aide was not working with Paul [Reina], the aide was doing the work for Paul [Reina]." (Scheuerell Dep. at p. 145.)

113.   Global Ethics responded on June 12, 2015, suggesting that Scheuerell contact Julie Repka, the human resource manager for that area. (Vance Decl., ¶45, Ex. 40.)

   **RESPONSE:**  Not disputed.

114. Global Ethics responded at 3:07 p.m. on June 12.  (*Id*.)

**RESPONSE:**  Not disputed but clarified that Global Ethics responded in writing at 3:07

p.m. on June 12. (Vance at Ex. 40.)

115. Scheuerell had already met with Reina, his guardian and his job coach by the time he
received the response from Global Ethics. (Slaght Dep., 31:4-32:2) (meeting with
Scheuerell was at 9:00 a.m. on June 12, 2015).)

**RESPONSE:**  Not disputed that Ms. Slaght testified that the June 19, 2015 meeting was

at 9:00 a.m. Mr. Scheuerell testified that he could not recall whether he discussed items in the

Global Ethics response referenced here "beforehand or after." (See Scheuerell Dep. at pp. 75-76.)

116. In the afternoon of June 11, 2015, Scheuerell called Rose Slaght, Reina's guardian and
substitute job coach, and asked to meet with her and Reina the next morning. (Slaght Dep.,
28:17-29:7.)

**RESPONSE:**  Defendants dispute that the cited material supports the statement that Mr.

Scheuerell requested that he meet with Mr. Reina the next morning. During the June 11, 2015

telephone call with Ms. Slaght, Mr. Scheuerell requested that he meet with her the next morning.

(Slaght Dep., 28:17-29:7.)The remaining fact is not disputed.

117. Slaght believed that the meeting was simply a "meet and greet" with the new store manager.
(Slaght Dep., 28:25-29:5.)

**RESPONSE:**  Not disputed.

118. Slaght, Reina, and Coppernoll met Scheuerell in his office at the back of the store in the
morning of June 12, 2015. (Slaght Dep., 30:9-12, 31:25-32:2; Scheuerell Dep., 138:13-
139:4.)

**RESPONSE:**  Defendants do not dispute that the cited material supports the statement.

However, also present at the meeting was Leah Stroh (formerly known as Leah Wampole).

(Scheuerell Dep. 138:23-139:4.)

119. At no time during the 15-minute meeting did Scheuerell mention any alleged abuse of Reina. (Slaght Dep., 31:4-34:18.)

**RESPONSE:** Disputed. Mr. Scheuerell testified that during the meeting he "did inquire about the incident where the job coach was beating Mr. Reina" and that "Matt [Coppernoll] commented that that's what he had to do to get Paul [Reina] to do things once in a while." (Scheuerell Dep. at p. 139.) Defendants also dispute that the cited testimony supports an inference that Mr. Scheuerell did not reasonably believe the incident occurred. Finally, Mr. Scheuerell testified that the meeting may have lasted an hour or two, but that he did not specifically recall. (*Id*. at p. 141.)

120. Instead, Scheuerell started the conversation by saying that he did not have paperwork on Reina. (*Id*.)

**RESPONSE:** Disputed as stated. This proposed fact assumes as true that rather than comment on the reported abuse Mr. Scheuerell commented on another matter.

121. Slaght asked how that was possible since Reina had worked there for almost 17 years. (*Id*.)

**RESPONSE:** Not disputed but clarified that Mr. Scheuerell testified that the majority of the conversation was around Mr. Reina and his job coach, and that "the job coach cannot do all of the work that Paul [Reina] is responsible for and that [he] needed some ADA documentation . . . so that that [Walmart] could better provide a reasonable accommodation for Mr. Reina." (Scheuerell Dep. at pp. 139-140.)

122. Scheuerell responded by saying that "I have nothing that states that Paul has a disability and deserves an accommodation." (*Id*.)

**RESPONSE:** Disputed. Mr. Scheuerell does not recall stating that "I have nothing that states that Paul has a disability and deserves an accommodation." (Scheuerell Supplemental Decl. at ¶ 7; *also see generally* Scheuerell Dep. at pp. 138-145 (discussing what he recalls about the meeting with Ms. Slaght and others).)

47

123. Slaght responded, "You are kidding, right?" (*Id.*)

**RESPONSE:**  Disputed. Mr. Scheuerell recalls Ms. Slaght being unhappy during the meeting but does not recall Ms. Slaght stating "You are kidding, right?" (Scheuerell Supplemental Decl. at ¶ 8; *also see generally* Scheuerell Dep. at pp. 138-145 (discussing what he recalls about the meeting with Ms. Slaght and others).)

124. Scheuerell retorted that his managers said that the job coach was doing 80 to 90 percent of the work. (*Id.*)

**RESPONSE:**  Disputed. Defendants dispute that the cited material supports the statement in that Mr. Scheuerell did not say that management was the source of his information. (Slaght Dep., at p. 31:4-34:14.) The remaining fact is not disputed but clarified. Mr. Scheuerell testified that "[b]ased on my observations with my own eyes, the aide was not working with Paul [Reina], the aide was doing the work for Paul [Reina]." (Scheuerell Dep. at p. 145.)

125. Slaght protested, saying that this was not true. (*Id.*)

**RESPONSE:**  Not disputed.

126. Scheuerell next handed Slaght a new hire packet for Reina to complete. (*Id.*)

**RESPONSE:**  Defendants dispute that the cited material supports the statement. Mr. Scheuerell removed the new hire information from the standard full packet of new hire documents and returned the medical/accommodations portion of the packet to Ms. Slaght for completion. (Slaght Dep. 33:21-34:7.)

127. Slaght objected that it was inappropriate to require Reina to fill out the paperwork for a new hire when he had worked at Walmart for almost 17 years. (*Id.*)

**RESPONSE:**  Disputed in part. Mr. Scheuerell recalls Ms. Slaght being unhappy during the meeting but does not recall Ms. Slaght specifically saying that she thought it was inappropriate to have Mr. Reina fill out "new hire" paperwork.  (Scheuerell Supplemental Decl. at ¶ 10; *also*

*see generally* Scheuerell Dep. at pp. 138-145 (discussing what he recalls about the meeting with Ms. Slaght and others).)

Defendants also dispute this proposed fact to the extent that it infers that Mr. Scheuerell intended for the new hire portion of the entire new hire employee packet to be completed when he gave the whole packet to Ms. Slaght. Confirming to Ms. Slaght that he did not intend for the new hire portion of the packet to be completed, he removed that portion of the packet and returned only the accommodation request portion of the packet to Ms. Slaght to be completed. (Slaght Dep. 33:21-34:7.)

The remaining portion of this proposed fact is not disputed.

128.   Scheuerell then gave Slaght an accommodation form for Reina's doctor to complete, and said, "Paul cannot return to work until he has been deemed fit to work by his doctor."  (*Id; see also* Coppernoll Dep., 173:11-16.)

**RESPONSE:**  Disputed in part. Defendants do not dispute that Mr. Scheuerell gave Ms. Slaght an accommodation form for Mr. Reina's doctor to complete. Defendants, however, dispute this proposed fact to the extent that it characterizes the accommodation form as a document that was not included in the single packet of information given to Ms. Slaght by Mr. Scheuerell. (*See* Slaght Dep. at pp. 33:21-34:7; Coppernoll Dep. at p. 173:11-16.) Also, Mr. Scheuerell does not recall specifically telling Ms. Slaght "Paul cannot return to work until he has been deemed fit to work by his doctor." (Scheuerell Supplemental Decl. at ¶ 11; *also see generally* Scheuerell Dep. at pp. 138-145 (discussing what he recalls about the meeting with Ms. Slaght and others).) The remaining portion of this proposed fact is not disputed.

129.   Scheuerell did not say in this meeting that he believed that Coppernoll had assaulted Reina. (Slaght Dep., 177:14-178:22.)

**RESPONSE:**  Disputed. Mr. Scheuerell testified that during the meeting he "did inquire about the incident where the job coach was beating Mr. Reina" and that "Matt [Coppernoll]

commented that that's what he had to do to get Paul [Reina] to do things once in a while." (Scheuerell Dep. at p. 139.) Defendant also disputes that the cited testimony supports an inference that Mr. Scheuerell did not reasonably believe the incident occurred.

130.   Slaght took the form and she, Reina, and the job coach left. (Slaght Dep., 34:4-15.)

**RESPONSE:** Not disputed.

131.   Reina never worked at Walmart again. (*See* Slaght Dep., 198:19-199:7; 302:7-15; *see* Rule 30(b)(6) Dep., (Repka), September 10, 2018, 69:11-14 (not aware of Reina being scheduled to work after June 12, 2015).)

**RESPONSE:** Not disputed.

132.   Scheuerell does not recall making the decision to place Reina on leave while medical information was sought or who made that decision.   (Scheuerell Dep., 254:15-255:7.)

**RESPONSE:** Not disputed.

133.   Scheuerell does not recall being concerned about Reina's safety because he was not able to see cars driving in, out or through the lot.  (Scheuerell Dep., 255:11-21.)

**RESPONSE:**   Not disputed. However, this proposed fact is not material, as Mr. Scheuerell's concern is of no consequence. It is undisputed that the parking lot was a dangerous place and Ms. Slaght herself was concerned about Mr. Reina's safety while he was working in the parking lot at Walmart. (Slaght Dep. at pp. 243.) In fact, Mr. Reina was almost hit by a bus in the parking lot at Walmart. (*Id.*)   Also, Mr. Fallon testified that there were a couple of near misses of Mr. Reina being hit in the parking lot while he was working as Mr. Reina's job coach, and that people constantly ran the stop signs in front of the store. (Fallon Dep. at p. 58.)

134.   Slaght took the accommodations form from Scheuerell to the health care clinic where Reina received treatment. (Slaght Dep., 57:15-60:22.)

**RESPONSE:** Not disputed.

135.   Because Reina's treating physician was unavailable, another doctor completed the form. (*Id.*)

**RESPONSE:** Defendants do not dispute the statement to the extent that a physician other than Mr. Reina's treating physician completed his accommodations request form. However, Mr. Reina had initially made an appointment with a different, third doctor who when presented with the accommodations request form refused to complete it on behalf of Mr. Reina. (Slaght Dep. 58:25-59:17, 60:20-22.) Finally, according to Ms. Slaght, Dr. Lewinski conferred with Mr. Reina's treating physician in completing the form. (Slaght Dep. at p. 60.) Mr. Reina's treating physician in turn indicated that he did not recall having a discussion with Dr. Lewinksi. (Deming Dep. at p. 62.) At any rate, who filled out the form is not material because Plaintiff does not dispute the impairments listed on the form. (*See* Defendants' Reply to EEOC Response to Proposed Fact 71.) Ms. Slaght also provided this form to Walmart on behalf of Mr. Reina. (EEOC's Proposed Fact 139.)

136. The doctor indicated in the accommodation form that Reina had deaf mutism, developmental delay, visual loss, and anxiety state. (Scheuerell Decl., Ex. B.)

   **RESPONSE:** Not disputed.

137. It noted that he was limited in hearing, seeing, speaking, and lifting more than 50 pounds. (*Id.*)

   **RESPONSE:** Disputed in part. Defendants do not dispute that the cited material supports the statement. However, Defendants dispute the proposed fact to the extent that it mischaracterizes the totality of the limitations identified on the form. The limitations listed on the form also include learning, reading, thinking, and sleeping. (Scheuerell Decl., Ex. B.)

138. It listed the suggested accommodations as being "job coach to do seeing and hearing." (*Id.*)

   **RESPONSE:** Not disputed.

139. On July 9, 2015, Slaght returned the form to Scheuerell at the Walmart store. (Slaght Dep., 99:16-23.)

   **RESPONSE:** Not disputed.

140.   Slaght asked Scheuerell when Reina could return to work. (*Id.*).

**RESPONSE:**  Not disputed.

141.   Scheuerell looked the form over, and said, "Don't call me. I'll call you." (Slaght Dep., 193:12-195:5.)

**RESPONSE:**  Disputed. Defendants dispute the statement as an incorrect recitation of the cited material. The cited material does not support the statement that Mr. Scheuerell looked the form over. Ms. Slaght specifically testified that she "did **not** observe [Mr. Scheuerell] look at it" and that she "knew he needed some time to look at it" before responding to its contents. (Slaght Dep. 194:15-21.) This proposed fact is not supported by evidence in the record.  Also, Mr. Scheuerell testified that at the time he meet with Ms. Slaght he "reviewed the document and told her that [he] would go ahead and sent his in." (Scheuerell Dep. at p. 164.) Finally, Mr. Scheuerell does not recall specifically telling Ms. Slaght "don't call me, I'll call you." (Scheuerell Supplemental Decl. at ¶ 12.)

142.   Scheuerell asked no questions about the form, and did not seek any clarification of its contents from Slaght, (Slaght Dep., 193:12-195:5), or from the doctor who filled out the form. (Scheuerell Dep., 170:24-171:1.)

**RESPONSE:**  Disputed in part. Defendants dispute the first part of this proposed fact. Subsequent to being provided with a copy of the form, Mr. Scheuerell, on or about July 9, 2015, informed Ms. Slaght that it was not clear if the requested accommodation for a job coach was requesting that Mr. Reina be able to utilize a non-employee job coach of his choosing, or if Wal-Mart was being requested to provide a job coach. (Scheuerell Dep. pp. 164-165.) He requested clarification. (*Id.*) He also advised Ms. Slaght that Mr. Reina's physician needed to review the Cart Attendant Job Description and opine on what functions Mr. Reina could or could not do with or without reasonable accommodation. (*Id.* at pp. 165-166.)

Defendants do not dispute the second part of this proposed fact.

143.   Slaght did not hear back from Scheuerell again. (Slaght Dep., 98:20-102:10 (Slaght has not heard from Scheuerell or returned to Walmart since he told her, "Don't call me, I'll call you.").)

**RESPONSE:**  Disputed in part. Defendants dispute that Mr. Scheuerell told Ms. Slaght

"Don't call me, I'll call you." Defendants do not dispute the remaining part of this proposed fact.

144.   Slaght authorized the service facilitator for the agency overseeing Reina's job coach and benefits to contact Scheuerell.  (Slaght Dep., 101:12-102:5.)

**RESPONSE:**  Defendants dispute that the cited material supports the proposed fact. Ms.

Slaght testified that "two of [their] team members" tried to engage with Mr. Scheuerell.

145.   The service facilitator, Matthew Matheny, tried repeatedly to contact Scheuerell, documenting telephone messages left for Scheuerell on three separate occasions.  (Vance Decl., ¶33, Ex. 31, at ARC000177, ARC000179.)

**RESPONSE:**  Defendants object to and dispute this proposed fact as being completely

anchored on impermissible hearsay. Accordingly, this proposed fact is not based on competent

evidence, and should be disregarded in its entirety.

At any rate, this proposed fact, and the evidence proferred in support of the same is not

material, because it is vague and ambiguous and has no bearing or relevance to the question of

whether the Defendants failed to reasonably accommodate Mr. Reina's disability, failed to engage

in an interactive process or terminated his employment because of his disability. Mr. Matheny's

notes provide that on each occasion he purportedly called he:

"Called Wal-Mart to speak to store manager. No answer. Left message."

(Vance Decl. at Ex. 31.) From this, there is no indication as to who he left a message with or how

he left a message (with a random associate who may have answered the phone, with an associate

in a particular department, through voicemail on any general line, through any voicemail for Mr.

Scheuerell, to someone else's voicemail, etc.) and whether he even called the correct store or phone

number. (*Id*.) There is also no indication of what he said in the purported message or that he even

indicated the purpose of his call. During his testimony (which is not cited by Plaintiff here), Mr. Matheny did indicate that he called the Beloit store and left a voicemail but could only recall a 608 area code and did not indicate whose phone line he left his voicemail(s) on. (Matheny Dep. at pp. 125-128.) The evidence cited by Plaintiff in support of this proposed fact is insufficient.

146.   Matheny also never heard back from Scheuerell. (Matheny Dep., 125:19-128:12, 129:15-130:5.)

**RESPONSE:** Disputed. The cited material does not indicate that Mr. Matheny specifically left a voice mail for Mr. Scheuerell. This proposed fact therefore assumes facts not in the record and is not supported by the cited evidence. and is  Defendants do not dispute that the cited material supports the statement. *Also see* Defendants' Response to EEOC Proposed Fact 146 above.

147.   Slaght monitored Reina's schedule through Walmart's online portal for employees. (Slaght Dep., 302:7-15.)

**RESPONSE:**  Defendants dispute the statement as inconsistent with the cited material. Ms. Slaght testified that she checked Walmart's online portal one time at the end of July to see if Mr. Reina was scheduled to work. (Slaght Dep. at p. 302:7-15.)

148.   Walmart did not schedule Reina to work even though Slaght had returned the paperwork. (*Id.*; *see* Rule 30(b)(6) Dep., (Repka), September 10, 2018, 69:11-14 (not aware of Reina being scheduled to work after June 12, 2015).)

**RESPONSE:**  Defendants dispute the statement to the extent that it infers that Mr. Reina's return to work was predicated solely on the completion and return to Walmart of the Accommodation Medical Questionnaire. Walmart needed and requested additional information in order to assess what, if any, reasonable accommodations Mr. Reina needed to be able to perform his job. (Scheuerell Dep. at pp. 164-165) (indicating that additional information was needed after receiving the accommodation form); Coffin Dep. at ¶ 7, Ex. B (letter requesting additional

information). That information ultimately went beyond what was on the accommodation form. (*Id*.)

This proposed fact is not otherwise disputed.

149.   In early August 2015, Slaght, acting for Reina, sought help from Walmart through a link for complaints in the online portal.  (Slaght Dep.,196:5-198:4.)

**RESPONSE:**  Defendants do not dispute that Ms. Slaght alleged that she sought help but notes that Plaintiff has offered no documentary evidence that she in fact did.

150.   She emailed Walmart asking for help because she felt the manager was discriminating against Reina. (*Id*.)

**RESPONSE:**  Defendants do not dispute that Ms. Slaght alleged that she sent an email asking for help but notes that Plaintiff has offered no documentary evidence that she in fact did.

151.   The next time that she logged on to check for a response in early August, she found that Walmart had terminated Reina's access to the online portal. (*Id*.)

**RESPONSE:**  Defendants do not dispute that Ms. Slaght alleged as much but notes that Plaintiff has offered no documentary evidence (i.e. a picture of the computer screen or other documentation) that she in fact did.

152.   Walmart does not maintain an employee manual or handbook. (Vance Decl., ¶ 42, Ex. 37 (Defendants' response to Request for Production No. 7.)

**RESPONSE:**  Disputed as incomplete. Defendants noted in its response to Plaintiff's Request for Production No. 7 that it was producing policies in effect at the Beloit Store regarding disability discrimination and accommodation requests. Defendants' reference to maintenance of an employee manual/handbook was in reference to whether the Beloit Store had a specific employee handbook or manual that applied to the store in particular, as this was the question that was posed. Plaintiff does not dispute that the Beloit Store had in place policies regarding disability

discrimination and accommodations. (*See* Defendants' Reply to EEOC Response to Proposed Facts 8-9.)

153.  In 2015, Walmart employees and managers could access the Walmart's policies on Walmart's intranet, the WIRE, only from its computers located inside Walmart facilities, such as those in the office area. (Scheuerell Dep., 156:25-159:15.)

**RESPONSE:**  Not disputed.

154.  Reina filed a charge of discrimination in September 2015. (Vance Decl. ¶19, Ex. 18.)

**RESPONSE:**  Not disputed.

155.  The parties went through EEOC-sponsored mediation in March 2016, which was unsuccessful. (*See* Slaght Dep., 217:4-9.)

**RESPONSE:**  Not disputed.

156.  During this mediation, a Walmart representative said that Reina would never work at Walmart again. (Polizzi Dep., 13:6-8, 40:23-41:20; *see also* Slaght Dep., 217:17-218:12.)

**RESPONSE:** Defendants object to and dispute this proposed fact as being completely anchored on inadmissible evidence, as it concerns comments allegedly made during mediation. *See* Fed. R. Evid. 408. Accordingly, this proposed fact is not based on competent evidence, and should be disregarded in its entirety.

157.  After the mediation, Reina received a letter dated March 24, 2016, from Walmart asserting that Walmart needed additional information. (Coffin Decl., ¶ 7, Ex. B.)

**RESPONSE:**  Not disputed.

158.  Reina did not receive the letter until April 4, 2016.  (*See* Coffin Decl., ¶ 7.)

**RESPONSE:**  Not disputed.

159. The March 24, 2016, letter from Walmart was drafted by its lawyers. (Scheuerell Dep., 188:25-193:20; Vance Decl., ¶ 31, Ex. 29.)

**RESPONSE:** Defendants dispute this proposed fact as unsupported by the cited material. According to Mr. Scheuerell, Walmart's legal department "participated" in the drafting of the letter.

160. Slaght did not respond to the March 24, 2016, letter. (Slaght Dep., 216:1-217:3.)

**RESPONSE:** Not disputed.

161. Walmart's policies provide that reasonable accommodation requests should be acted upon quickly. (Vance Decl., ¶34, Ex. 32 at Bates No. D001997 ("After the associate completes the REQUEST FOR ACCOMMODATION FORM, forward it to your People Manager/HR Manager/MHRM within 24 hours after you receive it."), D02000 ("If the People Manager/HR Manager/MHRM determines that the Associate who requested an accommodation is not qualified, s/he will send the request for accommodation to Accommodations Service Center within 24 hours. The Accommodation Service Center will review the request and communicate the decision to the People Manager/HR Manager/MHRM within three business days of receipt.")

**RESPONSE:** Not disputed.

162. Walmart's policies provide that managers should not take away existing accommodations while Walmart is considering revision of those accommodation and that managers should not automatically put the associate on a leave of absence when an accommodation is requested. (Vance Decl., ¶34, Ex. 32, at Bates No. D01996, D01997; *see also* Repka Dep. 143:16-146:8.)

**RESPONSE:** Defendants dispute that the cited material supports the statement that managers should not take away existing accommodations while Walmart is considering revision of those accommodation(s). The General Guidelines are clear that "an associate's existing accommodation [should not be withdrawn] **without first conferring with** your people manager, human resources manager, market human resources manager or the Accommodations Service Center." The remaining portion of the proposed fact is not disputed.

163.   Walmart's policies provide that managers should determine whether the associate can continue to do his/her job while the request is pending, noting that the easiest way to make this determination is to ask the associate. (Vance Decl., ¶34, Ex. 32, at Bates No. D01997; Repka Dep., 143:16-146:8.)

**RESPONSE:**  Not disputed.

164.   Walmart requires managers to complete annual trainings on the topics of disability discrimination and requests for accommodations. (Rule 30(b)(6) Dep., (Vargas), September 18, 2018, 76:25-77:13.)

**RESPONSE:**  Not disputed.

165.   Walmart's policy on requests for accommodations instructs managers to forward requests for reasonable accommodations to the Accommodation Services Center for review if the manager decides to deny the request for any reason. (Vance Decl., ¶34, Ex. 32, at Bates No. D02002.)

**RESPONSE:**  Not disputed.

166.   Walmart's policy on requests for accommodations instructs managers to hold a private meeting with the associate to communicate a final decision on a request for accommodation as soon as possible. (Vance Decl., ¶34, Ex. 32, at Bates No. D02003.)

**RESPONSE:**  Not disputed.

167.   Despite Walmart's policy that managers will need to determine whether the associate can continue to do his job while the request for accommodation is pending, Repka did not ask Reina whether he can continue to do his job while his request for accommodation was pending at any point in 2015.  Further, Repka did not know whether anyone asked Reina to continue in his job while his request for accommodation was pending.  (Repka Dep., 145:8-146:8; Vance Decl., ¶34, Ex. 32 at D01997.)

**RESPONSE:**  Not disputed.

168.   Repka was not involved in any decisions relating to whether Reina was or was not qualified.  (Repka Dep., 155:19-156:16.)

**RESPONSE:**  Not disputed.

169.   Repka was not involved with decisions by Walmart's Accommodations Center.  (*Id.*, 145:20-146:8, 161:4-164:22:18, 138:1-139:23.)

**RESPONSE:**  Not disputed.

170. Julie Repka was proffered by Walmart as its Rule 30(b)(6) designee to testify on, among other things, the facts relating to reasonable accommodation of Reina during his employment at Walmart, including the results of any analysis of Paul Reina's requests for reasonable accommodation, and any evaluation of whether he was a qualified individual with a disability.  (See Vance Decl., ¶32, Ex. 30; Rule 30(b)(6) Dep. (Repka), September 10, 2018, 5:2-14; 6:16-7:6.)

**RESPONSE:**  Not disputed.

171. Walmart supplemented its Rule 26 initial disclosures on September 13, 2018, just over one week before the dispositive motion deadline. (Vance Decl. ¶37, Ex. 34.)

**RESPONSE**:  Not disputed. This proposed fact is not material, as it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability, or whether Mr. Reina is a qualified individual with a disability. *Also see* Defendants'  Reply to EEOC Response to Proposed Fact 99 and 103.

172. In its supplement, Walmart listed a number of additional witnesses, including two that the EEOC was unfamiliar with. It also did not provide last known addresses for Walmart employees, including nonmanagers. (*Id*.; *see* Vance Decl., Ex. 33 (original Rule 26 disclosure).)

**RESPONSE:**  Defendants object to this proposed fact in that it is vague and ambiguous as to which two individuals it is allegedly unfamiliar with. Subject to said objection,  Defendants do not dispute that it amended its Rule 26(a)(1) initial disclosures to include potential additional witnesses. However, the inference in this statement that somehow the Plaintiff has been prejudiced is disingenuous. *See* Defendants'  Reply to EEOC Response to Proposed Fact 99 and 103. Further, this proposed fact is not material, as it has no bearing or relevance to the question of whether Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

173. The EEOC protested Walmart's tardy and inadequate disclosure. (Vance Decl., ¶38, Ex. 35.)

**RESPONSE:** Defendants dispute the characterization that the Defendants' amended initial disclosures were tardy or an inadequate disclosure. The EEOC had notice of potential witnesses Amanda Fellows and Sheila Rae Martin a couple of years ago. (Supplemental Declaration of Warren Buliox (October 22, 2018) at ¶ 4.) Further, the EEOC was informed that it could contact these individuals through the Defendants' counsel. (*Id.* at ¶ 6.) Finally, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability, or whether Mr. Reina is a qualified individual with a disability.

174. With its motion for summary judgment, Walmart submitted declarations from two of the managers who the EEOC protested were unfamiliar to it. (*See* DKT 24, DKT 32.)

**RESPONSE:**  Defendants do not dispute that it submitted declarations from Amanda Fellows and Sheila Rae Martin in support of its motion for summary judgment. However, the EEOC's statement that it was unfamiliar with these individuals is untruthful. Plaintiff has known of these individuals for years. *See* Defendants' Reply to EEOC Response to Proposed Fact 99 and 103. Regardless, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability, or whether Mr. Reina is a qualified individual with a disability.

175. Prior to the submission of the amended Rule 26 disclosure, the EEOC had taken or attended the depositions of all the witnesses identified by Walmart. (Vance Decl. ¶ 36.)

**RESPONSE:** Not disputed.

176. One week *after* Walmart filed its motion for summary judgment, Walmart told the EEOC that each of the two witnesses had signed a prior evaluation of Reina.  (Vance Decl., ¶39, Ex. 36.)

**RESPONSE:** Defendants dispute the characterization in this proposed fact that the EEOC was unaware of Amanda Fellows and Sheila Rae Martin until a week after the Defendant filed its motion for summary judgment. Plaintiff has known of these individuals for years. *See* Defendants' Reply to EEOC Response to Proposed Facts 99 and 103. Regardless, this proposed fact is not material because it has no bearing or relevance to the question of whether the Defendants failed to reasonably accommodate Mr. Reina's disability or terminated his employment because of his disability.

177. Dozens of people had signed evaluations of Reina during his almost 17 years of employment.  (*See* Vance Decl., Ex. 1-17.)

**RESPONSE:** Not disputed.

178. The EEOC did not have time to take the depositions of the additional witnesses before the September 21, 2018, deadline for dispositive motions, or before this response was filed. (Vance Decl. ¶¶40-41.)

**RESPONSE:** Disputed. Plaintiff was aware of several of these individuals for years, and with one individual, Mr. Brown, interviewed him during its administrative processing of this case. *See* Defendants' Reply to EEOC Response to Proposed Fact 99 and 103. Also, Defendants' Initial Disclosures were updated on September 13, 2013, meaning that Plaintiff's had an entire month before its responsive briefing was due to depose the individuals at issue.

Dated at Milwaukee, Wisconsin this 22nd day of October 2018.

_s/ Warren E. Buliox_____

MWH LAW GROUP LLP
Emery K. Harlan, Esq.
emery.harlan@mwhlawgroup.com
Warren E. Buliox, Esq.
warren.buliox@mwhlawgroup.com
Carlos R. Pastrana, Esq.
carlos.pastrana@mwhlawgroup.com
735 N. Water St., Suite 610
Milwaukee, WI 53202
Phone: (414) 436-0353
Fax: (414) 436-0354

**COUNSEL FOR DEFENDANTS**