IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                OPINION AND ORDER

         Plaintiff,

                17-cv-739-bbc

    v.

WAL-MART STORES, INC. and
WAL-MART STORES EAST, LP,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Paul Reina, who has multiple disabilities, worked as a cart pusher for defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, LP, from 1998 to 2015. Plaintiff Equal Employment Opportunity Commission has filed this lawsuit under Americans with Disabilities Act, 42 U.S.C. § 12112(a) et seq., contending that defendants failed to provide Reina with a reasonable accommodation and terminated his employment because of his disabilities. Now before the court is defendants' motion for summary judgment. Dkt. #21. For the reasons explained below, I am denying the motion because I conclude that disputed issues of material fact remain that must be resolved by a jury. Fed. R. Civ. P. 56(a).

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

# UNDISPUTED FACTS

## A. <u>Background</u>

Paul Reina is 40 years old and deaf with developmental, visual and intellectual impairments. He spent the first six years of his life in an institution, after which Rose Slaght and her husband became his foster parents. Slaght is Reina's legal guardian. Reina is nonverbal, but his family and job coaches communicate with him using different forms of sign language. His receptive skills are better than his expressive skills.

Reina's first job during high school was working in a laundromat, and he later worked in a delicatessen. In October 1998, Reina's high school program helped him become a cart pusher (also sometimes referred to as a "cart attendant" or "courtesy associate") at the Wal-Mart store in Beloit, Wisconsin, where he worked until June 12, 2015.

While Reina was working at the Beloit store, defendants had policies in place to foster equal employment opportunities, provide accommodations in employment for people with disabilities, prevent unlawful discrimination on the basis of a protected characteristic (including disability) and provide for prompt investigation and documentation of reported violations of the policies. Defendants train their employees on the Americans with Disabilities Act and disability rights, including issues of accommodation and accessibility. Between January 6, 2014 and June 12, 2015, defendants also had a policy prohibiting any form of violence in the workplace.

Defendants' policies provide that reasonable accommodation requests should be acted upon and communicated to the employee as soon as possible and that managers should

determine whether the employee can continue to perform his job while the request is pending. Although managers generally make accommodations at the store level, defendants have an Accommodations Services Center, which is a corporate division devoted to requests for accommodation. Defendants' policies instruct managers to inform the center if they decide to deny an accommodation request for any reason.

Employees and managers had access to defendants' policies through the company's intranet, which is referred to as "the Wire." In 2015, employees could access the Wire only from computers located inside Wal-Mart facilities.

## B. <u>Reina's Accommodations and Job Duties</u>

In February 1999, the store agreed to provide Reina the following accommodations: (1) he could work with his job aide; (2) he would not have to handle fragile merchandise; and (3) he would not be assigned to do tasks that he was incapable of handling. While employed with defendants, Reina always worked with a job coach, including Slaght, Matt Coppernoll, Margie Polizzi and Mike Fallon. Coppernoll was Reina's primary job coach from 2005 to 2015, and the other individuals filled in for Coppernoll on a substitute basis. (Defendants point out that there is no evidence that any of these individuals were professionally trained as job coaches or that they provided job training or placement services, but for ease of reference, I will continue to refer to them as job coaches, as the parties do.) Reina's family arranged for the job coaches, who were paid through the Medicaid waiver

program. One job coach, Polizzi, submitted to a background check and fingerprinting. (The parties do not say whether defendants requested these things.)

The primary purpose and function of a cart pusher or cart attendant has remained the same during Reina's employment with defendants. The job description for a cart attendant, as revised on July 31, 2007, identifies the following as essential functions:

- Maintains availability of and organizes carts and flatbeds, assists customers with transporting items, loads merchandise into customer vehicles and properly and safely utilizes cart retrieval equipment (or the "cart caddy").

- Provides customer service by acknowledging the customer, identifying customer needs, assisting with purchasing decisions, locating merchandise, resolving customer issues and concerns and promoting products and services, while maintaining a safe shopping environment.

Employees working in other positions at the store provide customer assistance, such as stockers who load and unload items for customers, and greeters who direct and assist customers. Defendants do not require cart attendants to use the cart caddy unless they are pushing more than 10 carts at a time. Managers can direct cart attendants to use the cart caddy, but one is not always available. (Although Reina's job coaches say that Reina was as efficient or more efficient at clearing carts manually than other cart pushers who used the cart caddy, defendants question the basis of their knowledge.)

Although the parties dispute whether all of the functions of a cart attendant were considered essential for Reina's position and whether and to what extent his job coaches may have performed his job for him, they do not dispute the following:

- Coppernoll watched for oncoming cars when Reina was retrieving carts and directed Reina's attention to the location of carts as needed.

- Coppernoll and Polizzi tried to make sure Reina stayed focused on his job duties.

- When Reina was pushing a long line of carts, Polizzi would steer the front with one finger.  Fallon grabbed the front cart to keep it in line.  (It is unclear from the job coaches' testimony whether Reina could have steered a lesser number of carts on his own.)

- When a cart caddy was used, Reina collected and loaded the carts onto the caddy and his job coach operated the mechanism to drive the machine.  (The parties dispute to what extent and how safely Reina was able to operate the cart caddy by himself.)

- When Reina was collecting carts, Coppernoll held the lead cart for Reina to prevent it from rolling away.

- Reina picked up trash in the parking lot, wiped down carts if they were wet and broke down boxes.

- Reina waved and smiled at customers on occasion and helped them load items into their cars.  Slaght alerted Reina if a customer said hello or needed help.  Polizzi encouraged Reina to interact with customers.  About once a week, Coppernoll would coach Reina to carry a customer's groceries to his or her car, and Reina loaded and unloaded the cart.  Polizzi noted that other cart pushers had walkie talkies to alert them when a customer needed assistance but that Reina was not provided a walkie talkie.

- Polizzi worked alongside Reina as he collected carts or picked up trash either to model the job for Reina or to remain active while Reina worked.  Defendants never told Polizzi that this was not acceptable.

Defendants never told Slaght that they did not want Reina's job coach to operate the cart caddy, steer carts or hold the lead cart.

Several different managers rated Reina's performance between 1998 and 2014, and their evaluations were generally positive and complimentary, noting that Reina was a "solid performer" and was meeting expectations.  The following are examples of the comments that managers made about Reina on his evaluations:

- According to Reina's 1999 evaluation, he took "direction very well from job coach," "does his job to the best of his abilities," "works very well with fellow associates."

- Reina's 2000 evaluation states that "Paul brightens everyone's day with his endearing personality," "finds enjoyment in all he does" and "every person here finds Paul a very special young man."

- Reina's 2001 evaluation notes that he is "always prompt with good attendance," "steadily pushes carts" and "keeps up well."

- Reina's 2002 evaluation states that "Paul has been a great cart pusher" and his "job coach has kept him more active which he seems to like—works steady always."

- Reina's 2003 evaluation notes that "Paul is very dependable and hard working. Constantly maintaining carts in corrals" and "[l]oved to keep busy."

- Reina's 2004 evaluation states that he "worked to the best of his ability" but advised him to "remember to push under 10 carts at a time" and to "constantly monitor carts."

- Reina's 2013 evaluation states that "Paul does well with making sure carts are full in the bay. Paul is good at making sure that there are no stray carts all over and makes sure that all the carts are cleaned up around the building."

- Reina's 2014 evaluation stated:

  Paul is a pleasure to work with. Paul knows his expectations and does his job. Paul gets along with his fellow associates as well is friendly to the customers. Paul's attendance is decent having not missed any of his shifts, which shows his dedication to the job. Paul is good about making sure the carts are cleaned out of garbage.

  Development for Paul would be to communicate with management when he is taking his break and to watch his tardies. Paul also needs to be aware that when he is not using the cart caddy, only 10 carts to be pushed at a time.

On some evaluations, "N/A" was written next to a task for which Reina did not receive a rating or evaluation. For example, Reina's 2008 evaluation did not evaluate him on helping customers find what they needed. Some of Reina's evaluations listed or noted "areas of improvement," but none of them stated that Reina was not meeting expectations or was performing a function incorrectly. In 2001, the evaluation identified as a goal, that Reina "will continue to work to [the] best of ability and improve if possible."

(The parties dispute whether Reina successfully performed the essential functions of his job on his own. Two of Reina's former Wal-Mart managers, Amanda Fellows and Sheila Rae Martin, aver that their evaluations of Reina's performance in 2013 and 2014 were based on what he and his job coach "collectively were able to achieve" and that they did not believe that Reina could perform the essential functions of his position on his own. The 2013 and 2014 evaluations do not state anything about "collective" performance or mention Reina's job coach. In addition, because defendants did not identify Fellows and Martin as witnesses until just before they filed their motion for summary judgment, plaintiff did not have the opportunity to depose them.)

## C. Alleged Incidents Between Reina and Coppernoll

On December 26, 2012, a shift manager, Leah Wampole (who later changed her last name to Stroh), reported an incident between Coppernoll and Reina in an email to James Ford, the market human resources manager:

> I have a serious situation that I need help handling. I have a mentally handicap [sic] associate that [sic] is a cart pusher. He has a job aid[e] that

assists him everyday. The job aid[e] is hired through his parents, not a company. Today I had three customer[s] complain that the job aid[e] was physically abusing the associate in the parking lot. I viewed video with the APA and was able to see Matt (the job a[e]) putting his hands on cart pusher Paul. The altercation goes on for 10-15 minutes. Matt restrains him, pushes him, grabs him. At one point, although not completely clear in the video, Paul is on the ground and you can see Matt raise his hand like he was hitting him which matches to what the customer said. Matt then puts the associate into a vehicle where they sit for about 5 minutes with the car running. Paul is unable to communicate because of his disability. Can you please advise me in what steps I need to take to ensure that my associates and customers remain safe.

Wampole called the police who investigated and classified the report as "unfounded" because even though an altercation occurred, there were no injuries to either party.

In late May or early June 2015, Jeff Scheuerell became the manager (the highest level of management) of the Beloit store. During a meeting on June 10, 2015, Stroh (formerly Wampole and now the co-manager of the Beloit store) told Scheuerell and Human Resources Manager Julie Repka about the 2012 incident between Coppernoll and Reina and the outcome of the police investigation. She also forwarded them the emails she had sent about the incident in 2012. (The parties dispute whether on or about June 9, 2015, a customer made a report to the store about observing Coppernoll sitting on Reina's chest and punching Reina in the face. Scheuerell avers that he learned about the report on June 9, but he fails to say how he learned about it or what he was told. Stroh also generally avers that she had become aware of a second incident in June 2015, but she fails to provide any details. For its part, plaintiff points out that: (1) the Beloit Police Department does not have a police report associated with such an incident and defendants have not produced or identified any witness statements, videos or internal interview reports concerning it; (2) Slaght and

Coppernoll both testified that they were not told about an incident occurring in 2015; (3) Stroh had forwarded her email about the 2012 incident around this time, suggesting that this is the incident that Scheuerell was concerned about; and (4) Stroh testified that her only recollection of a 2015 incident was a general discussion in the June 10, 2015 meeting that "this has happened before" and that she did not "specifically remember" the 2015 incident, dkt. #45 at 55.)

## D. Reina Asked to Complete Accommodation Paperwork and Does Not Return to Work

Scheuerell and Repka decided to "delve deeper" into the work relationship between Reina and Coppernoll. Scheuerell learned from Stroh that Reina was "deaf, blind and mute" and that Stroh thought Reina's job coach was performing the majority of the functions of Reina's job. (Plaintiff disputes the truth of Stroh's statement on the ground that Stroh testified at her deposition that her only personal observation of a job coach performing work was running the cart caddy for Reina.)

On June 11, 2015, Scheuerell called defendants' global ethics hotline to express concerns about the potential wage and hour issues related to work performed by Reina's job coach, whom defendants did not pay or employ. He reported that Coppernoll "is doing all of Paul Reina's work" and had "assaulted Paul." Dkt. #27, exh. 3 at 2-3. (It is not clear from the record of the call whether Scheuerell identified the assault as taking place in 2015 or in the past. In addition, Scheuerell and Repka testified that they had observed from a parked car in the parking lot that Coppernoll was performing work for Reina, who was not

doing anything and seemed incapable of doing the work related to his job. However, plaintiff disputes this account with testimony from Coppernoll and other job coaches and points out that the report to the hotline did not mention Scheuerell's observations of Reina's work.)

Scheuerell and Repka decided that Reina should provide current, medically-supported information about his physical condition and what, if any, reasonable accommodations existed that could allow him to perform the essential duties of his job. On the afternoon of June 11, 2015, Scheuerell contacted Slaght to request a meeting, which Scheuerell, Slaght, Coppernoll and Reina attended on June 12, 2015. At the meeting, Scheuerell expressed his concern that Reina's job coach was performing the majority of Reina's work. He gave Slaght a new hire packet that included an "Accommodation Medical Questionnaire" and the cart attendant job description. Scheuerell told Slaght that a physician had to complete the form. (The parties dispute exactly what was said during this meeting, including whether Scheuerell said that he believed that Coppernoll had assaulted Reina or whether Scheuerell told Reina not to return to work until he had been "deemed fit to work" by his doctor.) Also on June 12, 2015, but after the meeting occurred, the global ethics hotline responded to Scheuerell in writing, suggesting that he contact Repka, the human resource manager for the area.

Slaght asked a physician at Reina's health care clinic to complete the accommodation form. Dr. Susan Lewinski listed Reina's diagnoses as "deaf mutism, developmental delay, visual loss and anxiety state." Dkt. #27, exh. 2. She recommended "job coach–to do seeing & hearing" as an accommodation and noted that he was limited in the areas of hearing,

seeing, speaking, lifting more than 50 pounds, learning, reading, thinking and sleeping. Id.
On July 9, 2015, Slaght returned the form to Scheuerell at the store and asked him when
Reina could return to work. (The parties dispute what happened next. Scheuerell says he
asked Slaght for more information about the requested accommodation. Slaght says that
Scheuerell did not ask for anything and stated, "don't call me. I'll call you," but Scheuerell
does not recall saying this. Slaght also testified that defendants never asked for clarification
from her or Reina's physician about the July 2015 form, and it was her understanding from
two of Reina's service team members that they had attempted to reach Scheuerell, but he did
not speak with them or return their calls.) Slaght did not hear from Scheuerell again.

   In early August 2015, Slaght sought help for Reina from defendants by emailing a
complaint using a link on an online portal for employees. When Slaght attempted to access
the portal again in early August, she found that defendants had terminated Reina's access.

   Reina was not placed on the Beloit store's schedule and did not return to work after
the June 12, 2015 meeting. (The parties dispute the status of Reina's employment. Plaintiff
says Reina was constructively discharged because 1) he was sent home on June 12 and
denied access to the company's online portal; 2) no one asked Slaght about the July 2015
request for accommodation and Scheuerell told her not to call about it; and 3) Scheuerell
stated that Reina could not return to work until he had been deemed fit to work.
Defendants deny terminating Reina and say that he was placed on leave and inactive status
because he failed to provide updated and more specific medical information; Reina posed a
danger to himself and customers while working in parking lot (which defendants say is based

on Slaght's deposition testimony that Reina almost got hit by a bus in the store parking lot on one occasion); and the non-employee job coach presented a potential (unidentified) risk to the company. The record contains no evidence showing when Reina was placed on leave or who made the decision to place him on leave or what the particular reason was for doing so. Sheuerell does not recall making the decision.)

Reina filed a charge of discrimination in September 2015, alleging that defendants failed to accommodate his disabilities and effectively discharged him from his employment. Reina and defendants participated in a mediation sponsored by the Equal Employment Opportunity Commission on March 18, 2016, but it was not successful. (Plaintiff seeks to introduce a statement concerning the status of Reina's employment that defendants' representative allegedly made during this mediation. However, Fed. R. Evid. 408 provides that statements made in settlement negotiations are inadmissible to prove liability on the underlying claim or to impeach a prior inconsistent statement. Although plaintiff says that defendants waived their objection under this rule by their own reliance on Slaght's understanding of statements Scheuerell made during the mediation, I am not persuaded that such a waiver occurred. In any event, because neither defendants' alleged statement nor Slaght's understanding of Scheuerell's statements is dispositive of the issues in this case, I have not considered this evidence for purposes of resolving defendants' motion for summary judgment.)

In a letter to Reina dated March 25, 2016, Wal-Mart's Accommodation Service Center stated:

We are reaching out in an effort to continue the interactive process. On or about mid to late July 2015, we received your Accommodation Medical Questionnaire and expressed a desire for clarification. To date, we have not received any additional information.

\* \* \*

Please present [the Cart Attendant] job description to your health care provider and have him/her explain how a "job coach" will enable you to perform the essential functions of the job. Please also have your health care provider identify what, if any, other accommodations exist that will enable you to perform the essential functions of this role.
. . . It is important to provide this information, as it serves as the basis for your Request for Accommodation, and without it, we are not able to complete our review.

The Accommodation Service Center did not receive a response to the letter. Although Slaght received the letter on April 4, 2016, she waited a few months before opening it and did not take any action in response. The Equal Employment Opportunity Commission issued a determination on Reina's charge of discrimination on or around March 15, 2017.

OPINION

The Americans with Disabilities Act prohibits an employer from discriminating against "a qualified individual on the basis of disability," including by failing to make reasonable accommodations and denying employment opportunities, which includes termination of employment. 42 U.S.C. § 12112(a) and (b)(5)(A), (B). See also Brumfield v. City of Chicago, 735 F.3d 619, 630 (7th Cir. 2013). Plaintiff contends that defendants failed to accommodate Reina's disabilities and unlawfully terminated (or at least constructively terminated) his employment because of his disabilities.

To prove a failure to accommodate, plaintiff must establish that: (1) Reina is a qualified individual with a disability, meaning that he can perform the essential functions of the employment position with or without reasonable accommodation; (2) defendants were aware of his disability; and (3) defendants failed to reasonably accommodate his disability. Equal Employment Opportunity Commission. v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005) (citing Hoffman v. Caterpillar, Inc., 256 F.3d 568, 572 (7th Cir. 2001)); 42 U.S.C. § 12111(8). With respect to the third element, the Act requires the employer and the employee to participate in an interactive process about appropriate and reasonable accommodations. Sears, Roebuck. 417 F.3d at 797 (citing Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998)). In cases in which a disabled employee did not receive a reasonable accommodation, the "employer will be liable only if it bears responsibility for the breakdown of the interactive process." Id. (citing Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)). Further, an employer is not required to provide the accommodation if it can demonstrate that doing so would impose an "undue hardship." 29 C.F.R. § 1630.9(a).

To prove discriminatory termination based on disability, plaintiff must show that: (1) Reina is disabled; (2) he is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. Felix v. Wisconsin Dept. of Transportation, 828 F.3d 560, 568 (7th Cir. 2016); Majors v. General Electric Co., 714 F.3d 527, 533 (7th Cir. 2013).

For purposes of summary judgment, defendants do not contest that Reina was disabled.  However, they assert several grounds on which they say plaintiff's claims must fail, including that:   (1) the provision of a permanent job coach is not a reasonable accommodation, even when the employer does not have to arrange or pay for the coach; (2) Reina is not a "qualified individual" because his job coach performs the essential functions of a cart pusher for him; (3) using a non-employee to perform work for defendants poses an undue hardship on defendants because it exposes the store to legal and safety risks; (4) Reina, and not defendants, destroyed the interactive process; (4) there is no evidence that Reina was terminated because of his disabilities; and (5) there is no evidence that defendants acted with the malice or reckless indifference necessary to support an award of punitive damages.  I discuss each of these arguments below and conclude that disputed issues of fact preclude entry of summary judgment in favor of defendants.

## A.  Qualified Individual and Reasonable Accommodation

To succeed on any of its claims, plaintiff must show that Reina is a "qualified" individual with a disability, meaning that he is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position."  42 U.S.C. § 12111(8).  See also Majors, 714 F.3d at 533 (quoting same).  Reasonable accommodations are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable [a qualified] individual with a disability . . . to perform the essential

functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii).   In determining whether a job function is essential, courts look to the "employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position."  Majors, 714 F.3d at 534 (quoting Rooney v. Koch Air, LLC, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)).

1.  Permanent job coach as reasonable accommodation

The Equal Employment Opportunity Commission's Interpretive Guidance states that "an employer, under certain circumstances, may be required to provide . . . a temporary 'job coach' to assist in the training of a qualified individual with a disability as a reasonable accommodation."  29 C.F.R. pt. 1630, app. at § 1630.9 (entitled "not making reasonable accommodation").  The regulation is silent on the subject whether a job coach, particularly one that is not paid by or provided by the employer, may be a permanent accommodation and still be considered reasonable.  However, the Commission's "Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities" states that "[a]n employer also may be required to allow a job coach paid by a public or private social service agency to accompany the employee at the job site as a reasonable accommodation."  EEOC Notice No. 915.002 (Mar. 25, 1997) (available at https://www.eeoc.gov/policy/docs/psych.html).

Limited published case law exists on the subject, but as defendants point out, a few federal district courts in other jurisdictions have held that the permanent or indefinite use of a job coach is not a reasonable accommodation, even if the employer does not have to pay

for the job coach.  <u>Kleiber v. Honda American Manufacturing</u>, 420 F. Supp. 2d 809, 822-23 (S.D. Ohio 2006) (full-time job coach not reasonable accommodation); <u>Equal Employment Opportunity Commission v. Dollar General Corp.</u>, 252 F. Supp. 2d 277, 290 (M.D.N.C. 2003) (full-time job coach providing more than training is not reasonable accommodation). In <u>Kleiber</u> and <u>Dollar General</u>, the district courts relied on an unpublished decision, <u>Equal Employment Opportunity Commission v. Hertz Corp.</u>, 1998 WL 5694, *5 (E.D. Mich. Jan. 6, 1998), in which two individuals with disabilities had job coaches furnished by a third party without cost to the employer.  After reviewing the Commission's interpretive guidance, the district court held that "[i]f a temporary job coach providing job training to a qualified individual *may* be a reasonable accommodation, the clear implication is that a full-time job coach providing more than training to unqualified Individuals [sic] is not."  <u>Id.</u> at *5 (emphasis in original).  The court reasoned that it had no basis on which to hold that "once an employer evidences an intent to and does provide employment for a handicapped person with support for that person of a job coach, it is obligated to continue that relationship in perpetuity and without regard to any event(s) that make that employment relationship untenable."  <u>Id.</u> at *5.

Although the court in <u>Hertz</u> cited <u>Ricks v. Xerox Corp.</u>, 877 F. Supp. 1468, 1477 (D. Kan. 1995), and <u>Gilbert v. Frank</u>, 949 F.2d 637, 644 (2d Cir. 1991), in support of its conclusion, neither of those opinions hold specifically that an employee's need for a permanent versus a temporary job coach made the accommodations unreasonable in themselves.  Instead, the <u>Ricks</u> and <u>Gilbert</u> courts were concerned about the fact that two

people performing the same tasks normally performed by one employee. <u>Gilbert</u>, 949 F.2d at 644 ("[S]uggestion that coworkers might perform [] part of Gilbert's job as Manual MD Clerk [] sought the elimination, for Gilbert, of essential functions of the job," which is not a reasonable accommodation); <u>Ricks</u>, 877 F. Supp. at 1477 (court unpersuaded that "requiring Xerox to hire a 'helper' to assist [plaintiff] in performing the essential functions of any position would, as a matter of law, be a reasonable accommodation.").

Therefore, to the extent that defendants are advocating for a per se rule that a permanent job coach is never a reasonable accommodation, I am not persuaded by their argument. The holdings in <u>Kleiber</u>, <u>Dollar General</u> and <u>Hertz</u> are not binding on this court. Further, although the Commission's interpretive guidance discusses the propriety of a temporary job coach, it does not expressly preclude one that is needed on a permanent basis. Moreover, the Court of Appeals for the Seventh Circuit has not adopted such a rule.

The court of appeals has held that "[a]n ADA plaintiff can establish discrimination by showing the employer failed to accommodate the employee, but [he] first must establish that [he] is a qualified individual with a disability." <u>Majors</u>, 714 F.3d at 535 (citing <u>Hoffman</u>, 256 F.3d at 572). "The defendant has the burden to prove that the accommodation would create an undue hardship on the business, but the plaintiff must first 'show that the accommodation he seeks is reasonable on its face.'" <u>Id.</u> (citing <u>Oconomowoc Residential Programs, Inc. v. City of Milwaukee</u>, 300 F.3d 775, 783 (7th Cir. 2002)). On the other hand, the court of appeals has cautioned that

> The ADA does not give employers unfettered discretion to decide what is reasonable. The law requires an employer to rethink its preferred practices or

established methods of operation. Employers must, at a minimum, consider possible modifications of jobs, processes, or tasks so as to allow an employee with a disability to work, even where established practices or methods seem to be the most efficient or serve otherwise legitimate purposes in the workplace.

Miller v. Illinois Department of Transportation, 643 F.3d 190, 199 (7th Cir. 2011).

In considering whether a job coach was a reasonable accommodation, the court of appeals focused on the type and amount of assistance provided by the job coach, concluding that reliance on "another person to perform an essential function of the job . . . is, as a matter of law, not reasonable," and does not require the employer "to show the accommodation would create an undue hardship." Majors, 714 F.3d at 535. Other circuits have reached a similar conclusion. E.g., Martinson v. Kinney Shoe Corp., 104 F.3d 683, 687 (4th Cir. 1997) (The "ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled employee's position."); Gilbert, 949 F.2d at 644; Miller v. Santa Clara County Library, 24 Fed. Appx. 762, 765 (9th Cir. 2001) (unpublished) (additional person to help clearly unqualified individual was not reasonable accommodation). These holdings are consistent with plaintiff's own internal compliance manual, which states that the Commission will make interpreters, readers and other assistants available to perform physical tasks that its employees cannot perform because of a disability but instructs that "[i]n no case should a staff assistant be called upon—by management or by the employee(s) to whom he or she is assigned—to perform the essential functions of the job held by the employee with the disability." Procedures for Providing

<u>Reasonable Accommodation for Individuals with Disabilities</u>, Appendix E, Staff Assistance Slots, available at https://www.eeoc.gov/eeoc/internal/reasonable_accommodation.cfm#AppE (accessed on December 7, 2018).

Acknowledging these holdings of the court of appeals, defendants argue that even if a permanent job coach can be considered a reasonable accommodation in certain cases, plaintiff cannot show that Reina was a "qualified individual" because his job coach performed all of the essential functions of his job, including 1) organizing, retrieving and managing shopping carts and flatbeds and 2) assisting customers by transporting items and loading merchandise into their vehicles. However, as discussed below, factual questions remain about both the essential functions of Reina's position and the amount of assistance that Reina needed to perform those functions.

2. <u>Essential functions of Reina's job</u>

In determining whether a job function is essential, courts look to the "employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." <u>Majors</u>, 714 F.3d at 534 (quoting <u>Rooney v. Koch Air, LLC</u>, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)). Also relevant are "the consequences for not requiring the individual to perform the duty." <u>Stern v. St. Anthony's Health Center</u>, 788 F.3d 276, 285 (7th Cir. 2015) (quoting <u>Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits</u>, 601 F.3d 674, 679 (7th Cir. 2010)). Although "the employer's judgment is an

important factor, . . . it is not controlling. . . .  [W]e also look to evidence of the employer's actual practices in the workplace."  Id.

Defendants rely on the cart attendant job description and the testimony of Scheuerell, Repka and a few other employees to show that the essential functions of Reina's position included retrieving and managing carts and flatbeds (both manually and using the cart caddy), assisting customers (acknowledging them, assisting them with merchandise, resolving disputed issues and concerns and promoting products and services) and maintaining a clean and safe work environment (picking up trash and breaking down boxes).  However, plaintiff has presented evidence suggesting that not all of these functions were considered essential for Reina's position, particularly those related to using a cart caddy and customer assistance:

- Ann Adamczyk, a former management employee of defendants, testified that cart attendants spend about 95 percent of their time pushing carts, which entailed collecting carts from the parking lot and putting them in the bay.

- Polizzi (one of Reina's job coaches) testified that Reina spent 98 percent of his time collecting carts.

- Cart attendants were not required to use the cart caddy to retrieve carts but were told to do so if they were pushing more than 10 carts at a time. In addition, the cart caddy was not always available.

- According to Coppernoll, Reina carried groceries for customers only about once a week.

- Some of Reina's past performance evaluations listed "N/A" next to duties related to "customer carry outs" and assisting customers.

- Defendants have other employees, such as stockers and greeters, who provide direct assistance to customers.

Defendants have several arguments about why plaintiff's evidence is not credible or persuasive, but those issues are best left for the jury to resolve at trial. <u>Brown v. Smith</u>, 827 F.3d 609, 613 (7th Cir. 2016) ("The essential-function inquiry is a factual question, not a question of law."). After considering Reina's work experience and defendants' expectations and practices with respect to Reina during that time, a reasonable jury could conclude that not all of the duties listed in the cart attendant job description were essential functions of the position. <u>E.g.</u>, <u>Shell v. Smith</u>, 789 F.3d 715, 716 (7th Cir. 2015) (finding sufficient evidence from which reasonable jury could conclude that driving bus was not essential function of plaintiff's job as mechanic's helper in case in which job description listed driving as an occasional function and plaintiff had performed job for 12 years without driving); <u>Dollar General</u>, 252 F. Supp. 2d at 288-89 (finding number of factors showed that plaintiff held a modified position that did not contemplate her performing all essential functions of clerk position as described in defendant's manual). Therefore, for purposes of summary judgment, I conclude that plaintiff has presented sufficient evidence from which a reasonable jury could conclude that the essential function of Reina's position was to collect carts from the parking lot and put them in the bay and that using the cart caddy or interacting with customers were not essential functions of his job.

3. <u>Assistance required from job coach</u>

According to plaintiff's version of events, Reina is able to perform the essential functions of the job that he performed for 17 years with only physical and verbal prompts

from his job coach, such as helping steer a long line of carts that Reina was pushing, identifying carts to collect or pointing out items that needed to be loaded into customers' cars. Plaintiff argues that the job coach serves as Reina's "eyes and ears" in the parking lot. Defendants argue that Reina's impairments prevented him from performing even the most insignificant of tasks and some of their employees observed Reina's job coaches performing most of the duties of his job for him. After reviewing the evidence presented by the parties, I find that there are genuine issues of fact about the extent Reina's job coaches may have provided assistance to Reina and whether they were required to perform certain essential job duties for Reina beyond merely demonstrating proper technique. These factual questions do not support the grant of summary judgment to defendants on the question whether Reina was qualified for the cart attendant position. <u>Dollar General</u>, 252 F. Supp. 2d at 290 (finding same and sending question to jury). For purposes of summary judgment, however, I am satisfied that plaintiff has presented a prima facie case showing that Reina was a qualified individual under the Americans with Disabilities Act.

4. <u>Undue hardship</u>

Defendants argue that even if the provision of a permanent job coach for Reina is a reasonable accommodation in this case, it poses an undue burden because it exposes the store to legal and safety risks. Generally, undue hardship means "an action requiring significant difficulty or expense" when considered in light of

(i) the nature and cost of the accommodation needed;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10).  See also Vande Zande v. State of Wisconsin Department of Administration, 44 F.3d 538, 543 (7th Cir. 1995) (employer has opportunity to prove that costs are excessive in relation to benefits of accommodation or to employer's financial survival or health).  In support of its position that legal or safety risks can also can create an undue hardship for an employer, defendants cite two unpublished district court opinions involving religious accommodation claims brought under Title VII of the Civil Rights Act, which defines undue hardship as imposing more than a *de minimis* cost on the employer. Robinson v. Children's Hospital Boston, 2016 WL 1337255 (D. Mass. Apr. 5, 2016); Equal Employment Opportunity Commission v. Oak-Rite Manufacturing Corp., 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001) (undue hardship can exist if proposed accommodation would "either cause or increase safety risks or the risk of legal liability for the employer") (internal citations omitted).  However, defendants have not cited any legal authority for their position that the Title VII standard for religious accommodations should apply to disability accommodation claims under the Americans With Disabilities Act.

In any event, defendants have not shown that they are entitled to judgment as a matter of law with respect to whether Reina's requested accommodation would pose an undue burden on them.  Defendants contend that they could "arguably be party to negligence and other tort claims should Mr. Reina's helper, while performing tasks for Walmart, damage customer property or hurt someone."  Dkt. #22 at 28.  Although defendants argue that the potential risks are "significant," they present no evidence in support of their contention and fail to describe with any particularity what risks they face.

Defendants cite the alleged reports of Coppernoll's "beating" of Reina as a safety risk.  However, the police investigated the report of abuse, including reviewing video footage of the incident in 2012 and determined that it was "unfounded."  There is little evidence from which a reasonable jury could conclude that another incident occurred in 2015, but even if the event did occur, it is not clear that allowing Reina to have a job coach poses a significant safety risk to Reina or defendants' customers.  A reasonable jury could conclude that the incidents were limited to the relationship between Reina and Coppernoll and are unlikely to recur, particularly if Coppernoll did not continue to serve as Reina's job coach.  Accordingly, defendants' motion for summary judgment will be denied on this ground.

## B.  Interactive Process

Once an employee requests a reasonable accommodation, the employer must meet the employee half way and engage in a "flexible, interactive process" to identify the necessary accommodations.  Basden v. Professional Transportation, Inc., 714 F.3d 1034, 1038 (7th

Cir. 2013).  Both parties are responsible for determining what accommodations are needed.

Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996).

Where the employee does not provide sufficient information to the employer to determine

the necessary accommodations, the employer cannot be held liable for failing to

accommodate the disabled employee.  Beck v. University of Wisconsin Board of Regents, 75

F.3d 1130, 1135 (7th Cir. 1996).  Reeves ex rel. Reeves v. Jewel Food Stores, Inc., 759 F.3d

698, 701-02 (7th Cir. 2014).

Although defendants blame the failure of the interactive process on Slaght, who they

say never responded to Scheuerell's requests for clarification after she turned in the

accommodation request in July 2015, plaintiff has presented evidence that Scheuerell told

Slaght not to contact him and did not follow up with Slaght until after Reina filed a charge

of discrimination and the parties attempted mediation in March 2016.  If the jury were to

believe plaintiff's version of events, it could conclude that defendants failed to meet Reina

half way and engage in an interactive process to identify possible accommodations for him.

On the present record, I conclude that defendants are not entitled to summary judgment

with respect to plaintiff's claim that they failed to engage in an interactive process with

Reina.


## C.  Disability Discrimination

Defendants argue that plaintiff cannot prove its discriminatory termination claim

because Reina was not able to perform the essential functions of his position with a

reasonable accommodation and there is no evidence that he was actually terminated. However, as discussed above, questions of fact remain with respect to what tasks made up the essential functions of Reina's position, how Reina performed those tasks and what assistance he required from his job coach. Also in dispute is whether Reina was terminated in July 2015.

Although defendants contend that Reina "went on leave/inactive status while Walmart waited for information it requested," dkt. #23 at 39, they have not explained or submitted any evidence showing who made the decision to place Reina on leave, when the decision was made or how the decision was made or communicated to Reina. Scheuerell testified that he was waiting for information from Slaght about Reina's requested accommodation, but he also stated he did not recall making the decision to place Reina on leave. For its part, plaintiff argues that defendants terminated Reina because they did not want to continue accommodating his disability by allowing him to have a job coach.

Under plaintiff's version of the events, Scheuerell sent Reina home on June 12, told him he could not return to work until he had been deemed fit to work by his physician, did not ask about the July 2015 request for accommodation that Slaght submitted for Reina and told Slaght not to call him about the accommodation. There also is evidence that defendants did not attempt to contact Reina or Slaght again until almost a year later, after Reina filed a charge of discrimination and the parties made an unsuccessful attempt to mediate his claim. Construing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that defendants constructively terminated Reina because they did not want

to accommodate his disability, and that instead of allowing Reina to return to work, they strung him along while purportedly waiting for what they considered acceptable paperwork. Accordingly, I conclude that plaintiff has made a sufficient showing to withstand summary judgment with respect to the discrimination claim.

### D. Punitive Damages

"Punitive damages are available for violations of the Americans with Disabilities Act if the defendant discriminated 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Equal Employment Opportunity Commission v. Flambeau, Inc., 846 F.3d 941, 947 (7th Cir. 2017) (citing 42 U.S.C. § 1981a(b)(1)). Plaintiff may show "malice" or "reckless indifference" toward the employee's rights "by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws" but nonetheless ignored them or lied about their discriminatory activities. Equal Employment Opportunity Commission v. AutoZone, Inc., 707 F.3d 824, 835 (7th Cir. 2013) (quoting Bruso v. United Airlines, Inc., 239 F.3d 848, 857-58 (7th Cir. 2001)). "When a plaintiff imputes liability to the employer through an agent working in a 'managerial capacity . . . in the scope of employment,'" as plaintiff does in this case, "the employer has the opportunity to avoid liability for punitive damages by showing that it engaged in good-faith efforts to implement an anti-discrimination policy." Id. The analysis is a fact-intensive one, and "although the implementation of a written or formal anti-discrimination policy is relevant to evaluating an employer's good faith efforts . . ., it

is not sufficient in and of itself to insulate an employer from a punitive damages award." Id.

Defendants contend that a reasonable jury could not conclude that they acted with malice or reckless indifference to Reina's federally protected rights because they 1) accommodated Reina's disabilities for years; 2) they had good reasons to ask Reina for new accommodation paperwork, including allegations that Reina's job coach physically assaulted Reina and was performing all of Reina's work; and 3) they had anti-discrimination and reasonable accommodation policies in place and an entire department devoted to handling requests for reasonable accommodations. However, factual disputes remain concerning defendants' reasons for requesting new paperwork from Reina, how defendants approached Reina and how Reina responded that could raise questions about defendants' intent. In addition, some question remains about whether defendants followed their policies in this case, particularly to the extent that the policies required accommodation requests to be acted upon and communicated to the employee as soon as possible and that managers should determine whether the employee can continue to perform his job while the request is pending. Under plaintiff's version of the events, neither of these things occurred, and defendants' accommodations center did not become involved until March 2016.

In sum, until the facts are further developed at trial, it is not possible to determine as a matter of law whether punitive damages would be appropriate in this case in the event that defendants are found liable.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, LP , dkt. #21, is DENIED.

Entered this 18th day of December, 2018.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge