UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

 -vs-                          Case No. 17-CV-739-JDP

WAL-MART STORES, INC., and       Madison, Wisconsin
WAL-MART STORES EAST, L.P.,      October 7, 2019
                              8:13 a.m.

     Defendants.

_____

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

          U.S. Equal Employment Opportunity Commission
          BY:  LAURIE A. VASICHEK
          330 2nd Avenue South, Suite 720
          Minneapolis, Minnesota  55401

          U.S. Equal Employment Opportunity Commission
          BY:  CARRIE VANCE
          310 West Wisconsin Avenue, Suite 500
          Milwaukee, Wisconsin  53203

          U.S. Equal Employment Opportunity Commission
          BY:  JEAN P. KAMP
          500 West Madison Street, Suite 2000
          Chicago, Illinois  60661

Also appearing:  ROSEANN SLAGHT, Guardian
                 AMANDA BECKERINK, Paralegal


Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

For the Defendants:

                MWH Law Group, LLP
                BY:  EMERY K. HARLAN
                735 North Water Street, Suite 610
                Milwaukee, Wisconsin  53202

                MWH Law Group, LLP
                BY:  WARREN E. BULIOX
                111 East Wisconsin Avenue, Suite 1000
                Milwaukee, Wisconsin  53202

Also appearing:   JULIE REPKA, Corporate Representative, Walmart
                KIMBERLY ROYAL, In-House Counsel, Walmart
                TRACY TOMPKINS, Paralegal

***

## INDEX

CONFERENCE                                                    2-20

VOIR DIRE                                                    20-131

INTRODUCTORY INSTRUCTIONS                                   130-146

***

15    (Proceedings called to order at 8:13 a.m.)

16       THE CLERK:  Case No. 17-CR-739, *Equal Employment*

17  *Opportunity Commission v. Walmart Stores, Incorporated*, called

18  for a pretrial conference.

19    May we have the appearances, please.

20      MS. VASICHEK:  On behalf of the EEOC, Laurie Vasichek,

21  Carrie Vance, and with us is paralegal Amanda Beckerink.

22      THE COURT:  Good morning.

23      MR. HARLAN:  Good morning, Your Honor.  Emery Harlan on

24  behalf of Walmart along with my colleague Warren Buliox, Tracy

25  Tompkins from our office, and Julie Repka, who is our corporate

1  rep, and also in the audience is Kimberly Royal, who is in-house

2  counsel at Walmart.

3       THE COURT:  All right.  Very good.  Good morning.

4  All right.  So we're here just to clarify/finalize so that

5  we're ready for jury selection at 9:00.  So I circulated the

6  final version of the *voir dire* and the preliminary instructions.

7  So I incorporated some of the refinements that Walmart submitted

8  on the preliminary instructions, so they're ready to go.  I

9  don't really need any further input on that.

10  I got late-breaking news here was the defendants' request

11  for reconsideration of two rulings in the Court's final pretrial

12  conference order.  I'm going to deny both of those, but they do

13  warrant some explanation here.  So, first of all, the basis of

14  my ruling that the wage and hour issue is excluded is really

15  based on the potential for confusion and waste of time to have

16  to take a dive into the law on wage and hours concerns.  That

17  doesn't mean that all of the evidence in the excerpt of the

18  deposition that you submitted with this, that that doesn't go

19  in.

20       MR. HARLAN:  Oh, thank you, Your Honor.

21       THE COURT:  So you can talk about who is doing what

22  with the cart caddy, all of that.  In fact, the EEOC is asking

23  in the final instructions that I include an instruction that the

24  past experience with Mr. Reina can come in as an explanation for

25  who's doing what in his job.  I'm going to include that in the

1    final instructions, that that's perfectly fine as a

2    consideration.  You're going to look at who did what in Mr.

3    Reina's work as a cart pusher, okay?  And it pretty much comes

4    out of the EEOC guidance on what you get to consider.  So that

5    past history between Mr. Reina and his job coach and who's doing

6    the job, that's a fair consideration.  So that evidence comes

7    in.

8              MR. HARLAN:  Your Honor, can I just say one thing?

9              THE COURT:  Yes.

10             MR. HARLAN:  So the real issue for us, Your Honor --

11             THE COURT:  Stay seated.

12             MR. HARLAN:  Oh, okay.  The real issue for us, Your

13   Honor, is we need to be able to explain what motivated our

14   people to start to ask questions and report to corporate.

15   There's no dispute that Ms. Repka and Mr. Scheuerell, when they

16   observed what was going on, they reported it to corporate, and

17   that was the justification for how they looked into what was

18   going on.  So I think we ought to be able to at least say that.

19             THE COURT:  I understand your argument.  I understand

20   your argument, but how are we going to present that concern

21   without raising the potential issue that the jury is going to

22   get concerned that they have to decide whether there was a wage

23   and hours issue?

24             MR. HARLAN:  Your Honor, we have no intention of trying

25   to argue that somehow the accommodation isn't appropriate

```
 1    because of --
 2              THE COURT:  You can put in evidence that they were
 3    concerned that it was inappropriate for Mr. Reina's job coaches
 4    to be performing the work.
 5              MR. HARLAN:  Okay.  And so you're not going to preclude
 6    us -- for instance, there is -- there's all sorts -- there's a
 7    communication between Mr. Scheuerell and the ethics hotline
 8    where he raises the question about whether that's appropriate,
 9    and they write back explaining, "Hey, you need to go do X, Y,
10    and Z."  You're not precluding us from putting that in.  You're
11    just saying we can't argue it's a violation, and we're not --
12              THE COURT:  You'll have to point me to the evidence
13    because I don't want the jury to get wrapped up in considering
14    whether there's a wage and hours violation.
15              MR. HARLAN:  So if you look at Exhibit 42 of the EEOC's
16    exhibits, that's one place.
17              MS. VASICHEK:  If I may, we did ask that the defendants
18    redact the paragraph that deals with the wage and hour concerns.
19              MR. HARLAN:  I think there's --
20              THE COURT:  Give me that exhibit number again, please.
21              MR. HARLAN:  It's 42, Your Honor.
22              THE COURT:  Plaintiff's Exhibit 42?
23              MR. HARLAN:  We're not planning to right now use that
24    as part of opening, and I think for the first -- it's not going
25    to really be relevant to our case until we get into our case.  I
```

1    don't think we're going to be showing it to witnesses.  And then

2    there's also a letter from Ms. Repka to Mr. Coppernoll where she

3    asks for information about -- and it doesn't expressly say wage

4    and hour in it, but it's talking about "Please give me some

5    information about off-the-clock work concerns we have and give

6    me some information about what you're doing."  So that's an

7    incredibly important document for us because, again, it puts --

8            THE COURT:  What document is that?

9            MR. HARLAN:  520, Your Honor, in defendants' exhibits.

10   Oh, you told me to sit down.  I'm sorry.

11           THE COURT:  Okay.  I'm looking at 520, and I don't see

12   any reference -- at least in the version that I have, I don't

13   see any reference to the wage and hour issue.

14           MR. HARLAN:  Yeah, yeah.  It doesn't expressly set

15   forth, so we just want to make sure that this is not precluded

16   by virtue of your ruling, and Ms. Repka is going to explain that

17   this was sent -- she was asked to send this by corporate to

18   follow up based on concerns that they had a non-Walmart

19   associate working and, therefore, there could be some wage and

20   hour concerns.  We don't intend to argue that it was a

21   violation, but, again, it puts into context why they were doing

22   what they were doing, and we're not in any way planning to try

23   to put on a case that this was a wage and hour violation at all.

24           THE COURT:  I don't see any problem with Exhibit 520.

25           MR. HARLAN:  Thank you, Your Honor.  And we have one

1    other place where it comes up.  It's in the communication with

2    the ethics hotline.

3              MS. VASICHEK:  That's 518.

4              MR. HARLAN:  Thank you.  No, but it's actually the

5    transcript.  Yeah, 518 is another place.  Thank you, Laurie.  So

6    there, after Mr. Scheuerell reported the ethics issue, a woman

7    at corporate wrote back and then basically tells him, "Hey, we

8    may have a violation" --

9              THE COURT:  What exhibit are we looking at here?

10             MR. HARLAN:  I'm sorry, Your Honor.  518.

11             THE COURT:  The second paragraph in 518 just directly

12   raises the wage and hour violation.

13             MR. HARLAN:  Right.  And, Your Honor, the only purpose

14   of this exhibit is just simply to put into context why

15   Mr. Scheuerell went down this path, not that we're trying to

16   prove that there was a wage and hour violation.  We're not going

17   to argue to the jury, "Hey, this is an undue burden or hardship

18   because there's a wage and hour violation," but the jury has to

19   understand what was motivating them to look into the

20   Reina/Coppernoll situation in totality, not just because of a

21   concern about abuse, but also because of this concern, and then

22   we're going to move off of it.  We're not going to argue

23   anything.  This will be very quick, but the jury needs to

24   understand because I think the EEOC is going to argue, "Hey, you

25   should infer some improper motive because they didn't have any

1    basis to even be talking to Mr. Reina about his job coach
2    relationship," and it's without question that this was something
3    that motivated them because otherwise it wouldn't make sense
4    that they're reporting it up.  Now -- and I think Your Honor
5    doesn't believe it has merit, and that's fair, but at least it
6    does explain that they had a good-faith belief that there may be
7    an issue.
8         THE COURT:  I'm just not going to let you put in the
9    second paragraph here, but there is the email from Morrison to
10   Scheuerell.  He can just testify that he -- you can redact it,
11   and you can take out the two paragraphs, whatever you want to
12   do.  You can put in that he was directed to follow up by legal
13   and that he was doing what the legal department had indicated,
14   but we're just not going down this road with the wage and hour
15   stuff.
16        MR. HARLAN:  Thank you for your consideration, Your
17   Honor.
18        MS. VASICHEK:  Your Honor, may I ask for a brief
19   revisiting of Defendants' Exhibit 520, which is the letter to
20   Mr. Coppernoll?  While it doesn't say wage and hour, that is the
21   only purpose for the letter.  It's seeking to have information
22   relating to off-the-clock work and to have detail about the
23   off-the-clock concerns --
24        THE COURT:  That doesn't raise the concern that I have,
25   so no.

1          MS. VASICHEK:  Thank you, Your Honor.

2          THE COURT:  Okay.  All right.  So --

3          MR. HARLAN:  And are you fine with 42, Your Honor?

4          THE COURT:  Pardon me?

5          MR. HARLAN:  Are you fine with EEOC Exhibit 42?

6          MS. VASICHEK:  42 is the same, I believe, as 518 --

7          MR. HARLAN:  Oh, it's the same.

8          MS. VASICHEK:  -- and so that's the one we asked for

9    the paragraph to be redacted.

10          THE COURT:  So that's fine.

11          MR. HARLAN:  Thank you, Your Honor.

12          THE COURT:  All right.  Then on the *Kolstad* defense, so

13   I went over the summary judgment submissions with a microscope

14   to figure this out, and so I explained it in my final pretrial

15   conference order.  I'm not revisiting that ruling.  You didn't

16   plead.  You didn't litigate the *Kolstad* defense.  But it

17   warrants some explanation here because what my ruling

18   essentially means is there's not going to be a separate

19   instruction or jury question on the *Kolstad* defense.

20          MR. HARLAN:  Yes, sir.

21          THE COURT:  But what you did do at summary judgment and

22   what I expect you to do here is to contest the evidence that the

23   EEOC has that Walmart acted maliciously or recklessly.  The

24   basis for your motion for summary judgment was that there was no

25   evidence that Walmart had acted maliciously, and so the *Kolstad*

 1    defense is really a three-part presentation.  The first two

 2    parts the burden is on the plaintiff to show that there was

 3    reckless or malicious conduct, that there's a basis for employer

 4    liability, and then the third element is that good-faith *Kolstad*

 5    defense, which the defendant has the burden on.  That's out,

 6    that third element, but there's still a fair fight about whether

 7    Walmart acted maliciously or recklessly, and the burden is on

 8    the plaintiff to show that, and Walmart can introduce whatever

 9    it has to show that it wasn't acting maliciously or recklessly.

10    So your policies come in.

11            MR. HARLAN:  Okay.  Thank you, Your Honor.

12            THE COURT:  All right?  That's the result of this.  So,

13    frankly, I had some puzzlement about why the EEOC wanted to play

14    it this way, but that's how they chose.  So they don't get an

15    instruction that the burden is on you to show the good-faith

16    defense, but they still have the burden to show that you were

17    reckless or malicious, and if you have policies that you made a

18    good-faith effort to comply with, then that is evidence that you

19    have that negates an element that they have to show.  So those

20    come in.

21            MR. HARLAN:  And, Your Honor, I hope --

22            THE COURT:  Now, they get to show that you didn't

23    follow them.

24            MR. HARLAN:  Absolutely.  Your Honor, and I hope that

25    you will at least leave a little sliver of hope that you allow

1    us to talk to you about why a punitive damage instruction

2    doesn't even make sense in this case given the state of the law

3    on permanent full-time job coaches.

4            THE COURT:  When we get to that point, I expect you to

5    make a motion, as the rules provide, that I should decide that

6    as a matter of law.

7            MR. HARLAN:  Yes, sir.  Thank you.

8            THE COURT:  All right.

9            MS. VASICHEK:  Okay.

10            THE COURT:  So those are the explanations of the motion

11   for reconsideration there.

12        The issue that was raised over the weekend by the EEOC I've

13   already expressed some sympathy for, including some instruction

14   about looking at the work history of Mr. Reina, and so I will

15   look at that when the time comes on the final instructions, but

16   we don't need to resolve that today, but something along those

17   lines will be included in the instructions.

18        Okay.  Anything else that we can straighten out before we

19   begin the trial?

20            MS. VASICHEK:  Yes, Your Honor, there are a few things.

21            THE COURT:  Okay.

22            MS. VASICHEK:  And we've discussed most of these, I

23   believe, with defense counsel.  First, the EEOC is seeking back

24   pay in this case, and we just wanted to inquire as to how the

25   Court wanted to take the evidence on back pay.  So that's

```
1    strictly to the Court.

2              THE COURT:  Yeah.

3              MS. VASICHEK:  Whether you want to take it with

4    testimony outside the jury or whether you would want us to

5    submit it on paper.

6              THE COURT:  I'm open to input on that.  One thing I

7    will tell you is I don't want to -- if it's just a question for

8    me, I don't want to take time to present it in front of the

9    jury.

10             MS. VASICHEK:  No, no, and we don't intend to present

11   it --

12             THE COURT:  And I expect it's something that you could

13   probably effectively present on paper.  If I'm wrong about that,

14   tell me, and we'll arrange for you to be able to present it in

15   the courtroom, but I think you can just submit it to me in

16   paper.  That's my assumption.

17             MR. HARLAN:  Your Honor, can we reflect on that?

18             THE COURT:  Yeah.

19             MR. HARLAN:  I wasn't prepared to deal with that

20   question.

21             MS. VASICHEK:  The second thing is that we're asking

22   for an exception from the rule on sequestration for the charging

23   party's guardian, Ms. Slaght, to allow her to sit at counsel

24   table.

25             THE COURT:  Any objection to that?
```

```
 1              MR. HARLAN:  Yes, Your Honor.  We vigorously object to
 2     it.  Ms. Slaght is going to be a material witness in this case.
 3     In fact, she's their cleanup witness in this case.  We are
 4     already at a tremendous disadvantage in this case because Mr.
 5     Reina himself is not going to testify in the case, and we've
 6     made our record on that, but we think it's entirely unfair that
 7     Ms. Slaght, who is going to be a material witness, is sitting
 8     through the whole testimony and then gets to testify, especially
 9     when there is a remedy for that, right?  So her husband, for
10     instance, could be here as the representative of the family, but
11     we don't think it's appropriate for her, given that she's going
12     to have a prominent role in the trial.  That's our objection.
13              MS. VASICHEK:  We --
14              THE COURT:  I share those concerns.
15              MS. VASICHEK:  We would note that Ms. Repka is -- who
16     is the defendants' corporate representative, is also a witness
17     and is -- they intend to put on last.
18              THE COURT:  That's true, yeah, but --
19              MS. VASICHEK:  Also, we believe that Ms. Slaght's
20     presence is necessary to help the EEOC in its presentation of
21     the case.  She will help us keep the facts straight.  She's
22     particularly going to be important during --
23              THE COURT:  All right.  I'll allow it.  I'll grant an
24     exception.  She can sit at counsel table.  Go ahead.
25              MS. VASICHEK:  Second, Your Honor, there's a dispute
```

1    between the EEOC and Walmart regarding the manner in which we

2    present certain evidence, specifically the performance

3    evaluations.  The EEOC was intending to put on a corporate

4    custodian of records from Walmart through which to publish the

5    performance evaluations to the jury, and Walmart has expressed

6    disagreement.

7         THE COURT:  These are Mr. Reina's performance

8    evaluations?

9         MS. VASICHEK:  Correct.

10         MR. HARLAN:  Your Honor, can I be heard on that

11    briefly?

12         THE COURT:  Yes.

13         MR. HARLAN:  The one thing -- I haven't had the

14    pleasure of trying a case in front of you, but the one thing

15    I've discerned from you is that you want to move things along.

16    There is absolutely no reason to have to have Ms. Repka go up

17    there and read some documents that we've admitted basically.

18    What would be the purpose of that?  I mean, these -- this

19    evidence --

20         THE COURT:  That is a -- that's a good question.  What

21    would be the --

22         MS. VASICHEK:  The purpose is to enable the EEOC to

23    publish them to the jury.

24         THE COURT:  So we just need some way of putting them in

25    to the jury.

```
1              MS. VASICHEK:  Yeah, to put them in front of them.
2              THE COURT:  And there's -- you agree they're
3      admissible --
4              MR. HARLAN:  She can project them up.  We have no
5      objection to her --
6              THE COURT:  Yeah.  We don't need the witness to do
7      that.  We've agreed they're admissible, so use them how you
8      will.
9              MS. VASICHEK:  So just so we can be straight then on
10     how this would work just mechanically, we have basically 17
11     years of performance evaluations, and so the idea is we'd be
12     able to put them up on the display for the jury and then
13     highlight certain sections?
14             THE COURT:  Sure.
15             MR. HARLAN:  We have no objection to that, Your Honor.
16             MS. VASICHEK:  I guess our thought is it's just --
17     would be easier with a witness on the stand to have them do it.
18             THE COURT:  The witness is just a prop then.
19             MS. VASICHEK:  Okay.  So no.  Okay.
20             THE COURT:  Yeah.  You don't need that.  Now, you have
21     17 years --
22             MS. VASICHEK:  Yeah.
23             THE COURT:  -- of performance evaluations.  Okay.  I
24     shudder to think you're going to show us 17 years of performance
25     evaluations.  One perspective that we could take is to say,
```

1    look, they're already in evidence.  Use them at closing.  But I
2    expect that you want to include some of them in a presentation.
3    So Ms. Slaght, for example, can say he always got good
4    performance evaluations, and you could show them during her
5    testimony if you want to include them during the evidence
6    portion, but I don't want to look at all 17 of them.  The jury
7    doesn't want to look at all 17 of them, and you're not going to
8    get any static from the defense if you say he always got good
9    reviews and you showed a handful of them as a sample.  And then,
10   of course, I expect you to show them in closing.  All that's
11   fine, but we don't need to drag it out with having a witness go
12   through them all.
13          MS. VASICHEK:  The next point is, Your Honor, is the
14   manner in which we present deposition designations.  Is it okay
15   to have a counsel sit at the table?  For example, if I read the
16   designations, to have Ms. Vance sit at the counsel -- sit at the
17   witness --
18          THE COURT:  There are various ways of doing this.
19   That's one acceptable way.  So put somebody on the witness stand
20   to read the witness's answers.  Are these video --
21          MS. VASICHEK:  Not the EEOC's designations, no.
22       There are a number of objections to the designations.
23          THE COURT:  We'll have to take a break during some
24   period and rule on those objections.
25          MS. VANCE:  And if I --

```
 1            MR. HARLAN:  I don't think that's going to take a lot
 2     of your time, Your Honor.  I think we're going to fold like a
 3     tent on some of them.
 4            THE COURT:  Good.  Why don't you try to do that without
 5     my help first.
 6            MR. HARLAN:  Yeah, okay.  During a break we'll do that.
 7            MS. VANCE:  Your Honor, could you advise us on how we
 8     deal with a designation that has an objection within it from the
 9     deposition?
10            THE COURT:  I'm going to rule on it before you put the
11     person on, so at some point you'll either get the defense to
12     fold like a tent like they promised or we'll -- at some point
13     we'll take a break and you can -- I'll rule on them.
14            MS. VASICHEK:  Also, we are presenting admissions from
15     the answer and different discovery, and our intention there, if
16     the Court would permit, would be simply to say "At this time,
17     the EEOC would like to move to admit the answer and publish to
18     the jury the admission at paragraph 4."
19            THE COURT:  That would be fine.
20            MR. HARLAN:  Well, Your Honor, I don't know if I agree
21     that the EEOC should be able to characterize them as an
22     admission.  They come into evidence.  That's the basis for them
23     coming into evidence, but, of course, our witnesses can testify
24     differently than what's in those answers.  It's not a judicial
25     admission.
```

```
1              THE COURT:  Well, are they -- most of them are not.
2     I've already ruled on that but --
3              MS. VASICHEK:  I think the answer is --
4              THE COURT:  I think the answer has a different status.
5     That one is a judicial admission.
6              MR. HARLAN:  Okay.  Your Honor, on the issue of these
7     read-ins for depositions, we obviously have only objected to
8     one, and we've agreed that that's going to happen.  I'm sure you
9     don't want the EEOC then replowing the field, right?  So when
10    they cover that testimony through read-ins, they don't get to
11    come up and ask the witnesses the same questions again because
12    these witnesses are testifying.
13             THE COURT:  Well, my understanding is that we're doing
14    these depositions because they're going to be in their
15    case-in-chief, so they're putting in the deposition designations
16    in their case-in-chief.  Then you're going to call the
17    witnesses, and then they're going to cross-examine them, right?
18             MR. HARLAN:  Yeah, that's correct.
19             THE COURT:  Okay.  So the rule that would cover that is
20    that cumulative is an appropriate objection.
21             MR. HARLAN:  Okay.  Thank you, Your Honor.
22             THE COURT:  So trials are repetitive, so I don't know
23    that a single instance of repeating the same thing is going to
24    be a problem, but if it goes on, I'm going to sustain an
25    objection that it's cumulative.
```

1          MS. VASICHEK:  And then, finally, we have financial

2     stipulations that we would intend to just stand up and say "This

3     is the parties' stipulation and records on Walmart's financial

4     condition" as opposed to getting into anything deep.

5          THE COURT:  That sounds fine.  In my introductory

6     instructions, I tell the jury that they can consider

7     stipulations and that if something is stipulated I'll tell them

8     that.  So if you would, just let me know when you want to do it,

9     and I'll tell the jury that now you're going to hear about a

10    stipulation between the parties, and then you can present.

11         MS. VASICHEK:  And then, finally, we would do the same

12    with the declaration relating to the absence of the 2015 police

13    report and the police report.

14         THE COURT:  Okay.  Good.

15         MS. VASICHEK:  And then, finally, Your Honor, we have a

16    whole host of stipulated exhibits or exhibits on which the

17    rules -- which the Court's pretrial orders admitted, and I'd

18    like to go through them just so the parties can perhaps move

19    jointly for admission or at least --

20         MR. HARLAN:  Can we do that at a break, Your Honor?

21         THE COURT:  Yes.  We can do that at a break, and is

22    this -- has this been submitted in documents that I received so

23    docket 173 and 174?  Is that what we're going to see?

24         MS. VASICHEK:  I don't believe -- no, Your Honor.  I

25    mean, I can run through them really quickly so the defendant can

1    have time to look at them at a break.

2              MR. HARLAN:  Thank you.  Thank you.

3              THE COURT:  Yeah.  Don't do it now.

4              MS. VASICHEK:  Don't do it now?  Okay.

5              THE COURT:  All right.  Anything else?

6              MR. HARLAN:  No, Your Honor, not for Walmart.

7              THE COURT:  Okay.  Very good.  We'll see you at 9:00

8    when we'll begin jury selection.

9              MR. HARLAN:  Thank you.

10             THE CLERK:  This Honorable Court stands in recess.

11         (Recess at 8:38 a.m. until 9:04 a.m.)

12             THE COURT:  Why don't we sit down while we're lining

13   the jurors up.  It must be an unusually unruly group.

14         All right.  We're going to bring in our jury -- jurors.

15         (Prospective jurors enter the courtroom at 9:10 a.m.)

16             THE CLERK:  The United States District Court for the

17   Western District of Wisconsin is now in session.  District Judge

18   James D. Peterson presiding.  Please be seated and come to

19   order.

20         Case No. 17-CV-739, *Equal Employment Opportunity Commission*

21   *v. Walmart Stores, Incorporated, and Walmart Stores East, L.P.*,

22   called for jury selection and trial.

23             THE COURT:  Good morning, everyone.  We'll introduce

24   the lawyers and the parties to you in just a moment, but right

25   now you're the focus of what we are doing.  So we're here for

1    jury selection, which means that we have to ask you some

2    questions so that we can do two things:

3         One, I have to make sure that those of you who will serve

4    on the jury can be fair, so I'm going to ask you some questions

5    that will help me identify any of you who have had some

6    experience or some attitude that might make it inappropriate for

7    you to serve on the jury.

8         Also, the parties will make the final selection about who

9    serves on the jury, so for them to do that, they need to know a

10   little bit about your experiences and your backgrounds.  So

11   that's the two reasons that we're going to ask you these

12   questions this morning.

13        You have to answer my questions under oath, so your

14   obligation during jury selection is really simple.  It's just

15   that you have to tell me the truth and answer completely in

16   response to my questions.  So our first task is to have you all

17   sworn in as prospective jurors, so I'll ask everybody in the

18   jury box and in the courtroom who is a prospective juror to

19   stand up and raise your right hand, and the clerk is going to

20   swear you in as potential jurors.

21                    **PROSPECTIVE JURY PANEL, SWORN**

22        THE COURT:  All right.  This is a civil case involving

23   the Americans with Disabilities Act, which we'll refer to as the

24   "ADA."  The ADA makes it illegal for employers to discriminate

25   against individuals on the basis of disability.  The plaintiff

1    is the Equal Employment Opportunity Commission, which we'll

2    sometimes refer to as the "EEOC."   The defendants are Walmart

3    Stores, Incorporated, and Walmart Stores East, L.P., and I will

4    refer to them just as "Walmart."   The EEOC alleges that Walmart

5    violated the rights of a Walmart employee, Paul Reina, under the

6    ADA, and Walmart disputes that it violated Mr. Reina's rights.

7         I'm going to address my first questions to those of you in

8    the jury box, but I'll ask those of you who are in the gallery

9    portion of the courtroom to pay attention to my questions.   If I

10   have to replace one of the panel members who is in the jury box

11   with one of you, we'll have to do kind of a catch-up round where

12   I will ask you, the replacement juror, all of the questions that

13   we have covered so far, and if you pay attention and imagine

14   what your answers would be to my questions as we go through them

15   with those of the people in the panel, we can do the catch-up

16   round really quickly.   You'll see how efficiently we can go if

17   you're paying attention.   So I won't ask you to raise your hand

18   or to speak up, but pay attention to my questions and imagine

19   what your answers would be in case I need to get them.

20        So the first question that I have is have any of you heard

21   of this case before today?   If you have, raise your hand, and

22   we'll bring you over to sidebar to discuss it.   Nobody has heard

23   of this case before today?   Good.

24        So the trial of the case will begin today, and I'm going to

25   do everything I can to move it along very efficiently, so I

```
 1   think it will take three days, maybe four days, but I want to

 2   make sure you would be available for the rest of the week should

 3   it go that long.  I don't think it will.  We'll move it along

 4   quickly, but if I need you, I would like you to be available

 5   through Friday.  So are any of you unable to serve as a juror

 6   for this week, not including the weekends?  We don't work

 7   weekends here.  Okay.  And this is Mr. Peschl; is that right?

 8   No, I'm one off.  Mr. Schwenn.

 9           MR. SCHWENN:  That's it.

10           THE COURT:  Okay.  Mr. Schwenn, we're going to bring a

11   microphone over to you because we always have to speak by the

12   microphone.  And I know jury service is an inconvenience, but

13   it's actually really pretty interesting.  Everybody tells me

14   they're really gratified when it's over, but if you have an

15   organ transplant scheduled -- tell me what your problem is.

16           MR. SCHWENN:  I live alone, and I actually can't afford

17   to be off work that many days.

18           THE COURT:  Okay.

19           MR. SCHWENN:  I'll be homeless then and wouldn't be

20   able to pay my rent.

21           THE COURT:  Okay.  Now, we do pay you for your work

22   here.

23           MR. SCHWENN:  That wouldn't cover it.

24           THE COURT:  Okay.  And does your employer not cover it?

25           MR. SCHWENN:  No.
```

1          THE COURT:  What kind of work do you do?

2          MR. SCHWENN:  No, I asked.  I'm a carpenter.

3          THE COURT:  Okay.  And so if you're off, you're just

4     not going to get paid?

5          MR. SCHWENN:  Yeah.  No work, no pay.

6          THE COURT:  And it would be a financial hardship for

7     you.

8          MR. SCHWENN:  Very much so, yes.

9          THE COURT:  All right.  Well, I don't ask you -- I'll

10    ask you to endure an inconvenience, but I'm not going to ask you

11    to endure a severe financial hardship.  So on that basis, I'll

12    excuse you.

13         MR. SCHWENN:  Thank you.

14         THE COURT:  But I am going to ask you to stay in the

15    courtroom for jury selection just in case things get so tight

16    with jurors that I need to kind of --

17         MR. SCHWENN:  That's fine.

18         THE COURT:  -- twist your arm, but I'll excuse you, and

19    I'll put you at the end of the line.  So I won't use you unless

20    I absolutely have to.

21         MR. SCHWENN:  Okay.  Thank you.

22         THE COURT:  I'll excuse you for now, but stay in the

23    room.

24         MR. SCHWENN:  Do you want me to go over there?

25         THE COURT:  Yeah.  So you can go over there, and then

1    we're going to take the next person from the list.

2              THE CLERK:  Monica M. Sauter, please.

3              THE COURT:  All right.  Ms. Sauter.

4        MS. SAUTER:  Yes.

5              THE COURT:  I'm going to illustrate the catch-up

6    process.  Have you heard of this case before today?

7        MS. SAUTER:  No.

8              THE COURT:  You're caught up.  Almost.  Can you serve

9    through Friday?

10             MS. SAUTER:  If I need to, yes.

11             THE COURT:  All right.  Very good.

12        All right.  At this point, I'm going to ask the parties --

13   and, actually, I'll ask counsel to introduce themselves and

14   their clients, and the reason I'm doing that is I want to find

15   out if any of you know any of these people, so with that, let's

16   begin.  We'll begin with the plaintiff.

17             MS. VASICHEK:  I am Laurie Vasichek with the EEOC.

18             MS. VANCE:  Good morning.  Carrie Vance with the EEOC.

19             MS. BECKERINK:  Amanda Beckerink, also with the EEOC.

20             MS. VASICHEK:  And with us at the table is Rose Slaght,

21   who is the guardian of Paul Reina.

22             THE COURT:  Do any of you know any of those lawyers or

23   Ms. Slaght?  And Mr. Reina, anybody know Paul Reina?  And Mr.

24   Reina and Ms. Slaght, you're from Beloit, right?

25             MS. SLAGHT:  South Beloit, sir.

```
1              THE COURT:  South Beloit.  Any of you know any of those
2       folks?
3            All right.  Let's look to the defense side.
4              MR. BULIOX:  Good morning.  My name is Warren Buliox.
5              MR. HARLAN:  Good morning.  Emery Harlan, and also with
6       us is our paralegal, Tracy Tompkins, and Julie Repka, who is
7       going to be here throughout trial who is the human resource
8       representative for the company, and also in the gallery is
9       Kimberly Royal, who is an in-house lawyer at the company from
10      headquarters.
11             THE COURT:  Do any of you know any of those folks on
12      the Walmart side?
13          I'm going to read a list of witnesses that may be called to
14      testify here, and so if you would, just listen to these names
15      and tell me if any of these names sound familiar to you if they
16      are people you might know.  Roseann Slaght -- and I want to make
17      sure I pronounce your name right.
18             MS. SLAGHT:  Slaght.
19             THE COURT:  Slaght.  Okay.
20             MS. SLAGHT:  Like "cat."
21             THE COURT:  Margaret Polizzi, Matthew Matheny, Matthew
22      Coppernoll, Gera-Lind Kolarik, Ann Adamczyk, Reginald Coffin,
23      Sheila Rae Martin, Amanda Fellows, Jeffrey Scheuerell, Julie
24      Repka, Leah Stroh, Herminio Vargas, Joseph Neblock, Melissa
25      Lawent, Dr. Susan Lewinski, Dr. Richard Deming, Dan Ramsey,
```

```
 1    Dr. Michael Shapiro.  Any of those folks?  Anybody know any of
 2    those?  All right.
 3        Do any of you know me or any of the court personnel that
 4    you've had to deal with so far?
 5        Yes.  Mr. Yeakey?
 6            MR. YEAKEY:  That's correct, sir, yes.
 7            THE COURT:  Mr. Yeakey, who do you know?
 8            MR. YEAKEY:  I know you.
 9            THE COURT:  And how do you know me?
10            MR. YEAKEY:  You were in my -- you were the judge in my
11    wife's citizenship ceremony.
12            THE COURT:  All right.  How is she doing?
13            MR. YEAKEY:  She was very thrilled that day, and she's
14    doing very well.
15            THE COURT:  Very good.
16        All right.  Anybody else know me or anybody else?
17        Mr. Hollar.
18            MR. HOLLAR:  Yes.  I know Teresa and Peter.
19            THE COURT:  Okay.  And why don't you tell us how you
20    know them.
21            MR. HOLLAR:  My mom worked here for 40 years for Judge
22    Shabaz.
23            THE COURT:  Okay.  All right.  And so through that
24    time, you got to know some of the people in the court here.
25            MR. HOLLAR:  Yes, Your Honor.
```

```
1              THE COURT:  Okay.  All right.  Very good.

2         Anyone else?

3         Do any of you know anybody else on the jury panel?  All

4    right.

5         Okay.  At this point we have some standard questions that

6    we ask of each of you, kind of a little bit of an interview

7    where you're going to tell us a little bit about yourself so we

8    can get to know you, and so I'm going to have the microphone

9    sent to Mr. Schroeder, and we'll have you do this in the

10   microphone.  You can stand or sit, however you're comfortable,

11   and then just answer the questions on the form for us, and we'll

12   find out a little bit about you.  And we will do these things in

13   order because it makes it easier for us to take notes if we

14   always begin and do things -- and we'll begin with Juror No. 1,

15   Mr. Schroeder.

16              MR. SCHROEDER:  Hi.  My name is Richard Schroeder.  I

17   do live in Madison.  I'm 53 years old.  I am married.  I have

18   one daughter.  She's going to Platteville.  My current

19   occupation is I work for TDS Corporate.  I'm an enterprise

20   storage administrator.  Let's see.  Told you about my daughter,

21   Morgan.  She's going to school.  I have not been in the

22   military.  I went through high school.  I do have some college

23   classes but no degree.

24        I am in no memberships of any organizations.  I play golf,

25   like to watch sports, do stuff with my family.  Media
```

1    consumption, not much, Facebook.  That's about it.  I do read

2    sports magazines.  I do read some detective novels and stuff

3    like that.  I have never written a letter to the newspaper or

4    magazines, and I do not have any bumper stickers on my car.

5         THE COURT:  Very good.  And what does your spouse do?

6         MR. SCHROEDER:  My spouse is a graphic designer for UW.

7         THE COURT:  Thank you.

8    Next up, Ms. Laing.

9         MS. LAING:  Hello.  I'm Karen Laing.  I'm 48 years old.

10   I live in Madison and have for the last two-and-a-half years,

11   before that in the area though.  I live with my partner and my

12   teenage daughter.  I am self-employed and am a mindfulness

13   teacher and also work in health care and training and supporting

14   health care people with mindfulness and also have a doula

15   organization, so I own two companies.  My partner works as a

16   contract employee right now for the state benefits organization

17   for the -- anyway, WRS or something like that.  And --

18        THE COURT:  So the retirement system.

19        MS. LAING:  Yes, right, the retirement system.  Thank

20   you.  Anyway, I have not served in the military.  I have an

21   associate's degree.  I actually started studying fine arts and

22   then moved into training as a midwife, and the rest of my

23   professional education have been certifications and board --

24   international board certifications as a lactation consultant,

25   for instance.

1          I belong to organizations such as the Society for

2    Participatory Medicine, mindfulness groups, Buddhist

3    communities.  My hobbies, I love to garden.  I had a farm for a

4    number of years.  I kayak and love being outdoors.  I'm working

5    a lot now, so I don't get to do those.  Media consumption, truly

6    overwhelmed by most social media, so I mostly engage on social

7    media for professional reasons and try to go to public radio or

8    other trusted news sources.  I don't remember if I've ever

9    written a letter to the editor.  I know I've -- maybe around

10   professional journals I've written maybe one, but I don't know

11   if I submitted it.  And I do not have any bumper stickers on my

12   car.

13          THE COURT:  All right.  Thank you, Ms. Laing.

14       Next up, Mr. Molinaro.

15          MR. MOLINARO:  Hi.  My name is Paul Molinaro.  I am 34

16   from Monona.  I guess if that's considered Madison, I've lived

17   here on and off for about 15 years now.  I am married.  I have

18   one daughter.  She's 5 months old.  Current occupation, I work

19   for a real estate development and management company.  My spouse

20   is a physician's assistant with Dean SSM.  I do not have any

21   adult children, have not served in the military.  I have a

22   bachelor's degree.

23          Memberships, I'm in a few different commercial real estate

24   groups.  I'm also on the board of directors for Easterseals

25   Wisconsin.  Hobbies and leisure: outdoor hunting, fishing,

```
1    boating, camping, kayaking.  Media consumption, mostly online,
2    not a whole lot of social media.  I've never written a letter to
3    the editor.  I have one bumper sticker on my truck.  It's
4    "Vortex Nation."  I think that was it.
5              THE COURT:  What's the bumper sticker again?
6              MR. MOLINARO:  "Vortex Nation."
7              THE COURT:  Vortex, is that the optical company that
8    makes, like, rifle scopes and stuff like that?
9              MR. MOLINARO:  Yep.
10             THE COURT:  And tell us about your work with
11   Easterseals.
12             MR. MOLINARO:  So I'm on the board of directors.
13   Easterseals Wisconsin is an organization that serves people with
14   disabilities through various programs.  I'm on the development
15   committee to help fundraise for the group as well as the camp
16   committee to try to make the camp as good of an experience for
17   the campers as we can.  I have a sister that has gone to camp
18   for 15 or 20 years.
19             THE COURT:  All right.  Very good.  Thank you.
20         Next up, Mr. Hoffmann.
21             MR. HOFFMANN:  Good morning.  My name is Paul Hoffman.
22   I'm 55.  I live in Madison.  I've lived here since 1996, so over
23   20 years.  I'm married, 30 years.  We have four kids.  I'm a
24   banker.  I work for Monona Bank.  I'm the president of the bank.
25   My wife is -- works for the DOT as a limited-term employee.  She
```

1    writes newsletters.  My adult kids, let's see, my oldest son

2    is -- lives up in the Twin Cities.  He's a software developer.

3    My daughter, Elise, lives with us right now.  She graduated in

4    May and is looking for a job in marketing.  My son, Joe, is over

5    in Michigan going to school to be a dentist.  He's in the first

6    year of dental school.  And my daughter, Anna, is out in Utah,

7    and she's going to the University of Utah, and she's a ski

8    jumper.  We've never served in the military.  I have gone

9    through graduate school of banking.  I have -- my majors are the

10   study of business and humanities.

11        Membership in different groups.  I'm involved in a lot of

12   banking groups.  I'm a member of Maple Bluff Country Club.  I

13   serve on the board for that.  I'm on the board for the Goodman

14   Community Center.  It's a community organization on the east

15   side.  And I'm on the board for the Rotary Club in Madison,

16   downtown Madison.

17        For hobbies, I love to garden.  I love to cook, play golf.

18   Media consumption: listen to NPR, read *The Wall Street Journal*,

19   read the *Wisconsin State Journal*, read the *Milwaukee Journal*

20   *Sentinel*.  I'm on some social media, whether it's Facebook or

21   even Channel 3000.  I've written a letter to the editor when I

22   was a kid.  They expanded the comic section.  And I don't have

23   any bumper stickers.

24        THE COURT:  Were you against that development?

25        MR. HOFFMANN:  I was for it, and they kept it.

1           THE COURT:  All right.

2           MR. HOFFMANN:  And no bumper stickers.

3           THE COURT:  All right.

4           MR. HOFFMANN:  Thanks.

5           THE COURT:  Thank you.

6      Mr. Lankau.

7           MR. LANKAU:  So I'm Richard Lankau.  I'm 39.  I live in

8      Madison.  I've lived here for about four years.  I'm married.  I

9      have one son, 6 years old.  I'm an associate professor at the

10     University of Wisconsin.  I've never owned or managed a company.

11     My wife is a state employee at the Department of Health

12     Services.  She's an epidemiologist.  I don't have any adult

13     children.  I have never served in the military.  I have a Ph.D.

14     in biology and environmental sciences.

15         I'm involved in some professional organizations with my

16     scientific career.  For hobbies and leisure-time, again, I like

17     to garden and do outdoor things and a lot of kid-related stuff.

18     Media consumption, I'm not on social media in any way, but I get

19     most of my news from public radio or a variety of online

20     sources.  I've never written a letter to an editor, and I don't

21     have any bumper stickers.

22          THE COURT:  I would infer that you're an associate

23     professor of biology or environmental sciences?

24          MR. LANKAU:  I'm in the plant pathology department.

25          THE COURT:  Plant pathology.  Okay.  All right.  Thank

1    you.

2        Ms. Moore-Kerr.

3            MS. MOORE-KERR:  Kerr.

4            THE COURT:  Kerr.

5            MS. MOORE-KERR:  Yep.  So I'm Jennifer Moore-Kerr.  I'm

6    55.  I live in Spring Green, which is a small community west of

7    Madison by about an hour.  I've lived there since 2000.  I am

8    divorced.  I have three children.  I am self-employed and other

9    employed.  I at some times have four jobs.  At the moment, I

10   have three.  I work for -- I'm an independent contractor for an

11   organization called the Interactivity Foundation.  Our mission

12   is to promote civic civil dialogue, so I'm interested in this.

13   I also do child care.  I also work at a cafe in Spring Green.

14   My adult children, my daughter lives in Asheville, North

15   Carolina, and she works as the international student coordinator

16   for her alma mater, Warren Wilson College.  I've never been in

17   the military.  I have a master's of arts and teaching and an

18   undergraduate degree in sociology.

19       I am a member of Moms Demand Action, which is a gun sense

20   legislation organization.  I've been involved in several

21   educational organizations.  I like to be outside.  I like

22   hiking, kayaking, anything outside.  I used to run an organic

23   vegetable farm.  I, therefore, don't love gardening anymore.

24   That's the answer to if I ever owned or managed a company.  My

25   ex-husband and I ran the farm together, owned and ran it.  I use

1    Facebook just for social stuff.  I listen to NPR, read *The New*

2    *York Times*, *Washington Post*, other sources online.  I don't

3    watch television news.  I probably have written a letter to the

4    editor, but like you said, I don't really remember, and I do

5    have bumper stickers on my car.

6            THE COURT:  All right.  You told us what one daughter

7    did, and I assume --

8            MS. MOORE-KERR:  Oh, yes.  I'm sorry.  And I have a son

9    who's in college at Champaign-Urbana and a son who is still at

10   home.

11           THE COURT:  Thank you.

12       All right.  Mr. Yeakey, and, again, I want to make sure

13   I've got it pronounced --

14           MR. YEAKEY:  Yeakey, long "A."  That's correct, yes.  I

15   am 50 years old.  I've lived here for about 25 years.  Married,

16   one kid.  She is 14.  I work in IT.  I have not owned a company.

17   Spouse's occupation is a teacher.  Adult children, no.  Military

18   service, Air Force Auxiliary major.  School is German

19   philosophy, and I'm also going back to school for the Air

20   Command and Staff College.  That is through the Air Force.

21   Memberships and hobbies, I am a cyclist, skier, and hiker and

22   camper.  Media consumption, I watch public TV.  I don't believe

23   I've ever written a letter to a newspaper.  Bumper stickers, I

24   do not have any.

25           THE COURT:  And if you would, just tell us a little bit

```
1    more about your work.  You're in IT.  Who do you work for?
2              MR. YEAKEY:  I work for the state.
3              THE COURT:  Okay.  And what department?
4              MR. YEAKEY:  DOA.
5              THE COURT:  Okay.  And what do you do?
6              MR. YEAKEY:  I basically get IT connections for the
7    libraries in the schools throughout the entire state.
8              THE COURT:  And your wife is a teacher.
9              MR. YEAKEY:  Yes, sir.
10             THE COURT:  What does she teach and where?
11             MR. YEAKEY:  She teaches young kids up to 10 years old,
12   I believe.
13             THE COURT:  Okay.  And a public school teacher?
14             MR. YEAKEY:  She is private.
15             THE COURT:  Private school teacher.  Okay.  Thank you.
16        Okay.  Ms. Duncan.
17             MS. DUNCAN:  My name is Sarah Duncan.  I'm 40.  I live
18   in Fort Atkinson.  I'm married, and we have two sons, ages 9 and
19   4.  I'm the director of business services for Clinton Community
20   School District.  I have no military service.  I have a master's
21   degree in school business management.
22        I am a member of WASBO, which is the Wisconsin Association
23   of School Business Officials.  My family and I love to camp.  I
24   run.  Most of my media consumption is some Instagram.  I get
25   most of my news online from a variety of sources.  I've never
```

1    written a letter to the editor, and I have no bumper stickers on

2    my car.

3              THE COURT:  What does your spouse do?

4              MS. DUNCAN:  Oh, he's a high school teacher.

5              THE COURT:  All right.  In Fort Atkinson?

6              MS. DUNCAN:  Yes.

7              THE COURT:  What does he teach?

8              MS. DUNCAN:  He teaches family and consumer education.

9              THE COURT:  Thank you.

10         I'm going to bring the microphone down here to the other

11    end of the front row to Mr. Hollar.

12              MR. HOLLAR:  So my name is Jim Hollar.  I'm 45.  I live

13    in Madison and have for most of my life, a couple years out in

14    Washington state.  Married, two kids.  My current occupation is

15    I teach for Edgewood College in the educational leadership

16    program.  Never owned or managed a company.  My wife also

17    teaches at Edgewood College in the teacher ed program.  No adult

18    children.  No military service.  I have a Ph.D. from UW-Madison

19    in education.

20         Some memberships, mostly in educational organizations.  I'm

21    a member of the PTO board for Midvale-Lincoln schools.  Hobbies,

22    playing with kids.  Media consumption, I'd say *The New York*

23    *Times* and NPR.  And I have never written a letter to the editor,

24    and no bumper stickers.

25              THE COURT:  Thank you.

1          Mr. Kuckkan.

2               MR. KUCKKAN:  My name is David Kuckkan.  I have lived

3     in the City of Lake Mills since 1972.  I'm married.  I have two

4     adult children.  One lives in the Minneapolis area and the other

5     in Hazelhurst, Wisconsin.  I've never managed a company.  When I

6     was working, I worked for Hamlin, Incorporated, for 44 years.  I

7     am now retired.  I was a tool and die maker while I worked

8     there.  My wife was an IT manager at a local bank in Lake Mills.

9     She is now retired for about five months.  I was in the service

10    in the Army.  I obtained a rank of E-5, Spec-5 as they called it

11    at that time, and I was discharged in 1967.  I graduated from

12    high school.

13         Do not belong to any organizations.  I love to hunt and

14    fish.  Media, I read newspapers, watch television, news shows

15    and stuff like that.  I have never written any letters to the

16    magazines or newspapers, and no bumper stickers.

17              THE COURT:  Thanks for your military service.  Tell us

18    what your kids do.  I think you said you had two kids.  I'm

19    inferring that they're adults?

20              MR. KUCKKAN:  Excuse me?

21              THE COURT:  Your children, what do they do?

22              MR. KUCKKAN:  My daughter that lives in the Minneapolis

23    area is a payroll manager, and my son that lives in Hazelhurst,

24    he is creative granite.  He installs and manufactures granite

25    countertops.

```
1              THE COURT:  Very good.  All right.  Thank you very
2       much.
3           Next up, Ms. Sauter.
4              MS. SAUTER:  Yes.  My name is Monica Sauter.  I'd like
5       to remain seated.  Is that possible?  I have a knee injury.
6              THE COURT:  That's fine.
7              MS. SAUTER:  And I'm going to have to get a different
8       seat in the jury box because I can't sit here comfortably.
9              THE COURT:  Okay.
10             MS. SAUTER:  Is that okay?
11             THE COURT:  You can sit or stand, whatever makes you
12      comfortable, and we'll --
13             MS. SAUTER:  Okay.  I need to be moved soon because I'm
14      uncomfortable here.
15             THE COURT:  Okay.  Would it help you to be on the end?
16             MS. SAUTER:  Yes.  I need more leg room in front, and
17      Teresa thought one of the end ones in the back would be fine for
18      me.
19             THE COURT:  All right.  How about, Mr. Schroeder, do
20      you want to trade seats?
21             MR. SCHROEDER:  That's fine.
22             THE COURT:  Let's do it right now.
23             MS. SAUTER:  All right.  Thank you.
24          All right.  Monica Sauter.  I'm 51 years old.  I live in
25      Fitchburg, Wisconsin.  I've lived there since 2001.  I am
```

1    married.  I have two children.  I am an assistant scientist at

2    the UW-Madison School of Medicine.  Never owned a company.  My

3    husband is a family medicine physician with SSM Health.  I have

4    one 20-year-old that's a sophomore at UW-Platteville.  No

5    military service.  I have a Ph.D. in molecular biology, and I'm

6    a virologist at the UW.

7         No major memberships.  I'm a lap swimmer.  I love to read,

8    like being outside.  Media consumption, NPR for the radio, NBC

9    15 usually for news, *Wisconsin State Journal*.  I do not take

10   part in social media.  No bumper stickers, and no letters to the

11   editor.

12              THE COURT:  Great.  And if we accommodate you by having

13   you in a seat on the end, does that do --

14              MS. SAUTER:  Oh, yes.  This is fine.  Thank you.  It's

15   much better.

16              THE COURT:  Will you be able to sit there all day --

17              MS. SAUTER:  Yes, if I have to.

18              THE COURT:  -- if you serve?  Great.  Thank you.

19              MS. SAUTER:  Thank you.

20              THE COURT:  Okay.  Then we're going to go down to

21   Mr. Peschl.

22              MR. PESCHL:  Hi.  My name is John Peschl.  I am 45, and

23   I live in Sun Prairie.  I live with my partner.  I do not have

24   any children.  Currently I am an elementary school teacher for

25   Sun Prairie.  I do not own a company.  My partner is a middle

1    school band teacher in Stoughton.  I have not served in the

2    military.  I have a master's degree in educational leadership.

3          I'm not part of any organized membership groups.  For

4    hobbies, I love to travel and go on nature walks.  Media

5    consumption, I like to read fiction.  I watch local news and

6    sometimes listen to podcasts for my local news.  I've never

7    written a letter to the editor.  I don't have any bumper

8    stickers.

9          THE COURT:  Thank you.

10    Ms. Bukolt.

11          MS. BUKOLT:  Yes.  Hi.  My name is Alyssa Bukolt.  My

12    husband and I live in Stoughton.  I've lived in the Madison area

13    for about seven years now.  We don't have any children yet, just

14    a fluffy dog that keeps us busy.  Right now I'm a real estate

15    agent.  I was a commercial real estate paralegal for a couple of

16    years.  Before that, I was a legal assistant.  I have never

17    owned or managed a company, but my husband is a project manager

18    at a security and access control company.  I don't have any

19    military experience.  I have a bachelor's degree in political

20    science from Edgewood College.

21          The only membership I have is in any real estate groups

22    locally or statewide.  Hobbies, I love to go on hikes with my

23    dog and my husband.  I love to sing.  I love to play the piano,

24    read a good book, watch a good movie.  Media consumption, I'm on

25    basically all social media.  I try to avoid news at all costs,

1        if I'm being completely honest at this point.  I've never

2        written a letter to the editor, and I don't have any bumper

3        stickers on my car.

4                THE COURT:  All right.  Thank you.  I'm not sure you

5        told us your age.

6                MS. BUKOLT:  I'm 28.

7                THE COURT:  28.  Thank you.

8            Next up, Ms. Pulvermacher.

9                MS. PULVERMACHER:  I'm Samantha Pulvermacher.  I'm 32.

10       I live outside of Lodi, Wisconsin.  Been there for five years.

11       I am married, no kids.  My current occupation is human

12       resources.  I have never owned or managed a company, but my mom

13       owns a business.  Current occupation for my spouse, he's a

14       service water treatment technician.  I have no adult kids.  No

15       military service.  My highest education is a master's in

16       business administration.

17           I'm a member of the Hundred-Plus Women, Madison chapter,

18       and SHRM.  My hobbies are camping, cooking, hang out with

19       friends, helping animals.  Media consumption is local news on

20       the TV and all social media.  I've never written a letter to the

21       editor, and I have no bumper stickers.

22               THE COURT:  If you would, tell us -- you said you were

23       in HR.  What do you do, and who do you work for?

24               MS. PULVERMACHER:  I work at Sub-Zero Group, Inc.,

25       Madison/Fitchburg campus, and I'm the human resource generalist

1  there, so I'm involved with everything from recruiting to

2  hiring, firing, employee relations, union, kind of everything

3  that comes with it.

4           THE COURT:  Okay.  Whatever they need.

5           MS. PULVERMACHER:  Yeah.

6           THE COURT:  And then you said you were in two groups

7  that I caught.  Hundred-Plus Women of Madison, is that a service

8  organization?  Tell us a little bit about that group.

9           MS. PULVERMACHER:  It's a nonprofit organization.

10  There is a hundred-plus women-members-only that we go in

11  quarterly.  We have three local nonprofit people that present to

12  us, and we all donate a hundred dollars each meeting to raise

13  over $10,000 in an hour for the group that we select.

14           THE COURT:  Very nice.  And then I think you said you

15  were a member of SHRM; is that right?

16           MS. PULVERMACHER:  Yeah.

17           THE COURT:  And what is that?

18           MS. PULVERMACHER:  The Society for Human Resources

19  Management.

20           THE COURT:  Okay.  That's a professional group.

21           MS. PULVERMACHER:  Yes.

22           THE COURT:  All right.  Thank you very much.

23       All right.  So now I have some questions that are oriented

24  a little bit more toward the issues that are going to come up in

25  this case.  So the first thing I'm going to do is to ask you

1    about your experiences with litigation, and I have a couple of

2    points of guidance for you.

3        If there's anything that you would like to discuss

4    privately, and by that I mean with me and one lawyer from each

5    side, you can come over to what we call sidebar.  There's a

6    little microphone over here.  We'll play some pleasant white

7    noise so we can speak confidentially over here.  So if there's

8    anything that involves something you want to keep more private,

9    we can do that.

10        The second thing is a lot of my questions are going to ask

11   you about whether you, a relative, or a close friend has ever

12   done something.  So my first question is whether you, a

13   relative, or close friend has ever been a party to a lawsuit.

14   Let me tell you what I have in mind about that.  I'm interested

15   not only in your own experiences but the experiences of those

16   who are close enough to you so that their experiences and values

17   might influence your thinking.  So if you have some distant

18   relative who has been involved in a lawsuit but that person is

19   not really close to you and you don't -- their thinking doesn't

20   influence yours, I don't really need to know about that.  Same

21   thing with friends.  So if you have some acquaintance who has

22   done something, I don't need to know about it, but if it's

23   somebody close enough to you that their experiences would

24   influence your thinking, then you should tell me about it, and

25   I'll let you draw the line.

1          So I have some cousins that I hope I really don't hear

2    from.  So if you have relatives like that, you don't have to

3    tell me about their experiences.  But you might have somebody

4    who is literally more distant, a relative, who is nevertheless

5    really close to you, and I'll let you decide if that's somebody

6    whose experiences you should share with us today.

7          So as I said, my first question is have you, a relative, or

8    close friend ever been a party to a lawsuit?  Have you ever sued

9    somebody or gotten sued?

10         Okay.  We'll try to do these in order.  It makes it easier

11   to take notes.  And so I think it was Mr. Lankau; is that right?

12             MR. LANKAU:  (Mr. Lankau nods head.)

13             THE COURT:  Okay.  Let's get the microphone over to

14   Mr. Lankau.

15             MR. LANKAU:  My father-in-law is a medical doctor, and

16   so he's been involved in malpractice suits a few times in his

17   career.

18             THE COURT:  Okay.  And did your father-in-law tell you

19   much about those suits?

20             MR. LANKAU:  No.  I don't know many of the details.

21             THE COURT:  Okay.  All right.  And do you think your

22   father-in-law's experience in those malpractice suits -- and I

23   can assume that he was the defendant in those --

24             MR. LANKAU:  Yes.

25             THE COURT:  -- lawsuits.  Do you think his experiences

1          would leave you with any kind of enduring feelings about the

2          justice system that might influence your thinking in this case?

3                    MR. LANKAU:  I don't believe so.

4                    THE COURT:  Very good.  All right.

5              And then, Ms. Bukolt, did you have your hand up?

6                    MS. BUKOLT:  I have two different ones.  My dad was an

7          owner of a building and contracting company, and they had a suit

8          brought against them.

9                    THE COURT:  Okay.

10                   MS. BUKOLT:  And then also my husband's company, they

11         sued another party.  Somebody left their company and tried to --

12         it was -- I don't really even know all the details of it, but

13         they sued the other party.

14                   THE COURT:  Okay.  So your husband's company was

15         involved in a business dispute.

16                   MS. BUKOLT:  Yes.

17                   THE COURT:  Okay.  And do you know how that got

18         resolved?

19                   MS. BUKOLT:  I don't know all the details of it, but I

20         know it is resolved.

21                   THE COURT:  It is resolved.  Did it go to a trial or --

22                   MS. BUKOLT:  I believe --

23                   THE COURT:  -- did they reach a settlement?

24                   MS. BUKOLT:  I think it ended up being settled, but

25         they did go to court.  I know that.  That's about all I know

```
 1     though.
 2             THE COURT:  All right.  And then your dad's company got
 3     sued you said?
 4             MS. BUKOLT:  Yes.
 5             THE COURT:  What kind of suit was that?  Do you
 6     remember?
 7             MS. BUKOLT:  A subcontract -- one of the
 8     subcontractors, one of their men fell off the building on one of
 9     the sites, so they sued my dad's company because he was the
10     general contractor.
11             THE COURT:  Okay.  And do you know how that got
12     resolved?
13             MS. BUKOLT:  No.  I don't know.  It was years ago, and
14     that's all I know about it.
15             THE COURT:  All right.  And do you think the -- any of
16     those experiences you think would color your decision-making in
17     this case?
18             MS. BUKOLT:  No.
19             THE COURT:  Okay.  Very good.
20         Okay.  I want to make sure I don't miss anybody.  Okay.
21     Mr. Molinaro.
22             MR. MOLINARO:  A couple instances.  The company I work
23     for, we're in real estate management, so we've had a couple
24     suits, tenant defaults, some slip and falls, things related to
25     that.  And then I don't know if this counts, but my dad is an
```

```
1      attorney in Wausau, Wisconsin, so he's obviously been involved
2      in a few cases.
3           THE COURT:  We're going to ask a little bit more
4      specifically about your dad's experiences as an attorney.
5      That's another question, but let's just deal with those
6      lawsuits.  So I think you said slip and falls, tenant defaults.
7      And so what was -- what is -- well, I shouldn't assume.  Were
8      you involved in those -- in that litigation at all?
9           MR. MOLINARO:  We never -- I guess we had a couple of
10     tenant defaults that got to litigation.  Everything else was
11     settled.  But, yes, I was involved as the main contact for the
12     company.
13          THE COURT:  Okay.  So we'll ask about this too.  Might
14     as well get to it right now.  Did you have to testify at all?
15     Did you give a deposition or testify in court?
16          MR. MOLINARO:  Never had to testify.  Again, I think we
17     just agreed to judgments outside of court.
18          THE COURT:  Okay.  All right.  And let me ask you this:
19     Do you think those experiences would affect your decision-making
20     in this case at all?
21          MR. MOLINARO:  No.
22          THE COURT:  All right.  As long as you have the
23     microphone and we're talking about it, let's stick with
24     Mr. Molinaro for a minute.  So your dad was an attorney in
25     Wausau you said?
```

```
 1              MR. MOLINARO:  Is still.

 2              THE COURT:  He still is.  Okay.  What kind of law

 3      practice does he have?

 4              MR. MOLINARO:  A little bit of everything.  He does

 5      some business law, a lot of personal injury, some divorce stuff.

 6              THE COURT:  Okay.  Is he with a firm?

 7              MR. MOLINARO:  He is on his own.

 8              THE COURT:  Okay.  All right.  And so he sounds like he

 9      had kind of a general practice.

10              MR. MOLINARO:  Correct.

11              THE COURT:  All right.  Did he tell you a lot about his

12      work?

13              MR. MOLINARO:  Not really.

14              THE COURT:  No?

15              MR. MOLINARO:  I've got some lawyer jokes though if we

16      want to get into those.

17              THE COURT:  All right.  Did your dad do much litigation

18      work?

19              MR. MOLINARO:  Yes.

20              THE COURT:  Okay.  And so did he commonly represent

21      plaintiffs, defendants, whatever the needs of his clients were?

22              MR. MOLINARO:  Yeah, mostly plaintiffs, I believe, on

23      the personal injury side.  I think the personal injury piece was

24      the biggest part of his practice.

25              THE COURT:  Okay.  So mostly personal injury work.
```

```
1   Okay.  And so do you think the fact that your dad was a personal
2   injury lawyer, which means that he represented plaintiffs, do
3   you think that would color your decision-making in this case?
4            MR. MOLINARO:  No.  I think about all lawyers the same.
5            THE COURT:  I'm glad to hear that, I think.
6       All right.  Mr. Hoffmann.
7            MR. HOFFMANN:  Working at the bank, we've had a lot of
8   cases just over the years, different foreclosures, mostly
9   related to nonpayment of loans.
10           THE COURT:  Okay.  And so tell us, if you would, a
11  little bit about your own involvement in those cases.  Did you
12  ever get to the point where you had to testify on things?
13           MR. HOFFMANN:  I've never had to testify.  I've given a
14  deposition in a couple cases, but mostly the cases have been
15  discussed with me and just talked about with maybe the attorneys
16  and trying to figure out what do we do to move forward.
17           THE COURT:  Okay.  All right.  And do you think those
18  experiences would affect your decision-making in this case?
19           MR. HOFFMANN:  I don't think so.
20           THE COURT:  All right.  Very good.  Okay.  This was the
21  question of whether you had been a party to a lawsuit.  I want
22  to make sure I don't miss anybody.  Okay.
23      Have you, a relative, or a close friend ever been a witness
24  in a lawsuit?  And, again, you will see sometimes the questions
25  overlap a little bit, so we've already heard Mr. Hoffmann said
```

```
 1    he gave a deposition in a couple cases, so if we've already
 2    heard about it, we don't need to hear it again.  But other than
 3    what we've already heard, anybody or anybody close to you ever
 4    been a witness in a lawsuit, meaning you had to give testimony
 5    and sat for a deposition?  Anything like that?  Okay.
 6        How many of you have served on a jury before?  Anybody
 7    served on a jury?
 8        Okay.  Let's do it in order.  And, Ms. Moore-Kerr.
 9            MS. MOORE-KERR:  Kerr.  We can just do Moore if that's
10    easier.
11            THE COURT:  As you choose.  You get to decide how
12    you're going to be called.  Okay.  Ms. Moore.
13            MS. MOORE-KERR:  Yes.
14            THE COURT:  When did you serve on a jury and what kind
15    of case was it?
16            MS. MOORE-KERR:  It was maybe 20 years ago in Iowa
17    County.  It was a case about a dog, and I believe -- it was a
18    dispute between neighbors over the dog's behavior, and I think
19    it was finished in a day.
20            THE COURT:  Okay.
21            MS. MOORE-KERR:  And I honestly don't remember how we
22    decided it.  I remember the process but not the decision.
23            THE COURT:  Okay.  So you don't remember how -- but did
24    you deliberate and reach a verdict?
25            MS. MOORE-KERR:  Yes.
```

```
1              THE COURT:  Were you the jury foreperson?
2              MS. MOORE-KERR:  No.
3              THE COURT:  Okay.  And you don't remember which way it
4     went.
5              MS. MOORE-KERR:  No.
6              THE COURT:  Okay.  All right.  Very good.
7         Anybody else in the back row?  We've got a whole bunch of
8     hands in the front.
9         Okay.  Front row, previous jury service.  We'll start with
10    Mr. Kuckkan, and then we'll go down the row.  When and where?
11             MR. KUCKKAN:  I actually have been called to serve
12    three times in Jefferson County.  I served on four panels.  One
13    was a civil case, the other three were criminal.
14             THE COURT:  So speaking of the times that you -- so did
15    you serve on the civil case?
16             MR. KUCKKAN:  Yes.
17             THE COURT:  Did you deliberate and reach a verdict?
18             MR. KUCKKAN:  Yes.
19             THE COURT:  What kind of case was it; do you recall?
20             MR. KUCKKAN:  It was an accident involved with a
21    nursing home.  My father was actually a resident at this place,
22    and they did a field trip to The Domes in Milwaukee.  On their
23    way back, they were struck -- the van that they were all in was
24    struck by a chemical company truck, and the manager of the
25    nursing home was suing them for $3 million because of his
```

1       injuries and not being able to work after that.  There were

2       three people that were killed in that accident.  My father was

3       not on that trip or whatever, but I knew a number of the people

4       that were involved in it because of my dad being a resident

5       there.

6               THE COURT:  All right.  And you served on that jury.

7       Did you deliberate and reach a verdict?

8               MR. KUCKKAN:  Yes.

9               THE COURT:  Okay.  And did you find for the plaintiff

10      or the defendant?

11              MR. KUCKKAN:  We found for the plaintiff.  We did not

12      give him as much money as what they originally wanted, but both

13      sides were satisfied.  It was never appealed or anything.

14              THE COURT:  Okay.  And were you the jury foreperson?

15              MR. KUCKKAN:  No.

16              THE COURT:  Okay.  And if my count is right, then you

17      served on juries in two criminal matters?

18              MR. KUCKKAN:  Correct.

19              THE COURT:  And did you find -- in those cases, did you

20      convict or acquit?

21              MR. KUCKKAN:  We convicted in both cases.

22              THE COURT:  Okay.  And were you the jury foreperson in

23      either one of those cases?

24              MR. KUCKKAN:  No.

25              THE COURT:  Thank you.

```
1          All right.  Mr. Schroeder.
2               MR. SCHROEDER:  Long time ago when I was 18, so 35
3      years ago, it was a drunk driving trial.
4               THE COURT:  Okay.  And where was it?
5               MR. SCHROEDER:  In Dane County.
6               THE COURT:  Okay.
7               MR. SCHROEDER:  And we found him guilty.
8               THE COURT:  All right.  And were you the jury
9      foreperson?
10              MR. SCHROEDER:  No, I was not.
11              THE COURT:  Okay.  And who else?  Mr. Peschl, did you
12     have your hand up?
13              MR. PESCHL:  Yes.  I think it was about ten years ago.
14     It was in Madison.  It was a -- there were three or four charges
15     that we had to assess.  A lot of them -- I think more than one
16     had to do with a parole violation.  I was the foreman.  It was a
17     one-day, full-day trial.
18              THE COURT:  And did you convict?
19              MR. PESCHL:  On, I think, one of the three, and that
20     was something to do with not being completely honest with
21     police.
22              THE COURT:  Okay.
23              MR. PESCHL:  Something like that.
24              THE COURT:  Thank you.
25          Anybody else?  All right.
```

```
 1        All right.  Again, the questions overlap, so if you've
 2   already told us about this, we don't need to hear about it
 3   again, but have you or anyone close to you ever had a dispute
 4   with a business?  Did you get into a dispute with a business?
 5        Next set of questions are a little bit more specialized to
 6   this case.  First one is this:  Have you or anyone close to you
 7   ever been employed by Walmart Stores?  Anybody ever worked for
 8   Walmart or anybody close to you work for Walmart?
 9        Mr. Molinaro.
10        MR. MOLINARO:  My mom worked at Walmart in Minoqua,
11   Wisconsin, part time after she retired from teaching.
12        THE COURT:  That was in Minoqua?
13        MR. MOLINARO:  Correct.
14        THE COURT:  And what did she do?
15        MR. MOLINARO:  She was a cashier.
16        THE COURT:  Okay.  And how long did she work?
17        MR. MOLINARO:  I think she only worked about -- it
18   wasn't full time.  It was a couple of summers.
19        THE COURT:  All right.  And did she tell you much about
20   her experiences working for Walmart?
21        MR. MOLINARO:  Yeah.  Not a great experience.
22        THE COURT:  Not a great experience.  Okay.  All right.
23   We may follow up with that, but we'll work our way back to that.
24        Okay.  Anybody else ever work for Walmart?
25        Mr. Kuckkan.
```

1          MR. KUCKKAN:  My sister worked in Watertown for Walmart

2    for 12 years.

3          THE COURT:  Okay.  In Watertown, you said?

4          MR. KUCKKAN:  Correct.

5          THE COURT:  And what did she do?

6          MR. KUCKKAN:  She worked in the bakery and deli area.

7          THE COURT:  And did she tell you much about her work at

8    Walmart?

9          MR. KUCKKAN:  Somewhat, but not a lot.

10          THE COURT:  Okay.

11          MR. KUCKKAN:  Do you want me to elaborate more or

12    whatever?  I can.  But she started suffering from dementia, and

13    because of that, they were making things pretty tough on her or

14    whatever --

15          THE COURT:  I'll ask you -- we'll take that up at

16    sidebar too, so we'll follow up with that.  All right.  Very

17    good.

18       Anybody else who had a person, themselves or someone close

19    to them, work for Walmart?  Okay.

20          All right.  And then this is a question I would like to

21    just -- this is -- I want you to answer yes.  I don't want you

22    to tell me what they are.  We'll follow up at sidebar, but the

23    question is do you have strong feelings, whether positive or

24    negative, about Walmart?  Anybody feel like they have strong

25    feelings about Walmart, positive or negative?  We'll take

1      inventory, and we'll do all these at sidebar.

2          So let's just go down the list.  So we've got Ms. Sauter.

3      Raise your hand high, so I can see.  I'll do the back row first.

4      Okay.  Ms. Laing.  Okay.  Anybody else in the back row?

5          Okay.  Now we're coming down to the front row.  Mr. Hollar

6      and Mr. Schroeder.  Okay.  Very good.  Mr. Kuckkan, did you have

7      your hand up?

8              MR. KUCKKAN:  No.

9              THE COURT:  We're going to follow up with you anyway

10     about your sister's experience.  Anybody else in the front row?

11     All right.  Very good.  Okay.

12         The EEOC is a federal agency that is responsible for

13     enforcing federal employment laws.  Have you or anyone close to

14     you ever been employed by the Equal Employment Opportunity

15     Commission?  Let's just start with that.  Anybody ever work for

16     the EEOC or anybody close to them work with the EEOC?

17         Okay.  I'm going to cast a broader net because in addition

18     to the EEOC, I want to know if you or anyone close to you has

19     also worked for any other agency involved in employment law such

20     as the Department of Workforce Development, the Equal Rights

21     Division, or DIHLR?  So those are state agencies that work in

22     the area of employment rights.  So you or anybody close to you

23     ever work for any of those organizations?  Okay.

24         Do any of you have any special knowledge or training

25     related to disability discrimination or the ADA, the Americans

1    with Disabilities Act?

2        So we've got Ms. Pulvermacher.  And so, Ms. Pulvermacher,

3    you're the HR generalist at Sub-Zero.

4            MS. PULVERMACHER:  Yes.

5            THE COURT:  Okay.  And so, if you would, just give us a

6    thumbnail sketch about your background of experience and

7    training relating to disability discrimination or the ADA.

8            MS. PULVERMACHER:  I have training with my profession.

9    I currently handle all the leave cases that relate to FMLA/ADA

10   at Sub-Zero for salaried employee groups.

11           THE COURT:  Okay.  Did you say all the lead cases you

12   said?

13           MS. PULVERMACHER:  Leave cases.

14           THE COURT:  Leave cases.  Okay.  So you deal with the

15   leave cases, and that's under FMLA, and what was the other --

16           MS. PULVERMACHER:  ADA.

17           THE COURT:  ADA.  Okay.

18           MS. PULVERMACHER:  And then I recently just went to a

19   conference for employee relations law as well.

20           THE COURT:  Okay.  And so I don't want to assume, but

21   it's kind of by the nature of your position that you come to the

22   questions of FMLA leave or disability rights from the employer

23   perspective; is that fair to say?

24           MS. PULVERMACHER:  Yes.

25           THE COURT:  Okay.  And so let me ask you this:  In this

1    case, you're going to be asked to decide questions that relate

2    to the application of the Americans with Disabilities Act.  Do

3    you think you're in a position to be fair to both sides in this

4    case?

5              MS. PULVERMACHER:  No.

6              THE COURT:  Do you think that you will have an

7    inclination to view it from the employer's perspective?

8              MS. PULVERMACHER:  I would probably lean more that way.

9              THE COURT:  Okay.  And so I'm going to instruct you --

10             MS. PULVERMACHER:  I'd try to be fair --

11             THE COURT:  Well, I'm glad that you would --

12             MS. PULVERMACHER:  -- but with my profession --

13             THE COURT:  Well, my question is I'm going to instruct

14   you that you should follow the law -- I'll give you instructions

15   on the law and how you should apply it to this case, and then

16   I'll tell you to decide the case based on the evidence that's

17   presented here in the courtroom.

18             MS. PULVERMACHER:  Yeah.

19             THE COURT:  And I'm confident that you would try to do

20   your best.

21             MS. PULVERMACHER:  Yeah.

22             THE COURT:  But I also am going to ask if you feel like

23   you could really be fair to both sides, and if you don't feel

24   like you can be fair to both sides, then I'm going to need to

25   know that.  And so, like I said at the beginning of *voir dire*,

```
 1    your only obligation here is to be honest with me.  And so, like
 2    I said, I don't question your motives.  I'm sure you would try
 3    to be fair, but you kind of said that you would come at it from
 4    the employer's perspective.
 5            MS. PULVERMACHER:  I mean, that would be my direct
 6    thought because that's what I work with every day.  I'd try to
 7    hear both parties like I do in my job, but I deal with the
 8    employer side every day, and I've also dealt with EEOC claims of
 9    submitting documentations and stuff with our company.
10            THE COURT:  So you think that, despite your best
11    efforts, you would still tend to have a somewhat --
12            MS. PULVERMACHER:  It's hard to say.  I've never done
13    this before, so I would try --
14            THE COURT:  Well, now is your chance.
15            MS. PULVERMACHER:  -- but I don't know.
16            THE COURT:  Well, and again, I don't want to deprive
17    you -- just because you work in HR, that is not disqualifying,
18    but it does raise a fair question about whether you'd be able to
19    step out of your normal workday role into being an unbiased
20    person.
21            MS. PULVERMACHER:  I understand.
22            THE COURT:  And I'm getting the impression that you
23    have some doubts about your ability to do that.
24            MS. PULVERMACHER:  I mean, I would try.
25            THE COURT:  I'm sure you would.
```

```
1                    MS. PULVERMACHER:  I guess that's all I can say.

2                    THE COURT:  But you have doubts about -- am I right

3        that you have doubts about whether you could do it?

4                    MS. PULVERMACHER:  I would have doubts.

5                    THE COURT:  All right.  I'm going to excuse you.

6                    MS. PULVERMACHER:  Thanks.

7                    THE COURT:  Okay.

8                    MR. HARLAN:  Your Honor, can we approach briefly for a

9        second?

10                   THE COURT:  Sure.  Come on up.

11                   MR. HARLAN:  Thank you.

12              (Discussion held at sidebar at 10:06 a.m.)

13                   MR. HARLAN:  It doesn't relate to her.

14                   THE COURT:  Okay.

15                   MR. HARLAN:  I'm a little concerned we're asking

16       questions about what people think about Walmart --

17              (Reporter interruption.)

18                   THE COURT:  We have the white noise.  We're okay.

19       There's a microphone right there.

20                   MR. HARLAN:  I'm a little concerned when you're --

21                   THE COURT:  A little louder.

22                   MR. HARLAN:  I'm a little concerned when you asked

23       them, you know, what's your experience with Walmart.  So we

24       already had one juror -- perspective juror say, "Hey, they did

25       my sister wrong."  I'm wondering, for that question, if you can
```

1    talk to them to the side because I'm afraid that if --

2           THE COURT:  We're going to bring them all over to

3    sidebar.

4           MR. HARLAN:  Okay.  Thank you.  Sorry about that.

5       (Sidebar discussion ends at 10:07 a.m.)

6           THE COURT:  So let's take a replacement for

7    Ms. Pulvermacher.

8           THE CLERK:  Stephen J. O'Dell.

9           THE COURT:  All right.  Mr. O'Dell, a couple of

10   preliminaries.  Have you heard about this case before today?

11          MR. O'DELL:  No, I have not.

12          THE COURT:  Can you serve through Friday if you have

13   to?

14          MR. O'DELL:  I run the CDL program and several programs

15   at Blackhawk Technical College.

16          THE COURT:  Okay.

17          MR. O'DELL:  And right now I'm the only one that runs

18   those programs.  I could probably go as long as Friday but not

19   beyond.

20          THE COURT:  Okay.  We're going to be done by Friday.

21      Okay.  All right.  And do you know any of the lawyers or

22   the representatives of the parties here?

23          MR. O'DELL:  I do not.

24          THE COURT:  Okay.  And do you -- did you hear the list

25   of witnesses that I read?

```
1            MR. O'DELL:  I don't know any of the witnesses.
2            THE COURT:  Very good.  All right.  And do you know me
3     or any of the court personnel you've had to deal with?
4            MR. O'DELL:  I don't.
5            THE COURT:  Know anybody else on the jury panel?
6            MR. O'DELL:  No, I don't.
7            THE COURT:  Okay.  So with that, why don't you tell us
8     about yourself.
9            MR. O'DELL:  Let's see.  So my name is Stephen O'Dell.
10    I'll be 60 years old on October 9th.
11           THE COURT:  Happy birthday in advance.
12           MR. O'DELL:  Oh, thank you.  I currently live in
13    Janesville, Wisconsin, have been a resident of Wisconsin since
14    1959, was born here.  Parents were divorced, so when they split
15    up, some time in Chicago with my mother and most of the time
16    with my dad.  I'm married.  I have two adult children.  One is a
17    pediatric pharmacist with Mercy Health System, and the other is
18    attending UW-Whitewater.  She's in pre-med.  My current
19    occupation, I work for Blackhawk Technical College.  I'm a
20    program director and lead instructor for the CDL program,
21    motorcycles, forklift training, bridge crane training, and
22    several other associated programs.
23           THE COURT:  CDL stands for commercial driver's license?
24           MR. O'DELL:  Yes, correct.  I have owned my own
25    business and owned my own business for 20 years.  I was a
```

1    contractor to industrial equipment manufacturers.  I ended up

2    with viral meningitis in 2012, and so I stepped away from it.  I

3    wasn't able to travel as much anymore at that point, and I

4    accepted the position at Blackhawk.

5         THE COURT:  All right.  And the contracting business

6    that you had, what was it?

7         MR. O'DELL:  It was industrial sales, bridge cranes.

8    My biggest customer was General Motors, and I supplied their

9    industrial equipment, forklifts, electric vehicles, Bobcats, you

10   name it, anything industrial.

11        THE COURT:  Okay.

12        MR. O'DELL:  I have a master's degree in business

13   administration.  My minor is in industrial marketing.  I do not

14   currently have any memberships with any organizations.  I

15   collect cars, and that's my biggest hobby.  I represented my

16   uncle's business also, which is Barrett-Jackson Auction Company

17   in Scottsdale, Arizona.  I really stay away from the media.  I

18   watch the weather.  That's about all the time I have right now

19   for it.  I have not written any letters to any editors that I'm

20   aware of, and, no, I don't ever put bumper stickers on my car.

21        THE COURT:  And does your spouse have an occupation?

22        MR. O'DELL:  She is.  She has been with Mercy Health

23   Systems since 1987.  She went to school for social work.  She is

24   a discharge planner that deals with sensitive cases that come

25   into the hospital.

 1          THE COURT:  Okay.  Thank you.  All right.  Have you or

 2    anyone close to you ever been a party to a lawsuit?

 3          MR. O'DELL:  I have not, no.

 4          THE COURT:  Okay.  How about somebody close to you?

 5          MR. O'DELL:  No.

 6          THE COURT:  Okay.  Ever been -- you or someone close to

 7    you ever been a witness in a lawsuit?

 8          MR. O'DELL:  Yes.

 9          THE COURT:  Okay.  Tell us about that.

10          MR. O'DELL:  It was for a neighbor of ours many years

11    ago.  I was close to 18 and was called as a witness.  They were

12    renting their house and had some property damage, and I was

13    asked to basically testify as to the condition of the home.

14          THE COURT:  Okay.  And did that go to court?

15          MR. O'DELL:  Yes, it did.

16          THE COURT:  Okay.  And so was there a full trial and

17    everything like that?

18          MR. O'DELL:  Yes, there was.

19          THE COURT:  Do you remember how it came out?

20          MR. O'DELL:  Well, our neighbor, which was a friend,

21    they were successful with the case.

22          THE COURT:  And do you think that experience would have

23    any influence on your decision-making in this case?

24          MR. O'DELL:  No.

25          THE COURT:  Have you served on a jury before?

```
 1              MR. O'DELL:  Twice before.
 2              THE COURT:  Okay.  Tell me when and where that was.
 3              MR. O'DELL:  Again, many years ago, Walworth County.
 4    One was a drunk driving case with a victim that was killed in
 5    the accident.  The operator of the vehicle was found guilty, and
 6    I was the foreman of the jury at the time.
 7              THE COURT:  Okay.  And then you said you did it twice.
 8              MR. O'DELL:  Oh, the other one was a civil case, and,
 9    again, it was a dispute between a landlord and a renter.
10              THE COURT:  Okay.  All right.  And did that case -- did
11    you deliberate and go to a verdict on that one?
12              MR. O'DELL:  Yes.
13              THE COURT:  Okay.  Did you find for the landlord or the
14    renter?
15              MR. O'DELL:  Actually, the renter in that particular
16    case.
17              THE COURT:  Okay.  And were you the foreperson in that
18    one?
19              MR. O'DELL:  No, I was not that time.
20              THE COURT:  All right.  Very good.  All right.  Have
21    you or anyone close to you ever had a dispute with a business?
22              MR. O'DELL:  I had a minor one with some luggage with
23    American Airlines, but they compensated for that.
24              THE COURT:  Okay.  All right.  Very good.  All right.
25    Have you or anyone close to you ever been employed by Walmart?
```

1             MR. O'DELL:  I have not.

2             THE COURT:  Okay.  Do you have strong feelings,

3     positive or negative, about Walmart?

4             MR. O'DELL:  Not really.

5             THE COURT:  And you heard me describe the EEOC as a

6     federal agency that's responsible for enforcing federal

7     employment laws.  Have you been employed by the -- you or anyone

8     close to you been employed by the EEOC or any of the other

9     agencies that are responsible for employment rights laws?

10             MR. O'DELL:  No.  The only person that I've had in our

11     family that was legally related was a grandfather, and he was a

12     federal judge.

13             THE COURT:  Okay.  All right.  And where was that?

14             MR. O'DELL:  Chicago, Illinois.

15             THE COURT:  What was his name?

16             MR. O'DELL:  Thomas W. Barrett.

17             THE COURT:  Very good.  All right.  Do you have any

18     special knowledge or training related to disability

19     discrimination or the ADA?

20             MR. O'DELL:  No, I don't.

21             THE COURT:  You are caught up.

22         All right.  The next question is have you or anyone close

23     to you ever received any education or training in the legal

24     profession?  So we've already heard about Mr. Molinaro's

25     father's law practice.  Anybody else have someone close to you

1     that has got a background in the legal profession?

2          MR. HOLLAR:  My mother graduated from the UW Law

3     School, and my uncle is a practicing attorney in California.

4          THE COURT:  Okay.  And so I know about your mom, but

5     why don't you tell what your mom did so that everybody else can

6     understand what your mom's role was here at the court.

7          MR. HOLLAR:  That's a tough one, but she was a clerk

8     for Judge Shabaz here for probably not 40 years but a little bit

9     less than that and helped him write his decisions and do his

10    work.

11         THE COURT:  Okay.

12         MR. HOLLAR:  I believe she had a couple other roles

13    here before that as well, and before that I think she worked

14    both here and Milwaukee in the different court systems.

15         THE COURT:  Okay.  All right.  And then you said it was

16    an uncle?

17         MR. HOLLAR:  Yeah.

18         THE COURT:  Tell us about your uncle's law practice.

19         MR. HOLLAR:  So he is kind of an *L.A. Law* lawyer out in

20    San Francisco working for -- I think right now he's working on a

21    case against some investment firms, bringing suit against them

22    for the meltdown, and works on sort of high-profile cases out

23    west.

24         THE COURT:  And does he -- well, let me ask you this:

25    Does he tell you a lot about his work?

```
1              MR. HOLLAR:  You know, a couple cases like the one

2     against the banks I think he's told me quite a bit about just

3     from me asking him, and then there was one where he was

4     defending Princeton, and he told me quite a bit about that, but

5     that was years ago.

6              THE COURT:  All right.  Do you think your uncle's

7     experience would have any -- does he have a plaintiff's

8     perspective or a defense perspective?  From the ones you

9     described, it's hard for me to tell.

10             MR. HOLLAR:  Whoever-pays-him perspective, I think.

11    I'm sorry.  But, no, I don't think his experiences would impact

12    my ability to sit.

13             THE COURT:  All right.  I'll ask you the same thing

14    about your mom's experience, but she dealt from the Court's

15    perspective, so it wouldn't be plaintiff or --

16             MR. HOLLAR:  Right, yeah.

17             THE COURT:  -- defendant, but maybe there's something.

18             MR. HOLLAR:  No, no impact.

19             THE COURT:  Okay.  All right.  Very good.  All right.

20    Thank you.  Anybody else?  And, remember, the question was

21    people close to you that have a background or training in the

22    legal field.

23         And this is Mr. Lankau.

24             MR. LANKAU:  Yeah.  My brother is a private lawyer in

25    Texas.
```

```
 1            THE COURT:  Okay.  Tell us about his practice.
 2            MR. LANKAU:  He's part of a firm.  He's dealt mostly
 3    with corporate law, I think, both plaintiff and defendant sides.
 4            THE COURT:  Okay.  So does litigation work?
 5            MR. LANKAU:  He does litigation work.
 6            THE COURT:  Okay.  Do you think his experience would
 7    have any effect on your decision-making in this case?
 8            MR. LANKAU:  Perhaps a little bit of cynicism about the
 9    system.
10            THE COURT:  Okay.  Well, I don't know about cynicism,
11    but being skeptical is a good perspective.  Nothing wrong with
12    that.  So why don't you tell me more about that.  Do you have a
13    serious concern that it would affect your ability to be fair to
14    both sides in this case?
15            MR. LANKAU:  I don't think so.
16            THE COURT:  As long as you're equally cynical about
17    both sides.
18        All right.  Anyone else?
19        Ms. Bukolt.
20            MS. BUKOLT:  Just myself.  I was a legal assistant --
21            THE COURT:  Oh, yes, that's right.  Tell us a little
22    bit more about that, if you would.  What kind of work did you
23    do?
24            MS. BUKOLT:  I started when it was Whyte Hirschboeck
25    Dudek.  It is now Husch Blackwell here in Madison.  And when I
```

1    was a legal assistant, I mostly supported real estate attorneys,

2    sometimes litigators but not very often, and they do more

3    corporate business, things like that, and then when I was a

4    paralegal, I was a commercial and real estate development

5    paralegal.

6            THE COURT:  And did you get involved in disputes when

7    you were doing that work?

8            MS. BUKOLT:  Not really.  It was mostly just

9    transactional.

10           THE COURT:  Okay.  All right.  Sounds good.  Anything

11   about that experience that you think would affect your

12   decision-making in this case?

13           MS. BUKOLT:  I don't think so.

14           THE COURT:  Good.  All right.

15       Anybody else?  Last chance on the people close to you that

16   have a background in the law.  Okay.

17       Have any of you ever been involved in any dispute with a

18   state or federal government, including any governmental agency?

19   Any dispute with a government agency?

20       Have you or anyone close to you ever been the subject of an

21   investigation by any governmental body?

22       Have any of you been an officer, manager, or supervisor in

23   any of your previous jobs?  Any of you served as an officer,

24   manager, or supervisor?  Okay.  So we're asking about work as a

25   supervisor.

```
1          So we'll start with Ms. Laing, and we'll just go down the
2     row, and you can tell us about your experiences as officer,
3     manager, or supervisor.
4          MS. LAING:  I'm CEO and president of my own two
5     companies.  I have about 40 employees for one.  The other is in
6     its early phases, so my employees actually are working with the
7     other company.
8          THE COURT:  All right.  And have you had occasions to
9     have disputes with your employees?  Have you ever had to
10    terminate anybody, for example?
11         MS. LAING:  Certainly I have had terminations.  I've
12    had breach of noncompetes that I've talked with people about but
13    haven't taken legal action on.
14         THE COURT:  All right.  Thank you.
15        Next up, Mr. Molinaro.
16         MR. MOLINARO:  I'm an officer at the company I work at.
17    Mainly the function is to be able to sign documents when the
18    owner is not around, so I don't get involved in really any of
19    the HR stuff, although I would have the authority if he wasn't
20    capable or around to handle it.
21         THE COURT:  All right.  Thank you.
22        Next up.  Go ahead.  This is Mr. Hoffmann.
23         MR. HOFFMANN:  Yeah.  As the president of the bank, I
24    have had a number of HR-related issues to manage with that.  I'm
25    also -- with the country club, we have had some HR issues as
```

1    manager there.  How far back do you want to go?  I've been

2    supervisor or manager --

3         THE COURT:  Well, as the president of the bank and in

4    your role at Maple Bluff, it's enough to know that we've -- you

5    have background in that experience.  But let me ask you this,

6    sort of the same question I had for Ms. Pulvermacher:  You would

7    tend to come at these questions certainly for the bank as a

8    representative of the management at the bank, and so do you feel

9    that you can be fair to both sides here, that you can evaluate

10   the aggrieved employee's perspective as represented by the EEOC

11   here or would you have such a commitment to the management

12   perspective that it would be hard for you to be fair to both

13   sides here?

14        MR. HOFFMANN:  I definitely think I approach things in

15   a very fair manner.  I try to do that, and we have had

16   situations where we've had to let people go, and they maybe had

17   a claim, and we've -- maybe for unemployment, and I've not

18   fought that because I thought that it was a fair claim.  But

19   otherwise it is probably more my perspective as a manager to

20   have that perspective.

21        THE COURT:  And that's kind of a given, and so it's not

22   disqualifying just because you have this job.  But at the end of

23   the case, I'll give you instructions about what the law is and

24   how it applies to this case, and then I'll tell you you have to

25   decide the case on the basis of the evidence that's presented

```
1    here in the courtroom.  Will you be able to do that and be fair
2    to both sides?
3              MR. HOFFMANN:  Most definitely.
4              THE COURT:  Okay.  All right.  Very good.
5         Next, anybody else in the back row?  Management experience?
6         Mr. Lankau.
7              MR. LANKAU:  Yeah.  As a principal investigator at the
8    university, I manage and supervise a handful, five or six
9    employees.
10             THE COURT:  Okay.  Have you had difficulties or
11   disputes arise that you've had to deal with?  Have you ever had
12   to take discipline against any employee?
13             MR. LANKAU:  Nothing that's raised to the level of
14   involving HR.
15             THE COURT:  Okay.  All right.  Very good.
16             MS. MOORE-KERR:  I don't think I count.
17             THE COURT:  Okay.  All right.  Pass the microphone down
18   to Mr. Yeakey then.
19             MR. YEAKEY:  Yes.  I've been supervisor at my prior job
20   and my current job, all in IT.
21             THE COURT:  Okay.
22             MR. YEAKEY:  And I have had to fire somebody in the
23   past.
24             THE COURT:  All right.  And it's basically the same
25   question.  So you're also an employee, so I don't know that it
```

1    necessarily commits you to some particular perspective, but

2    let's just be sure.  Can you follow my instructions to apply the

3    law and be fair to both sides in this case?

4            MR. YEAKEY:  Yes, sir, I can.

5            THE COURT:  Very good.

6        Okay.  Ms. Duncan?

7            MS. DUNCAN:  I'm the business manager of the school

8    district, so I do oversee several of the directors.  It does

9    involve HR.

10           THE COURT:  Okay.  And have you had difficulties with

11   employees that you've had to take disciplinary action?

12           MS. DUNCAN:  I have.

13           THE COURT:  Okay.  And do you think that you could

14   evaluate this case, because you're kind of a management employee

15   but also an employee yourself -- do you think you would be able

16   to follow my instructions and be fair to both sides in this

17   case?

18           MS. DUNCAN:  I do.

19           THE COURT:  Very good.

20       Okay.  Now, let's come down to the front row, and we're

21   looking for people who have had supervisor or managerial

22   experience particularly relating to dealing with employees.

23   Let's make sure we don't skip anybody else in the front row.

24       Okay.  All right.  Mr. O'Dell.  Go ahead.

25           MR. O'DELL:  My current position at Blackhawk Technical

1    College, I have several employees, and as part of my position, I

2    have to screen our new students that are coming in, so we do

3    several background checks to confirm that they qualify to get a

4    commercial driver's license.  I also work with students that are

5    interested in getting a commercial driver's license that may

6    have disabilities to confirm that they can successfully operate

7    the equipment.  And past career have always been in management,

8    so I have had people working for me and have had to make

9    decisions.

10         THE COURT:  Okay.  And given that your history is in

11   management, do you think that you would be able to listen to my

12   instructions, decide the case on the basis of the evidence, and

13   be fair to both sides in this case?

14         MR. O'DELL:  Yes, sir.

15         THE COURT:  Okay.  All right.

16    All right.  This question, I think, substantially overlaps

17   with the last one, but I'll ask it, and if there's anything else

18   that you need to tell us about, you can do it.  So other than

19   what you've already told us, have you been responsible or

20   involved in the hiring, promotion, demotion, or firing of

21   employees?  And I think we substantially got that in the last

22   go-around, but let's just make sure.  Anyone else have any

23   experience with hiring, firing, promotion, and demotion of

24   employees?

25         Okay.  Go ahead, Mr. O'Dell.

1           MR. O'DELL:  Yes.  Currently I hire employees for

2    Blackhawk Technical College for my area, and in the past, I've

3    been responsible for hiring CDL drivers and also mechanics,

4    diesel repair, and industrial equipment repair.

5           THE COURT:  Okay.  All right.  And again --

6       Go ahead, Mr. Peschl.

7           MR. PESCHL:  I've been on committees to help hire new

8    teachers or principals or support staff where I provided input,

9    but I've never made the actual decision.

10          THE COURT:  All right.  Thank you.

11      And, again, if you've already told us about this, we don't

12   need to hear it again, but have you or anyone close to you ever

13   been involved in a dispute relating to employment?  Been

14   involved in a dispute relating to employment?  For example,

15   anybody contest a termination or something like that?

16      Okay.  Mr. O'Dell.

17          MR. O'DELL:  Early in my career, I represented a

18   company that was a merger of two firms.  We sold and

19   manufactured overhead bridge cranes.  I was commissioned at the

20   time and covered a multistate territory, and there was a dispute

21   over commissions.

22          THE COURT:  All right.  And so were you one of the

23   people who were disputing commissions that were owed to you?

24          MR. O'DELL:  Yes.

25          THE COURT:  Okay.  All right.  And how did that get

```
 1   resolved?
 2          MR. O'DELL:  It was successful, although the State of
 3   Wisconsin got involved at the time.
 4          THE COURT:  Okay.  So did it go through an arbitration
 5   proceeding?
 6          MR. O'DELL:  Yes.
 7          THE COURT:  Okay.  All right.  All right.  And so it
 8   was resolved in the arbitration?
 9          MR. O'DELL:  Yes.
10          THE COURT:  Okay.  All right.  Next question, have you
11   or anyone close to you ever been involuntary discharged from
12   employment?  You or anyone close to you involuntarily discharged
13   from employment?
14       Have you or anyone close -- I'm sorry.  There we go.
15   Mr. Kuckkan.
16          MR. KUCKKAN:  Yeah.  I worked for the company for 44
17   years, and I had prostate surgery.  Went back to work on a
18   Tuesday, and Thursday I was laid off permanently or whatever.  I
19   had highest seniority.  I was top wage and had the most vacation
20   and everything.  It was a nonunion shop, so they picked and
21   choose who they wanted to get rid of.  The company was going
22   through some tough times.  All the people under me -- we had ten
23   people at that time -- I trained just about every one of them,
24   but because of my status, I was let go.
25          THE COURT:  Okay.  And so was that your most recent
```

```
 1    employment?

 2            MR. KUCKKAN:  Excuse me?

 3            THE COURT:  Was that your most recent employment?

 4            MR. KUCKKAN:  Yes.

 5            THE COURT:  So that was after 40 years of work.

 6            MR. KUCKKAN:  Yes.

 7            THE COURT:  Okay.  All right.  And so did you raise any

 8    challenge to that?  Did you contest it at all?

 9            MR. KUCKKAN:  No, I didn't.

10            THE COURT:  Okay.  All right.  And did that -- does

11    that experience leave you with any -- I can only imagine -- it

12    sounds very clear that you're unhappy about it.

13            MR. KUCKKAN:  I was unhappy for a few days or whatever,

14    but because I was nearing retirement age, it was the best thing

15    that could have happened to me.

16            THE COURT:  Okay.  And so you've come around to accept

17    it.  Let me ask you this:  Does that experience leave you with

18    any kind of lingering resentment against employers generally?

19            MR. KUCKKAN:  No.

20            THE COURT:  Do you think it would affect your

21    decision-making in this case?

22            MR. KUCKKAN:  No.

23            THE COURT:  All right.  Very good.

24        Okay.  Anybody else on that one?  That was the involuntary

25    discharge question.
```

1      Okay.  This next question is have you or anyone close to

2    you ever been unfairly disciplined or discriminated against at

3    work?  Anybody feel that they have been unfairly disciplined or

4    discriminated against at work?  Or anyone close to you have that

5    experience?  Okay.

6      Have you or anyone in your family ever filed an

7    employment-related complaint with an administrative agency such

8    as the EEOC or the Wisconsin Department of Workforce

9    Development?  You or anyone close to you filed an

10   employment-related complaint?  We've got Mr. O'Dell.  Anyone

11   else?

12     Okay.  Mr. O'Dell.

13       MR. O'DELL:  It was the company that I had mentioned

14   earlier.  I was selling overhead bridge cranes and conveyor

15   systems at the time, and it was a dispute over commissions.

16       THE COURT:  Okay.  So that commission complaint.  Okay.

17     Anybody else?  Okay.

18     Do you or anyone else close to you have a disability or a

19   permanent medical condition that restricts or limits the ability

20   to work?  Anybody have a condition that restricts or limits your

21   ability to work?

22     Okay.  Mr. Molinaro.

23       MR. MOLINARO:  I have a twin sister with Down syndrome.

24       THE COURT:  Okay.  And is that the sister who prompted

25   your interest in the Easterseals?

1          MR. MOLINARO:  Correct.

2          THE COURT:  Okay.  All right.  Very good.

3      Anybody else in the back row?  Okay.  Let's go back to

4  Ms. Sauter.

5          MS. SAUTER:  I do have some chronic knee pain, but my

6  employer has adjusted to everything I need --

7          THE COURT:  Okay.

8          MS. SAUTER:  -- to accommodate that.

9          THE COURT:  Okay.  And so --

10         MS. SAUTER:  But it does limit my ability to, like,

11  stand for a long period of time or walk for a long period of

12  time.

13         THE COURT:  Okay.  And your employer has accommodated

14  that?

15         MS. SAUTER:  Yes.

16         THE COURT:  All right.  Anyone else in the back row?

17     Mr. Lankau.

18         MR. LANKAU:  I'm not sure if this is relevant, but my

19  son has learning disabilities.  I don't know if that will affect

20  his employment in the future or not.

21         THE COURT:  All right.  Thank you.

22      Anybody else in the back?

23      Front row.  Again, the question is disability or permanent

24  medical condition that relates to work.

25         Mr. O'Dell.

```
1          MR. O'DELL:  It was as a result of the viral

2     encephalitis that I had.  End of 2012 I was hospitalized for

3     four months, had some serious aftereffects from it, muscles,

4     brain bleed, renal failure, a pacemaker at one point.  It took

5     me about two-and-a-half years of rehab to get back to where I

6     was, and right now I'm fine as long as I don't push it too much,

7     and my employer is aware of that.

8          THE COURT:  Okay.  All right.  Thank you.

9     All right.  Let's take this opportunity to deal with the --

10    those of you who had opinions about -- or experiences with

11    Walmart, and we'll have to deal with these at sidebar.

12         So, Ms. Sauter, are you able to come down here in sidebar?

13         (Discussion held at sidebar at 10:33 a.m.)

14         THE COURT:  All right.  This is a microphone right

15    here, so you can speak into that.  And I think you raised your

16    hand in response to the question about whether you have strong

17    feelings about Walmart, so tell us what your feelings are.

18         MS. SAUTER:  I guess I just -- I'm not happy how they

19    treat their employees, and, in general, I'm not happy about the

20    company.

21         THE COURT:  Okay.

22         MS. SAUTER:  I think they're ruining a lot of smaller

23    businesses, taking away jobs, and, like I said, they have so

24    much as a family and as a company, but yet they're stingy to

25    their employees and the fact that they were not allowing some
```

1     disabled people to do greeting jobs, which was probably a source

2     of major satisfaction for those people and a job that they could

3     do well.  If they were not allowing them to do that anymore, I

4     think that's terrible.

5            THE COURT:  Okay.  So those are issues that cut pretty

6     close to the issues in this case, and so at the end of the case,

7     I would tell you "Here's the law that you have to apply, and you

8     have to decide it based on the facts of this case."  Would you

9     be able to set aside all those past --

10           MS. SAUTER:  No, I couldn't.

11           THE COURT:  Okay.

12           MS. SAUTER:  I don't think I can.

13           THE COURT:  Okay.  I'm going to excuse you then.

14           MS. SAUTER:  Okay.  Do I wait in the courtroom?

15           THE COURT:  Yeah, wait in the courtroom.

16           MS. SAUTER:  All right.  Thank you.

17        (Ms. Sauter excused.)

18           THE COURT:  I don't know if we're going to get to this,

19    but I have four jurors left, and so I don't know -- I've got

20    one, two, three, four, five people, I guess, we have to bring

21    down, so maybe some of them will be big Walmart fans and they

22    won't pose the same issues.

23        Ms. Laing.

24        I believe you answered yes to the question about whether

25    you have strong feelings about Walmart.  This is a microphone

1    here, so if you can try to direct your comments to that.

2         MS. LAING:  You know, just I boycott.  I don't go.  I

3    don't shop there.

4         THE COURT:  Okay.

5         MS. LAING:  I try to --

6         THE COURT:  Why not?

7         MS. LAING:  Just corporate lobbying and unfair pricing

8    that affects local communities.  You know, I'm not fully

9    informed about the employment, you know, policies, but I know

10   that, you know, that's been a challenge as well, sort of

11   blocking workers from organizing and so forth.  So, you know, I

12   mean, I try to see everything in fair ways, but they certainly

13   do have --

14        THE COURT:  You come to the case with some negative

15   feelings about Walmart.

16        MS. LAING:  Yeah.

17        THE COURT:  All right.  So at the end of the case, I'm

18   going to give you detailed instructions about the law that you

19   have to apply, and I'm going to tell you that you have to decide

20   the case based on the evidence that's presented here in the

21   courtroom, and I'm going to ask you to set your feelings aside.

22   Do you think you can do that and be fair to both sides in this

23   case?

24        MS. LAING:  It's part of my practice to see things with

25   equanimity.

1          THE COURT:  I mean, none of the things you mentioned
2     are issues in this case.
3          MS. LAING:  Yeah.
4          THE COURT:  It's not about unions, not about pricing,
5     none of that.
6        Do you have any follow-up questions?
7          MS. VASICHEK:  No, Your Honor.
8          MR. HARLAN:  You heard some -- you think you have some
9     concerns about their employment practices?
10          MS. LAING:  Yeah.
11          MR. HARLAN:  Can you give us a little bit more
12     information in terms of the nature of those concerns?
13          MS. LAING:  I am not -- I have not followed it closely
14     enough to be precise so --
15          MR. HARLAN:  But your impression of Walmart is that
16     they have, you know, unfair employment practices?
17          THE COURT:  Before you answer that, we just need to
18     make sure that we speak up a little bit.  So the question was --
19          MR. HARLAN:  Are you sure they can't hear me?
20          THE COURT:  I know you're capable of it, but you're
21     being cautious about how loud it is.  But the question is that
22     you had heard that there are unfair employment practices.  Do
23     you have any specifics?
24          MS. LAING:  No, I don't have specifics, just knowing
25     that, you know, some corporations are more committed to creating

```
1    fair wage structures and, you know, valuing that, and I don't

2    feel that Walmart does or at least what, you know -- I mean, you

3    know, whatever information I encountered or read about was some

4    years ago, so I'm going to be in integrity and say I don't know

5    the details or don't remember the details.

6              THE COURT:  All right.  Okay.  Thank you.

7         (Ms. Laing excused from sidebar.)

8              THE COURT:  I'll give you a chance to make motions on

9    any of the jurors after we talk to them.

10             MR. HARLAN:  Okay.

11             THE COURT:  The first one was so obvious.

12             MR. HARLAN:  Right.

13             MS. VASICHEK:  And we didn't oppose it.

14             THE COURT:  Yeah.

15             MR. HARLAN:  So are you saying you've got one in the

16   credit or something?

17             MS. VASICHEK:  Pardon me?

18             THE COURT:  Mr. Molinaro.

19             MR. HARLAN:  You've got one in the bank?

20             MS. VASICHEK:  That's right.

21             THE COURT:  This is a microphone, so we have to -- we

22   all have to speak into this.  Okay.  So if I recall, your mom

23   worked for Walmart in Minoqua?

24             MR. MOLINARO:  Correct.

25             THE COURT:  And you said it wasn't a good experience.
```

1          MR. MOLINARO:  Correct.

2          THE COURT:  So tell us the story.

3          MR. MOLINARO:  So part of it -- so Minoqua is a tourist

4     town, and the amount of customers coming in varies substantially

5     from winter to summer and even from Wednesday to Friday during

6     the summer months.  So they would get flooded with people on

7     Friday, Saturday, Sunday, and the store just was completely

8     understaffed, so customers would be very rude because the lines

9     would take a while.

10         The other part that she didn't like, and this is coming

11    from her, and I don't remember exactly how she described it --

12    this was a couple years ago -- but it appeared that all the

13    employees were being kept below full time so benefits wouldn't

14    have to be given out.  So she had wanted more hours, but they

15    wouldn't give her anything more than whatever they needed to be

16    under that threshold.

17         THE COURT:  Okay.  The issues in this case aren't

18    really directly related to those questions, and so at the end of

19    the trial, I'll give you instructions about the law, and we'll

20    tell you that you have to decide the case based on the evidence

21    presented in this case.  Will you be able to follow my

22    instructions and decide the case on the basis of the evidence

23    and be fair to both sides?

24         MR. MOLINARO:  I'll try to be as fair as possible.  It

25    will be tough to not think about something that happened to your

1    mom.

2            THE COURT:  Well, and I understand that you'll carry

3    some background of experience, but one of the things I ask about

4    jurors in every case is to set those feelings apart, set those

5    aside, and do your job as a juror.  Do you think you'd be able

6    to do that?

7            MR. MOLINARO:  As best as I can, yeah.

8            THE COURT:  Okay.  All right.  Any follow-up?

9            MR. HARLAN:  So did your mother share any stories about

10   the treatment of employees or colleagues at Walmart when she was

11   there or anything about greeters or anything like that?

12           MR. MOLINARO:  She got cursed out a couple times

13   because people would show up for their vacation, and they'd come

14   in on Friday and wouldn't be at their lake house in 30 minutes,

15   and they'd have a 45-minute line, and they'd curse her out for

16   not being fast enough.

17           MR. HARLAN:  No, but in terms of how management treated

18   her colleagues --

19           MR. MOLINARO:  No.

20           MR. HARLAN:  Okay.

21           THE COURT:  Anything else?

22           MR. HARLAN:  Nothing.

23           THE COURT:  All right.  Thank you, Mr. Molinaro.

24       (Mr. Molinaro excused from sidebar.)

25           THE COURT:  Mr. Hollar.

```
 1          All right.  How are you doing?

 2              MR. HOLLAR:  Good.  I decided to shave today.  It was a

 3      mistake.

 4              THE COURT:  Well, you otherwise look fine.

 5              MR. HOLLAR:  Thanks.

 6              THE COURT:  So I think you responded to the question

 7      about having strong feelings about Walmart, so tell me what your

 8      feelings about Walmart are.

 9              MR. HOLLAR:  Yeah.  I guess just generally negative,

10      nothing specific.  I'm maybe categorized as a Madison

11      progressive liberal, sort of anti-big-box corporations and

12      things like that.  I had some friends who were involved in the

13      efforts to keep Walmart out of Stoughton that were unsuccessful.

14      I guess it's just a thing that, you know, I wouldn't spend my

15      money there, but I don't think that it makes me unable to be a

16      juror in this case.  I think I can think about it impartially,

17      but it is -- it's definitely -- if I read about this case in the

18      newspaper, I would probably be kind of anti-Walmart in my sort

19      of subjective opinion about it.

20              THE COURT:  So nothing that you mentioned specifically

21      was related to Walmart's employment practices or Walmart's

22      treatment of disabled employees.

23              MR. HOLLAR:  No.  Yeah, yeah.  Just a general --

24              THE COURT:  Okay.  And you've kind of anticipated my

25      question, which is that I'll give you instructions at the end of
```

1    the case, tell you to decide it on the basis of the facts that

2    are presented in the courtroom, and to be fair to both sides.

3              MR. HOLLAR:  Yeah.  I believe I can do that.

4              THE COURT:  Okay.  All right.  Any follow-up questions?

5              MR. HARLAN:  So you said your actual practice now is

6    you don't go to Walmart at all because in your mind you believe

7    Walmart's not a good corporate citizen, a good company?

8              MR. HOLLAR:  Yeah.  I guess kind of the mom-and-pop

9    narrative of Walmart comes in, those kinds of smaller,

10   family-run or, you know, generational businesses get moved out

11   or get -- they have to close, whatever.  So, yeah.

12             MR. HARLAN:  How long have you avoided shopping at

13   Walmart?

14             MR. HOLLAR:  I think since they kind of appeared along

15   with Sam's Club and things like that.  I've just -- since

16   they've been in Madison, I've just -- I don't know where that's

17   kind of come from.  Again, I think it's just a product of being

18   in Madison, but generally just kind of a -- if I can spend my

19   money at, like, a smaller hardware store, I'll do that.  If I

20   have to go to Home Depot, I'll go to Home Depot, but just in

21   terms of where I want to spend my money, I would rather do it at

22   someplace that has been around that I feel like is a smaller

23   business.

24             MR. HARLAN:  Thank you.

25             THE COURT:  Do you have the same feeling about Home

1    Depot?

2            MR. HOLLAR:  You know, you follow the kind of news

3    about the ownership of Home Depot and Menards, you know, and

4    they act politically and -- but in the case of Home Depot, it's

5    like I sort of have to hold my nose because it's the only kind

6    of game in town, and if it's -- there's a hardware store that's

7    on Midvale and the beltline there that's been there for 40 years

8    I think, and if it's something I can get there, I'll go there,

9    but if I have to go to Home Depot, I will.  So it's just -- I

10   guess it's never come up where I had -- you know, I never felt

11   like I had to go to Walmart where sometimes I feel like I have

12   to go to Home Depot.

13           THE COURT:  All right.  Thank you.

14           MR. HOLLAR:  Yeah.

15       (Mr. Hollar excused from sidebar.)

16           THE COURT:  Mr. Kuckkan.

17           MR. HARLAN:  I did have another question for him.

18   Like, since his mother was the permanent clerk for Judge Shabaz,

19   did he ever have a two-week trial?

20           THE COURT:  I can answer that for you.

21       Mr. Kuckkan, I think you had responded that you knew

22   someone who had worked at Walmart?

23           MR. KUCKKAN:  Yes, my sister.

24           THE COURT:  Your sister worked at Walmart.  So if you

25   would, tell us about her experiences working for Walmart.

1          MR. KUCKKAN:  Well, she was working in the deli and

2     bakery department, and she was starting to suffer early dementia

3     signs or whatever, and because of that, she knew she had

4     problems remembering what her duties were, and she would

5     actually write herself notes as to what to do next on all of her

6     duties.  And it got to a point where she apparently even wasn't

7     following her notes correctly, and she was making mistakes.  And

8     Walmart at the time was giving her some grief about it, and I

9     don't know that she ever got an official reprimand, but she said

10    that she couldn't get along with her supervisor.  And then she

11    took a day of vacation, and when she got back the next day, they

12    said she never notified anybody, she just walked out without

13    letting anybody know, so they were going to lay her off for a

14    week or something like that, discipline her, whatever.  But on

15    her own then, she up and quit, and it was because of her

16    dementia that she wasn't able to continue working.

17         She is now 64 years old.  I have activated power of

18    attorney, health and financial.  She's in Jefferson Memory Care.

19    So that was about four to five years ago when she worked at

20    Walmart.

21              THE COURT:  I'm sorry about your sister's difficulties.

22              MR. KUCKKAN:  It's a tough road, but it is what it is.

23              THE COURT:  She's awfully young for it.

24              MR. KUCKKAN:  Yeah.

25              THE COURT:  So the way you tell the story suggests some

          1    criticism of Walmart's conduct, but it also expresses some
          2    understanding of their difficulties.
          3         MR. KUCKKAN:  Very much so, yeah.  I mean, I've been
          4    dealing with her dementia now for, like I said, five, six years
          5    or whatever, and, you know, I understand some of the reasoning,
          6    that she couldn't do her job and everything.  So I deal with her
          7    now, you know, as being power of attorney and everything and,
          8    you know, making sure that she's being taken care of, and, I
          9    mean, she's got some other health issues she's dealing with
         10    right now, so it's not easy for her and me either.
         11         THE COURT:  Yeah.  So now that you've gained that
         12    perspective, do you think that Walmart handled your sister's
         13    employment properly or do you still have criticisms of Walmart?
         14    What's your kind of bottom line from this perspective now?
         15         MR. KUCKKAN:  I guess I don't know every detail, so I
         16    don't know if they handled it correctly or not.  Like I said,
         17    she was the one that ended up quitting, but I think they were
         18    happy that she did.  So that's my own opinion.
         19         THE COURT:  Uh-huh.  Well, let me ask you this:  So at
         20    the end of the trial, I'll give you instructions in detail on
         21    how to apply the law to this case, and I'll tell you that you
         22    need to decide the case on the basis of the evidence presented
         23    in the courtroom and that you have to be able to be fair to both
         24    sides.  Will you be able to do that?
         25         MR. KUCKKAN:  I believe so.  Like I said, in that civil

```
1     case, I knew quite a few of the witnesses.  I knew the manager
2     that was suing the chemical company and everything, and both of
3     the attorneys on each side accepted me and let me serve on the
4     panel.  So I try to be fair.
5          THE COURT:  I would say that judge and both the sides
6     in that case had a lot of confidence in your ability to be a
7     fair man.
8          MR. KUCKKAN:  Yeah.  I mean, after it was over with,
9     the judge told us -- you know, it was Habush Habush & Rottier.
10    David Rottier was the lawyer for the plaintiff and everything,
11    and he seemed happy that I was able to render a fair verdict.
12         THE COURT:  All right.  Any follow-up?
13         MR. HARLAN:  Again, like the judge, I am sorry for your
14    situation.  I really don't have any additional questions.
15         THE COURT:  All right.
16         MS. VASICHEK:  I guess my only question is do you think
17    there's something more your sister should have done in
18    connection with Walmart?
19         MR. KUCKKAN:  I don't know of anything whatever.
20         MS. VASICHEK:  Okay.  Thank you.  And I too am sorry
21    about your sister.
22         MR. KUCKKAN:  Okay.  Thank you.
23         THE COURT:  Thanks, Mr. Kuckkan.
24         MR. KUCKKAN:  All right.
25       (Mr. Kuckkan excused from sidebar.)
```

```
 1          THE COURT:  Mr. Schroeder.
 2       All right.  I think you answered yes to the question about
 3    having strong feelings about Walmart.
 4          MR. SCHROEDER:  Yes.
 5          THE COURT:  So tell us about your feelings about
 6    Walmart and where they come from.
 7          MR. SCHROEDER:  Where they come from?  Just from what
 8    I've read and seen on the news.  I mean, I don't personally shop
 9    there.  I don't -- you know, it's a strong feeling that me and
10    my wife, neither one of us will.  A lot of it has to do with
11    their payroll and how they handle paying employees and sometimes
12    with the management with women and not being looked over.  I
13    think it's -- me and my wife both feel like it's a bad business
14    model, and, you know, you've got that kind of wealth, you know,
15    pay your employees better.
16          THE COURT:  So when you say "payroll," it means just
17    basically the level --
18          MR. SCHROEDER:  Level --
19          THE COURT:  -- of wages?
20          MR. SCHROEDER:  I'm sorry, yes.
21          THE COURT:  And this case obviously relates to
22    employment.
23          MR. SCHROEDER:  I know.
24          THE COURT:  But you haven't said anything specifically
25    about Walmart's treatment of disabled employees.  I don't know
```

```
1     if that's an issue that you have --
2              MR. SCHROEDER:  Without knowing more about it, it's
3     kind of hard to comment on that at this point.
4              THE COURT:  All right.  And so you seem to be concerned
5     about sex discrimination at Walmart.
6              MR. SCHROEDER:  Yeah.  It's overall -- their overall
7     management and how they treat some of their people.
8              THE COURT:  Okay.  All right.  So at the end of the
9     case, I'll give you some pretty detailed instructions about the
10    law that you're required to apply to this case, and I'll tell
11    you that you have to decide the case based on the evidence
12    presented in this case.
13             MR. SCHROEDER:  Yep.
14             THE COURT:  And then I also need to be sure that you
15    can be fair to both sides.  So do you think you can put your
16    feelings about Walmart as a company aside and --
17             MR. SCHROEDER:  And just look at it from the case?
18             THE COURT:  Yeah.
19             MR. SCHROEDER:  I think I could.
20             THE COURT:  Yeah.  Okay.
21        All right.  Any follow-up questions for Mr. Schroeder?
22             MR. HARLAN:  Mr. Schroeder, so your feelings about
23    Walmart as kind of a corporate citizen are such that you just
24    don't go there at all, correct?
25             MR. SCHROEDER:  Correct.  I mean, I shouldn't say that.
```

```
1    I was there this last weekend with my daughter.  I won't stop
2    her from shopping there, and I will help her.  She knows my
3    feelings about it though, but I understand it being a college
4    student and less money, she goes where it's most reasonable or
5    affordable for her to go.  But she knows me -- mine and her
6    mother's choice on that, but I'm not going to stop anyone from
7    ever going to Walmart.  I don't go out and tell everybody I hate
8    Walmart.  That's not for me to do.  Those are just my feelings.
9            MR. HARLAN:  And then when the judge asked you after he
10   instructs you at the end of the case whether you can be fair, I
11   think your response was "I think I can be."
12           MR. SCHROEDER:  I know, and I do believe I can be.
13           MR. HARLAN:  Okay.  Fair enough.  Okay.
14           THE COURT:  Any other follow-up?
15           MS. VASICHEK:  No.
16           THE COURT:  Thanks, Mr. Schroeder.
17      (Mr. Schroeder excused from sidebar.)
18           THE COURT:  Did I miss anybody?  I think that's who I
19   got.
20           MS. VASICHEK:  I think that's everyone.
21           THE COURT:  Okay.  I think I got everybody who said yes
22   to having strong feelings about Walmart.  All right.
23           MR. HARLAN:  I mean, Your Honor, I'm very concerned
24   about Mr. Hollar and Mr. Kuckkan.  They have very strong
25   feelings.  Mr. Kuckkan's sister has a disability or appears to
```

1    have a disability, and I think it's very clear with his

2    statements that he didn't think she got a fair shake from

3    Walmart.  So that gives us some deep concerns about his ability

4    to be fair and impartial in this case, and it was pretty clear

5    that he had dislike for Walmart.

6        Mr. Hollar was very adamant that he won't spend a dime at

7    Walmart because of his feelings about the company, thinks that

8    it's a big-box retailer that is unfair to small companies, and

9    so he is somebody that shouldn't be allowed to sit on this panel

10   because of the feelings he expressed, likewise with Mr. Kuckkan.

11       For the others, you know, we'd like to hear more of your

12   questions.

13       THE COURT:  We do have some more questions.  I don't

14   know that they go to this subject exactly but --

15       MS. VASICHEK:  With regard to both witnesses, they both

16   said that they could be fair and impartial.  With respect to

17   Mr. Hollar, he said that he really had nothing specific relating

18   to employment as an issue.  With regard to Mr. Kuckkan, he sort

19   of had, like, feelings both ways.  It was, like, not that he was

20   condemning one side or the other, so I don't think there's basis

21   for dismissal for cause for either.

22       MR. HARLAN:  With respect to Mr. Kuckkan, he said he

23   thought they were trying to get her to quit.  He had formed that

24   opinion about how they treated his sister.

25       MS. VASICHEK:  He said that he didn't think they were

1    sad that she quit.  I don't recall him saying that she felt

2    forced to quit.

3              MR. HARLAN:  Okay.  We have a divergence of memories on

4    that.

5              THE COURT:  Well, I think what he said was that they

6    were happy that she quit.  She actually did make the decision to

7    quit but that they were fairly -- they were nudging her in that

8    direction beforehand by giving her the suspension so -- okay.

9    What about Laing and Molinaro?

10             MR. HARLAN:  I don't think on this particular issue

11   that we would necessarily object on this issue, but he obviously

12   has some issues.  He has a sister with DS, and he's active in

13   Easterseals.

14             THE COURT:  That's material for a peremptory strike.

15   That's not a basis for prejudice against Walmart.  It was

16   really -- he was down here -- because he didn't even say that he

17   had strong feelings about Walmart.  It was based on his mom's

18   experience as the clerk at the Walmart store, as the bakery

19   person at the Walmart store.  And then Laing --

20             MR. HARLAN:  Laing, you know, she said that they had --

21   I mean, her issues do relate to employment.  She said that she

22   had formed the opinion that they're either anti-union, they

23   don't treat their employees fairly, and how Walmart treated Mr.

24   Reina is front and center in this case, so I think she should be

25   excused for cause.

1          MS. VASICHEK:  She -- my recollection was that her

2     issues were dealing with payroll.  They weren't dealing with

3     other aspects of employment, and she specifically said that she

4     could be fair.

5          THE COURT:  Yeah.

6          MR. HARLAN:  But she also said she came to the table

7     with some deeply-held feelings about the company in areas that

8     relate to this case in terms of how Walmart deals with its

9     employees.

10        You're going to be arguing that, aren't you?

11        MS. VASICHEK:  I'm not going to be arguing that they

12    didn't let people unionize.

13        MR. HARLAN:  No, I'm sure you won't.

14        THE COURT:  So we've got Laing, Molinaro, Hollar, and

15    Kuckkan.  So you'd -- you want to move on those four?

16        MR. HARLAN:  Yes.

17        THE COURT:  Okay.  All right.  And you oppose all of

18    those?

19        MS. VASICHEK:  Yes.  There was Ms. Sauter too just so

20    that we're --

21        THE COURT:  Ms. who?

22        MS. VASICHEK:  Ms. Sauter was the first one to come up.

23        THE COURT:  I excused her.

24        MS. VASICHEK:  Oh, she's the one you excused.

25        THE COURT:  She was an easy -- she was the easy call.

1        All right.  I will excuse Laing and Molinaro.  I will deny

2    the motion with respect to Hollar and to Kuckkan.  Mr. Kuckkan

3    I'm going to deny because, although he had difficulties with his

4    sister's experience, he did indicate that he could be fair,

5    which is not decisive obviously.  I've got to look behind that.

6    But I think he recognized the complexity in the decision-making

7    about somebody who he knew had -- he recognizes now had

8    disabilities that really interfered with the ability to do her

9    job.  So I didn't detect from Mr. Kuckkan antagonism toward

10   Walmart's perspective in matters generally, and even as to his

11   sister's experiences, I think he recognizes there that they had

12   a difficult decision to make.  So I don't think that he is

13   resolutely or even really disinclined to see both sides in this

14   case.  And he did not say -- he was here because of his sister's

15   experience.  He did not say he had strong feelings about

16   Walmart.

17       As for Mr. Hollar, Mr. Hollar expresses a kind of a

18   generalized political grievance against big-box retailers, and I

19   think that he didn't mention anything specifically to its

20   treatment of the disabled.  And so I think his general political

21   views about the American economy are really not going to come to

22   bear in this case, and I'm confident that he can be fair.

23       The other two, Laing and Molinaro, really did express some

24   sort of deep-seated baggage that was more pointed toward the

25   issues in this case, so I'll excuse those two.

```
 1            MR. HARLAN:  Thank you.
 2         (Sidebar discussion ends at 11:01 a.m.)
 3            THE COURT:  All right.  I'm going to excuse Ms. Laing
 4     and Mr. Molinaro, and we'll take the next two jurors.
 5            THE CLERK:  Ms. Sauter was excused as well?
 6            THE COURT:  Ms. Sauter was excused, yes.
 7            THE CLERK:  Did you want Mr. Schroeder back in seat No.
 8     1?
 9            THE COURT:  Put Mr. Schroeder back in his position as
10     Juror No. 1.
11            THE CLERK:  For Juror Laing, could we please have
12     Jeanine Ashline.  And for Juror Molinaro, Tabitha Buckley.
13            MR. HARLAN:  Andy, could you repeat that, please?  Are
14     you able to repeat that?
15            THE CLERK:  For Juror No. 2, it will be Jeanine
16     Ashline, and for Juror No. 3, it will be Tabitha Buckley.
17        And, Ms. Buckley, you'll be seated right next to her.
18            MR. HARLAN:  Thank you.
19            THE CLERK:  And then for Juror Sauter, it will be Tad
20     Christen.
21            THE COURT:  All right.  Welcome to the jury.  Let me
22     ask our three new jurors, have any of you heard of the case
23     before today?
24            MS. ASHLINE:  No.
25            MS. BUCKLEY:  No.
```

1          THE COURT:  Can you serve through Friday if needed?

2          MS. ASHLINE:  Yes.

3          THE COURT:  Do you know any of the counsel or any of

4     the representatives of the parties?

5          MS. ASHLINE:  No.

6          THE COURT:  Do you recognize any of the names of the

7     witnesses that I read?

8          MS. ASHLINE:  No.

9          MR. CHRISTEN:  I do not.

10          THE COURT:  All right.  Let's do the introduction --

11     the introduction portion now.  So we'll start with Ms. Ashline.

12          MS. ASHLINE:  My name is Jeanine Ashline.  I go by

13     Jeanne.  I'm 66.  I live in Sun Prairie -- or in the Town of

14     Burke outside of Sun Prairie.  I've lived in that location since

15     1985.  I'm married, and I have two adult children.  My older

16     daughter is a senior systems analyst at Thrivent up at Appleton.

17     My younger daughter is a credit specialist for U.S. Cellular at

18     the regional location here in Madison.  I am retired.  I worked

19     at -- I retired from Meriter Hospital, worked in their finance

20     department for 28 years.  I've never owned or managed a company.

21     My husband is currently retired.  He worked for over 35 years as

22     a tool and die maker.  I was never in the military.  My husband

23     was.  He was a Marine.  I have an associate degree from MATC in

24     accounting.

25          I don't currently have any membership in any group or

```
 1    organization.  For hobbies and leisure activities, we -- I have
 2    two puppies that keep me busy and seemed like a good idea in
 3    retirement, but I don't know.  And we recently began kayaking,
 4    and I like to read.  And so for media, I read -- generally read
 5    The State Journal every day, and I look at some news feeds from,
 6    you know, social media.  And I've never -- I recalled when I was
 7    listening to everyone that I had written many years ago a letter
 8    to the editor, but it was about neighbors walking dogs on other
 9    people's lawns, mostly mine, and that was back in the '70s.  So
10    I haven't written any other letters.  And I do not have any
11    bumper stickers on my car.
12              THE COURT:  Thank you.
13         Ms. Buckley.
14              MS. BUCKLEY:  My name is Tabitha Buckley.  I'm 29.
15    I've lived in Madison for four or five years now.  I'm currently
16    engaged, and we don't have any children.  I work as a part-time
17    bank teller at a credit union.  I've never owned or managed a
18    company.  My fiancé is a lab tech at Muchinex Sciences (ph.).  I
19    have never been in the military.  I went to MATC for both human
20    services and accounting, but I never graduated.
21         I'm not a member of any groups or organizations.  I read,
22    spend time with my fiancé, go to concerts.  I tend to read
23    fiction.  I don't really watch or read the news.  I mostly
24    listen to JJO, Z104.  I have not written a letter to the
25    newspaper, and I don't have any bumper stickers.
```

1          THE COURT:  You said you went to MATC for human

2    services.  What's human services?

3          MS. BUCKLEY:  The human -- like social work.

4          THE COURT:  Okay.  All right.  Thanks.

5       Okay.  And next up, Mr. Christen.

6          MR. CHRISTEN:  My name is Tad Christen.  I'm 28 years

7    old.  I grew up -- or excuse me.  I live in Madison.  I have

8    lived here for eight years.  I'm single, no children.  I'm a

9    manager at a restaurant.  I worked there for about eight years.

10   I don't have children.  Never been in the military.  I graduated

11   high school.

12      No groups or organizations.  Hobbies, I take my dog for a

13   walk, play golf, sports activities.  Media: NPR, local news.

14   Never written a letter, and I don't have any bumper stickers.

15         THE COURT:  Where do you work?  What restaurant?

16         MR. CHRISTEN:  Lombardino's Deli and Restaurant in

17   town.

18         THE COURT:  All right.  I'll try to catch all three of

19   you up together, so if you three would pay attention, we'll get

20   this done quickly.

21      Have you, a relative, or a close friend ever been a party

22   to a lawsuit?  Sue or sued anybody?  Okay.  Let's start with

23   Ms. Buckley.

24         MS. BUCKLEY:  My aunt actually was in a lawsuit with a

25   company.  I don't know how far it went, but I know it was

1    solved, and she won.

2          THE COURT:  Okay.  Do you know what the nature of the

3    dispute was?

4          MS. BUCKLEY:  Job discrimination.

5          THE COURT:  Okay.  And who did she work for?

6          MS. BUCKLEY:  I honestly don't know the company.  It

7    was out in Watertown.

8          THE COURT:  Okay.  Know any other details about the

9    suit?

10          MS. BUCKLEY:  No.

11          THE COURT:  Just that she was successful.

12          MS. BUCKLEY:  That she was successful, and it was job

13    discrimination.

14          THE COURT:  And do you know if it went all the way to

15    trial?

16          MS. BUCKLEY:  I don't know.

17          THE COURT:  All right.  Okay.  And very good.

18       Okay.  And, Mr. Christen, I think you had your hand up too.

19          MR. CHRISTEN:  Yep.  I was involved in a case.  A lady

20    backed into my car when I was driving one night, and a few

21    months later she sued for medical damages to her and her son.

22    My insurance company covered and had my lawyer, and as far as I

23    know, she did settle right before the trial.

24          THE COURT:  So settled before trial.  Did you have to

25    give a deposition?

1          MR. CHRISTEN:  I did.

2          THE COURT:  Okay.  And your insurance company

3     covered the --

4          MR. CHRISTEN:  They footed everything, yeah.

5          THE COURT:  Okay.  All right.  All right.  And were you

6     satisfied with how the thing got resolved?

7          MR. CHRISTEN:  I was kind of left out of it, so I guess

8     so, yeah.

9          THE COURT:  All right.  All right.  Very good.

10         Okay.  And have you, a relative, or a close friend ever

11     been a witness in a lawsuit?

12         Ms. Ashline.

13         MS. ASHLINE:  I -- when I left an employer and I went

14     to a different job, a year or two later I was subpoenaed to

15     testify in a trial related to I was a lead person, and one of

16     the people that worked under me, a young girl, she apparently

17     was let go by her former employer.  And I didn't really know her

18     very well, and I was actually quite surprised to get the

19     subpoena because I had no contact with -- no one had told me.  I

20     didn't even know there was a trial, and I didn't even know what

21     it was about.  And so when I appeared, it was the State of

22     Wisconsin against the company, and it had to do with -- it must

23     have been employee related.  She apparently went to Florida for

24     a week and had a good time but told them that she was going to

25     see a doctor, but they found out basically that she used that

```
 1     for vacation.  And so I was to testify, I guess, on her ability
 2     as an employee.
 3              THE COURT:  All right.
 4              MS. ASHLINE:  And I don't have any idea how that turned
 5     out.
 6              THE COURT:  And so did you testify at a trial?
 7              MS. ASHLINE:  Yes, yeah.  Yeah, I was subpoenaed, yeah.
 8              THE COURT:  Okay.  All right.  And you don't know how
 9     it turned out?
10              MS. ASHLINE:  I don't.
11              THE COURT:  All right.  Okay.  Have any of you served
12     on a jury before?
13          Ms. Ashline.
14              MS. ASHLINE:  I served for Dane County.
15              THE COURT:  Okay.  When was that, what kind of case?
16              MS. ASHLINE:  Well, it was a number -- quite a few
17     years ago, and it was a homicide by intoxicated use of a motor
18     vehicle.
19              THE COURT:  All right.  And did you deliberate and
20     reach a verdict?
21              MS. ASHLINE:  We did.
22              THE COURT:  Did you acquit or convict the defendant?
23              MS. ASHLINE:  Acquit.
24              THE COURT:  Okay.  And were you the jury foreperson?
25              MS. ASHLINE:  I was not.
```

1          THE COURT:  Okay.  All right.  Anybody else serve on a

2     jury?  Okay.

3          Have you or anyone close to you ever had a dispute with a

4     business?

5          Ms. Buckley.

6          MS. BUCKLEY:  That was my aunt again.

7          THE COURT:  Yes.  And, again, if we have -- if you

8     already told us about it, you don't need to tell us again but --

9          MS. BUCKLEY:  It was actually with a couple businesses.

10         THE COURT:  All right.  That's good.  Okay.

11         Have you or anyone close to you ever been employed by

12    Walmart?

13         Okay.  Mr. Christen.

14         MR. CHRISTEN:  I was personally employed for a couple

15    years just -- at the end of high school, and my brother -- I

16    believe two of my brothers and my sister also worked at the

17    Walmart in Monroe, Wisconsin.

18         THE COURT:  Okay.  All right.  I'm going to call you

19    over to sidebar in a minute.  We'll go through some more

20    questions, but you'll come over, and you can talk about your

21    employment at Walmart.  All right.

22         MS. ASHLINE:  She also --

23         THE COURT:  I'm sorry.  Ms. Buckley.

24         MS. BUCKLEY:  My sister and my siblings have worked at

25    Walmart, as well as a couple of my closer friends.

1          THE COURT:  Okay.  We'll call you over too.  All right.

2     And then let me ask -- so we're going to talk to two of our

3     jurors about this, but let's find out, Ms. Ashline, do you have

4     strong feelings, positive or negative, about Walmart?

5          MS. ASHLINE:  I don't.

6          THE COURT:  Okay.  All right.  Okay.  We'll do some

7     more questions before we go to the sidebar.

8          The EEOC is a federal agency responsible for federal

9     employment laws.  Have you or anyone close to you ever been

10    employed by the EEOC or any of the state agencies that are

11    involved with employment law?  Okay.

12         Do any of you have special knowledge or training related to

13    disability discrimination or the ADA?

14         Do you or anyone close to you, have you received education

15    or training in the legal profession?

16         Have you -- any of you been involved in any dispute with

17    the state or federal government, including any governmental

18    agency?

19         Have you or anyone close to you ever been the subject of an

20    investigation by a governmental body?

21         Have you ever been the officer, manager, or supervisor in

22    any current or previous job?

23         Okay.  Mr. Christen.

24         MR. CHRISTEN:  I have been the general manager at

25    Lombardino's restaurant for about five years now, which includes

```
 1    hiring and firing.
 2              THE COURT:  Okay.  And have you had disputes with
 3    employees?  Have you had to fire or discipline employees?
 4              MR. CHRISTEN:  I have had to fire and discipline
 5    employees, yes.
 6              THE COURT:  Okay.  And you yourself are an employee at
 7    Lombardino's, right?
 8              MR. CHRISTEN:  Correct.
 9              THE COURT:  Okay.  Do you think you would have a bias
10    toward the management perspective in an employment dispute?
11              MR. CHRISTEN:  I don't believe I would, no.
12              THE COURT:  Okay.  All right.  And I think you have
13    answered that you've been responsible or involved in the hiring,
14    promotion, demotion, and firing of employees --
15              MR. CHRISTEN:  Correct.
16              THE COURT:  -- at Lombardino's.  Okay.
17         Anybody else been involved in that in any way of our new
18    jurors?
19         Have you or anyone close to you ever been involved in a
20    dispute relating to employment?  We've got your aunt, of course.
21         Have you or anyone close to you ever been unfairly
22    disciplined or discriminated against at work?
23         Go ahead, Ms. Buckley.
24              MS. BUCKLEY:  My fiancé had an issue with one of his
25    employers.
```

1           THE COURT:  Go ahead.  Tell us about it a little bit.

2           MS. BUCKLEY:  The owner decided to take issue with my

3      fiancé and his work ethic, and it never went to court, but he

4      was having some issues and got fired.

5           THE COURT:  Okay.  So he was terminated by that

6      employer.  Okay.  And there was no -- did he file a complaint or

7      anything like that so it was --

8           MS. BUCKLEY:  No.

9           THE COURT:  Okay.  All right.  Do you think your

10     fiancé's experience would color your decision-making in this

11     case?

12          MS. BUCKLEY:  No.

13          THE COURT:  Have you or anyone in your family ever

14     filed an employment-related complaint with an administrative

15     agency such as the Equal Employment Opportunity Commission or

16     the Wisconsin Department of Workforce Development?  Okay.

17        Do any of you or do you have anyone close to you that has a

18     disability or permanent medical condition that would restrict or

19     limit the ability to do work?

20        Okay.  Ms. Buckley.

21          MS. BUCKLEY:  I suffer from chronic back issues.

22          THE COURT:  Okay.  And has that come up in your

23     employment before?  Have you had to be accommodated for that?

24          MS. BUCKLEY:  Yes.  I have had to fill out the FMLA

25     paperwork several times.

1        THE COURT:  Okay.  All right.  And do you feel that
2    your employer handled it appropriately?
3        MS. BUCKLEY:  Yes.
4        THE COURT:  Okay.  And do you think that experience or
5    background would affect your decision-making in this case?
6        MS. BUCKLEY:  No.
7        THE COURT:  Okay.  All right.  Let's see.  We've got
8    Ms. Buckley and Mr. Christen who have Walmart experiences.
9    Let's come over to sidebar to discuss those.  We'll start with
10   Ms. Buckley.
11       (Discussion held at sidebar at 11:18 a.m.)
12       THE COURT:  Hello.  We've got to wait for the other
13   side to get here.  And this is a microphone, so I'll have you
14   speak into that.
15       All right.  So you're here because I don't think you worked
16   for Walmart, but I think you had family who worked for Walmart?
17       MS. BUCKLEY:  Yes.
18       THE COURT:  Okay.  So tell us who you know that worked
19   for Walmart and about their experiences.
20       MS. BUCKLEY:  Yes.  My sister, Tanya Buckley, she used
21   to work at Walmart.  I don't really know much about her
22   experience, but she was terminated.  I don't know why.  My
23   sister has some shady work experience, so it's hard to believe.
24   No feelings towards Walmart for that reason.  It's my sister's
25   fault.

```
 1              THE COURT:  Okay.
 2              MS. BUCKLEY:  My stepbrothers worked at the Monona
 3     Walmart.  I'm not really close to them, but I think they're
 4     still there.  I'm not a hundred percent sure.
 5              THE COURT:  Okay.  And those are your --
 6              MS. BUCKLEY:  My stepbrothers.
 7              THE COURT:  Stepbrothers.
 8              MS. BUCKLEY:  And then I've had a couple of personal
 9     friends that I've been close to that have worked for Walmart.
10     They left on their own accord, so they didn't have any issues
11     with them.
12              THE COURT:  Okay.  So did any of those folks have
13     experiences that you would categorize as very positive, very
14     negative?
15              MS. BUCKLEY:  I think my sister was complaining a
16     little bit, but I really don't -- you know, it's hard to believe
17     what she says, so I didn't -- take it with a grain of salt.
18              THE COURT:  Okay.  All right.  So --
19              MS. BUCKLEY:  I don't think it's going to affect how
20     I -- if I were to go to trial, I don't think it would affect it.
21              THE COURT:  All right.  Thank you.  Any follow-up?
22              MS. VASICHEK:  I just have a few.  Do you recall the
23     positions they were in?
24              MS. BUCKLEY:  My brothers were the back room, like
25     stockers.  And my sister, I believe she was a cashier.  Again,
```

1    my other friend was a cashier, and I believe the other one was a

2    backroom stocker.

3              MR. HARLAN:  We have no issues with Ms. Buckley.

4              THE COURT:  Okay.

5              MS. VASICHEK:  No.

6              THE COURT:  Thanks, Ms. Buckley.

7              MS. BUCKLEY:  Thank you.

8          (Ms. Buckley excused from sidebar.)

9              THE COURT:  Mr. Christen.

10        All right.  I think you worked for Walmart.

11             MR. CHRISTEN:  I did.

12             THE COURT:  And you had some other people that you knew

13    who worked for Walmart.

14             MR. CHRISTEN:  Yes, my siblings.

15             THE COURT:  Tell us -- go ahead.

16             MR. CHRISTEN:  I worked for Walmart for two years, and

17    I was let go, which I thought was in poor manner because I was

18    really good at my job.  And then as more recently, my little

19    brother, who actually just moved here to Madison, he was let go

20    as well.  He was hired as the, like, assembler for, like, bikes

21    and things like that, and he was often called on to help other

22    people do their job, and in turn they assumed he was not doing

23    his, even though he was told to help others, and then he was in

24    turn let go as well.  My sister, she never got -- she wasn't let

25    go.  She was a cashier there for a long time, probably three

```
 1    years, and she just always talked negatively about the place.
 2    So I'm not a huge fan of Walmart in general, and since then I
 3    was hired to my new job and went from being the house to
 4    managing the restaurant in less than three or four years, so I
 5    felt like I was doing --
 6              THE COURT:  So you like Lombardino's better than
 7    Walmart.
 8              MR. CHRISTEN:  Yes, yes.  So if I was good at my job,
 9    and they didn't appreciate that.
10              THE COURT:  So you personally felt that you were
11    unfairly treated by Walmart.
12              MR. CHRISTEN:  Absolutely, yes.
13              THE COURT:  And do you still have a negative feeling
14    about Walmart?
15              MR. CHRISTEN:  Yeah.  I don't shop there at all.
16              THE COURT:  This kind of cuts -- well, I would ask, if
17    I thought you could be fair to Walmart --
18              MR. CHRISTEN:  Uh-huh.
19              THE COURT:  -- to decide the case following my
20    instructions on the law and decide it just on the basis of this
21    evidence and set your own personal experience aside, but since
22    it was actually your experience, I'm not sure --
23              MR. CHRISTEN:  As a person, I feel like I would be able
24    to do that, but in the same time, those things did happen to me,
25    so it's hard to not be thinking about them as well.
```

1          MS. VASICHEK:  Can I ask what position you had?

2          MR. CHRISTEN:  I was a cashier, and I also worked in

3    the back unloading trucks.

4          MS. VASICHEK:  Do you think you could be fair?

5          MR. CHRISTEN:  Like I said, I believe that I'm a fair

6    person, but it would definitely be in the back of my head.

7    That's as far as it goes.  I don't really know, unless I'm in

8    the situation, how I really feel.

9          THE COURT:  Yeah.  I don't have any doubt about the

10   effort that you would make to be fair, but because you yourself

11   had the experience of being terminated in a way that you think

12   was wrongful, I just don't know that I could be confident that

13   you'd be able to set that direct experience aside.

14         MR. CHRISTEN:  Okay.  Yeah, I mean, whatever you feel.

15   I mean, that's just how I feel.

16         THE COURT:  How does Walmart feel?

17         MR. HARLAN:  We obviously are concerned, and we're here

18   to get a fair trial.

19         MR. CHRISTEN:  That's just my honest opinion.

20         THE COURT:  Yeah.  I mean, I would be inclined to

21   excuse you so --

22         MR. CHRISTEN:  Okay.

23         THE COURT:  Thanks for coming in.

24         MR. CHRISTEN:  Absolutely.  Thank you.

25         THE COURT:  All right.

```
 1              (Sidebar discussion ends at 11:24 a.m.)
 2                   THE COURT:  All right.  We'll take our next juror.
 3                   THE CLERK:  Jacob Jelinek, please.
 4                   THE COURT:  All right.  Let's get you caught up.  Have
 5       you heard of this case before today?
 6                   MR. JELINEK:  No.
 7                   THE COURT:  Can you serve through Friday if needed?
 8                   MR. JELINEK:  I think so, yes.
 9                   THE COURT:  And do you know any of the counsel or any
10       of the representatives of the parties?
11                   MR. JELINEK:  No.
12                   THE COURT:  Did you recognize any of the names of any
13       of the witnesses that I read?
14                   MR. JELINEK:  No.
15                   THE COURT:  Do you know me or any of the court
16       personnel you've dealt with?
17                   MR. JELINEK:  No.
18                   THE COURT:  Do you know any of the other people on the
19       jury panel?
20                   MR. JELINEK:  No.
21                   THE COURT:  All right.  Why don't you tell us about
22       yourself.
23                   MR. JELINEK:  Is there a little sheet or something,
24       cheat sheet?  My name is Jacob Jelinek.  I'm 35, and I'm from
25       Prairie du Sac, Wisconsin.  I've lived there since about 2013.
```

```
 1     Marital status, I have a wife, no children.  My wife works for
 2     Children's Hospital of Minnesota.  My current occupation is
 3     engineering manager for Milwaukee Valve.  Have you ever owned or
 4     managed a company?  No.  Current or former occupation of you
 5     spouse.  Nurse practitioner.  My wife is a nurse practitioner.
 6     Adult children, no.  Any military service, no.  I graduated from
 7     UW-Madison with a master's in nuclear engineering and
 8     engineering physics.
 9         Memberships of groups, not anything current, no.  Hobbies
10     and leisure-time activities, I enjoy reading and going for hikes
11     and stand-up paddle boarding and going to concerts, kind of
12     anything friends want to go do.  Media consumption, I'm on
13     Facebook and Instagram and Snapchat and all that other good
14     stuff.  Where do I get my news?  Primarily from a number of
15     different sources on the internet.  I don't really watch much
16     TV.  I don't really listen to the radio.  Have you ever written
17     a letter to the editor?  No.  Do you have any bumper stickers on
18     your car?  Yes, I do.  It says "Duh."  And I used to say that a
19     lot, and so my parents got me that and put it on my car.
20             THE COURT:  All right.  Have you or anyone close to you
21     been a party to a lawsuit?
22             MR. JELINEK:  No.
23             THE COURT:  Ever -- you or anyone close to you ever
24     been a witness in a lawsuit?
25             MR. JELINEK:  No.
```

1          THE COURT:  Have you ever served on a jury before?

2          MR. JELINEK:  No.

3          THE COURT:  Have you or anyone close to you ever had a

4    dispute with a business?

5          MR. JELINEK:  No.

6          THE COURT:  Have you or anyone close to you ever been

7    employed by Walmart?

8          MR. JELINEK:  No -- my sister-in-law, yeah.

9          THE COURT:  Sister-in-law.

10         MR. JELINEK:  Yes.

11         THE COURT:  Okay.  We do those at sidebar, so let me

12   get through a few more questions, and then we'll come over and

13   talk about it.

14      Do you have strong feelings, positive or negative, about

15   Walmart?

16         MR. JELINEK:  No.

17         THE COURT:  The EEOC is responsible for enforcing

18   federal employment laws.  Have you ever been employed by the

19   EEOC or any of the other governmental agencies that are involved

20   with employment rights?

21         MR. JELINEK:  No.

22         THE COURT:  Do you have any special knowledge or

23   training related to disability discrimination or the ADA?

24         MR. JELINEK:  Sort of.  I had training through my

25   workplace as a manager for disabilities and harassments and

1    discrimination.

2              THE COURT:  So was that training -- it sounds like you

3    got generally broad training in employment law; is that right?

4              MR. JELINEK:  Essentially.

5              THE COURT:  And one of the units was --

6              MR. JELINEK:  Disabilities, yes.

7              THE COURT:  Okay.  All right.  Have you or anyone close

8    to you ever received any education or training in the legal

9    profession?

10             MR. JELINEK:  No.

11             THE COURT:  Okay.  You hesitate a little?

12             MR. JELINEK:  I'm trying to think.  I don't think --

13   nothing comes to mind.

14             THE COURT:  Have you ever been involved in a dispute

15   with a state or federal government?

16             MR. JELINEK:  No.

17             THE COURT:  Have you or anyone close to you ever been

18   the subject of an investigation by a governmental body?

19             MR. JELINEK:  No.

20             THE COURT:  Have you -- I can anticipate the answer

21   here is yes.  You've been an officer, manager, or supervisor in

22   any current or previous job?

23             MR. JELINEK:  Yes.

24             THE COURT:  Tell us about that a little bit.

25             MR. JELINEK:  I'm an engineering manager.  I deal with

1    approximately six individuals that I manage.  It's really easy.

2    They're a bunch of engineers, not a whole lot of conflict there.

3    I am part of the hiring process, but I've never fired anybody.

4            THE COURT:  Okay.  All right.  Have you ever had an

5    occasion to discipline anybody or take any action?

6            MR. JELINEK:  Nothing, no.  They're awesome.

7            THE COURT:  Good for you.  Okay.  And so you described

8    your involvement in the hiring and promotion.

9        Have you or anyone close to you ever been involved in a

10   dispute relating to employment?

11           MR. JELINEK:  No.

12           THE COURT:  Have you or anyone close to you ever been

13   involuntarily discharged from employment?

14           MR. JELINEK:  No.

15           THE COURT:  Have you or anyone close to you ever been

16   unfairly disciplined or discriminated against at work?

17           MR. JELINEK:  No.

18           THE COURT:  Okay.  Have you or anyone in your family

19   ever filed an employment-related complaint with an

20   administrative agency such as the EEOC or the Wisconsin

21   Department of Workforce Development?

22           MR. JELINEK:  No.

23           THE COURT:  And do you or anyone close to you have a

24   disability or permanent medical condition that would restrict

25   the ability to work?

1           MR. JELINEK:  No.

2           THE COURT:  Okay.  At this point, why don't you come

3     over and tell us about your sister-in-law's work with Walmart.

4           (Discussion held at sidebar at 11:30 a.m.)

5           MR. JELINEK:  Hi.

6           THE COURT:  Hello.  Thanks for coming over.

7           MR. JELINEK:  No problem.

8           THE COURT:  We're going to wait for Mr. Harlan.  Okay.

9     When and where did your sister work for Walmart, what did she

10    do, and how was it?

11          MR. JELINEK:  I don't really know.  I just know she

12    works there part time.  She's in college, and that's about the

13    extent that I know.

14          THE COURT:  So she works there now.

15          MR. JELINEK:  She works there in the summers.  She's

16    not there right now.

17          THE COURT:  Okay.  At what Walmart location does she

18    work?

19          MR. JELINEK:  I think it's Mukwonago.

20          THE COURT:  Does she tell you anything about working

21    there?

22          MR. JELINEK:  No.

23          THE COURT:  So you don't know whether it's good or bad

24    or --

25          MR. JELINEK:  Don't know whether it's good or bad.

```
1              THE COURT:  Okay.  And do you have strong -- you don't
2       have strong feelings about Walmart.
3              MR. JELINEK:  It's a store.
4              THE COURT:  I think we're good.  Any follow-up?
5              MS. VASICHEK:  No.
6              MR. HARLAN:  No follow-up.
7              THE COURT:  Very good.  Thank you.
8         (Sidebar discussion ends at 11:31 a.m.)
9              THE COURT:  I think we're kind of in the homestretch
10      here just in case you're wondering, but everybody is caught up.
11      And so usually I take a break after about two hours.  We've been
12      going about two-and-a-half hours.  Can we press on for
13      another -- can we make it another half hour?  Don't be
14      embarrassed.  Frankly, I'm surprised I can endure this long.
15             But have any of you or anyone close to you ever worked with
16      a job coach or an aide?  Job coach or a job aide?  You or anyone
17      close to you ever work with a job coach or aide?
18             Have you or anyone close to you been injured on the job and
19      unable to return to work because of that injury?  And I think
20      Mr. O'Dell told us about his situation, although I don't know if
21      it was an injury on the job.  It was a health problem.
22             MR. O'DELL:  Yeah.  And I was a private contractor at
23      the time so --
24             THE COURT:  All right.  Anybody else miss time from a
25      work-related injury?
```

1          Mr. Jelinek.  There's a microphone we'll bring over to you.

2               MR. JELINEK:  It was actually while I was at school, so

3     I think it kind of -- it was covered with workman's comp, I

4     think.  I was in an accident and had to have my bowel sectioned.

5               THE COURT:  Okay.

6               MR. JELINEK:  It was emergency surgery.

7               THE COURT:  Okay.  Was that an injury on the job?

8               MR. JELINEK:  Yes.

9               THE COURT:  Okay.  Okay.  And can you tell us -- just

10    tell us a little bit more about it.

11              MR. JELINEK:  Sure.  I was working in an experimental

12    test set-up testing high pressure/high temperature corrosion

13    applications and unsealing the canister that was pressurized.

14    It was depressurized, but one of the valves failed during the

15    process of opening it up, and the system repressurized and blew

16    an end cap off into my stomach.  Yeah.  Caused my bowel to

17    explode, and so I was taken to the hospital.

18              THE COURT:  That sounds terrible.

19              MR. JELINEK:  Emergency surgery.  Yeah, it wasn't

20    awesome.

21              THE COURT:  Have you recovered fully?

22              MR. JELINEK:  Yes.

23              THE COURT:  I'm glad to hear that.  And so -- and then

24    it was covered by worker's compensation?

25              MR. JELINEK:  A hundred percent, yeah.

1          THE COURT:  Okay.  All right.  And so you feel like

2     your employer handled that occasion appropriately?

3          MR. JELINEK:  It was awesome, yeah.

4          THE COURT:  All right.  Have you or anyone close to you

5     ever requested a job modification or a change in the work

6     environment due to a medical condition?  Anybody ever have to

7     request a job modification or a change in work environment as a

8     medical condition?

9        Okay.  Mr. Jelinek.

10         MR. JELINEK:  I mean, just because of the accident,

11    they obviously let me do less work.  I was off for a month and a

12    half, and when I came back, it was light duty.

13         THE COURT:  So your schedule and duty were

14    accommodated --

15         MR. JELINEK:  Yes.

16         THE COURT:  -- as you were recovering.  Okay.  Very

17    good.

18       Okay.  Ms. Buckley.

19         MS. BUCKLEY:  I just have to be accommodated at some of

20    my jobs because of my back issues.

21         THE COURT:  Okay.  All right.  And that has been

22    successfully accommodated; is that right?

23         MS. BUCKLEY:  Yes.

24         THE COURT:  Okay.  Do any of you have strong opinions,

25    whether positive or negative, about whether individuals with

1    disabilities should be entitled to the same employment

2    opportunities as nondisabled workers?  Any of you have strong

3    opinions, positive or negative, about whether individuals with

4    disabilities should be entitled to the same employment

5    opportunities as nondisabled workers?

6         Do any of you have strong feelings, again positive or

7    negative, about the Americans with Disabilities Act, which makes

8    it illegal for employers to discriminate against individuals on

9    the basis of disability?  Anybody have strong feelings, positive

10   or negative, about the Americans with Disabilities Act?

11        All right.  Here are my concluding questions.  Before I

12   ask -- before I do that, let me get counsel from both sides just

13   to come up one more time.

14        (Discussion held at sidebar at 11:35 a.m.)

15             THE COURT:  My concluding questions are about whether

16   you can follow my instructions and be fair to both sides, but I

17   always, before I do that, see if there's any other follow-up we

18   need from anybody or whether there's any other jurors you wanted

19   to move to strike for cause.

20             MS. VASICHEK:  I think we've talked about all the

21   jurors for cause, so I don't see anything there.

22             MR. HARLAN:  Yeah, same here.

23             THE COURT:  Okay.  Because usually I don't get

24   anything -- it's rare that I get anything here, so now is a good

25   chance to follow up.  Okay.  Thank you.

```
 1              (Sidebar discussion ends at 11:36 a.m.)

 2              THE COURT:  All right.  Two final questions:  At the

 3      end of the case, I will give you instructions that will govern

 4      your deliberations.  You are required to follow these

 5      instructions even if you do not agree with them.  Is there any

 6      one of you who would be unable or unwilling to follow my

 7      instructions?

 8         Last question is kind of a catch-all:  Do you know -- any

 9      of you know of any reason whatsoever why you could not sit as a

10      trial juror with absolute impartiality to all the parties in

11      this case?

12         Okay.  Those are my questions.  Here's what's going to

13      happen next:  We can relax a little bit.  The parties will now

14      make their final selections about who will actually serve on the

15      jury, and so we can relax while they do that.  It usually takes

16      ten or 15 minutes.  We can move around, but we have to stay in

17      the room so they can look at us while they make their decisions.

18      So you can relax, but they're going to go to work for ten or 15

19      minutes and make up their minds about who they want to serve on

20      the jury.

21              (Attorneys exercise strikes from 11:37 a.m. until

22      11:46 a.m.)

23              THE COURT:  All right.  Mr. Wiseman is going to

24      announce who is serving on the jury.

25              THE CLERK:  The following jurors are excused and can
```

1    take a seat at the rear of the courtroom: Paul A. Hoffmann,

2    Richard Anthony Lankau, Sarah G. Duncan, David L. Kuckkan, John

3    C. Peschl, Alyssa Mae Bukolt.

4         And the following jurors have been selected, and I'll have

5    you move seats in a little bit to fill in: Richard N. Schroeder,

6    Jeanine Ashline, Tabitha Buckley, Jennifer Moore-Kerr.  And,

7    Ms. Kerr, if you could move down.

8              THE COURT:  Actually, Ms. Moore, if you would just move

9    one seat, and then the three of you will move over a little bit.

10   That seat that Mr. Schroeder is in is a partially obstructed

11   view.  We don't use it unless we need to.  So all right.  Very

12   good.

13             THE CLERK:  Matthew J. Yeakey -- and do you want

14   Mr. Yeakey sitting in the front row, four and four?

15             THE COURT:  Yes.  And so, Mr. Hollar, if you move over

16   to your right one seat, and then we'll --

17             THE CLERK:  Mr. Yeakey will take the seat in the

18   corner.  Jim L. Hollar, Jacob Jelinek, and Stephen O'Dell.

19             THE COURT:  Very good.  And you can move down and close

20   ranks there.

21        Okay.  First, to those of you who have not been selected

22   for jury service, my apologies, and I don't say that

23   facetiously.  People almost uniformly tell me jury service in

24   this court is really very interesting and engaging, and even

25   when people tell me they were really nervous about it at the

1    beginning, they really found it really gratifying and really

2    interesting.  So better luck next time.  But I also, before I

3    let you go, I have to thank you.

4         I don't know if you realize this, but it's been 230 years

5    that we have been doing this in federal courts, calling citizens

6    forward to serve as jurors in civil cases in federal juries.

7    It's part of the Constitution that you have a right to a jury

8    trial in a civil case.  So there are many generations before you

9    that have shown up to do this, but the right to a jury trial

10   wouldn't mean anything if people didn't show up for jury

11   service.  So thank you for coming in and answering our questions

12   honestly.  I appreciate it very much.  So you are now excused

13   with the Court's profound gratitude.  Thank you.

14        Those of you who are in the jury box, we have one thing

15   that I definitely am going to do before lunch, and then I'm

16   going to ask if you can endure another 15 minutes, and if you

17   can't, that's understandable -- we'll take a break -- but if you

18   can hang in there for 15 minutes, then we'll be done, and we'll

19   take an hour for lunch.  Got 15 more minutes?  All right.  Good.

20        Here's the thing you're going to have to do:  Stand up, and

21   raise your right hand, and you're now going to be sworn in as

22   jurors.

23                    **JURY PANEL, SWORN**

24             THE COURT:  Very good.  Have a seat.

25        Here's what I'm going to do next:  I have some preliminary

1    instructions about how the case is going to proceed, a little

2    bit of orientation about what questions you're going to have to

3    answer, and then we'll take our lunch break.  And so this takes

4    me about 15 minutes, but if I can get this done, then I don't

5    have to excuse -- it will be more efficient this way.  Your

6    total exposure to me will be reduced if you do it this way.  So

7    here we go.

8         Members of the jury, we're about to begin the trial of the

9    case.  Before it begins, I will give you some instructions to

10   help you understand how the trial will proceed, how you should

11   evaluate the evidence, and how you should conduct yourselves

12   during the trial.  This will take me about 15 minutes, and I

13   will give you written copies of all of my instructions so that

14   you will have my instructions in writing when you deliberate.

15        The party who begins the lawsuit is called the plaintiff.

16   In this case, the plaintiff is the Equal Employment Opportunity

17   Commission, or the "EEOC."  The party against whom the suit is

18   brought is called the defendant, and in this case, the

19   defendants are Walmart Stores, Inc., and Walmart Stores East,

20   L.P., and I'll refer to the defendants together just as

21   "Walmart."

22        The EEOC is the federal agency responsible for enforcing

23   workplace discrimination laws, including the Americans with

24   Disabilities Act, or "ADA."  When a person feels that his or her

25   employer has discriminated against them, that person may file a

charge of discrimination with the EEOC.  The EEOC has the
authority to file a lawsuit and to seek remedies against the
employer on behalf of that person.  Alternatively, the person
may file his own lawsuit.  In this case, the EEOC is suing on
behalf of one of Walmart's employees, Paul Reina, who is an
individual with a disability.  It does not matter to you that it
is the EEOC rather than Reina himself who has filed this
lawsuit.  You should give the same consideration to the case
either way.

Reina worked as a cart pusher at a Walmart store in Beloit.
The EEOC contends that Walmart violated the ADA in two ways.
First, the EEOC contends that Walmart discriminated against
Reina by not accommodating his need for a full-time job coach.
Second, the EEOC contends that Walmart terminated Reina based on
his disability when it suspended him and did not schedule him
for further work hours.  Walmart denies that it discriminated
against Reina.  Walmart contends that Reina is not a qualified
individual under the ADA because he could not perform the
essential functions of his position and that his request for a
full-time job coach was not a reasonable accommodation under the
ADA.

Your job, as jurors in this case, will be to decide if
Walmart violated the ADA and what damages, if any, the EEOC is
entitled to recover from Walmart for Reina.  I will give you
more specific instructions about the legal principles that you

1    must apply after you hear the evidence.

2        Let's talk about the *Functions of the Court and the Jury:*

3    One of my duties as the judge in this case is to decide all

4    questions of law and procedure.  In these preliminary

5    instructions, during trial, and at the end of the trial, I will

6    instruct you on the rules of law that you must follow in making

7    your decision.

8        You have two duties as jurors.  Your first duty is to

9    decide the facts from the evidence that you see and hear in

10   court.  Your second duty is to take the law as I give it to you,

11   apply it to the facts, and decide if the EEOC has proven that

12   Walmart's conduct violated the law.

13       You must perform these duties fairly and impartially.  Do

14   not let sympathy, prejudice, fear, or public opinion influence

15   you.  You should not take anything that I say or do during the

16   trial as indicating what I think of the evidence or what I think

17   your verdict should be.

18       Here's how the case is going to proceed:

19       First, an attorney from each side will make an opening

20   statement.  We'll do that right after lunch.  What is said in

21   opening statements is not evidence.  It is simply a guide to

22   help you understand what each party expects the evidence to

23   show.

24       Second, after the opening statements, the plaintiff will

25   introduce evidence in support of its claim.  At the conclusion

1    of their case, the defendants may introduce evidence.  And,

2    finally, the plaintiff may choose to introduce some rebuttal

3    evidence.

4        Third, after the evidence is presented, I will instruct you

5    on the law that you are to apply in reaching your verdict.  I

6    will give you copies of all of my instructions, the instructions

7    I'm reading now and the ones after the evidence, so that you

8    have them all in writing when you deliberate.

9        Fourth, the parties will then make closing arguments

10   explaining to you what they believe the evidence has shown and

11   what inferences you should draw from the evidence.  What is said

12   in closing argument is not evidence.  The plaintiff will make

13   the first closing argument and can make a short rebuttal

14   argument after the defendants' closing argument.

15       Fifth, I will give you a few very brief instructions about

16   how you should conduct your deliberations.

17       And then, sixth, you will retire to the jury room and

18   conduct your deliberations.

19       The trial will take three or four days I expect.  The trial

20   day will normally run from 5:00 a.m. until 5:30 p.m. -- I'm

21   sorry -- from 9:00 a.m. to 5:30 p.m.  If we have to, we'll start

22   at 5:00 a.m.  That's a contingency plan.  9:00 to 5:30 p.m.

23   Usually you'll have an hour for lunch and two additional short

24   breaks, one in the morning and one in the afternoon.  Usually

25   I'll take the lunch from 12:30 to 1:30.  Today we'll do it a

1    little early.  Sometimes I have to adjust the schedule to take

2    care of something in another case, so we'll have to be somewhat

3    flexible.  And the courtroom is sometimes kept at a cold

4    temperature, so I encourage you to bring clothing that will keep

5    you comfortable in a range of conditions.

6         During recesses you have to keep in mind the following

7    instructions:

8         First, do not discuss the case either among yourselves or

9    with anyone else during the course of the trial.  I realize that

10   this case is the one thing that you all have in common, but you

11   must not talk about it, even amongst yourselves, until it's time

12   to deliberate.  Once you express an opinion, there is a natural

13   tendency to defend it, and this might make you resist changing

14   your mind.  The parties to this lawsuit have a right to expect

15   from you that you will keep an open mind throughout the trial.

16   You should not reach a conclusion until you have heard all of

17   the evidence and you have heard the lawyers' closing arguments

18   and my instructions to you on the law and you've retired to

19   deliberate with the other members of the jury.

20        I must warn you in particular against commenting about the

21   trial in an email or on a blog or on Twitter or any other social

22   media platform.  There are cases that have to have been retried

23   because a member of the jury communicated electronically about

24   the case during the trial.  You can imagine what this would mean

25   in terms of the cost of a retrial, the inconvenience to your

1    fellow jurors whose work would have gone for nothing, and the

2    stress experienced by the parties.

3         Second, do not permit any third person to discuss the case

4    in your presence.  If anyone tries to talk to you despite your

5    telling them not to, report that fact to the Court as soon as

6    you're able.  Do not discuss the event with your fellow jurors

7    or discuss with them any other fact that you believe you should

8    bring to the attention of the Court.

9         Third, although it is a normal human tendency to converse

10   with people with whom one is thrown into contact, please do not

11   talk to any of the parties or their attorneys or the witnesses.

12   And by this I mean not only do not talk about the case, but do

13   not talk at all, even to pass the time of day.  If one of the

14   witnesses or the attorneys passes by without talking to you,

15   they're not being rude.  They're simply following my

16   instructions.  In no other way can the parties be assured of the

17   absolute impartiality they are entitled to expect from you as

18   jurors.  We have a small courthouse here, so if you run into

19   anybody and they look the other way, don't take it personally.

20        Fourth, do not read about the case in newspapers or listen

21   to the radio or television broadcasts about the trial.  If a

22   newspaper headline catches your eye, do not examine the article

23   further.  Media accounts may be inaccurate, and they may contain

24   matters that are not proper for your consideration.  You must

25   base your verdict solely on the evidence that is presented here

1    in court.

2        Fifth, no matter how interested you are or may become about

3    the facts in this case, you must not do any independent

4    research, investigation, or experimentation.  Do not look up

5    materials on the internet or in any other source.  Again, you

6    must base your verdict solely on the evidence presented here in

7    court.

8        So you have to base the case on the evidence, so let's talk

9    about what the evidence is and how you should consider it.

10   Evidence at a trial includes the sworn testimony of the

11   witnesses, exhibits that are offered and accepted by the Court,

12   facts that are stipulated by counsel for both sides, and facts

13   that are judicially noticed.  A fact can be judicially noticed

14   if it can be established beyond dispute to my satisfaction, and

15   a stipulation is just an agreement between the parties that

16   something is true, and if something is stipulated or it's

17   judicially noticed, I'll tell you that.  You may consider only

18   the evidence that I admit into the record.  In determining

19   whether any fact has been proved, you should consider all of the

20   evidence bearing on the question regardless of who introduced

21   it.

22       The following things are not evidence: questions and

23   objections of the lawyers, testimony that I instruct you to

24   disregard, and anything that you may see or hear when the Court

25   is not in session, even if what you see or hear is done or said

1    by one of the lawyers, by the parties, or by one of the

2    witnesses.  You should listen carefully to the opening

3    statements and the closing arguments because they will help you

4    understand the evidence, but those statements and arguments by

5    the lawyers are not evidence, and you should decide the case

6    based on the evidence.

7         Evidence may be either direct or circumstantial.  Direct

8    evidence is direct proof of a fact, such as testimony by a

9    witness about what that witness said or heard or did.

10   Circumstantial evidence is proof of one or more facts from which

11   you could infer the existence of another fact.

12        Let me give you an example:  Imagine that the question is

13   whether a cat ate a mouse.  Direct evidence of this fact would

14   be a witness's testimony that she saw the cat eat the mouse.

15   Circumstantial evidence of the fact would be evidence that both

16   the cat and the mouse were put into the same pen from which

17   neither the cat nor the mouse could escape, and an hour later,

18   the mouse was gone.  This example is meant to show you that you

19   should consider both direct and circumstantial evidence.

20   Neither type is automatically more persuasive or more valuable

21   than the other.  It is up to you to decide how much weight to

22   give to any particular piece of evidence.

23        *Drawing of Inferences:*  You are to consider only the

24   evidence in the case, but your consideration -- in your

25   consideration of the evidence, you're not limited solely to what

1      you see and hear as the witnesses testify.  You are permitted to

2      draw reasonable inferences or conclusions from the facts that

3      you find have been proved if such reasonable inferences or

4      conclusions seem justified in the light of your own experience

5      and common sense.

6           *Burden of Proof:*  You will hear the term "burden of proof"

7      used during this trial.  In simple terms, the phrase "burden of

8      proof" means that the party who makes the claim has the

9      obligation of proving that claim.  At the end of the case, I

10     will instruct you on the proper burden of proof to be applied to

11     the issues in this case.

12          But here is the basic burden of proof concept that you

13     should bear in mind as you hear the evidence.  The EEOC is

14     required to prove its claims and any damages by a "preponderance

15     of the evidence."  "Preponderance of the evidence" means that

16     when you have heard all of the evidence that relates to a

17     particular claim, you must be persuaded that the claim is more

18     probably true than not true.

19          In light of this burden of proof, let me identify the main

20     issues you will have to decide.  You will have to decide whether

21     the EEOC has proved that, at the time Walmart suspended Reina,

22     Reina was able to perform the essential functions of his job as

23     a cart pusher with a reasonable accommodation.  You will also

24     have to decide whether the EEOC has proved that a full-time job

25     coach is a reasonable accommodation.  A reasonable accommodation

1   is one that would enable Reina to perform the essential

2   functions of his job and whose costs are not clearly

3   disproportionate to the benefits that it will produce.  It is

4   not a reasonable accommodation to require the employer to

5   eliminate or change the essential functions of the job or to

6   have the essential functions of the job performed by someone

7   else.

8        Under the ADA, Walmart does not need to endure an undue

9   hardship to provide a reasonable accommodation to Reina.  On

10  this issue, Walmart bears the burden of proof also by a

11  preponderance of the evidence.  Walmart would have to prove that

12  providing Reina with a full-time job coach would pose an undue

13  hardship on Walmart.

14       As I said, I will give you more detailed instructions about

15  how to decide these issues after you have heard the evidence.

16       Let's talk about depositions.  During the course of a

17  trial, the lawyers may refer to and read from depositions or

18  play portions of videotaped depositions.  Depositions are

19  transcripts of testimony taken while the parties are preparing

20  for trial.  Deposition testimony is given under oath just like

21  testimony given during the trial.  You should give deposition

22  testimony the same consideration that you would give to live

23  testimony given by the witnesses here in court.

24       *Credibility of Witnesses:*  In deciding the facts, you may

25  have to decide which testimony to believe and which testimony

1    not to believe.  You may believe everything a witness says, part

2    of it, or none of it.  In considering the testimony of any

3    witness, you may take into account many factors, including the

4    witness's opportunity and ability to see or hear or know the

5    things the witness testifies about, the quality of the witness's

6    memory, the witness's appearance and manner while testifying,

7    the witness's interest in the outcome of the case, any bias or

8    prejudice the witness may have, other evidence that may have

9    contradicted the witness's testimony, and the reasonableness of

10   the witness's testimony in light of all of the evidence.  The

11   weight of the evidence does not necessarily depend upon the

12   number of witnesses who testify.

13       A witness may be discredited by contradictory evidence or

14   by evidence that at some other time the witness has said or done

15   something or failed to say or do something that is inconsistent

16   with the witness's present testimony.  If you believe any

17   witness has been discredited, it is up to you to decide how much

18   of the testimony of that witness to believe.

19       If a witness is shown to have given false testimony

20   knowingly, that is, voluntarily and intentionally, about any

21   important matter, you have a right to distrust the witness's

22   testimony about other matters.  You may reject all the testimony

23   of that witness or you may choose to believe some or all of it.

24       There are three specific rules that apply to prior

25   statements by witnesses:

First, the general rule is that if you find that a witness
has said something before the trial that is different from what
the witness said at trial, you are to consider the prior
statement only as an aid in evaluating the truthfulness of the
witness's testimony at trial.  You cannot consider the prior
statement as evidence to prove a fact at issue in this trial.

Second, there is an exception to the general rule for
witnesses who are the actual parties in this case or who are the
employees or agents of the parties.  If you find that any of the
parties or employees or agents of the parties made statements
before the trial began that are different from the statements
they make at trial, you may consider as evidence in this case
whichever statement you find more believable.

Third, depositions are another exception to the general
rule.  As I explained, depositions are made under oath, and you
should consider them like any other testimony.  So prior
statements made in depositions can be used both to evaluate the
truthfulness of a live witness and as evidence to prove a fact
at issue in this trial.

*Experts:*  A person's training and experience may make him
or her an expert in a technical field.  The law allows that
person to state an opinion here about matters in that particular
field.  It is up to you to decide whether you believe the
expert's testimony and choose to rely upon it.  Part of that
decision will depend on your judgment about whether the expert's

background of training and experience is sufficient for him or
her to give the expert opinion that you heard and whether the
expert's opinions are based on sound reasons, judgment, and
information.

During the trial, an expert witness may be asked a question
based on assumptions that certain facts are true and then asked
for his or her opinion based on that assumption.  Such an
opinion is of use to you only if the assumption is based on
assuming facts that are proven later.  If you find that the
assumptions stated in the question have not been proven, then
you should not give any weight to the answer that the expert
gave to that hypothetical question.

*Objections:*  During the trial, you will hear the lawyers
make objections to certain questions or to certain answers of
the witnesses.  When they do so, it is because they believe the
question or answer is legally improper and they want me to rule
on it.  Do not try to guess why the objection is being made or
what the answer would have been if a witness had been allowed to
answer it.

If I tell you not to consider a particular statement that
has already been made, put that statement out of your mind and
remember that you may not refer to it during your deliberations.

*Judge's Comments to a Lawyer*:  I have a duty to caution or
warn an attorney who does something that I think is not in
keeping with the rules of evidence or procedure.  You're not to

1    draw any inference against the side whom I may caution or warn

2    during the trial.

3        *Questions:*  During the trial, I may sometimes ask a witness

4    questions.  Please do not assume that I have any opinion about

5    the subject matter of my questions.  I usually ask questions if

6    there's something that I think is unclear to you.  I try to

7    anticipate what might be puzzling to you, and I'll ask a

8    question to try to clear that up.

9        But if you want to ask a question about something you do

10   not understand, write it down on a separate slip of paper.  When

11   the lawyers have finished all their questions to the witness, if

12   your question is still unanswered to your satisfaction, raise

13   your hand, and I will take the written question from you, show

14   it to counsel, and decide whether it is a question that can be

15   asked.  If it cannot be asked, I'll tell you that.

16       I'll try to remember to ask about questions, but once we

17   get going, I try to move things along, so I'm probably going to

18   try to just get the next witness up.  But don't let me railroad

19   you.  If there's something you really want to know, raise your

20   hand, I'll see it, and then I'll get the written question from

21   you.  Like I said, I try to anticipate what's unclear to you,

22   but if I miss something, raise your hand, and we'll get it

23   cleared up.

24       *Notetaking:*  If you want to take notes, there are notepads

25   and pencils available to you.  This doesn't mean that you have

1    to take notes.  Take notes if you want to and if you think they

2    will help you recall the evidence during your deliberations.  Do

3    not let notetaking interfere with your important duties of

4    listening carefully to all of the evidence and of evaluating the

5    credibility of the witnesses.  Keep in mind that just because

6    you have written something down does not mean that the written

7    note is more accurate than another juror's mental recollection

8    of the same thing.  No one of you is the secretary for the jury

9    charged with the responsibility of recording the evidence.  Each

10   of you is responsible for recalling the testimony and other

11   evidence.

12        Although you can see that the trial is being recorded by a

13   court reporter, you should not expect to be able to use trial

14   transcripts in your deliberations.  You'll have to rely on your

15   own memories of the testimony in the case.  When you go back to

16   deliberate, you'll have all the written evidence.  We'll send

17   that back to you so that you have it to look at during your

18   deliberations, but you'll have to rely on your memory of the

19   testimony of the witnesses.

20        We have two monitors that we use to present evidence.  One

21   is over here mounted on the wall.  The other is on a stand over

22   there.  When the trial begins, we'll pull that over a little bit

23   closer to the witness stand.  You should be able to see one or

24   the other of them.  If you're having trouble seeing the

25   evidence, raise your hand and let me know.  I can make the

1    attorneys zoom in on a document so that the type is larger or

2    something like that.  So it's important you see the evidence.

3    If you're having trouble, raise your hand, and we'll do what we

4    can to make sure you can see it.

5         All right.  Those are my opening instructions.  So we will

6    take an hour for lunch now, and we will reconvene at 1:15.

7    We'll round up to the next five-minute increment there.  So 1:15

8    we'll come back, and then we'll hear the opening statements from

9    the parties, and then we'll roll right into the evidence.  So

10   remember not to talk about the case or do any research.  You can

11   tell your family that you have been chosen for a jury so they're

12   not wondering what happened to you, but don't tell them what

13   kind of case it is or anything about the case.  You can -- after

14   the trial is over, you can talk about it as much as you want,

15   but for now don't even tell them what the case is.

16        Yes?

17        MS. MOORE-KERR:  And you expect it will go through

18   Friday, so we should tell the employers that --

19        THE COURT:  I do not expect that it will go through

20   Friday.  I think it will go faster than that, and I'll do

21   everything I can to get it done faster than that, but it could

22   possibly go through Friday.  So I wanted to make sure you would

23   be available through Friday, but I expect it to go faster than

24   that.

25        MS. MOORE-KERR:  Do you have a guesstimate?

```
 1                THE COURT:  I have a hope.

 2                MS. MOORE-KERR:  I'll take a hope.

 3                THE COURT:  I would like to get it done in three days.

 4                MS. MOORE-KERR:  Counting today?

 5                THE COURT:  Counting today, yes.  So I'd like to have

 6       it done on Wednesday or at least have it in your hands on

 7       Wednesday.  That's when I'm going to try to get it done.  The

 8       parties told me it would take four days so --

 9                MS. MOORE-KERR:  Thank you.

10                THE COURT:  I sit up here, so I can get things to move

11       along quickly, so I'll do what I can to make it move along

12       quickly.  So I don't want to take any more time than I have to

13       from you.  All right?

14            We'll see you after lunch.

15                THE CLERK:  This Honorable Court stands in recess.

16            (Jury exits the courtroom at 12:12 p.m.)

17                THE COURT:  Okay.  I think you indicated you wanted to

18       use the podium at least for opening statements, so we will have

19       that set up, and then we can move the monitor over so it's

20       closer to the witness stand so it can be seen.

21            All right.  We'll see you at 1:15 also.  Thank you.

22            (Recess at 12:13 p.m.)

23                              ***

24

25
```

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is a true and accurate record of the proceedings held

4     on the 7th day of October, 2019, before the Honorable

5     James D. Peterson, Chief U.S. District Judge for the Western

6     District of Wisconsin, in my presence and reduced to writing in

7     accordance with my stenographic notes made at said time and

8     place.

9          Dated this 18th day of October, 2019.

10

11

12

13

14

15                          _____/s/ Jennifer L. Dobbratz_____

16                          Jennifer L. Dobbratz, RMR, CRR, CRC
                                 Federal Court Reporter
17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.