UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

 -vs-                           Case No. 17-CV-739-JDP

WAL-MART STORES, INC., and        Madison, Wisconsin
WAL-MART STORES EAST, L.P.,       October 8, 2019
                              8:44 a.m.

      Defendants.

_____

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF JURY TRIAL
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

          U.S. Equal Employment Opportunity Commission
          BY:  LAURIE A. VASICHEK
          330 2nd Avenue South, Suite 720
          Minneapolis, Minnesota  55401

          U.S. Equal Employment Opportunity Commission
          BY:  CARRIE VANCE
          310 West Wisconsin Avenue, Suite 500
          Milwaukee, Wisconsin  53203

          U.S. Equal Employment Opportunity Commission
          BY:  JEAN P. KAMP
          500 West Madison Street, Suite 2000
          Chicago, Illinois  60661

Also appearing:  ROSEANN SLAGHT, Guardian
                AMANDA BECKERINK, Paralegal

          Jennifer L. Dobbratz, RMR, CRR, CRC
          U.S. District Court Federal Reporter
          United States District Court
          120 North Henry Street, Rm. 410
          Madison, Wisconsin  53703
          (608) 261-5709

For the Defendants:

                    MWH Law Group, LLP
                    BY:  EMERY K. HARLAN
                    735 North Water Street, Suite 610
                    Milwaukee, Wisconsin  53202

                    MWH Law Group, LLP
                    BY:  WARREN E. BULIOX
                    111 East Wisconsin Avenue, Suite 1000
                    Milwaukee, Wisconsin  53202

Also appearing:  JULIE REPKA, Corporate Representative, Walmart
                  KIMBERLY ROYAL, In-House Counsel, Walmart
                  TRACY TOMPKINS, Paralegal

\*\*\*

## INDEX OF WITNESSES

| PLAINTIFF'S WITNESSES | EXAMINATION | PAGE |
|---|---|---|
| MATTHEW COPPERNOLL | Continued Direct Exam by Ms. Vance | 16 |
|  | Cross-Examination by Mr. Harlan | 36 |
|  | Redirect Examination by Ms. Vance | 82 |
| JULIE REPKA | (Deposition Designations Read) | 91 |
| MATTHEW MATHENY | Direct Examination by Ms. Vasichek | 92 |
|  | Cross-Examination by Mr. Harlan | 105 |
|  | Redirect Exam by Ms. Vasichek | 108 |
| AMANDA FELLOWS | (Deposition Designations Read) | 109 |
| SHEILA RAE MARTIN | (Deposition Designations Read) | 111 |
| REGINALD COFFIN | (Deposition Designations Read) | 111 |
| JULIE REPKA | (Deposition Designations Read) | 112 |

## INDEX OF EXHIBITS

| PLAINTIFF'S EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 4 | 2001 Performance Evaluation | 70 | |
| 9 | 2006 Performance Evaluation | 74 | |
| 11 | 2008 Performance Evaluation | 18 | |
| 15 | 2012 Performance Evaluation | 75 | |
| 22 | Job Description | 48 | |
| 30 | Progress Notes | 101 | |
| 31 | Email - Matheny | 103 | |
| 32 | Responses to Requests for Admission | 84 | 84 |
| 33 | Responses to Requests for Admission | 84 | 84 |
| 34 | Responses to Requests for Admission | 84 | 84 |
| 52 | Notice of 30(b)(6) Deposition | | 91 |
| 60 | Defendants' Answer to Complaint | 84 | 84 |

DEFENDANTS' EXHIBITS                              IDENTIFIED   RECEIVED

520      Letter                                      65          65

                              ***

4        (Proceedings called to order at 8:44 a.m.)

5           THE CLERK:  Case No. 17-CV-739, *Equal Employment*

6    *Opportunity Commission v. Walmart Stores, Incorporated, and*

7    *Walmart Stores East, L.P.*, called for the second day of jury

8    trial.

9        May we have the appearances, please.

10          MS. VASICHEK:  On behalf of the EEOC, Laurie Vasichek,

11   Carrie Vance, and Amanda Beckerink.

12          THE COURT:  Good morning.

13          MR. HARLAN:  Good morning, Your Honor.  Emery Harlan,

14   Warren Buliox, Tracy Tompkins, and Julie Repka on behalf of

15   Walmart.

16          THE COURT:  Good morning.

17          MR. BULIOX:  Good morning.

18          THE COURT:  All right.  So what can we do to facilitate

19   our work today?

20          MS. VASICHEK:  We have some exhibit issues that we

21   would like to address, Your Honor.

22          THE COURT:  Okay.

23          MS. VASICHEK:  First, yesterday defendants during trial

24   served on us or sent to us a series of six, I believe, exhibits

25   that they want to use with their expert, Dr. Shapiro.  We had

1    not seen them before.  We object to this late production.  We

2    haven't had time to prepare --

3             THE COURT:  What are the exhibits?

4             MS. VASICHEK:  Do you have them?

5             MR. HARLAN:  They're demonstratives, Your Honor, that

6    basically he would use to assist the jury in understanding what

7    a person would --

8             THE COURT:  Can I see them?

9             MR. HARLAN:  We can get them to you, Your Honor.  I

10   don't think we have printouts of them.  Can we send it to Andy

11   to get to you?

12            THE COURT:  No.  I want to see them right now.

13            MR. HARLAN:  Yes, sir.  Yes, sir.

14            MS. VASICHEK:  In addition, Your Honor, we believe that

15   they relate to the direct threat defense, which has been

16   excluded by the Court.

17            THE COURT:  While they're pulling those up, is there

18   anything else we can do this morning?

19            MS. VASICHEK:  Yes, Your Honor.  We also have an

20   objection to Exhibit 521, which is medical records that relate

21   to Paul Reina.  We have a specific objection to one as being

22   unduly prejudicial.

23            THE COURT:  Hold on.  Let me get those up here.

24        Okay.  I'm sorry.  Give me the exhibit number again, if you

25   would.

1          MS. VASICHEK:  521.

2          MR. HARLAN:  May I approach, Your Honor?

3          THE COURT:  Yes.  Okay.  So I see one.  Are they all --

4     I see.  Scroll down.

5          MR. HARLAN:  Yes.  Yes, sir.  And I guess defendants'

6     position is it would be helpful for the jury when he talks about

7     what his vision is.

8          THE COURT:  I would have allowed those if they had been

9     disclosed with the report, but they're untimely.  They're

10    excluded.  Okay?

11         MS. VASICHEK:  With regard to 521, Your Honor, we would

12    refer you to the first page of this document.  It refers to an

13    incident or a discussion in the year 2000, 16 -- 15 years before

14    Mr. Reina was let go where it says he's been acting out more

15    sexually, rubbing his penis.  This is unduly prejudicial.  It's

16    out of time.  It had nothing to do with what happened at Walmart

17    and why they let him go.

18         THE COURT:  I agree.  It's excluded.

19         MS. VASICHEK:  We'd also like to exclude any reference

20    made, in addition to this exhibit, to events of that time

21    relating to his developing sexuality.

22         THE COURT:  I agree.

23         MR. HARLAN:  Your Honor, can we speak?

24         THE COURT:  Briefly, go ahead.

25         MR. HARLAN:  Yeah.  So the issue, even on the exhibit

1    that you just excluded, there's information in there -- I can

2    understand if there's a concern about that reference, that we

3    can redact it, but the issue is absolutely relevant to damages.

4    They are claiming that as a result of what happened to him in

5    June of 2015, he suffered a material detrimental impact to his

6    health.  These records show that far in advance of that date,

7    Mr. Reina was experiencing a significant number of adverse

8    medical situations, including heightened anxiety, which is what

9    they're testifying to was a result of what happened to him at

10   Walmart.  So we think the records are absolutely relevant on the

11   damages issue.

12        MS. VASICHEK:  If we may --

13        MR. HARLAN:  It says right here that he's struggling --

14   they have been trying to redirect him as of this date, so this

15   is well before any issues with Walmart occurred, and they're

16   having to deal with that then.  And so for them to now testify

17   in this trial that all these adverse medical situations are due

18   to what Walmart caused him, these records are absolutely

19   pertinent and important for our defense.

20        MS. VASICHEK:  If I may, Your Honor, there's never been

21   any dispute that he has an anxiety disorder, but we don't see

22   where going back to 2000 has any relevance to this case.  We

23   would ask they be limited in the documents -- the medical

24   documents immediately preceding and after Mr. Reina --

25        THE COURT:  The 2000 is too remote in time.  I'm

1    excluding that.  So I understand your position.  I've heard it.

2    It's too remote in time.  2000 is out.

3        Now, 521 includes documents that are more contemporary.

4    There's some from 2010.  So my ruling on the 2000 exhibit,

5    that's out.

6            MS. VASICHEK:  Our request would be that they're

7    limited from 2013 forward.  That gives them a couple years in

8    advance, and it gives them a couple years after.

9            MR. HARLAN:  But the whole point, Your Honor, is if

10   this has been a long-standing issue, it makes it more likely

11   that the jury will consider this to not be causal to what

12   happened --

13           THE COURT:  2000 is too remote.  What is the cutoff

14   that's reasonable?  Do you have a constant set of records from

15   2000 going forward?

16           MR. HARLAN:  Yeah, we have an extensive set of records

17   that show that this is a long-standing issue.

18           THE COURT:  2000 is too remote.  So 2013 seems

19   reasonable to me.  All right.  So 2013 is the cutoff.

20           MR. HARLAN:  So if we don't have records here that show

21   that he was experiencing anxiety from 2013 to June of 2015 --

22           THE COURT:  Tell me what it is that you want to put in.

23           MR. HARLAN:  I guess, Your Honor, if you would -- we're

24   not going to use these records until Dr. Deming, so if you want

25   me to go through the records and then identify specific ones

1    that are more -- that are closer in time -- I'm just

2    concerned --

3         THE COURT:  Here's my -- if you have records that are

4    close in time -- 2013 seems reasonable to me as a cutoff.  You

5    show me what was going on with him in 2013, that is close enough

6    in time to be pertinent.  If you can show me that he has had a

7    consistent problem for a long time, that's another matter, but

8    to just go and pick out isolated incidents going back as far as

9    2000 seems unfair to me and really irrelevant.  Now, if it's

10   just a constant, ongoing problem, show me the records.

11        MR. HARLAN:  And, again, I will move on.  I understand

12   you're going to let me get back to you, but even if you look at

13   the first page, Your Honor, it says "This past year we've been

14   concerned about Paul's anxiety levels becoming increasingly

15   problematic."

16        THE COURT:  Yeah.  It's too far remote in time.

17        MR. HARLAN:  Okay.  Thank you, Your Honor.  I

18   appreciate you letting me be heard.

19        MS. VASICHEK:  Next, Your Honor, we'd like to

20   address -- I'm sorry.  Did I speak over you?

21        THE COURT:  No.  I'm ready for the next one.

22        MS. VASICHEK:  We'd like to address the defendants'

23   request to introduce Exhibits 47 and 48.  These are the charge

24   and the form that Ms. Slaght signed for the charge.  Our

25   understanding is that they've conceded the charge is relevant

1    and, excuse me, proper, and so we don't see what basis it is to

2    getting into this information again.

3            MR. HARLAN:  First of all, Your Honor, this is their

4    exhibit so --

5            THE COURT:  That doesn't matter.

6            MR. HARLAN:  So we are offering it to basically be able

7    to use it with Ms. Slaght to try to understand the

8    circumstances, because Mr. Reina's competence and his ability to

9    understand and communicate is a relevant issue in this case, and

10   so we intend to ask her some questions about how this charge got

11   signed.  You can see that it's signed by Mr. Reina.  There has

12   been conflicting testimony about what his ability to understand

13   and to comprehend and to communicate is, so we think it's

14   terribly important for us to be able to briefly discuss with Ms.

15   Slaght during her examination how she was able to communicate

16   with Mr. Reina about the circumstances set forth in the charge

17   that he signed.  So it would be one thing if the issue of his

18   competence and functionality and ability to comprehend things

19   was not a relevant issue in this case, but obviously to perform

20   customer service at the level Walmart expects --

21           THE COURT:  I'll allow you to ask how he signed the

22   form and how she got information about -- in the charge.

23           MR. HARLAN:  Thank you, Your Honor.

24           THE COURT:  It should be brief, and I don't want to go

25   through the whole document.

1            MR. HARLAN:  It will be exceedingly brief.

2            THE COURT:  Just questions about how he signed it and

3    how she got the information.

4            MR. HARLAN:  Thank you, Your Honor.

5            THE COURT:  Okay.  You said 47 and 48 did you say?

6            MS. VASICHEK:  Yeah.  48 is the document where she's

7    authorizing him to sign it.  So if 47 comes in, we don't have an

8    objection to 48 coming in.

9            THE COURT:  All right.

10           MR. HARLAN:  Do you want to take up the interview

11   comment document?

12           MS. VASICHEK:  Which one is that?

13           MS. VANCE:  That's the blank --

14           MS. VASICHEK:  Oh, the blank one.  Sure.

15       Carrie, that's yours.

16           MS. VANCE:  All right.  Your Honor, we do have a

17   challenge to a blank document coming in, an authenticity

18   challenge and relevance, and that's -- I need a second here --

19   510.  You'll see a blank sheet of paper with no indication that

20   Paul Reina -- that this blank sheet of paper had anything to do

21   with Paul Reina.  We don't know where this document came from.

22   We have no foundation.  It was not --

23           THE COURT:  Let's find out.

24           MR. HARLAN:  Ms. Repka is going to testify that this is

25   a document that --

1           THE COURT:  I'm sorry, who is?

2           MR. HARLAN:  Ms. Repka, sitting at counsel table, will

3    be testifying about the document.  She's a market human

4    resource, now people partner, if I've got the title right.  She

5    has competence to be able to testify to the authenticity of the

6    document, and that's what we plan to do.

7           THE COURT:  How is it relevant?

8           MR. HARLAN:  It's relevant because there are questions

9    on the document that they were using --

10           THE COURT:  It's the interview form.  I can see that.

11   So how is it relevant to Mr. Reina?

12           MR. HARLAN:  Because it's relevant to the case because

13   customer service is a key issue in the case.  There are

14   questions that relate to customer service.  The EEOC is

15   downplaying the importance of customer service.  The fact that

16   they have a document where they're interviewing associates on

17   that issue is absolutely relevant.  It shows that they are

18   really concerned about the ability to execute on customer

19   service.

20           THE COURT:  I still -- the relevance to Mr. Reina is

21   escaping me.  I don't see how this relates to Mr. Reina.

22           MR. HARLAN:  Because we are challenging Mr. Reina's

23   ability to deliver customer service, okay, Your Honor?  And so

24   we think a record that shows that the company has had a

25   long-standing practice of interviewing associates for positions,

```
1    okay, at the company where they are probing whether the
2    associate has the ability to execute customer service to their
3    expectations is absolutely relevant because it shows the bona
4    fide --
5              THE COURT:  I'm still lost here.
6              MR. HARLAN:  Okay.  Let me help you.
7              THE COURT:  Did Mr. Reina answer these questions?  Were
8    these put to Mr. Reina?
9              MR. HARLAN:  These questions were not put to Mr. Reina.
10             THE COURT:  Are they put to cart pushers?
11             MR. HARLAN:  They are put to cart pushers and other
12   employees.
13             THE COURT:  Okay.  So this is the interview form that
14   all employees are asked --
15             MR. HARLAN:  At one point in time -- I'll have to
16   confer with Ms. Repka in terms of the length of time -- but it
17   has been part of the interview process at Walmart.  So given
18   that customer service is an issue, how they vet employees and
19   what kind of information they're seeking that relates to their
20   ability to deliver customer service seems to me a relevant issue
21   that we ought to be able to explore and then prove that we're
22   concerned about it.
23             THE COURT:  But it didn't matter for Mr. Reina's
24   employment.
25             MR. HARLAN:  Well, the issue of customer service
```

1    absolutely mattered for Mr. Reina's employment.  Whether that

2    document was used in Mr. Reina's interview seems to me not the

3    real issue that we're trying to make, and we're trying to make

4    the point that customer service, contrary to what the EEOC has

5    maintained, is a real and it's an important issue at the

6    organization.

7              THE COURT:  But your client hired him without asking

8    him these questions.

9              MR. HARLAN:  Well, I didn't say that.  You asked about

10   those forms, and I'm saying I don't know the answer to that.  I

11   will get the answer.  I would at least ask --

12             THE COURT:  Isn't Ms. Repka right there?

13             MR. HARLAN:  Yeah.  I'd prefer not to talk to Ms. Repka

14   in open court about a privileged issue, but I would ask at the

15   minimum, Your Honor -- there's no reason to exclude it now.  Why

16   don't you reserve ruling on it until I can lay a foundation to

17   show that it's relevant?

18             THE COURT:  Because that would take time in front of

19   the jury, and I don't want to take the time if I know that

20   it's -- it's at best of marginal relevance.  I get the point

21   about customer service, but if you didn't ask this of Mr. Reina

22   before you hired him, I don't see how these questions are

23   relevant.  Some people you ask these questions; some people you

24   don't.  Mr. Reina you didn't ask him.

25             MR. HARLAN:  Right, but --

```
 1              THE COURT:  I fail to see the relevance at all here.
 2              MR. HARLAN:  Your Honor, I don't think I can state it
 3    any more clearly --
 4              THE COURT:  All right.  That one is out.
 5              MS. VASICHEK:  Next, Your Honor, we're moving to
 6    exclude Deposition Exhibit 516.  516 is a draft of a letter to
 7    Paul Reina that was never sent.  Ms. Slaght will testify she
 8    never got it.  Walmart has nobody to indicate it was ever sent.
 9              THE COURT:  All right.  What is the relevance of this
10    letter?
11              MR. HARLAN:  Your Honor, we will withdraw that one.
12              THE COURT:  Okay.  Good.
13              MR. BULIOX:  But, Your Honor, just to be clear, we're
14    just withdrawing the first two pages, which is the letter that
15    Mr. Reina -- or that was sent or at least drafted.
16              THE COURT:  Okay.  So that's the first two pages of 516
17    are withdrawn.
18              MR. BULIOX:  Yeah.
19              THE COURT:  That leaves the other pages of 516.
20              MR. BULIOX:  Which is the letter dated March 25th.
21              MS. VASICHEK:  And we don't have an objection to that,
22    those pages.
23              THE COURT:  Okay.  Good.  So that's resolved.  516 will
24    be -- first two pages are withdrawn.  Otherwise it's admissible.
25         Okay.  Anything else?
```

```
 1              MS. VASICHEK:  And, finally from us, there's a line at
 2      the bottom of 517 that we had an issue -- they would like to
 3      redact.  It says "I just sat through a mediation," and we may
 4      have worked this out.  If they would just substitute the word
 5      "meeting" for "mediation," which they're doing in other
 6      documents, I think that that would suffice.
 7              THE COURT:  Does that work it out?
 8              MR. HARLAN:  So let me look at it, Your Honor.  Yeah,
 9      substituting "meeting" for "mediation" would be fine.
10              THE COURT:  Okay.  Good.
11              MS. VASICHEK:  And I believe that's all we have at this
12      time.
13              THE COURT:  All right.  Very good.  Okay.  We've --
14              MR. BULIOX:  Judge, we have a few items.
15              THE COURT:  Okay.  We've got a jury waiting now.  Can
16      they wait until a break?
17              MR. BULIOX:  Sure.
18              THE COURT:  Okay.  Let's do that.
19          All right.  Let's bring the jury in.
20          Let's get Mr. Coppernoll back.
21              MS. VANCE:  In?
22              THE COURT:  Yes.
23           (Jury enters the courtroom at 9:02 a.m.)
24              THE CLERK:  The United States District Court for the
25      Western District of Wisconsin is now in session.  District Judge
```

```
 1     James D. Peterson presiding.  Please be seated and come to

 2     order.

 3         Case No. 17-CV-739, the EEOC v. Walmart Stores,

 4     Incorporated, and Walmart Stores East, L.P., called for the

 5     second day of jury trial.

 6             THE COURT:  Good morning.  Welcome back.  We're going

 7     to resume with Mr. Coppernoll, as soon as we bring him into the

 8     courtroom.  Here he is.  Very good.

 9         Come on up.  Good morning, Mr. Coppernoll.

10             THE WITNESS:  Good morning.

11             THE COURT:  We won't need to swear you in.  I'll just

12     remind you that you're still under oath, and you should stay one

13     foot away from the microphone.

14                   CONTINUED DIRECT EXAMINATION

15     BY MS. VANCE:

16     Q    Good morning, Mr. Coppernoll.

17     A    Good morning.

18     Q    And --

19             THE COURT:  Ms. Vance, you'll need to position the

20     microphone.

21             MS. VANCE:  Thank you.

22             THE COURT:  I understand.  You'll have to negotiate the

23     binder and the microphone both.

24     BY MS. VANCE:

25     Q    We were discussing performance evaluations.  I'll just
```

—MATTHEW COPPERNOLL - DIRECT—

1  refresh your recollection.  Exhibit 10 we had pulled up.  And

2  for Exhibit 10, I'd like you to look down at -- well, actually,

3  let's go back and establish this is the 2007 performance

4  evaluation we see on the second page, and the overall evaluation

5  is "Meets Expectations."  Do you see that?

6  A    Uh-huh.

7  Q    And you were part -- you participated in this performance

8  evaluation, correct, this review meeting?

9  A    Correct.

10  Q    All right.  And so I want to zoom in here on *Dependability*

11  for absences.  How many absences do you see there?

12  A    Zero.

13  Q    And for tardies?

14  A    One tardy.

15  Q    One tardy.  All right.  And then let's turn to that page

16  where we see the *Strengths*.  "Paul does what is asked of" --

17  excuse me.  "Paul does what is asked of him.  Brings in carts

18  from the lot.  Never calls in, is always at work."  And then we

19  had that one tardy.  When we go to *Areas For Improvement*, "Make

20  sure to get to work on time."

21  A    Yes.

22  Q    Yes.  And when -- and then I wanted to zero in on the pay

23  right above that.  The current pay was $9.07 per hour.  Then

24  there was a raise to -- of 40 cents to $9.49 an hour.  Do you

25  follow?

—MATTHEW COPPERNOLL - DIRECT—

1    A    Right, yes.

2    Q    And to your memory, did Mr. Reina have a raise every year

3    for his performance evaluation?

4    A    I believe so, yes.  Every year that I worked with him

5    anyway.

6    Q    I'll ask to turn to Exhibit 11, which is the next 2008

7    evaluation, and let's just scroll through so we can see the

8    overall evaluation is "Meets Expectations," and then when we go

9    back up through the exhibit, every single check -- "X" mark is

10   in a "Meets Expectations" column, correct?

11   A    Right.

12   Q    And then I wanted to zero in on these "NA"s.  On the third

13   line of the first page, I see "Answers all customer service

14   calls from other associates, NA."  Do you know what that means?

15   A    Not for certain, no.

16   Q    No.  And did other associates make customer service calls

17   to Mr. Reina in this time frame?

18   A    I'm assuming that might mean that they requested Paul to

19   assist them.  If Paul was asked to assist another worker, he

20   would certainly do that.

21        MR. HARLAN:  Your Honor, I would object and move to

22   strike based on foundation.

23        THE COURT:  Overruled.

24   Did he ever get asked by other Walmart employees to come

25   help out with something?

MATTHEW COPPERNOLL - DIRECT

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Give us an example.

 3              THE WITNESS:  A customer service representative or

 4     manager would, for instance, wave for Paul to come over and

 5     assist the customer with carrying out groceries to their

 6     vehicle, that type of situation.

 7              THE COURT:  Okay.  Anything else?  We talked about

 8     carrying groceries.  So he helped load groceries into the

 9     customers' cars.

10              THE WITNESS:  Correct.

11              THE COURT:  Did he do anything else?  Did he get asked

12     to do anything else?

13              THE WITNESS:  Pick up garbage in the parking lot.  I'm

14     thinking that's all that I recall at the moment.

15              THE COURT:  All right.  Very good.  Okay.  Back to you.

16              MS. VANCE:  Thank you.

17     BY MS. VANCE:

18     Q    And then it looks to me, do you agree, that there is no

19     check -- "X" mark regarding whether or not Paul met

20     expectations, was below expectations, or exceeded expectations

21     on that particular line, right?

22     A    Right.

23     Q    Okay.  And let's skip down to the -- two down, "Helps

24     customers find what they need."  Did you have any explanation,

25     as to why there's an "NA" right there, in that meeting?
```

```
 1    A    No.
 2    Q    And do you recall at any point anyone from Walmart
 3    commenting on Paul's performance of helping customers find what
 4    they need?
 5    A    No, I don't.
 6    Q    And if we could kind of slowly scroll through the rest of
 7    the document.  In the next part -- I want to just count with the
 8    jury -- I see --
 9              THE COURT:  I don't think we need to do that.
10    BY MS. VANCE:
11    Q    Okay.  I see a number of "NA"s.  And then we can go to the
12    Strengths section of this exhibit, please.  And if we could make
13    that readable.
14        Strengths: "Does a good job keeping carts filled inside the
15    building, works well with other cart pushers, does anything
16    asked from the CSMs."  Do you agree that's the performance
17    evaluation there?
18    A    Yes, I do.
19    Q    All right.  And then I'll ask that we go to -- no.  I'll
20    ask generally, Mr. Coppernoll, in your memory, was there ever
21    any indication in one of these performance evaluation meetings
22    with Paul and the managers that Paul was not performing the job
23    tasks that Walmart wanted him to perform?
24    A    No.  Paul always had positive reviews, and several times
25    there were comments made by managers that Paul was doing a good
```

```
1    job, and I would convey that to Paul during the meeting.
2    Q    Now, turning your attention to the scooters, the motorized
3    scooters that a customer can ride that has a basket in the front
4    for groceries.  To your knowledge, what was Walmart's policy
5    regarding those scooters for customers?
6    A    Well, as I remember, initially when I started, they were
7    not to be taken outside, and at some point, maybe around 2012,
8    2013, I think one of the managers -- the store manager approved
9    for those carts to be used out into the parking lot.
10   Q    And so if a customer -- in any situation where a customer
11   rode a scooter out to their car or out to the parking lot, what
12   would you and Paul do?
13   A    Typically people that rode the scooters out to the car,
14   they would usually return them to the vehicle, so Paul and I
15   would have no involvement most of the time.  There were
16   occasions --
17   Q    Actually, can you help me understand that?  You said
18   usually they would return them to the vehicle so you'd have no
19   problem?
20   A    Right.  So somebody would take the riding cart with their
21   groceries out to their vehicle, unload their vehicle -- unload
22   the riding shopping cart, and then return it back inside.
23   Q    I see.
24   A    So Paul and I would have no involvement in that situation.
25   If, for instance, somebody took the rider out to the parking
```

MATTHEW COPPERNOLL - DIRECT

1    lot, unloaded their vehicles, and perhaps left it, say, in the

2    handicapped section, if, when Paul and I were gathering the

3    carts out in the parking lot, we saw one of those, then I would

4    ride the shopping cart back into the building with Paul beside

5    me.

6    Q    Now, did Walmart ever give you any instruction regarding

7    those scooters?

8    A    Not that I recall, no.

9    Q    How often in your memory in the ten years would you

10   estimate that you encountered this issue where you rode the

11   scooter back into the store?

12   A    I mean, it was rare because most people returned the riding

13   shopping carts back into the building.  I would say maybe once

14   or twice a month.

15   Q    And did Walmart ever ask you or Paul to change anything

16   about the way you handled those scooters?

17   A    I don't think Walmart ever said anything about the shopping

18   carts.  It was, I guess, just common sense to me that you

19   wouldn't leave a shopping cart outside because of the various

20   weather conditions or whatnot.

21   Q    Now, I want you to just kind of think generally about the

22   job and the work Paul did with you.  Would you describe whether

23   any parts of the work Paul Reina performed were physically

24   strenuous?

25   A    Almost all parts of the job that Paul performed were very

1    physically strenuous, especially the parts of pushing the carts,

2    because you'd have as many as ten, maybe 12, carts nested

3    together, and he would have to push them.  Many times, because

4    the parking lot is on a slope, he would be pushing those carts

5    uphill.

6    Q    Would you characterize your role in the process, your role

7    as job coach, as a role that involved strenuous labor?

8    A    Not really because all I was basically doing was operating

9    as Paul's eyes and ears, watching out for traffic, maybe things

10   in the parking lot that could be a hazard, and steering.  That's

11   all I basically did was steer the lead cart in the direction we

12   wanted to go, and Paul would be pushing from the rear.

13   Q    And then were there any differences for you for the parts

14   of the job Paul did and the parts of the job you were able to

15   do?

16   A    Paul did the hard, physical job.  I just -- like I said, I

17   just kind of provided direction for him in that maybe watching

18   where the vehicles were, avoiding parked vehicles, other

19   pedestrians, and just watching to make sure everything was safe

20   for, you know, people involved.

21   Q    Okay.  And could you compare your ability for the strenuous

22   part of the job versus Paul's abilities for the physically

23   strenuous parts of the job?

24   A    Well, Paul's quite a bit younger.  He's 20 years younger

25   than I am, and he's very physically strong, and there's no way I

1    could do the job Paul did.  It's just -- steering the cart in a

2    direction is fairly easy.  Being in the back pushing it in all

3    kinds of weather conditions, heat, cold, maybe snow on the

4    ground, that's very physical labor.

5    Q    And just tell us for you personally, how would that have

6    affected you to do that?

7    A    Well, it would be fairly easy for me to steer the cart, but

8    for Paul in the back pushing, that's going to be -- that's quite

9    a lot of weight that he's pushing forward.

10   Q    I'll turn your attention to -- we've been discussing an

11   electric cart caddy that's motorized, automatically pushes

12   carts.  First of all, just give us a general idea about the

13   availability of the use of the cart caddy to you.

14   A    I'm not sure I understand the question.

15   Q    Were you -- was it even possible for you to use the

16   electric cart caddy every day?

17   A    The electric cart caddy, yeah, I could operate it.  I

18   operated it by the remote control.

19   Q    Okay.  So let's start out and think about how much you used

20   it.  When you first started as Paul's job coach, was there an

21   electric cart caddy?

22   A    I think there was, but its use was so unpredictable.  I

23   mean, sometimes the third-shift crew would fail to charge it

24   overnight, and then you couldn't use it during the day because

25   the machine was discharged.

MATTHEW COPPERNOLL - DIRECT

1    Q    Okay.  Was there any difference between the ability to use

2    it in the winter versus other weather?

3    A    In the winter, it was depending on the condition of the

4    parking lot.  If there was even an inch of snow on the ground,

5    you really couldn't use it because the wheels would just spin.

6    It's very heavy equipment.  It has like six or eight large car

7    or truck batteries in it, and so it's very, very heavy, and when

8    you would push it outside, if it was snowy or icy, you really

9    couldn't go anywhere.  And then you put any amount of carts on

10   the -- attach it to the cart caddy, then with that additional

11   weight, it would just -- the wheels would just spin.

12   Q    Is it fair to say then that if -- if there were winter

13   conditions in the parking lot, you were manually -- Paul was

14   manually pushing carts; is that right?

15   A    Correct, yes.

16   Q    So in the times when you did have the -- you know, the

17   right conditions for using the electric cart caddy, could you

18   describe kind of the breakdown with your role as the job coach

19   for getting the carts from wherever they are in the parking lot

20   to the cart caddy versus Paul Reina's role in that process of

21   loading the caddy?

22   A    I would basically steer the cart caddy down to the location

23   where we were going to -- or Paul was going to gather the carts,

24   and he would load or stack the carts into the -- see, on the

25   cart caddy, you have one cart that is always attached to the

MATTHEW COPPERNOLL - DIRECT

1    front of it.  You need that so that you can steer it more easily

2    from the front.  And so Paul would -- we would either seek

3    carts, stray carts we call them -- those are carts that are not

4    in the corral where you return them -- and those we would just

5    kind of walk by.  Paul would either go over on his own and get

6    that cart or I might point to the cart.  He would gather it and

7    pull it back and nest it in with the other carts that we had

8    collected.  Or else if we were near a cart caddy where -- or the

9    cart corral where there were several carts grouped together,

10   then Paul would pull them out and load them onto the cart caddy

11   until we had like -- it varied -- usually about 20, maybe 24,

12   carts together.  Then with using the hand-held remote control, I

13   would accelerate the carts from the rear as Paul was walking

14   aside of it, and I would also steer it towards the bay doors

15   where they would -- where they were brought into the building.

16   Q    And then as far as the last part of that process, what

17   happens when you get into the bay with the caddy?

18   A    Well, we wouldn't normally push the carts into the bay

19   using the cart caddy.  Paul would typically gather the carts off

20   of the cart caddy.  They would be facing the same direction as a

21   bay door.  He would usually open the door, go to the rear of the

22   carts and push them inside, and then close the door when we were

23   done.

24   Q    Did other -- you had an opportunity to observe other cart

25   pushers at work, correct?

1    A    Yes.

2    Q    Did other cart pushers use the electric cart caddy?

3    A    Yes, when they were there.  Typically Paul worked alone in

4    the morning from like 9:00 until 10:30, 11:00 when a second cart

5    pusher would come in, and Paul would -- we would let whoever the

6    new -- the cart pusher that came in use the cart caddy.

7    Q    Did other cart pushers also push -- manually push carts

8    through the parking lot without the caddy?

9    A    Yes.

10   Q    Did Walmart ever indicate to you that you and Paul should

11   or should not use the electric cart caddy?

12   A    No.

13   Q    Did Walmart management ever give you any feedback about

14   your efficiency or your inefficiency when you and Paul moved

15   carts from the parking lot to the store using the cart caddy?

16   A    I never remember them saying anything negative about Paul

17   using the cart caddy.

18   Q    And do you remember a comment from a former manager

19   about -- positive regarding efficiency?

20   A    Right.  I remember one of the former store managers -- I

21   think his name was Mike.  I can't remember his last name.  But

22   as we were pushing a group of carts up towards the bay door

23   entrance, Paul was gathering loose carts, or stray carts as we

24   call them, and nesting them together and pushing the carts

25   alongside of the cart caddy as I was operating it.  He was

—MATTHEW COPPERNOLL - DIRECT—

1    pushing additional carts up towards there, and Mike commented

2    "Now that's what I call efficiency."  That's basically the only

3    comment I remember.

4    Q    As part of your role as Paul's job coach, were you also

5    tuned into any anxiety problems that Paul might have had?

6    A    Yeah, I could tell when he was anxious.

7    Q    Would you describe for us how you would respond to Paul if

8    he was having -- if he was showing anxious -- or showing anxiety

9    at Walmart?

10   A    I would just try to maybe slow down and tell him, you know,

11   just calm down, take it easy, and maybe move him into an area

12   where he would be likely to be less distracted and could just

13   stop and take a break or a time-out, if you will.

14   Q    Okay.  So --

15        THE COURT:  I'm not sure you quite answered the

16   question.  How did you know that Paul was anxious?  What did he

17   do that made you recognize that he was having an anxiety issue?

18        THE WITNESS:  Okay.  He might do this hand wringing

19   gesture or go like this and make a stiff arm and stand up and --

20   or just make kind of a face that would show that he was upset

21   about something.

22   BY MS. VANCE:

23   Q    And I think you testified that you could take a break.  So

24   would you ask Paul "Do you need to take a break?  Do you want to

25   keep working?"  Is that something you would do?

—MATTHEW COPPERNOLL - DIRECT—

```
1    A    Right.  I would ask him, you know, "Do you want to, you

2    know, stop and take a break," or just maybe go sit in the car.

3    Things like that might calm him down, and then typically he'd

4    calm down after a couple minutes, and we'd continue working.

5         MS. VANCE:  And I'd ask the record to reflect that the

6    witness did use a few signs for some of his words during his

7    testimony to mimic how he communicates with Paul -- or

8    demonstrate.

9    BY MS. VANCE:

10   Q    Did you ever receive any complaints from Walmart management

11   about how you worked with Paul if he was having anxiety?

12   A    I don't remember ever receiving a complaint from any of the

13   managers.

14   Q    Okay.  And did you ever have any knowledge of a customer

15   showing concern about Paul having anxiety?

16   A    Yes.

17   Q    And what do you recall?

18   A    I remember one time I was at home after we had worked the

19   morning shift and received a call from Beloit Police

20   Department -- I think it was Town of Beloit Police Department.

21   Q    Can you help us out with a time frame here?  When was this?

22   Was it in the last year you worked with Paul?

23   A    It was a few years before that, maybe three years before,

24   and they told me that they were at Paul's home and they had

25   talked to him and that it seemed like there was a confrontation
```

MATTHEW COPPERNOLL - DIRECT

1    in the parking lot between him and I, and they wanted to know if

2    I was okay and basically if I had been injured and if I wanted

3    to file any kind of complaint or charges against Paul, which, of

4    course, I didn't.

5    Q    Say that again.  Of course you --

6    A    I did not.

7    Q    Did not.  And what do you remember?  What had happened that

8    day leading up to that?

9    A    Okay.  Paul had been agitated or anxious during the shift,

10   and I think he grabbed me by the lapel, which he did sometimes

11   when he was angry, rare occasion, he grabbed me by the lapel as

12   basically kind of to say "Stop.  Listen, something is wrong.  I

13   need -- I don't know what's going on."  And so I told him,

14   "Okay.  Well, we need to take a break and go to the car and sit

15   down."  Well, he did not want to go to the car.

16        So as he was grabbing me, I put my arm around him to kind of

17   give him a hug because that tended to calm him down, and after

18   that had happened, he seemed to calm down a little bit, but he

19   wanted to work -- continue working.  I wasn't sure he was ready

20   to continue working, so I wanted him to go to my car.  So I kind

21   of just tried to -- I nudged him or kind of -- I don't know what

22   the word is I'm looking for -- encouraged him to go back towards

23   my car, and I think I held my arms out like this, kind of stood

24   in front of him and directed him to go to the car.  And after a

25   couple minutes, he did go to the car again, and he was

—MATTHEW COPPERNOLL - DIRECT—

1    sufficiently upset that I thought we should just leave for the

2    day.

3    Q    During this time that you're describing, were you using

4    sign language?

5    A    Yes.

6    Q    Okay.  You testified about a bear hug.  Is that a tactic

7    you had ever used with Paul Reina in the past?

8    A    Several times, but I wouldn't classify it as a bear hug.  A

9    bear hug to me kind of connotates an aggressive-type action.  My

10   action was more like just kind of hold him and let him know, you

11   know, everything is okay, and I'm not going to hurt you, not

12   going to let anybody hurt you.  Just calm down and relax.

13   Q    Is it fair to call that an intervention for anxiety?

14   A    I would think so, yes.

15   Q    Did you and Ms. Slaght discuss interventions you would use

16   for Paul for anxiety?

17   A    Yes.

18   Q    And did you use any interventions this day three years

19   before Paul stopped -- before Paul's employment at Walmart

20   ended, did you use any interventions that day that you had not

21   previously discussed with Ms. Slaght?

22   A    I don't think so.

23   Q    At any time that day had you done anything to harm Paul

24   Reina?

25   A    No.

1    Q    At any time ever have you harmed Paul Reina?

2    A    No.

3    Q    Do you have knowledge of the result of the police

4    investigation?

5    A    Not really.  I never saw a report or anything like that.

6    Q    Okay.

7    A    I know there was no further action taken.

8    Q    Directing your attention to June, the last month of Paul's

9    employment with Walmart, active working with Walmart, explain

10   for us what happened during your last days working with Paul at

11   Walmart.

12   A    Okay.  Paul and I had worked a normal shift, and I think it

13   was about 11:45.  Paul was scheduled to get off at noon that

14   day, and about 11:45 Ms. Slaght came in and told us that we had

15   a meeting back with the store manager.  So we followed Rose back

16   and --

17   Q    Now, had you met this store manager prior to this meeting?

18   A    Not -- I wouldn't say an official meeting, but I had seen

19   him in passing and said hello, exchanged pleasantries, but

20   hadn't really talked to him or met him per se.

21   Q    And do you remember the name of this manager?

22   A    Jeff -- and it's a difficult-to-pronounce last name.  I

23   don't remember it.

24   Q    Does Scheuerell sound right to you?

25   A    Sounds right, yeah.

MATTHEW COPPERNOLL - DIRECT

1    Q    Okay.  And what interactions on that day did you have with

2    Mr. Scheuerell?

3    A    Well, when we went back to the meeting, he presented -- you

4    mean prior to the meeting?

5    Q    No, I'm sorry.  I'm asking you to tell us about the

6    meeting, please.

7    A    Okay.  When we went back into the meeting, he gave Rose a

8    piece of paper and informed her that in order for Paul to

9    continue working, she would need to fill out this information

10   and have his doctors complete it also.

11   Q    I want to ask you, to your memory of that meeting, was

12   there any discussion of Paul's anxiety?

13   A    No.

14   Q    Was there any discussion of how you interact with Paul

15   regarding anxiety?

16   A    No, I don't believe so.  No.

17   Q    And do you remember if there at that meeting was any

18   criticism of you and/or Paul?

19   A    I remember Jeff saying something to the effect that Paul

20   wasn't doing his job and that I was doing 90 to 95 percent of

21   his job.

22   Q    Did you respond to that?

23   A    Yeah.  I mean, I was just flabbergasted.  I could not

24   believe he said that, that I was doing 95 percent of Paul's job.

25   I'm physically incapable of doing that type of manual labor.  I

—MATTHEW COPPERNOLL - DIRECT—

1    think I made that clear to him that, you know, Paul's doing his

2    work.  I'm not doing 95 percent.  And at that point I believe he

3    said something like, you know, "You can just be quiet because

4    you're lucky I'm even allowing you in this meeting."

5    Q    And what do you remember saying in response to the idea

6    that you're performing the majority of the work?

7    A    I remember saying that I wasn't -- I couldn't do Paul's

8    job.  That's too hard of work for me.  Paul's doing his job.

9    Q    And did you ever return to work at Walmart after that

10   meeting?

11   A    No.  After we left, I never worked with Paul again at

12   Walmart.

13   Q    And then did you continue to work as a personal aide to

14   Paul beyond Walmart employment?

15   A    Yes.

16   Q    After Paul stopped being scheduled to work at Walmart, did

17   you have the opportunity to observe him to continue your work as

18   his personal aide?

19   A    Right, yes.  We did a number of things together.  We --

20   well, we seeked additional employment.  We went and filled out

21   applications at a number of establishments, businesses in the

22   Beloit area, South Beloit area.  We -- Paul had a little

23   semi-business where he built birdhouses and painted them, and

24   they were sold to his neighbors, friends, acquaintances.  We

25   also -- Paul eventually got a paper route with the Beloit

1    Shopping News and delivered quite a number of papers.

2    Q    And you said "eventually" got a job.  Do you recall how

3    much time lapsed between Walmart and the papers?

4    A    I can't say for sure.  I think it was maybe a year, a year

5    and a half, something like that.

6    Q    Now, I want to direct your attention to the period of the

7    summertime of 2015.  Did you ever, in your work -- continued

8    work with Paul, observe how the loss of employment at Walmart

9    impacted Paul?

10   A    Right.  When I'd go to visit Paul or his family or pick him

11   up to do an activity, he would ask if we were going to work.

12   Q    Can you demonstrate for us, please, how he would ask you

13   that?

14   A    Right.  He might say "Is it work time?"  And when he did

15   that, that would typically indicate to me that he was asking

16   about Walmart because that was -- for, you know, over ten years,

17   five days a week, we had done that activity.  So he was anxious,

18   and he'd ask about wanting to go to Walmart to work.

19   Q    And how -- what would happen?  How would you handle that?

20   A    I would tell him, "No, we don't work at Walmart anymore."

21   Q    Then what happens?

22   A    Well, he might make a face or do his kind of like stiff arm

23   thing.  It would last a few minutes, and then we'd either

24   continue with his activity or take a break and just let him

25   relax for a while until he was more comfortable to move on.

—MATTHEW COPPERNOLL - DIRECT—

```
1              MS. VANCE:  At this time, I have no further questions.
2      If the judge or the jury is going to question the witness, does
3      that happen now?
4              THE COURT:  We'll do cross-examination.
5              MS. VANCE:  Okay.
6              THE COURT:  Go ahead.
7                         CROSS-EXAMINATION
8      BY MR. HARLAN:
9      Q    Good morning, Mr. Coppernoll.  How are you?
10     A    Good.  Thank you.
11     Q    Good to see you.
12     A    How are you?
13     Q    Good.  Good to see you again.  We had a chance to spend
14     some time together when I took your deposition in this case,
15     right?
16     A    Yes.
17     Q    And during that time, I hope I treated you in a respectful
18     way.
19     A    Yes, you were fine.
20     Q    Okay.  And I plan to do the same today.
21     A    Thank you.
22     Q    So I do want to ask some questions relating to the
23     testimony you've given.  First, I want to just talk about your
24     relationship with the Slaght family.
25     A    Uh-huh.
```

MATTHEW COPPERNOLL - CROSS

1    Q    So everybody is clear, these folks are long-time, personal

2    friends, correct?

3    A    Correct.

4    Q    In fact, you would characterize Ms. Slaght and her husband

5    as two of your closest friends.

6    A    Yes, I would.

7    Q    You've socialized with them at dinners and on holidays?

8    A    Yes.

9    Q    And gone camping with them?

10   A    Yes.

11   Q    And that relationship has gone on for 45 years or so?

12   A    Yes.

13   Q    And you obviously want to be helpful to them in this case,

14   right?

15   A    Right.

16   Q    But you're going to tell the truth.

17   A    Absolutely.

18   Q    But you definitely want to assist them in this litigation,

19   right?

20   A    I want to assist in finding the truth.

21   Q    Yes, sir.  And so from 2005 to 2015, you were Mr. Reina's

22   primary job coach, correct?

23   A    His primary what?

24   Q    I'm sorry.  I'll get closer to the mic.  Job coach?

25   A    Yes.

MATTHEW COPPERNOLL - CROSS

1    Q    And so if anybody knows what the duties -- the essential

2    functions of the cart pusher job was during that time frame, you

3    would be the best person to testify to that, correct?

4              MS. VANCE:  Objection.  Argumentative.

5              THE COURT:  Overruled.

6              THE WITNESS:  I'm guessing I would be the most

7    experienced person.

8    BY MR. HARLAN:

9    Q    Right.  As opposed to any of his other job coaches.

10   A    Right, yes.

11   Q    So you would know what was going on in terms of Mr. Reina,

12   what the other cart pushers were doing for that time frame?

13   A    Right.

14   Q    Is that right?

15   A    Yes.

16   Q    Okay.  And, by the way, your role was to be his job coach,

17   correct?

18   A    Correct.

19   Q    And does that term "coach" bear any resemblance to

20   athletics in terms of coaching based on your experience?

21   A    I'm not sure if I could really equate it -- in effect -- in

22   the sense that we are a team working together to accomplish a

23   common goal, I would say yes.

24   Q    And that's what coaches do, right?

25   A    Right.

MATTHEW COPPERNOLL - CROSS

1    Q    But in the athletic realm, the coaches don't get on the
2    field and play, do they?
3    A    No.
4    Q    And that's not what you were supposed to be doing as a
5    coach, right?
6    A    I'm not sure what you mean by that.
7    Q    What I mean is you're not supposed -- you were not supposed
8    to be doing any aspect of Mr. Reina's job, correct, as his
9    coach?
10   A    I don't know that that's true.  I mean, I was acting as his
11   eyes and ears, and as one who was directing a cart to go one way
12   or another, Paul couldn't necessarily see what I wanted him to
13   do, and so -- and he couldn't view oncoming traffic.  So in that
14   sense, he would need some hands-on assistance from myself.
15   Q    So Ms. Slaght -- when you accepted the position to be his
16   job coach at Walmart, I think you testified just a few minutes
17   ago you understood your role as his job coach was to be his eyes
18   and ears, right?
19   A    Right.
20   Q    So that obviously, because of his vision impairment, if
21   there were hazards in the parking lot or traffic or something he
22   needed to avoid, you were there to help him avoid it, right?
23   A    Correct.
24   Q    And you could do that through signs, right?
25   A    Yes.

MATTHEW COPPERNOLL - CROSS

1    Q    Okay.  You didn't need to steer a cart in order for that to

2    happen, right?

3    A    If Paul couldn't see a hazard in front of him or an

4    oncoming vehicle, then my steering or directing him to stop was

5    necessary, yes.

6    Q    Right.  I mean, you could, for instance, touch him and tell

7    him, "Hey, don't go out there," right?

8    A    If Paul's way in the rear of a line of carts and I'm in

9    front, I couldn't very well touch him.

10   Q    Well, okay.  But you could look -- you could certainly turn

11   around and say, "Hey" -- you can give him a sign through your

12   communication "Don't proceed"?

13   A    Right.  If he was looking at me, I could.

14   Q    There wouldn't be a need for you to steer the carts in

15   order to serve as his eyes, correct?

16   A    I'm not sure about that.  I think it was necessary for me

17   to steer the carts.

18   Q    Okay.

19   A    I feel like it was.

20   Q    And you feel it was necessary because he couldn't do that

21   aspect of his job himself, correct?

22   A    Right, because he couldn't see oncoming hazards.

23   Q    And, therefore, in order for him to perform the essential

24   functions of his cart pusher job --

25            MS. VANCE:  Objection.  Legal argument.

MATTHEW COPPERNOLL - CROSS

1            THE COURT:  Overruled.  Go ahead.

2    BY MR. HARLAN:

3    Q    So for the purpose of him being able to perform the

4    essential functions of his cart pusher job, based on your

5    experience and knowledge of Mr. Reina, it was required for you

6    to do part of that job for him, correct?

7    A    I'm not really sure.  Could you restate the question?

8    Q    Yes, sir, I can.  So you told us that you felt that Mr.

9    Reina could not steer the carts himself, correct?

10   A    Right.

11   Q    And you would agree that --

12   A    Well, he could steer the carts himself, but he couldn't see

13   oncoming hazards.

14   Q    Okay.  He couldn't steer carts and avoid oncoming hazards;

15   that's your testimony?

16   A    He might not see them.

17   Q    Right.  So, in other words, he couldn't do it in a way

18   that's creating an accident, for instance, right?

19   A    Right.

20   Q    So that meant you had to do that for him, correct?

21   A    Right.

22   Q    He couldn't do it himself.

23   A    He wouldn't pay attention.

24   Q    I appreciate that, but so that means that he couldn't do it

25   himself; fair?

1    A    Okay.  Yeah.

2    Q    Okay.  And, therefore, you had to do that part of his job

3    for him; fair?

4    A    Yes.

5    Q    And so no amount of discussion with Walmart would change

6    that fact.  That's just a fact, correct?  He couldn't do it.

7         THE COURT:  I think we covered this.  He couldn't steer

8    the carts.

9         MR. HARLAN:  I'll move on.

10   BY MR. HARLAN:

11   Q    In terms of your role as Mr. Reina's job coach, you really

12   had no training to be a job coach, right?

13   A    I mean, other than the training from the previous fellow

14   that I had worked with and training I had from my previous

15   positions, no.

16   Q    So you certainly had no formal training to be a job coach,

17   correct?

18   A    Correct.

19         MS. VANCE:  Objection.  Mischaracterizes prior

20   exhibits, prior evidence.

21         THE COURT:  Overruled.  We saw you had some training,

22   but I guess none of that was about being a job coach; is that

23   right?

24         THE WITNESS:  Correct.

25         THE COURT:  Okay.

MATTHEW COPPERNOLL - CROSS

1    BY MR. HARLAN:

2    Q    And this, in fact, was your first stint being a job coach,

3    correct?

4    A    Yes.

5    Q    And this job coach -- job coach role that you served in

6    wasn't a volunteer position, was it?

7    A    No.  It was a paid position.

8    Q    So, for instance, in 2017 you got about $7,700 to be Mr.

9    Reina's job coach while he was building birdhouses; fair?

10   A    Among other things, yes.

11   Q    Okay.  Another way that you helped Mr. Reina perform the

12   essential functions of his job --

13          MS. VANCE:  Objection to the legal term "essential

14   functions."

15          THE COURT:  Yeah.  I don't know that this witness

16   really knows what the essential functions are, so put it in

17   terms that he can understand.

18   BY MR. HARLAN:

19   Q    So another way that you helped Mr. Reina perform the key

20   functions of his job or key job responsibilities was to keep him

21   on track, right?

22   A    Correct.

23   Q    Would you explain to the jury why you had to do that?

24   A    Because when Paul completed a certain aspect of his job, he

25   might stall and not know what to do to go on to the next step.

MATTHEW COPPERNOLL - CROSS

 1     For instance, if he had pushed a row of carts into the bay doors

 2     inside the store and after he had went and closed the door, he

 3     may not know what I wanted him to do yet, you know, next, so

 4     then I would have to go back and physically -- not physically,

 5     but assist him in going on to the next step, which might be

 6     going back outside to get another row of carts.

 7     Q    And so when you had started to work with Mr. Reina, he had

 8     been doing this for a long time, correct?

 9     A    Correct.

10     Q    And so one would expect that he would understand what he

11     was supposed to be doing when he finished one task, correct?

12     A    I mean, I can't get inside Paul's head, so I don't know

13     what he was thinking, but he might -- you know, I don't know why

14     he wouldn't or would.

15     Q    Okay.  But be that as it may, the reality is when you were

16     working with him from 2005 to 2015, you found it necessary,

17     given who Mr. Reina, you know, is and what his capabilities

18     were, that you had to prompt him and get him focused so he

19     wouldn't stall and do other aspects of his job, correct?

20     A    Right.  I assisted him in that.

21     Q    Now, part of Mr. Reina's job was to undergo regular

22     training at Walmart, correct?

23     A    Yes.

24     Q    And so I want to spend a few minutes talking about that.

25     And those trainings would be delivered via computer-based

MATTHEW COPPERNOLL - CROSS

1    learning programs, correct?

2    A    Yes.

3    Q    A typical setup would be you would go to the office with

4    Mr. Reina, and there would be a program that would play some

5    sort of training piece that the company wanted Mr. Reina to know

6    about and then test his knowledge afterwards, correct?

7    A    Correct.

8    Q    Now, that was part of his job, right?

9    A    Yes.

10   Q    That's one of the key job responsibilities is to undergo

11   that training, correct?

12        MS. VANCE:  Object to the characterization of "key job

13   duties."

14        THE COURT:  Overruled.  You can answer it.  Was that

15   one of his key job responsibilities?

16        THE WITNESS:  I think it was an important part of his

17   job duties.

18   BY MR. HARLAN:

19   Q    And so that's another thing that Mr. Reina couldn't do

20   himself; fair?

21   A    No, because it was -- I mean, it required you put on

22   headphones and listen to the material as it was being presented

23   on the computer screen.

24   Q    So the answer is, yes, it was something that Mr. Reina

25   could not do for himself, correct?

1    A    Correct.

2    Q    And so, as a result, what happened is that you would put

3    the headphones on as if you were Mr. Reina, and then you would

4    answer the questions that would come after the training had been

5    delivered, and then by answering those questions, you were

6    conveying to Walmart that Mr. Reina had received that training,

7    correct?

8    A    Yes.

9    Q    And I take it, as you sit here now and reflect upon that,

10   you have to know that wasn't right, correct?

11   A    Well, I don't know.  If I knew the material and I was

12   working with Paul, then I would instruct him in following those

13   procedures.

14   Q    But by taking the questions under his sign-in and under his

15   name, you were basically telling the company that Mr. Reina

16   understood the content that was delivered.

17   A    Could you repeat the first part of that, please?

18   Q    Would you agree with me that by taking the test at the end

19   of the material being delivered, you were communicating to the

20   company that Mr. Reina had received that information and had

21   absorbed it sufficiently to be able to answer the questions at

22   the end, correct?

23   A    Yes, in as much as the personnel director was standing over

24   our shoulder watching it.  I'm sure he was completely aware of

25   what was going on as well.

MATTHEW COPPERNOLL - CROSS

```
1    Q    Right.  But irrespective of whether that personnel -- that
2    unnamed personnel person was there watching that, you know that
3    that wasn't something you should have been doing, correct?
4    A    No, I don't know that.
5    Q    So you think it was appropriate for you to take training
6    that Mr. Reina was supposed to be receiving and then answer
7    questions as if you were Mr. Reina and tell the company that he
8    had passed the training?
9    A    I don't think it was wrong.
10   Q    Okay.  And do you have any information that folks in the
11   corporate office knew this was happening?
12   A    Excuse me?
13   Q    You said that there was a person at the store -- you said
14   there was a person at the store who was there when you would do
15   this from time to time?
16   A    That was Jim, the personnel manager, yes.
17   Q    So he's a local guy, right?
18   A    Yes.
19   Q    Do you have any knowledge of someone at Walmart corporate
20   knowing that this was going on?
21   A    I know absolutely nobody at Walmart corporate other than
22   yourself.
23   Q    Me?
24   A    Yeah.
25   Q    Okay.  I'm local.
```

MATTHEW COPPERNOLL - CROSS

1    A    Okay.

2    Q    Tracy, can we put up 22?

3        At your deposition, we went through the essential functions

4    of the cart pusher position on a job description.  Do you

5    remember that?

6    A    Vaguely.

7    Q    Okay.  We're just going to talk about them briefly and move

8    along.

9        If you could -- perfect.

10       So I want to focus on the *Essential Functions* section.  So

11   this is the job description that would have been in place when

12   Mr. Reina was there, right?

13   A    Okay.  Yeah.

14   Q    Okay.  So under the *Essential Functions,* there's a list of

15   items, and I just want to talk to you about them.  So the first

16   one says "Maintains availability and organizes carts/flatbeds."

17   You'd agree that that was an essential function of Mr. Reina's

18   job throughout the time he was at Walmart, correct?

19   A    Yes.

20   Q    Okay.  And it's also an activity that you saw other cart

21   pushers at Walmart doing, correct?

22   A    Yes.

23   Q    No dispute about that?

24   A    No.

25   Q    And that was, frankly, the most common aspect of his job

1    that he would do, correct?

2    A    Correct.

3    Q    And you saw Mr. Reina gathering those flatbeds that would

4    be in the parking lot from time to time?

5    A    Yes.

6    Q    And you also saw the other cart pushers doing that?

7    A    Yes.

8    Q    Okay.  Then the next thing that's listed is "assists

9    customers with transporting items."  That's listed as an

10   essential function.  Would you agree that that was one of the

11   essential functions of Mr. Reina's position when you worked with

12   him for that ten-year period?

13   A    Yes.

14   Q    Okay.  And customers on a regular basis would come up to

15   you and Mr. Reina asking for help transporting items, correct?

16   A    Yes.

17   Q    Out in the parking lot?

18   A    Yes.

19   Q    Sometimes they would need help taking groceries out to

20   their car, loading them into a vehicle, right?

21   A    Correct.

22   Q    It's something that happened many, many times while you

23   were working with Mr. Reina, correct?

24   A    Yes.

25   Q    And that particular function is something that Mr. Reina

1    could not do without you doing it for him, correct?

2    A    No, that's not true.

3    Q    So what part of that function could he do without your

4    assistance?

5    A    He could -- well, he could push the carts.  He could gather

6    the carts and flatbeds.  He could assist the customers with

7    transporting items and loading merchandise --

8    Q    Yeah.  I'm on the second point -- I'm sorry.  I didn't mean

9    to interrupt you.  I'm on the "assisting customers with

10   transporting items."  Is it the fact that he wouldn't even know

11   to go to the customer's car without you directing him to do

12   that?

13   A    Right, yes.

14   Q    Okay.  And that has nothing to do with his -- he would need

15   you to tell him to go to a customer's car.  Otherwise, the

16   customer wouldn't get him to go, correct?

17   A    Unless they knew sign language.

18   Q    Right.  And did you ever see an occasion where he

19   communicated with a customer who needed help taking groceries to

20   their car in sign language?

21   A    Yes.

22   Q    Okay.  How many times did you see that happen?

23   A    It was very rare.

24   Q    Okay.  So it's very rare that there are going to be

25   customers in that parking lot, based on your experience, who

MATTHEW COPPERNOLL - CROSS

 1    know the sort of sign language that Mr. Reina can understand?

 2    A    Right.

 3    Q    And on that issue of sign language, is it your

 4    understanding that Mr. Reina is proficient in ASL?

 5    A    Paul is -- he knows a lot more about ASL than I do.

 6    Q    And I think you testified in your deposition he actually

 7    knows ASL, right?

 8    A    I believe so, yes.

 9    Q    And so if there's somebody communicating with him in a

10    setting where they're using American Sign Language, you believe

11    he should understand that, correct?

12    A    I believe so.

13    Q    And the reality is you can't remember a single time where

14    Mr. Reina was able to help a customer take groceries from the

15    store and place them in the customer's car without assistance

16    from you or somebody else, correct?

17    A    I was always with Paul.

18    Q    Right.  But more specifically, somebody always assisted

19    Paul in that essential function, whether it was you or another

20    employee, correct?

21    A    Correct.

22    Q    And you would agree -- we heard some testimony about the

23    cart caddy.  You would agree that it's part of the cart

24    pusher/cart attendant's job to use that cart caddy, correct?

25    A    Yes.

MATTHEW COPPERNOLL - CROSS

1    Q    And you regularly saw other cart pushers, the people who

2    had the same job as Mr. Reina, using that cart caddy?

3    A    Yes, I did.

4    Q    And it was standard operating procedure while you were

5    there --

6    A    Yes.

7    Q    -- correct?  Is that yes?

8    A    Yes.

9    Q    And so if you're a cart pusher trying to fulfill the

10   essential job functions of your job, you need to know how to use

11   that cart caddy; fair?

12   A    Yes, fair.

13   Q    But, in fact, you were the person who operated that cart

14   caddy, right?

15   A    Yes.

16   Q    You tried to train Mr. Reina on using the cart caddy,

17   didn't you?

18   A    Yes.

19   Q    And what was the result?

20   A    Well, Paul wouldn't stay focused long enough, and he

21   couldn't see far enough or couldn't anticipate, say, a vehicle's

22   destination or route and anticipate where that vehicle would be

23   in relation to where the carts would be when he arrived at it.

24   Q    So the bottom line is for that part of Mr. Reina's job,

25   which you said was an essential function of his job --

MATTHEW COPPERNOLL - CROSS

1          MS. VANCE:  Renew the objection to the use of the term

2     "essential function."

3          MR. HARLAN:  I'll withdraw, Your Honor.

4          THE COURT:  All right.  Go ahead.

5     BY MR. HARLAN:

6     Q    That you said was a key job responsibility of Mr. Reina,

7     you tried to train him to do it, but he couldn't do it; fair?

8     A    Yes.

9     Q    And, in fact, if Mr. Reina was allowed to operate the cart

10    caddy, from your perspective and based on your experience, that

11    would create a liability risk, wouldn't it?

12          MS. VANCE:  Objection.  Calls for a legal conclusion

13    from a lay witness.  And, Your Honor, we did address specific

14    affirmative defenses at motions in limine.

15          THE COURT:  Just make your objections.  Don't argue

16    them unless I ask for the argument.

17       Do you have any knowledge about whether -- what was your

18    view?  Did you think there was a legal risk?  Did you think

19    about it at all?

20          THE WITNESS:  I think there could potentially be an

21    accident.

22          THE COURT:  Okay.  All right.  The objection is

23    overruled.

24          MR. HARLAN:  I'll move on, Your Honor.

25    BY MR. HARLAN:

MATTHEW COPPERNOLL - CROSS

1    Q    Are you familiar with something called a ten-foot rule at

2    Walmart?

3    A    I think I know what the ten-foot rule is.

4    Q    What is it?

5    A    It's when you're within ten foot of a customer, you're

6    supposed to greet them, smile, say hello, things of that nature.

7    Q    And also engage with the customer to see if there's

8    anything you can do with the customer, right?

9    A    Okay.  Yes.

10   Q    And that's a fundamental business practice, customer

11   service principle, at Walmart based on your experience there,

12   right?

13   A    Yes.

14   Q    Could Paul engage with a customer who he encountered in a

15   parking lot consistent with that ten-foot rule in terms of,

16   "Hey, you need anything?  Can I point you somewhere?"  Did he

17   have the ability to do that?

18   A    Not unless they knew sign language.  But to be honest, I

19   didn't see many of the other cart pushers in the parking lot

20   engage in that type of behavior either.

21   Q    Okay.  You certainly personally observed other cart pushers

22   helping to identify customer needs in the parking lot, didn't

23   you?

24   A    Yes.

25   Q    Other cart pushers doing that, right?

MATTHEW COPPERNOLL - CROSS

1   A    Yes.

2   Q    And that was an essential part of Mr. Reina's job, right?

3            MS. VANCE:  Objection to "essential."

4            MR. HARLAN:  I'm sorry.  It's a bad habit, Your Honor.

5   I withdraw.

6   BY MR. HARLAN:

7   Q    It was a key job responsibility of Mr. Reina's, correct?

8   A    I guess, yes.  I don't know.

9   Q    Well, if you don't know --

10  A    I'm not really sure what you mean by that.

11  Q    Well, when you think about the totality of what he was

12  obligated to do since he took the job of a cart pusher, is

13  identifying customer needs one of those things?  It's

14  straightforward.

15  A    Well, I would interpret that for him.  If somebody asked

16  for help doing a certain activity, I would assist him with that.

17  Q    So the answer is, yes, it was a key job responsibility, but

18  you would do it for him?

19  A    I would assist him in helping -- getting it done.

20  Q    Well, how would Mr. Reina do his part then since you were

21  saying it was a joint effort?  How would Mr. Reina -- I don't

22  want to ask a hypothetical.  What did you experience with Mr.

23  Reina where he worked with a customer to identify the customer's

24  needs?

25  A    Okay.  If a customer, for instance, needed help bringing a

```
1    heavy item to return inside the store and they asked me, I would
2    direct Paul to lift the item, put it into a shopping cart, and
3    help them bring it into the store.
4    Q    Okay.  So -- but that's the execution, right?  But in terms
5    of engaging with the customer and helping to understand what the
6    customer really needs, the identification part is not something
7    you ever saw Mr. Reina do?
8    A    Paul couldn't hear them.  Unless they knew sign language,
9    he wouldn't know what they wanted him to do.
10   Q    So the answer is, no, that's not something you ever saw Mr.
11   Reina do, correct?
12   A    Right.
13   Q    And unless they knew sign language --
14        THE COURT:  We've covered that.
15        MR. HARLAN:  Okay.
16   BY MR. HARLAN:
17   Q    How about purchasing decisions?  If you look on the job --
18   the job description here says one of the things he's supposed to
19   be doing is "assisting with purchasing decisions," and that's
20   something you saw other cart attendants doing, right?
21   A    I don't remember ever seeing anybody -- any other cart
22   pushers assisting with purchasing decisions, no.
23   Q    All right.  So I'm not going to play the deposition.  I
24   want to move it along.  So in your -- again, you came to my
25   office for a deposition, correct?
```

MATTHEW COPPERNOLL - CROSS

1    A    Correct.

2    Q    And I just want you to -- and you swore to tell the truth

3    in that situation, right?

4    A    Yes.

5    Q    I just want to read these questions and answers in from the

6    deposition:

7        "Question:  Okay.  So if a customer approached Mr. Reina or

8    you asking for advice about products or asking for help

9    identifying where a product was, it's your testimony that that

10   was not something that Mr. Reina was supposed to be doing?

11       "Answer:  I'm not sure.

12       "Question:  Okay.  And how about the other employees, did you

13   observe other individuals at Walmart doing that function?

14       "Answer:  Yes."

15       Do you recall that testimony?

16   A    Not specifically, no.

17           MS. VANCE:  Can we get a page, Attorney Harlan, please?

18           MR. HARLAN:  I'm sorry.  That was 201, line 16 through,

19   I think, 25.

20   BY MR. HARLAN:

21   Q    Okay.  And how about loading merchandise?  Was that

22   something that was a significant job responsibility of Mr.

23   Reina?

24   A    I wouldn't say significant, but it was something that he

25   did on occasion.

MATTHEW COPPERNOLL - CROSS

1    Q    It was part of his job responsibilities?

2    A    Yes.

3    Q    Okay.  And that's another aspect of key job

4    responsibilities for Mr. Reina that you would help him perform,

5    correct?

6    A    Correct.

7    Q    Okay.  By performing some aspects of that, correct?

8    A    Right.  Well, identifying what part of the job he needed to

9    do.

10   Q    And it's also something you saw the other cart pushers

11   doing, correct?

12   A    Yes.

13   Q    Would you agree with me that, for the time you were working

14   with Mr. Reina, providing customer service was something that

15   was part of all the employees' responsibility?

16   A    Yes.

17   Q    It was an important aspect of what Walmart expected,

18   correct?

19   A    Yes.

20   Q    The next -- there's an item on the job description

21   "promoting products and services."  You would agree that that

22   was an important part of Mr. Reina's job, correct?

23   A    Yes.

24   Q    And something that you saw the other cart pushers doing,

25   correct?

1    A    Yes.

2    Q    And based on your knowledge of Mr. Reina, that's a job

3    function that he couldn't perform, correct?

4    A    Not unless he could, you know, the person asking the

5    question about a product or service, could use sign language.

6    Q    So are you saying that if a person who knew sign language

7    asked Mr. Reina about a product, he'd have the ability to

8    communicate via sign language with that customer about that

9    product based on your experience with him?

10   A    I would think, if it was a product he was familiar with, he

11   may be able to.

12   Q    Is it fair to say you never saw that happen though?

13   A    No.  I mean, yes, it's fair to say that.

14   Q    Thank you.  "Maintaining a safe shopping environment,"

15   that's another part of his job, correct?

16   A    Correct.

17   Q    And something that was a part of the other cart pushers'

18   job, right?

19   A    Yes.

20   Q    Another thing that Mr. Reina did was breaking down boxes,

21   correct?

22   A    Yes.

23   Q    And you helped him break down boxes as part of his job,

24   correct?

25   A    I would indicate what boxes needed to be broken down, and

MATTHEW COPPERNOLL - CROSS

1    he would do that, yes.

2    Q    Right.  And all of these things that we discussed where you

3    were helping him do that, the reason you were doing it is

4    because he needed you to do it, correct?

5    A    Or he needed me to identify what needed to be done, yes.

6    Q    And he couldn't do it by himself?

7    A    He could do the function by himself.  He may not understand

8    what to do until it was conveyed to him by me.

9    Q    Okay.  Maybe I'm missing something.  So, like, for

10   instance, the cart caddy, we've already established that that

11   was a key function or a key job responsibility, and you told us

12   you tried to train him on how to do it.  Are you saying you

13   think he could actually operate the cart caddy --

14          THE COURT:  We covered the cart caddy.  We're talking

15   about breaking down boxes, and I think his answer is clear.

16          MR. HARLAN:  Okay.  I'll move on, Your Honor.

17   BY MR. HARLAN:

18   Q    So breaking down boxes is something that you were helping

19   him with, correct?

20   A    I would assist in identifying what needed to be done.

21   Q    Okay.  Did you ever participate in breaking down boxes?

22   A    I don't remember ever breaking down the boxes.

23   Q    Ms. Slaght, based on your knowledge, was very rarely Mr.

24   Reina's job coach, right?

25   A    Of what?

MATTHEW COPPERNOLL - CROSS

1    Q    Ms. Slaght very rarely served as Mr. Reina's job coach.

2    A    Right.  It wasn't uncommon, but it was rare.

3    Q    It wasn't uncommon, but it was rare?

4    A    It wasn't rare.  I mean, she did it, but it was a rare

5    occurrence.

6    Q    Okay.  Thank you.  So in order for you to help Mr. Reina do

7    his job, the key job responsibilities of his job, you had to go

8    into noncustomer areas of Walmart, correct?

9    A    Right.

10   Q    So that would be in the back room where they have unsecured

11   merchandise and associates' personal effects, correct?

12   A    Yes.

13   Q    And one of the reasons you would go back there is to help

14   Mr. Reina clock in, correct?

15   A    Right.

16   Q    Mr. Reina was not able to be able to sign in and out by

17   himself, correct?

18   A    Well, there's a keypad that needs to be activated to clock

19   in and clock out, so, no, he couldn't do that.

20   Q    Okay.  And that keypad has basic labels on it, clock in,

21   clock out, right?

22   A    Right.

23   Q    You had a position immediately before becoming Mr. Reina's

24   job coach, correct?

25   A    Could you repeat that, please?  I'm having trouble hearing.

MATTHEW COPPERNOLL - CROSS

1          THE COURT:  You've got to stay by the microphone.  Pull

2     the microphone down a little bit and stay closer to it.

3          MR. HARLAN:  Okay.

4          THE COURT:  Thank you.

5     BY MR. HARLAN:

6     Q    So you had a job immediately before becoming Mr. Reina's

7     job coach, correct?

8     A    Yes.

9     Q    And what was that job?

10    A    I worked as a personal care worker at Dungarvin.

11    Q    Where is that located?

12    A    In Janesville, Wisconsin.

13    Q    How did that position end?

14         MS. VANCE:  Objection, Your Honor.  May we approach to

15    discuss at sidebar?

16         THE COURT:  Yes.

17    (Discussion held at sidebar at 10:18 a.m.)

18         MS. VANCE:  Your Honor, we did have a motion in limine

19    about a drug test that was positive, and the motion was granted

20    to keep that out as unfairly prejudicial.  This is where this is

21    going.

22         MR. HARLAN:  Under no circumstances am I going to ask

23    him what the circumstances were of his termination.  I'm just --

24         THE COURT:  You just asked him.

25         MR. HARLAN:  No.  I asked him how --

MATTHEW COPPERNOLL - CROSS

1          THE COURT:  Move on.  We're not going to go into this.

2          MR. HARLAN:  Judge, can I be heard just briefly and put

3     it on the record?

4          THE COURT:  Yes.

5          MR. HARLAN:  I think I should be able to put on the

6     record that this gentleman was terminated from his job

7     immediately before becoming a job coach because it relates to

8     some of the inherent risk of having somebody as a job coach that

9     doesn't go through any vetting process, that shows up without

10    any engagement by Walmart and becomes somebody's job coach

11    having access to noncustomer areas, customers' vehicles.  That

12    is part of our undue hardship defense.

13         THE COURT:  Your record is made.  It's overruled.  Move

14    on.

15        (Sidebar discussion ends at 10:19 a.m.)

16    BY MR. HARLAN:

17    Q    Mr. Coppernoll, did you go through any sort of vetting

18    process at Walmart?

19    A    Any sort of what?

20    Q    Vetting process in terms of your background at Walmart?

21    A    No.

22    Q    So basically you just showed up and became Mr. Reina's job

23    coach; fair?

24    A    That's fair.

25    Q    When you were serving as Mr. Reina's job coach, you would

MATTHEW COPPERNOLL - CROSS

1   don one of those reflective vests, correct?

2   A    Correct.

3   Q    And did it have -- and you'd also wear Walmart

4   paraphernalia, right, T-shirt, hat, that sort of thing?

5   A    I had a T-shirt that I purchased through the personnel

6   department.

7   Q    So -- and wearing all that gave the impression that you

8   were a Walmart associate, correct?

9   A    I imagine it may have.

10  Q    Right.  Because customers would come up to you and ask you

11  questions and seek help from time to time, right?

12  A    Correct.

13  Q    But you hadn't been through any sort of customer service

14  training at Walmart, correct?

15  A    Other than the computer-based learning activities, correct.

16  Q    Right.  And you had not talked to any Walmart management

17  about what their expectations were in terms of how you engage

18  with their customers, right?

19  A    No.

20  Q    So Walmart was put in the situation where you're working

21  with Mr. Reina, interfacing with their customers, not knowing --

22          MS. VANCE:  Objection.  Argumentative.

23          THE COURT:  Sustained.

24  BY MR. HARLAN:

25  Q    I'd like to show the witness Exhibit 520.  We'd like to

1    show the witness Exhibit 520.  All right.

2              THE COURT:  Is this in evidence yet?

3              MR. HARLAN:  We would move to admit it, if it's not.

4              THE COURT:  Is there any objection?

5              MS. VANCE:  Yes.  I do want to object for the record.

6              THE COURT:  Then take it down.  Don't show the jury

7    until we get these in.

8         All right.  What's your objection to 520?

9              MS. VANCE:  The relevance and the speculative nature of

10   any -- and the possibility to confuse the issues for the jury --

11             THE COURT:  It's overruled.  Okay.  Exhibit 520 is in.

12             MR. HARLAN:  Actually, I think it is admitted.

13             THE COURT:  Okay.  Go ahead.  Now you can show it.

14             MR. HARLAN:  I'm sorry, Your Honor.

15   BY MR. HARLAN:

16   Q    All right.  So, Mr. Coppernoll, do you recall getting this

17   letter from Julie Repka at Walmart asking for some information

18   about your working relationship with Mr. Reina?

19   A    Yes.

20   Q    Okay.  And she asked you -- can you scroll down a little

21   bit, Tracy?

22        So she asked you to provide her with some information,

23   right, about your work as Mr. Reina's job coach, right?

24   A    Could you point that out to me, because I think she asked

25   me questions about my work hours with Walmart.

MATTHEW COPPERNOLL - CROSS

1    Q    Right.  That's information, correct?

2    A    Right.  But I did not work for Walmart.

3    Q    Okay.  So did you get back to her and tell her that?

4    A    No.

5    Q    In fact, you didn't have any communication with her, right?

6    A    No.

7    Q    You completely ignored her request for information?

8    A    I didn't feel it was appropriate for me to respond.

9    Q    Even though you were on their facility talking to their

10   customers?

11   A    This was after Paul had finished -- been terminated from

12   working with Walmart.

13   Q    So you didn't -- at no point did you give her any of the

14   information?

15   A    No, because I didn't work for Walmart.

16   Q    So I take it -- we can move on from that exhibit -- given

17   the work area that you and Mr. Reina was in, the parking lot,

18   lots of cars and traffic in that parking lot?

19   A    Yes.

20   Q    Okay.  If you're not careful out there, if you're not --

21   don't know what you're doing, there's lots of potential for

22   negligence and accidents, correct?

23        MS. VANCE:  Objection.  This goes to the direct threat

24   defense, Your Honor.

25        THE COURT:  I think we've already covered this.  Move

MATTHEW COPPERNOLL - CROSS

1    on.

2    BY MR. HARLAN:

3    Q    Mr. Coppernoll, you talked about a technique that you would

4    use when Mr. Reina would have flare-ups at work, correct?

5    A    Yes.

6    Q    And yesterday you showed us a number of certificates from

7    trainings that you had received for dealing with individuals

8    with disabilities and those sorts of things.  Do you remember

9    all those certificates that the EEOC displayed?

10   A    Yes.

11   Q    Can you tell the jury which one of those trainings you

12   received where it said that somebody with special needs, the

13   appropriate approach is to put them in some sort of bear hug or

14   hug?  Where did you pick that up?

15   A    That seemed to have the most calming effect on Paul.  I

16   can't point to a specific class or seminar, but it seemed like

17   the least intrusive measure to redirect him.

18   Q    And there are about a dozen times, fair, while you were

19   working with Mr. Reina at Walmart where he would bang his head

20   against the wall?

21   A    It's probably around that.

22   Q    Okay.  So do you know whether Jeff Scheuerell, who you

23   spoke of earlier, or Ms. Repka, do you know if there was ever an

24   occasion when they came to the parking lot to observe you and

25   Mr. Reina working in the parking lot?

1    A    No.

2    Q    You don't know?

3    A    I don't know if they did that or not.

4    Q    Okay.  The meeting that you attended with Mr. Scheuerell,

5    Ms. Slaght, and Mr. Reina, you were allowed to come to that

6    meeting, correct?

7    A    I was directed to come back by Rose, yes.

8    Q    Okay.  But Mr. Scheuerell allowed you to be in that

9    meeting, because you're not a Walmart associate, right?

10   A    Right.

11   Q    You weren't at the time, were you?

12   A    No.

13   Q    So you had no right to be in that meeting, correct?

14   A    I --

15            MS. VANCE:  Objection.

16            THE WITNESS:  -- don't know that --

17            THE COURT:  Stop.  What's your objection?

18            MS. VANCE:  Argumentative.

19            THE COURT:  It is argumentative.  We've already covered

20   all that.  Ask the question you want to ask about the meeting.

21   BY MR. HARLAN:

22   Q    So in that meeting, Mr. Scheuerell was asking for

23   information about your working relationship with Mr. Reina,

24   correct?

25   A    Yes.

MATTHEW COPPERNOLL - CROSS

1    Q    Did Mr. Reina at any point in that meeting communicate with

2    any of the folks in that meeting?

3    A    No.

4    Q    Okay.  There was zero communication, correct?

5    A    Not that I recall.

6    Q    And this -- it became clear that the questions were being

7    asked about the appropriateness of you and Mr. Reina working

8    together, correct?

9    A    No, I don't believe that's true.

10   Q    Well, I think you testified that Mr. Scheuerell said that

11   you were doing substantially all of Mr. Reina's work, right?

12   A    That's what he said, yes.

13   Q    Right.  And despite that statement being made, Mr. Reina --

14   nobody communicated with him -- did you communicate with him and

15   ask him to speak or sign whether that was true or not?

16   A    No.

17   Q    You mentioned being present for some of the evaluations

18   that Mr. Reina received.  The fact is Mr. Reina never

19   communicated during his evaluations, did he?

20   A    Well, when I would tell him his supervisor says he's doing

21   a good job, he would say "Yes."

22   Q    Okay.  And how would you communicate?  Can you show us the

23   signs that you would give to Mr. Reina to indicate that he was

24   doing a good job?

25   A    I would say "You're doing a good job."

MATTHEW COPPERNOLL - CROSS

1    Q    Okay.  And Mr. Reina's response would be what?

2    A    "Yes."

3    Q    Okay.  Anything else that he ever responded or communicated

4    about his evaluations?

5    A    He would smile.

6    Q    Do you know an individual named Matt Matheny?

7    A    I think I've met him once or twice.  It seems like he's a

8    case worker for Arc.

9    Q    Can we put up Exhibit 4, Tracy?

10        Do you have any knowledge of whether that individual ever

11   observed you and Mr. Reina working together?

12            MS. VANCE:  I'm going to object to time frame here.

13            MR. HARLAN:  Ever.

14            THE COURT:  Ever.  It's overruled.

15            THE WITNESS:  I'm sorry.  What was the question?

16   BY MR. HARLAN:

17   Q    I was asking you about this gentleman that you said worked

18   for Arc, Matt Matheny.  Do you have any personal knowledge as to

19   whether he ever observed you and Mr. Reina working together?

20   A    I have no personal knowledge, but I've been informed that

21   he had.

22   Q    So looking at this evaluation, so I see the first item

23   there is "Practices 10 Foot Attitude," and he got a "Meets,"

24   correct, Mr. Reina?

25   A    Yes.

MATTHEW COPPERNOLL - CROSS

 1    Q    Okay.  And so in terms of engaging with customers, I think

 2    your testimony is that the only way he could do that is if there

 3    was a customer who knew sign language, correct?

 4    A    Right.

 5          MS. VANCE:  Objection.  Mischaracterizes prior

 6    testimony.

 7          THE COURT:  Overruled.  If that's not what you said,

 8    you can disagree with the question.

 9    BY MR. HARLAN:

10    Q    So I'm focused on the ten-foot rule piece of his evaluation

11    where he got a "Meets" expectation.  So if they were evaluating

12    what Mr. Reina himself could do, would you agree with me that he

13    couldn't practice the ten-foot rule unless it was a customer who

14    knew sign language?

15    A    I guess I would agree with that.

16    Q    Okay.

17    A    Well, he could engage to a certain extent.  He could smile

18    at them.

19    Q    But you told this jury that the ten-foot rule --

20          THE COURT:  We've covered it in great detail.  Let's

21    move on.

22    BY MR. HARLAN:

23    Q    There's another criteria that says "Answers all customer

24    service calls from other associates."  And he received a "Meets"

25    for that part of his evaluation.  Do you see that?

MATTHEW COPPERNOLL - CROSS

1    A    Right.

2    Q    Is that something that he ever did?

3    A    Yes.

4    Q    Okay.  How did he personally answer calls from other

5    associates?

6    A    Through my assistance, my interpretation and communication

7    to him.

8    Q    Okay.  So the answer is that you would answer calls and

9    that the associates would communicate with you, and then you

10   would give work direction to Mr. Reina.  Is that what you're

11   saying?

12   A    Yes.  I would provide information to him, to Paul, to

13   perform the job.

14   Q    And so for that aspect of his job, you were doing it for

15   him, correct?

16   A    I was assisting him in doing it.

17   Q    Also on that evaluation there's an item "Helps customers

18   find what they need."  He received a "Meets" for that.  Do you

19   see that?

20   A    Right.

21   Q    Did he ever do that?

22   A    With my assistance, we would help customers find items in

23   the store.

24   Q    So your testimony is you have recollection of a customer

25   needing to find something, and Mr. Reina was able to direct or

MATTHEW COPPERNOLL - CROSS

1      provide information to that customer as to where they could find

2      it?

3      A     We would provide it together.

4      Q     Okay.  But I'm focused on Mr. Reina.  Do you have knowledge

5      of what Mr. Reina did relative to that?

6      A     Independent of me, he probably would not.

7      Q     Okay.  So the answer is you never observed him do that,

8      help customers find what they need; fair?

9      A     I guess that's fair, yes.

10     Q     And on some of Mr. Reina's evaluations that you've seen, he

11     received a "Meets" for ensuring that OSHA guidelines were

12     followed.  Did you ever see any evidence that Mr. Reina

13     understood what OSHA guidelines were applicable to him and

14     followed them?  It's not on this evaluation.  I'm trying to move

15     along.

16     A     Right.  I'm not sure what you mean by that.  Could you

17     restate it, please?

18     Q     Okay.  Did you ever see on any of the evaluations -- you

19     said you sat in on a number of his performance evaluations,

20     right?

21     A     Yes.

22     Q     Okay.  Did you ever see one of the criteria that he was

23     evaluated on was following OSHA guidelines?

24     A     No, I never saw that.

25     Q     Okay.  Let me show it to you then.

MATTHEW COPPERNOLL - CROSS

1          If you can put up Exhibit No. 9, Tracy.

2          So if you look at the bottom of Exhibit No. 9, "Ensures" --

3     if you could go up, Tracy.  I'm sorry.  Yeah.  Right there.

4          So you see where it says "Ensures OSHA guidelines are being

5     followed properly" and he got a "Meets" for doing that?

6     A    I would think that you would need to ask the supervisors

7     that prepared the performance evaluation about that.  I mean,

8     they're the ones that are saying he meets the expectation.

9     Q    Right.  And what we're trying to understand here is whether

10    that's something that in reality they are evaluating you and him

11    together or the evaluation doesn't make sense.  So I'm asking

12    you, since you were his primary job coach from 2005 to 2015,

13    whether you ever saw any indication of Mr. Reina ensuring that

14    OSHA guidelines were being followed properly?

15    A    Yes.

16    Q    Okay.  Explain what he did that would indicate to you that

17    OSHA guidelines were being followed?

18    A    He stood in front of a spill on the floor of the store to

19    make sure nobody stepped in it until maintenance could arrive to

20    clean it up.

21    Q    What was -- was it some kind of chemical spill?

22    A    It was some type of spill.  We couldn't identify what it

23    was, but it was something that was spilled on the floor and

24    needed to be cleaned up.

25    Q    Do you recall what year that was?

MATTHEW COPPERNOLL - CROSS

```
1    A    No, I don't.

2    Q    And that was one time, right?

3    A    I remember one time specifically, yes.

4    Q    Anything else you observed him do that would indicate that

5    he understood what OSHA guidelines were and followed them

6    properly?

7    A    Not that I can remember.

8    Q    Did you see in his evaluation that he got a "Meets" for

9    assisting in layaway?  Did you ever see that?

10   A    I never saw him do anything with layaway.

11   Q    If we can look at Exhibit 15.  Going to the second page,

12   Tracy, in the Strengths column.

13        So there Mr. Reina is being given kudos for keeping up with

14   GLMS, in parentheses CBLS.  Do you know what that is?

15             MS. VANCE:  Objection.  Cumulative.  We went over this.

16             THE COURT:  Do you know what it is?  Overruled.  Go

17   ahead.

18             THE WITNESS:  The CBLS?

19             THE COURT:  Yeah.  What does that mean?

20             THE WITNESS:  That's a computer-based learning.

21   BY MR. HARLAN:

22   Q    And based on your experience, Mr. Reina never kept up with

23   that because you did it, correct?

24   A    I assisted him with it, yes.

25   Q    Okay.  During counsel for the EEOC's questioning, you got
```

MATTHEW COPPERNOLL - CROSS

1    into what efforts you were engaged in to help Mr. Reina find

2    another position, correct?

3    A    Yes.

4    Q    Where were the places you went to try to find another

5    position?

6    A    We went to Piggly Wiggly, Woodman's grocery store,

7    Salvation Army, Goodwill, a number of the Dollar Stores.

8    Q    So your understanding was after June of 2015, there were

9    jobs available for him based on seeing ads that you took him to

10   apply for, correct?

11   A    Some were ads that we had seen.  Others were just, I guess,

12   drop-in calls.

13   Q    Okay.  So for the time that he stopped reporting to work in

14   June of 2015, you basically went to about eight or ten places

15   for employment?

16   A    Probably about that.

17   Q    Okay.  Did you get any offers?  Did he get any offers for

18   positions?

19   A    Yes.  He was eventually accepted at the Shopping News.

20   Q    Okay.  And that's not a job, that he's an independent

21   contractor that does newspapers, right?

22   A    Well, it's a job to Paul.  I mean, I would consider it a

23   job if I had a paper route.

24   Q    Fair enough.  Is that the only one that he got a position

25   for?

MATTHEW COPPERNOLL - CROSS

1    A    That I'm aware of.

2    Q    So Woodman's -- we saw a video of him out at Woodman's.

3    What position did he seek at Woodman's?

4    A    Cart pusher, stockman.

5    Q    Okay.  And did he get an interview?

6    A    No.

7              MS. VANCE:  Objection.  Relevance.

8              MR. HARLAN:  It goes to damages, Your Honor.

9              THE COURT:  Overruled.  Go ahead.

10   BY MR. HARLAN:

11   Q    All right.  On the evaluations that you were shown so far

12   in your testimony, is there any place to put the job coach's

13   name on those evaluations?

14   A    No.

15   Q    You testified during direct examination that there was a

16   situation where a customer service manager asked Paul to take

17   things for a customer.

18   A    Could you repeat that, please?

19   Q    I thought I understood your testimony during direct

20   examination of an instance where a customer service manager

21   asked Mr. Reina to take something for a customer?

22   A    Yes.

23   Q    Okay.  Did they make the request of you, and then you

24   directed Mr. Reina to do that?

25   A    Yes.

1    Q    One of the things that you testified to was that while at

2    one point you're not supposed to take those motorized shopping

3    carts out in the parking lot, customers started to do that, and

4    from time to time, they would be left out there, right?

5    A    Correct.

6    Q    And it's the cart pusher's job, when they are left out

7    there, to bring those motorized shopping carts back to the

8    store, right?

9    A    I don't know that it's officially designated that they do,

10   but cart pushers normally would.

11   Q    And you saw other -- I'm sorry, sir.  Were you saying

12   something else?

13   A    No.

14   Q    And you saw other cart pushers doing that, correct?

15   A    Yes.  As well as other employees.

16   Q    And other employees.  And you testified that you would do

17   it.

18   A    Right.

19   Q    And so would there be a liability risk associated with you

20   having an accident in the parking --

21            MS. VANCE:  Objection.  Calls for a legal conclusion.

22            THE COURT:  Sustained.

23   BY MR. HARLAN:

24   Q    I take it you would agree that there's a potential for

25   accidents --

MATTHEW COPPERNOLL - CROSS

```
 1              MS. VANCE:  Objection.  Argumentative.

 2              THE COURT:  I agree, and we already covered this.  You

 3    asked him all this.

 4    BY MR. HARLAN:

 5    Q    Okay.  So you would end up taking those motorized carts --

 6              THE COURT:  Move on.  You already asked him about it.

 7    He said he took those back.

 8    BY MR. HARLAN:

 9    Q    Why were you taking -- why were you the person --

10              THE COURT:  He explained that too.

11              MR. HARLAN:  I don't think he explained why Mr. Reina

12    was not doing it.

13              THE COURT:  Why didn't Mr. Reina just do it?

14              THE WITNESS:  Because he couldn't anticipate vehicle

15    traffic or potential hazards.

16              THE COURT:  Very good.

17         Let's take our morning break at this point.  We'll reconvene

18    in 15 minutes.

19         (Jury exits the courtroom at 10:45 a.m.)

20              THE COURT:  Do you have any further questions?

21              MR. HARLAN:  I have a few more, Your Honor.

22              THE COURT:  All right.  You need to move this along.

23    The jury is completely disinterested.  You have asked the same

24    questions over and over again, and we do not have time to take

25    this much time to do a cross-examination.  The direct also is
```

MATTHEW COPPERNOLL - CROSS

```
1    very slow.  You have -- both sides have lost the jury, and it's

2    completely repetitive.  You need to move this along more

3    quickly.  Ask a question once, get your answer, and move on.

4        So use the break to sharpen your cross-examination.  I'll

5    give you no more than five minutes.

6        Do you have any redirect?

7            MS. VANCE:  I have less than five minutes of redirect,

8    Your Honor.

9            THE COURT:  All right.  There's no need to reunderline

10   what you did on direct.  So clarify things that need

11   clarification.  Whatever that is, I can hardly imagine.

12       See you at 11:00.

13       (Recess at 10:46 a.m. until 11:04 a.m.)

14           THE COURT:  Mr. Coppernoll, come on up.  Mr. Harlan.

15           MR. HARLAN:  Thank you, Your Honor.

16           THE COURT:  And do we have Mr. Coppernoll's juice or is

17   that not here yet?

18           MS. SLAGHT:  It's not here yet.

19           THE WITNESS:  They're getting that, Your Honor.

20           THE COURT:  Are you okay to continue until we get the

21   juice?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  All right.  As soon as you get it, we'll

24   bring it on up to him.  Okay?

25       All right.  Let's bring in the jury.
```

MATTHEW COPPERNOLL - CROSS

```
 1              MR. HARLAN:  Your Honor, you notice I don't have any
 2       notes here.
 3              THE COURT:  I don't see any paper, which suggests
 4       you're going to use your good, sound instincts as a lawyer --
 5       there you go.  Bring it on up.  Thank you -- to ask a few
 6       closing questions.
 7              MR. HARLAN:  Just one.
 8              THE COURT:  You know I never believe lawyers when they
 9       say that.
10          (Jury enters the courtroom at 11:05 a.m.)
11              THE CLERK:  This Honorable Court is again in session.
12       Please be seated and come to order.
13              THE COURT:  All right.  You may resume.
14       BY MR. HARLAN:
15       Q    Mr. Coppernoll, I really just have one additional question
16       for you.  You mentioned going with Mr. Reina to apply for
17       positions?
18       A    Yes.
19       Q    And I take it in that process you fill out applications,
20       correct?
21       A    Yes.
22       Q    And who did that?
23       A    I did.
24              MR. HARLAN:  That's all I have.
25              THE COURT:  Thank you.  Redirect.
```

MATTHEW COPPERNOLL - CROSS

1          MS. VANCE:  Thank you.

2                    REDIRECT EXAMINATION

3     BY MS. VANCE:

4     Q    Mr. Coppernoll, turning your attention to the issue of

5     computer-based training courses you testified about?

6     A    Yes.

7     Q    Am I right that Jim, the personnel manager, you said was

8     with you watching you take the courses with Paul; is that right?

9     A    Correct.  He was in the room watching.

10    Q    Did anything about the manner you conducted yourself there

11    ever get criticized?

12    A    No.

13    Q    Now, if an instance came up as you were doing the job where

14    something that you learned on a training was relevant to the

15    job, would you inform Paul about the correct procedure?

16    A    Of course, yes.

17    Q    I want to direct your attention to your prior testimony

18    about a comment that you and Paul were efficient.  Do you recall

19    what I'm talking about?

20    A    Yes.

21    Q    Was this a former manager?

22    A    It was -- he was a manager at the time.  He was the store

23    manager at the time.

24    Q    And I want to make sure we understand the testimony.  Is it

25    that you were using the cart caddy with the remote control,

────────MATTHEW COPPERNOLL - REDIRECT────────

1    right?

2    A    I was operating it, yes.

3    Q    And then explain the part that made it very efficient.

4    What was Paul doing while you were doing that?

5    A    Paul had been gathering up stray carts as we were pushing

6    the cart caddy with the attached carts towards the bay doors,

7    and Paul had gathered up a number of carts, maybe -- I don't

8    know -- half a dozen or so, and he was pushing them independent

9    but alongside of the cart caddy.

10   Q    In that situation, I'm envisioning the two of you pretty

11   much parallel; is that right?

12   A    Correct, yes.

13   Q    So did you have any physical role in steering the train of

14   carts Paul was pushing?

15   A    No.

16   Q    In that situation, Paul was independently doing all of the

17   pushing of the carts, correct?

18   A    Of those carts that he had.  He was not working -- doing

19   anything with the cart caddy, carts attached to that, but the

20   individual carts he was controlling, he had complete control

21   over them.

22   Q    Did anyone ever tell you to stay out of noncustomer areas?

23   A    No, never.

24        MS. VANCE:  Okay.  I have no further questions for this

25   witness at this time.

─────────────MATTHEW COPPERNOLL - REDIRECT─────────────

1              THE COURT:  Thank you, Mr. Coppernoll.

2         (Witness excused at 11:09 a.m.)

3              THE COURT:  And you can call your next witness.

4              MS. VASICHEK:  Your Honor, at this time, the EEOC is

5    going to enter -- move to admit certain documents, and then we

6    will read them -- portions of them to the jury.

7              THE COURT:  All right.

8              MS. VASICHEK:  It is moving admission of 60, 32, 33,

9    and 34, which is the answer to the complaint, production request

10   responses, responses to requests for admission, and responses to

11   a request for information.

12             THE COURT:  Okay.  And I think we've discussed this

13   before.

14             MR. HARLAN:  Yes.

15             THE COURT:  And.

16             MR. HARLAN:  No objection, Your Honor.

17             THE COURT:  Those will be admitted.  Okay.  All right.

18             MS. VASICHEK:  We would first like to turn to Exhibit

19   No. 60.

20             THE COURT:  Very good.

21             MS. VASICHEK:  This is the answer and affirmative

22   defenses of Walmart Stores to the EEOC's complaint, and we'd

23   like to turn to the answer to Allegation No. 19, which is "On or

24   about June 10th, 2015, Jeff Scheuerell began working as the

25   store manager for Walmart at its Beloit, Wisconsin, location.

MATTHEW COPPERNOLL - REDIRECT

1          Answer:  Defendants admit the allegations in paragraph 19."

2          Next, we'd like to go to allegation 26.  Allegation 26 is

3     "Walmart paid Mr. Reina for only two weeks of his suspension.

4     Mr. Reina has never been paid for the first -- beyond the first

5     two weeks of his suspension.

6          Answer:  Defendants admit the allegations contained in

7     paragraph 26."

8          Moving on to Exhibit 32.  Exhibit 32 is the June 16th, 2016,

9     response by Walmart to the EEOC's request for information,

10     focusing on No. 4, the response to No. 4.  We're going to

11     draw -- we'd like to draw the jury's attention to the last

12     sentence.  "Mr. Scheuerell began working at store 2532 on June

13     10, 2015, but did not appear on the electronic schedule until

14     June 15th, 2015."

15          Next, going to Exhibit 33.  This is defendants' objections

16     and answers to plaintiff's first set of requests for admissions.

17     Going to the response to No. 19, the request to admit No. 19 was

18     "Admit that Walmart put Paul Reina's employment into termination

19     status at some point in time between June 12th, 2015, and the

20     present.

21          Answer:  Admit that, by December 2017, Mr. Reina had been in

22     a leave/suspended status for well over a year.  Admit that in

23     December of 2017, Mr. Reina's employment with defendant was

24     terminated in the system."

25          Now, going to No. 34.  This is defendants' objections and

1    responses to plaintiff EEOC's first set of requests for

2    production of documents.  Going to No. 7, and this is a request

3    for "All employee manuals or handbooks in effect at defendants'

4    Beloit store from January 1, 2013, to the present."  We would

5    like to draw the jury's attention to the last sentence, which is

6    on the next page.  It states "Defendant does not maintain an

7    employee manual or handbook."

8         And, finally, 24, the response to 24, this requests "All

9    documents related to defendants' contention that the police were

10   called regarding an incident with Paul Reina in the summer of

11   2015 or at any other time."  Drawing the jury's attention to the

12   sentence "Defendant does not have a copy of the police report."

13        And that completes our submission on these documents, Your

14   Honor.

15             THE COURT:  Thank you.  Next witness.

16             MS. VASICHEK:  We are now going to read in deposition

17   designations from the 30(b)(6) deposition of Julie Repka.

18             MR. HARLAN:  Your Honor, can I approach for a second?

19             THE COURT:  Sure.

20        (Discussion held at sidebar at 11:15 a.m.)

21             MR. HARLAN:  So there are a number of these that we're

22   not maintaining objections to, but I don't think we ever got a

23   formal ruling, so for -- so is this the 30(b)(6)?

24             MS. VASICHEK:  Yeah, 30(b)(6).

25             MR. HARLAN:  So we had objected to the designations at

```
1   page 22, 23 as overbroad -- I'm sorry, not that one.  23, 12 to
2   23, 15.  So they're asking this 30(b)(6) --
3             THE COURT:  Let me see.  I'll take the transcript.
4   23 --
5             MR. HARLAN:  So it's 23, 12 to 23, 15 and then the next
6   one.  So they're asking her as a witness for the company about
7   specific conversations that people had --
8             THE COURT:  This is "At any time" -- I want to make
9   sure I'm in the right spot.  This is "At any time between '99
10  and '15, did Walmart ever tell Mr. Reina that he would no longer
11  be allowed to" --
12            MR. HARLAN:  Yes.
13            MS. VASICHEK:  That was specifically within our -- we
14  specifically had a Rule 30(b)(6) topic that the witness would be
15  called to testify as to reasonable accommodations --
16            THE COURT:  Okay.  So your objection is that the time
17  frame is overbroad?
18            MR. HARLAN:  No.  It's the whole subject matter, asking
19  a corporation to basically produce a witness who can testify to
20  a specific conversation as opposed to policies or procedures,
21  and the next question is similar to that.  So that's the
22  objection.
23            THE COURT:  Okay.  I'll overrule it as to that one.  It
24  seems a fair question.  It wasn't just about a specific
25  conversation, but it was in any way did they tell him he
```

1   couldn't work with a job coach, and then the next question is --

2            MR. HARLAN:  23, 19 through 26, 19, and it's really the

3   same objection to a number --

4            THE COURT:  We can no longer accommodate his

5   disabilities.

6            MR. HARLAN:  And, I guess, Your Honor --

7            THE COURT:  Yeah.

8            MR. HARLAN:  I'm sorry.

9            THE COURT:  Go ahead.

10           MR. HARLAN:  I also would object on a cumulative basis

11   because we've already had testimony about whether anything has

12   been communicated by the company about whether he can do certain

13   responsibilities or not.

14           MS. VASICHEK:  These are Walmart's admissions, Your

15   Honor --

16           MR. HARLAN:  Okay.

17           MS. VASICHEK:  -- in a 30(b)(6).

18           THE COURT:  I understand that.  I'm going to overrule

19   the cumulative one because all we have are whether these two

20   witnesses that we've had have heard anything, so this covers

21   whether they communicated it to anybody else.

22           MR. HARLAN:  So the rest of our objection would be

23   that, again, we think it's not reasonable to expect that a

24   corporation can produce a witness who can testify to whether

25   individual conversations happened with Mr. Reina or Mr. Reina's

```
1    job coach about specific duties.  They're asking about

2    conversations broadly.

3              THE COURT:  Okay.  So we've got the question about that

4    he couldn't work with a job coach, that he couldn't be

5    accommodated, that he wasn't qualified, make a determination

6    that he wasn't qualified.  So I don't see why they're asking an

7    unreasonable question about whether there was some specific

8    conversation or whether anybody said --

9              MR. HARLAN:  The objection is I don't think it's a

10   reasonable question to expect a corporation to be able to ask as

11   opposed to individual witnesses who would have been there at the

12   time.  So this was -- they were taking a 30(b)(6) deposition.  I

13   think it's overbroad in that context, and it's something that

14   should not be deemed read to the jury in this case.

15             THE COURT:  I'm going to overrule it, but, again, these

16   aren't judicial admissions.

17             MR. HARLAN:  Sure.

18             THE COURT:  So if you have a witness who says

19   "Actually, this is what I determined," then it's a fair factual

20   dispute, but I think they're entitled to put the evidence in.

21   Okay.  Those are overruled.

22             MR. HARLAN:  Okay.

23             MS. VASICHEK:  We're going to have Ms. Vance take the

24   witness stand while I --

25             MS. VANCE:  As the answerer.
```

1         THE COURT:  That's fine.  I'm going to tell the jury

2    it's going to be -- this is how we do testimony when it's from

3    depositions.

4         MS. VASICHEK:  Is there some way you can tell them it's

5    a 30(b)(6) because it's a different beast?

6         THE COURT:  Yeah.  I'll explain that.

7         MS. VASICHEK:  Okay.

8    (Sidebar discussion ends at 11:20 a.m.)

9         THE COURT:  All right.  We're now going to hear some

10   testimony by deposition, and I told you that depositions are

11   testimony that's taken in preparation for trial.  It's done

12   under oath.  You've already seen the use of some depositions

13   with live witnesses.  It's also appropriate sometimes just to

14   put the deposition in under certain circumstances.  This is one

15   of those circumstances.  And so what you're going to hear now

16   are excerpts from the 30(b)(6) deposition of Walmart, and I'm

17   going to explain what that is in a second.

18        Sometimes we have the depositions on video.  Sometimes we

19   just have a transcript, and if we just have a transcript, then

20   we've got to figure out how to read it to you, and so what

21   you're going to have here are two lawyers that are going to read

22   the testimony to you.  And so the answers that are the evidence

23   are going to come from Ms. Vance reading the testimony of the

24   30(b)(6) witness for Walmart.

25        A 30(b)(6) deposition is one where you don't know who the

1    person is necessarily who should be answering the questions.

2    You can notice an individual person for a deposition, but

3    sometimes you just notice the company for a deposition and say

4    "You figure out who should answer these questions on behalf of

5    Walmart."  And so Walmart then put up Ms. Repka as the 30(b)(6)

6    deponent who is the person who answers questions on behalf of

7    Walmart, and so that's what you're about to hear.

8        (Deposition designations of Julie Repka read 11:21 a.m.

9    until 11:22 a.m.)

10        MS. VASICHEK:  Your Honor, I don't know that this has

11    been separately admitted, so we'd like to admit it.

12        THE COURT:  All right.  Any objection to 52?

13        MR. HARLAN:  No objection, Your Honor.

14        THE COURT:  Okay.  It's admitted.

15        (Reading continued 11:22 a.m. until 11:25 a.m.)

16        MR. HARLAN:  Your Honor, I thought 24.

17        MS. VASICHEK:  We have substituted -- I'm sorry.  We

18    have substituted the actual exhibits for the deposition number.

19        MR. HARLAN:  Okay.

20        THE COURT:  So --

21        MR. HARLAN:  Okay.

22        THE COURT:  The issue here is when you take the

23    deposition, you mark the exhibits for the deposition.  You have

24    a set of numbers for that deposition, and then by the time you

25    get to the trial, you have a whole different set of numbering

JULIE REPKA - DEPOSITION

1    systems.  So they have substituted the numbers from the

2    deposition exhibits to the final exhibits, so these numbers are

3    different from what they were at the time, but these are the

4    documents that are involved.

5         (Reading continued 11:26 a.m. until 11:33 a.m.)

6         THE COURT:  All right.  Thank you.  And your next

7    witness?

8         MS. VASICHEK:  The EEOC calls Matt Matheny.

9         **MATTHEW MATHENY, PLAINTIFF'S WITNESS, SWORN**

10        THE COURT:  All right.  You don't need to lean into the

11   microphone to speak, but if you keep the chair so you're about

12   one foot away, we should be able to hear you just fine.

13        THE WITNESS:  Okay.

14        THE COURT:  That should probably work.  I'll adjust if

15   necessary.

16                    <u>DIRECT EXAMINATION</u>

17   BY MS. VASICHEK:

18   Q    Hi.  Could you introduce yourself to the jury?

19   A    Matthew Matheny.

20   Q    And, Mr. Matheny, what was your relationship with Paul

21   Reina?

22   A    I was a service facilitator at The Arc of Winnebago, Boone

23   and Ogle Counties.

24   Q    And what is -- first, what is Arc?

25   A    The Arc is an advocacy organization that provides services

MATTHEW MATHENY - DIRECT

1    for individuals with developmental disabilities.  Our agency

2    provided numerous services ranging from recreational activities,

3    guardianship for clients, book clubs, and we also did service

4    facilitation.

5    Q    And what is service facilitation?

6    A    Service facilitation is a service that is purchased by

7    families through the Medicaid waiver program for families to

8    help navigate the waiver program to kind of help them work

9    through any issues they may be having, just help them run their

10   program.

11   Q    What is the waiver program?

12   A    The Medicaid waiver program is a program -- it's ran in all

13   50 states.  It's a program where Medicaid will provide a block

14   grant to individuals who are deemed eligible so that they can

15   individually purchase services to help remain active in the

16   community.  Normally Medicaid is a fee-for-service program, so,

17   say, an individual goes to the doctor, the doctor would bill

18   Medicaid directly.  By using the waiver program, it gives the

19   family a pool of resources that they can then choose how they're

20   going to spend those resources to purchase services.

21   Q    Do you have any knowledge about how Paul Reina purchased

22   his services through the waiver program?

23   A    Yes, I do.

24   Q    And what do you know?

25   A    Mr. Reina and his family used the bulk of the resources to

MATTHEW MATHENY - DIRECT

1    purchase support workers.  The support workers worked with Paul

2    in different areas of his life, be it to help remain active in

3    the community, working in the community, and staying safe and

4    participating in activities at home.  The family also used a --

5    the waiver program to purchase our services.

6         Now, during the program, there was some changes to how it

7    was managed.  When I first started working at The Arc, it was

8    mandated by the State of Illinois that families had to utilize

9    our services.  I believe it was July of 2017 they made some

10   changes to the program to where it was then optional if families

11   chose to purchase our services through The Arc for service

12   facilitation.

13   Q    And what did Paul Reina's family do?

14   A    The family did choose to continue purchasing services.  I

15   had a conversation with Ms. Slaght kind of explaining the pros

16   and cons of purchasing the services.  I personally felt like Ms.

17   Slaght could probably do it without our services, but she went

18   ahead and chose to continue utilizing The Arc's services.

19   Q    Specifically what sort of services did you provide?

20   A    Oh, I'm sorry.  What we did was we did bimonthly visits on

21   average.  Now, there may be, due to illness, weather, there may

22   be a reason where I might have not visited a family every two

23   months.  It might have gone into three months.  We did bimonthly

24   visits with the family to check in to make sure things are going

25   well with the family.  Now, once again, going back to this July

MATTHEW MATHENY - DIRECT

```
 1    2017, there were some changes, but for the bulk of my time
 2    there, we also wrote an annual service plan.  Now, this was a
 3    plan that kind of gave a snapshot picture of Paul's life, did
 4    some descriptions of different areas in the home, community,
 5    health, future planning, just to kind of give a picture of Paul
 6    for the records, and we also worked as an advocacy for Paul in
 7    case the family was ever running into any issues.  We helped the
 8    family manage their monthly budget.  So let's say for the
 9    support workers the family chose to hire, we helped them
10    navigate the hiring process, the background checks, the
11    budgeting of hours, time sheet issues, anything that came along
12    with hiring the workers as well.
13    Q    Now, focusing on this "support workers," we've been calling
14    the people who worked with Paul "job coaches."  Does that fall
15    within the support workers category?
16    A    Yes.  From the, I guess, the idea of our agency, we call
17    them "support workers."  One of the beauty of the Medicaid
18    waiver program is it allowed the family to purchase these
19    services to use them how the family thought that they could best
20    benefit the client, be it in the community at the job or in the
21    home.
22    Q    Now, were these service workers subject to any background
23    checks?
24    A    Yes, they were.
25    Q    And what were the background checks?
```

MATTHEW MATHENY - DIRECT

1    A    Well -- and, first of all, I do want to state our agency

2    was not the agency that did the background checks.  There is a

3    fiscal management agency called Access, and they handled the

4    background check process and the employment paperwork, but we

5    did help facilitate, and we did communicate with that agency

6    very frequently.

7         What the agency did was if a worker was to start, they had

8    to complete a 20-some-page application verifying identity,

9    understanding their role in the program, making sure that they

10   understood DCFS regulations, Department of Child and Family

11   Service, and then they had to also get fingerprinted.  That was

12   an Illinois State Police fingerprint, and it was an outside

13   agency that took the fingerprints, but then Access processed

14   those to make sure there were no disqualifying convictions that

15   would have kept them from being able to be a support worker.

16        They only had to be fingerprinted at the start of the

17   process, but the Illinois State Police has a system -- I believe

18   they call it the wrap-back system -- where it continuously

19   checks records.  So if somebody has been fingerprinted to start

20   this and there is subsequently a conviction, it will then pop

21   up, and then if it would happen to be a disqualifying

22   conviction, we would be notified that they can no longer be a

23   support worker.

24   Q    And how often did they have to do the -- fill out the form

25   for the background check?

MATTHEW MATHENY - DIRECT

1    A    They initially had to fill out the form when they were

2    first hired for the Illinois State Police background check.  In

3    addition to that, they also had to complete a DCFS abuse check

4    to make sure that there had been no substantiated claims of

5    abuse against clients, and that was once a year.

6    Q    Now, I'd like to just focus your attention on Paul Reina's

7    work with Walmart.

8    A    Yes.

9    Q    Did you ever see Paul Reina working with his job coach?

10   A    Yes.

11   Q    Could you please -- could you say how many times?

12   A    Approximately I'm going to say two or three times.

13   Q    And how far away were you when you saw him?

14   A    Probably 20 to maybe 30 -- 20, 25 yards away.

15   Q    And why were you observing them?

16   A    Well, normally when I would do a visit with Mr. Reina, I

17   would go up shortly after noon.  It would be not too long after

18   he would complete his work at Walmart.  However, let's say Mr.

19   Reina and his worker wanted to go shopping or go to Dairy Queen

20   or something, I never wanted it to be a situation where I wanted

21   Mr. Reina to feel like he had to hurry home so he could see me.

22   In my mind, that would have made me somebody that Mr. Reina

23   would not want to come see, and it would negatively impact the

24   visits going forward.  So my intentions for going to see Mr.

25   Reina at Walmart was so, if nothing else, if when I got to do

MATTHEW MATHENY - DIRECT

1    the visit and Mr. Reina was not there, I could still write a

2    report and say "I was able to lay eyes on Mr. Reina.  He looked

3    healthy.  He looked like he is doing well, and he is still doing

4    what his family says he is doing."

5    Q   And what did you observe when you saw him at Walmart?

6    A   When I would observe him -- how my approach would be would

7    be I would park, like I said, a distance away near a corral

8    where I could see that there would be a numerous amount of

9    carts, knowing ideally that Mr. Reina would be at some point

10    coming around to move carts.  So my observation would be with

11    Mr. Reina with his job coach/support worker pushing carts with

12    his worker off to his -- very close proximity but to his side

13    kind of, as I like to say it, his eyes and ears.

14    Q   How long were your observations?

15    A   No more than of seeing Paul for maybe five minutes tops.

16    They were very brief observations.

17    Q   Did you see anything amiss in the relationship between the

18    job coach and Mr. Reina?

19    A   No, I never did.  They looked like they were operating as a

20    well-oiled machine when I saw them.

21    Q   Did you ever have any interactions with Mr. Reina in his

22    home?

23    A   Yes.  As I stated, I would visit Mr. Reina approximately

24    every other month.  During the visit, I would usually be there

25    for anywhere from 30 minutes maybe up to an hour or more.  Now,

MATTHEW MATHENY - DIRECT

1    that's not to say that I did see Mr. Reina the entire time

2    during that visit, but I would always make sure that I would

3    engage with him for at least ten minutes.

4    Q    Did you -- were you able to communicate with Mr. Reina?

5    A    I was able to communicate with Mr. Reina.  Now, not

6    verbally, but at least -- there's many different forms of

7    communication.  I could -- he would always be glad to shake my

8    hand, usually give a smile.  Like I said, there was a lot of

9    different ways that I could see Mr. Reina communicating, just

10   not verbally, but I was also able to get some basic verbal

11   communication with his family members using sign language as

12   well.

13   Q    Did you ever see anything prior to June of 2015?  Did you

14   ever see anything amiss in the home that stuck out to you?

15   A    No.  Prior -- during those visits, Mr. Reina was usually

16   getting home from work.  You could kind -- at least from my

17   perspective, I could see that Mr. Reina took a great deal of

18   pride in his work.  He was always very happy, had a smile on his

19   face, and seemed very content.

20   Q    Did you have any involvement with the events that followed

21   Mr. Reina being -- no longer working at Walmart?

22   A    The first I had heard about anything going on with Walmart

23   was when Ms. Slaght reached out to me to let me know that they

24   were going to be having a meeting coming up with Walmart, and I

25   believe she was a little nervous about it.  I know there was a

MATTHEW MATHENY - DIRECT

1    new manager in place and just a little worried about what might

2    be coming with that, and I made sure to let Ms. Slaght know, as

3    I would always do in any situation, that if there was anything I

4    could do to help, to please let me know.

5    Q    And did she ever seek your help?

6    A    Following -- after the meeting, and I don't remember the

7    exact time line, but it came out that Mr. Reina was no longer

8    working at that time.  I let Ms. Slaght know that I would

9    attempt to reach out to Walmart to see if maybe we could help

10   link the family up with some employment services.  I personally

11   am not an employment expert, but there are agencies in our area

12   that do work much closely -- more closely with employment, and I

13   was ideally hoping to help bring them involved if it became --

14   turned out that that was needed.

15       So Ms. Slaght did ask me to reach out to Walmart.  She

16   provided me with a phone number, and I did attempt to call

17   Walmart with the number that was provided and with the name that

18   was provided to see if I could be of any assistance.

19   Q    So were you calling the general store number or direct-dial

20   number?

21   A    Based on what I could tell from the phone call -- now, no

22   one ever did answer, but it seemed as though it was a direct

23   number.  When I'm thinking of, let's say, calling a Walmart or a

24   Target or a Walgreens, if I'm calling a store number, I expect

25   to hear the store hours, different departments, maybe an option

MATTHEW MATHENY - DIRECT

1    to leave a general message, but this was a -- seemed to be an

2    individual voicemail with a name.

3    Q    And were you confident that you were reaching someone to

4    whom you could speak about Mr. Reina's identity?

5    A    I am, because in a situation like that, protecting our

6    client's privacy is always our -- one of our first

7    responsibilities, and I made sure that I would have matched up

8    the name on the voicemail with the name that was provided by Ms.

9    Slaght.

10   Q    And how many times did you call?

11   A    I'm going to guess up to maybe ten times.  Now, I didn't

12   leave a voicemail every time.  I know for me personally at work,

13   if an individual is calling ten different times leaving ten

14   different voicemails, it's not going to speed the process up.

15   So I did call repeatedly, and I believe I probably left at least

16   a couple voicemails.

17   Q    Did you keep records of your calls?

18   A    I kept records of the voicemails that I did leave.

19   Q    Would you please pull up Exhibit 31.  And this has been

20   stipulated into admission between myself and defense counsel.

21   No, not that one.  Well, as long as -- okay.  We'll come back to

22   that one.  30 then.  Can you please focus in?  I'll tell you

23   specifically.  Would you focus in to the June 22nd entry?

24       Is this a copy of your note?

25   A    Yes, it is.

MATTHEW MATHENY - DIRECT

1    Q    And does it indicate you called Walmart?

2    A    Yes, it does.

3    Q    We continue to have some technical difficulties, but can

4    you confirm that that's one of the notes of your calls to

5    Walmart?

6    A    Yes.  I simply laid out that I did call Walmart with the

7    intent to speak to the store manager, but there was no answer,

8    and I did leave a voicemail message.

9    Q    Turning to the entry of July 7th, 2015.  Is that also a

10   confirmation that you called Walmart and left a message?

11   A    Yes, it is.

12   Q    Did you receive any calls back from Walmart?

13   A    No, I did not.

14   Q    Focusing on July 21st, 2015, and is that another

15   confirmation of a telephone message left with Walmart?

16   A    Yes, it is.

17   Q    Did you keep these messages concurrently with your calls?

18   In other words, did you mark them down on -- around the time you

19   made them?

20   A    Yes, I would.  The situation with a phone call that I'm

21   placing from the office, I would have made my notes pretty much

22   while making the call or just immediately upon terminating --

23   hanging up the phone.

24   Q    Did anyone from Walmart ever call you?

25   A    No.

MATTHEW MATHENY - DIRECT

1    Q    We briefly flashed up an exhibit, and I want to take you to

2    that for a minute.  That's Exhibit 30 [verbatim].

3         Now, you tried to help Ms. Slaght; is that correct?

4    A    Yes.

5    Q    And you wanted to help Paul?

6    A    Yes.

7    Q    And eventually you were moving on?

8    A    Yes.

9    Q    And you wrote an email to her?

10   A    Yes.

11   Q    And is this deposition -- excuse me, Plaintiff's Exhibit

12   31 --

13            THE COURT:  30, I think.

14            MS. VASICHEK:  30?

15            MS. VANCE:  No, 31.

16            THE COURT:  It's 31?  Okay.  Now you've got to clarify.

17   The call log, what exhibit was that?

18            MS. VASICHEK:  30.

19            THE COURT:  That was 30.  This is 31.  Thank you.

20   BY MS. VASICHEK:

21   Q    Now, this note states "Like I said, I'll be glad to help

22   you out in any way I can help to screw Walmart in the future if

23   I'm no longer in the area.  Not going anywhere quite yet, but

24   you never know."  Did you write that email?

25   A    Yes, I did.

MATTHEW MATHENY - DIRECT

1    Q    Why did you write it?

2    A    At the time, I knew that I was starting to look for another

3    job, and I just wanted to make sure that Ms. Slaght had my

4    contact information in case I was no longer at The Arc.

5    Q    I understand, but why did you use the language "to help you

6    screw Walmart in the future"?

7    A    I do regret sending that email.  And how I meant to say it

8    and what I should have said is I would attempt to help out in

9    any way that I can to provide the truth.

10   Q    Are you shading your testimony at all here today?

11   A    No.

12   Q    Were the notes that we saw earlier sent prior -- the

13   progress logs, were they entered prior to this email?

14   A    Yes.

15   Q    And this email was in September of 2017?

16   A    Yes.

17   Q    You did move on, did you?

18   A    Yes, I did.

19   Q    You mentioned briefly if you were to rephrase this email,

20   how would you rephrase it?

21   A    I would have said "Here's my contact information.  I will

22   help you in any way I can to provide the truth for Paul Reina."

23   Q    And was this voluntarily produced during the discovery in

24   this matter?

25   A    Yes, it was.

MATTHEW MATHENY - DIRECT

1    Q    So now you have talked briefly about what occurred with Mr.

2    Reina, how his attitude was when he was working at Walmart.  Did

3    you notice any change in his demeanor or behavior after?

4    A    Yes.  Now, and I, first of all, want to say, based on my

5    position, I am not in a role to diagnose an individual, but just

6    based on my observations, it felt like -- and also by reporting

7    of the family as well, but primarily even on my observations

8    during the visit, I noticed Mr. Reina had been spending more

9    time in his room.  He was less eager to engage.  It wasn't the

10   bright, cheery man that I had seen before coming home from work

11   with a big smile on his face.

12            MS. VASICHEK:  Thank you very much.  Pass the witness.

13            THE COURT:  Cross-examination.

14                       CROSS-EXAMINATION

15   BY MR. HARLAN:

16   Q    So, Mr. Matheny, we had a chance to meet at your

17   deposition, did we not?

18   A    Correct.

19   Q    Okay.  And I understand you apologized for sending an email

20   where you said that you wanted to screw Walmart, right?

21   A    Yes.

22   Q    And -- but you didn't say that your motives had changed.

23   Are you still trying to screw Walmart?

24   A    My role here is to tell the truth.

25   Q    I see.  And so notwithstanding the fact that you wrote an

MATTHEW MATHENY - CROSS

1    email that said that you wanted -- an unsolicited email that you

2    wanted to screw Walmart, you want this jury to believe that

3    you're here telling it like it is today?

4    A    Yes.

5    Q    Okay.  And, for instance, these phone calls that you said

6    that you made, the only person who can confirm that is you.

7    A    Correct.

8    Q    So if the jury is going to believe that those occurred,

9    they have to believe you.

10   A    Correct.

11   Q    And so, for instance, you can't identify anybody that you

12   spoke to at Walmart when you made these phone calls.

13   A    At the time that I made the call, I know I had made a brief

14   note when Ms. Slaght had passed along the phone number and the

15   name.  I do not still have those records, but I did call the

16   name and the phone number that was provided to me.

17   Q    Okay.  And you said you called about ten times?

18   A    Approximately.

19   Q    But you only have three documented times of calling.

20   A    I did document when I left my voicemail message.

21   Q    Okay.

22   A    If I can expand on that just briefly --

23              THE COURT:  That's all right.  Just answer --

24              THE WITNESS:  Oh, sure.  I'm sorry.

25              THE COURT:  Just answer the question.  If there's a

MATTHEW MATHENY - CROSS

```
 1     need for clarification --
 2               THE WITNESS:  I'm sorry.
 3               THE COURT:  -- the EEOC's lawyer can come back to it.
 4     BY MR. HARLAN:
 5     Q    What are you doing now?
 6     A    I am working as an individual service coordinator at
 7     Community Alternatives Unlimited in Chicago.
 8     Q    Okay.  So you came all the way to Chicago -- from Chicago
 9     to testify today?
10     A    Yes.
11     Q    And have you met with the EEOC to prepare for your
12     testimony today?
13     A    I have met with them, yes.
14     Q    In person?
15     A    Yes.
16     Q    Did you drive from Chicago to meet them in Milwaukee or
17     wherever you met them?
18     A    Yes.
19     Q    How many times?
20     A    Once.
21     Q    Okay.  And how about by phone?  Did you talk with them by
22     phone to prepare to give the testimony that you're giving today?
23     A    The EEOC reached out to me probably I'm going to say a
24     month ago and gave me a heads-up about the trial date and to let
25     me know that I would be receiving a subpoena.
```

```
 1     Q    And you said that you noticed that Mr. Reina was staying in

 2     his room more after he stopped reporting to work at Walmart, but

 3     you don't have any way to quantify how often he did that before

 4     he stopped working at Walmart or after, do you?

 5     A    No, I do not.

 6              MR. HARLAN:  That's all I have, Your Honor.

 7              THE COURT:  Any redirect?

 8                        REDIRECT EXAMINATION

 9     BY MS. VASICHEK:

10     Q    Did the EEOC subpoena you for your testimony?

11     A    Yes.

12              MS. VASICHEK:  Nothing further.

13              THE COURT:  Okay.  Thank you, Mr. Matheny.

14              THE WITNESS:  Thank you.

15         (Witness excused at 11:57 a.m.)

16              THE COURT:  Next witness.

17              MS. VASICHEK:  We're calling Rose Slaght, Your Honor.

18              THE COURT:  Very good.

19              MS. VASICHEK:  Oh, I'm sorry.  I was just corrected.

20     We're reading in deposition designations.

21              THE COURT:  Okay.  Is this an individual deposition?

22              MS. VASICHEK:  There are several, yes.

23              THE COURT:  Okay.

24              MS. VANCE:  Your Honor, we will begin with Amanda

25     Fellows.
```

MATTHEW MATHENY - REDIRECT

```
1            THE COURT:  All right.  Very good.  And I assume you've
2      got the lead-in, so they'll find out who Ms. Fellows is?
3            MS. VANCE:  Yes.
4            THE COURT:  Okay.  So these are individual depositions.
5      So this is just like we did before only before it was on behalf
6      of Walmart.  This is just the individual person who is being
7      deposed, and so here it is enacted for your edification.
8         Go ahead.
9          (Deposition designations of Amanda Fellows read 11:58 a.m.
10     until 12:01 p.m.)
11           MS. VANCE:  No further questions for this witness.
12        Your Honor, the next deposition we'd like to read
13     designations from is Sheila Martin.
14           MR. HARLAN:  May we approach, Your Honor?
15           THE COURT:  Yes.
16        (Discussion held at sidebar at 12:01 p.m.)
17           MR. HARLAN:  Unfortunately, we didn't get a chance to
18     confer before they put these witnesses on, but we did have some
19     counter-designations.  We're not -- we're going to withdraw our
20     objections to the testimony --
21           THE COURT:  Okay.
22           MR. HARLAN:  -- but we have some counter-designations
23     that we want to put in, and does the EEOC have any position on
24     that, and then how are we going to accomplish that?
25           MS. VANCE:  Yeah.  We did file objections to the
```

AMANDA FELLOWS - DEPOSITION

1    designations.  Once the witness was tendered on redirect, Mr.

2    Buliox -- the counter-designations are blue, Your Honor.

3              THE COURT:  Yeah.

4              MS. VANCE:  -- examined his own case with leading

5    questions.

6              THE COURT:  Uh-huh.

7              MS. VANCE:  And --

8              THE COURT:  So your objection --

9              MS. VANCE:  -- they do not complete the designations,

10   which were about whether or not use of the cart caddy was

11   required versus optional.

12             THE COURT:  Okay.  So there's no objection to they're

13   being leading here.

14             MS. VANCE:  It was waived at the time.

15             THE COURT:  All right.  So -- and so they're not --

16             MS. VANCE:  They're not responsive or completing to the

17   designation, which is about whether or not the caddy -- the

18   electric caddy was optional versus required.

19             MR. HARLAN:  We think that, for purposes of

20   completeness, that those particular questions should be part of

21   the read-in.

22             MS. VANCE:  This witness is available --

23             MR. HARLAN:  (Inaudible.)

24             MS. VANCE:  -- is on their witness list.

25             THE COURT:  You have to talk one at a time.  Okay.  So

1    the objection is that it's not responsive, so you're going to

2    ask Ms. Martin about the use of the cart caddy, and this is on a

3    different subject.

4           MS. VANCE:  Correct.

5           THE COURT:  Okay.  So if the witness were called

6    adversely, the way we would do this is that I would give Walmart

7    the chance to either just do responsive questions or to do their

8    examination in their case-in-chief, the principle being that if

9    you want to have the witness up there one time, you can do that

10   as a courtesy to the witness, but if you reserve and you want to

11   call the witness again yourself, then you're limited to the

12   scope of the examination.

13          MR. HARLAN:  Well, I guess we're sitting down, right?

14          THE COURT:  Yeah.

15        (Reporter interruption.)

16          THE COURT:  He's seeing where the ruling is going to

17   go.

18        (Sidebar discussion ends at 12:04 p.m.)

19        (Deposition designations of Sheila Rae Martin read

20   12:04 p.m. until 12:07 p.m.)

21          MS. VANCE:  Your Honor, now we would read from

22   designations of the deposition of Reginald Coffin.

23        (Deposition designations of Reginald Coffin read 12:07 p.m.

24   until 12:10 p.m.)

25          MS. VANCE:  And I'll ask to have entries around July

SHEILA RAE MARTIN - DEPOSITION/REGINALD COFFIN - DEPOSITION

1    17th, 2015, on the screen, please.  We passed it.  And go down

2    one more.  I think there's a July 15th entry.  Keep going.

3    Yeah.  Keep going.

4           (Reading continued 12:12 p.m. until 12:14 p.m.)

5           THE COURT:  I'm sorry to interrupt, but if you want the

6    jury to understand what we're looking at, we need to stop when

7    we are -- I don't think we need to count them now.  The

8    testimony is clear there were four entries, but if you want the

9    jury to be able to see what any of those entries are, we need to

10   put them up, stop, and give them a chance to look at it.  The

11   constant scrolling is not helpful.  I think we're fine at this

12   point, but if you want to return to this document, you have to

13   give the jury a chance to look at what they're seeing.

14          MS. VANCE:  We'll go on for purposes of this.

15          (Reading continued 12:15 p.m. until 12:23 p.m.)

16          MS. VANCE:  That completes our designations from the

17   deposition of Reggie Coffin, and we will read from the

18   deposition of Julie Repka as a fact witness.

19          THE COURT:  Okay.  Ms. Repka can be deposed as the

20   representative of Walmart and then also as the -- from her own

21   experiences, so now we're going to hear from the individual

22   deposition of Julie Repka.  Go ahead.

23          (Deposition designations of Julie Repka read 12:24 p.m.

24   until 12:56 p.m.)

25          MS. VANCE:  Your Honor, there is one more dep.

REGINALD COFFIN - DEPOSITION/JULIE REPKA - DEPOSITION

1          THE COURT:  We're going to need to take our lunch break

2     at this point.  I've got a hearing that I have to do at 1:00,

3     and the jury is going to need to eat their lunch anyway.  So

4     we'll reconvene at 2:00 and finish up with one more -- just one

5     more deposition?

6          MS. VASICHEK:  Yes.

7          MS. VANCE:  Jeff Scheuerell, yes.

8          THE COURT:  Okay.  Very good.  We'll see you at 2:00.

9        (Jury exits the courtroom at 12:57 p.m.)

10         THE COURT:  I've asked for somebody from IT to come up

11    and try to troubleshoot the laptop and the connection to our

12    system to see if we can figure out whether the problem is on the

13    laptop end or on our end, so maybe we can get it straightened

14    out.

15       See you at 2:00.

16       (Recess at 12:57 p.m.)

17                              ***

18

19

20

21

22

23

24

25

1    I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that the

3   foregoing is a true and accurate record of the proceedings held

4   on the 8th day of October, 2019, before the Honorable

5   James D. Peterson, Chief U.S. District Judge for the Western

6   District of Wisconsin, in my presence and reduced to writing in

7   accordance with my stenographic notes made at said time and

8   place.

9        Dated this 18th day of October, 2019.

10

11

12

13

14

15                              /s/ Jennifer L. Dobbratz

16                        Jennifer L. Dobbratz, RMR, CRR, CRC
                               Federal Court Reporter
17

18

19

20

21

22

23

24   The foregoing certification of this transcript does not apply to
     any reproduction of the same by any means unless under the
25   direct control and/or direction of the certifying reporter.