UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

               Plaintiff,          Case No. 17-CV-739-JDP

     vs.

WAL-MART STORES, INC. and      Madison, Wisconsin
WAL-MART STORES EAST, L.P.,     October 7, 2019
                         1:25 p.m.
             Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
**AFTERNOON SESSION**
HELD BEFORE CHIEF JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:
        U.S. Equal Employment Opportunity Commission
        BY:  LAURIE A. VASICHEK
        330 2nd Avenue South, Suite 720
        Minneapolis, Minnesota  55401

        U.S. Equal Employment Opportunity Commission
        BY:  CARRIE VANCE
        310 West Wisconsin Avenue, Suite 500
        Milwaukee, Wisconsin  53203

        U.S. Equal Employment Opportunity Commission
        BY:  JEAN P. KAMP
        500 West Madison Street, Suite 2000
        Chicago, Illinois  60661

Also Present:  Roseann Slaght, Guardian
               Amanda Beckerink, Paralegal

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter - U.S. District Court
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708

APPEARANCES:   (Continued)

For the Defendants:
          MWH Law Group, LLP
          BY:   EMERY K. HARLAN
          735 North Water Street, Suite 610
          Milwaukee, Wisconsin  53202

          MWH Law Group, LLP
          BY:  WARREN E. BULIOX
          111 East Wisconsin Avenue, Suite 1000
          Milwaukee, Wisconsin  53202

Also Present:  Walmart:
               Kimberly Royal, In-House Counsel
               Julie Repka, Corporate Representative

               Tracy Tompkins, Paralegal

### I-N-D-E-X

                                                  PAGES
OPENING STATEMENTS

By Ms. Vasichek                                    3-15
By Mr. Buliox                                     16-36

PLAINTIFF'S WITNESSES          EXAMINATION

MARGARET POLIZZI          Direct by Ms. Vance      37-62
                          Cross by Mr. Harlan      62-96
                          Redirect by Ms. Vance    97-99
MATTHEW COPPERNOLL        Direct by Ms. Vance     113-129

### E-X-H-I-B-I-T-S

PLAINTIFF'S EXHIBITS                 IDENTIFIED    RECEIVED

Exs. 1 thru 18 - Peformance Evaluations   102        103
Ex. 22 - Job Description                    36         36
Ex. 28 - Coppernoll Certifications         112        112
Ex. 59 - *Day in the Life* Video           101        101
Ex. 63 - Pre-Screening Questionnaire       102        103
Ex. 64 - Accomodation Reimbursement        102        103
Ex. 66 - Commendation                      102        103

DEFENDANTS' EXHIBITS

Exs. 572 thru 577 - Medicaid Waiver Forms 130        140

1          (Called to order at 1:25 p.m.)

2               THE COURT:  Maybe we can move that over a little

3    bit.

4               THE CLERK:  So they want it angled out a little

5    bit.

6               THE COURT:  So they can see it.  If it works for

7    you, it works for me.

8               MR. BULIOX:  We were just talking about angling

9    towards the jury a little bit.

10              THE COURT:  Angle it towards the jury a little

11   bit.  There we go.  That should be good.  Very good.  All

12   right.  Are we ready for the jury?  All right.  Let's

13   bring them in.

14          (Jury in at 1:26 p.m.)

15              THE COURT:  All right.  At this point we are

16   where we will begin with the opening statements, starting

17   with the plaintiff.

18              MS. VASICHEK:  Hello.  I'm Laurie Vasichek.  I

19   work with the EEOC.  We're the plaintiffs in this case, as

20   you've heard.  This is a case about how the defendant

21   Walmart could not see an individual's -- their employee's

22   abilities because of his disabilities.  We're going to be

23   presenting evidence in this case regarding how Mr. Reina,

24   Paul Reina, was denied the reasonable accommodation of a

25   full-time job coach and how Walmart ended his employment

1  because of his disability.  So what I'm going to do now is

2  take you through some of the evidence that we expect to be

3  introduced during the trial.

4      First, let's start with Paul Reina.  Paul Reina

5  worked at Walmart as a cart pusher.  While Paul is an

6  individual with a disability, he's deaf, he's visually

7  impaired.  He's developmentally disabled.  He's on the

8  autism spectrum.  He doesn't speak.  He communicates

9  through a simple sign language with his family and

10 friends.  It's called "home sign."  You will hear more

11 about that.

12     You won't hear directly from Paul in this case, but

13 you will hear from his foster mother and his guardian,

14 Rose Slaght, who is in the courtroom now.  Roseann and her

15 husband became Paul's foster parents when he was six years

16 old.  During the entire relationship, she ultimately

17 became his guardian.

18     At all times Roseann had the goal of having Paul work

19 in the community to hold community employment.  And as a

20 consequence, he took classes in school and his schooling

21 was focused on training him how to work out in the

22 community.  The goal was always to make Paul a taxpayer

23 rather than a tax recipient.

24     He held various positions starting in high school.

25 He had a certificate of completion from high school.  He

1    held various jobs.  You'll hear he worked in a laundromat,

2    he worked in a grocery store, and he currently works as a

3    newspaper delivery person.  You'll see a video in fact, a

4    short video, showing him doing part of that job.

5         Now, all this time in these jobs, Paul worked with a

6    job coach.  And the job coach was not paid by the

7    employer; it was paid through different types of public

8    agencies.  You will also hear evidence about the job that

9    Paul had at Walmart.  Paul got this job when he was in

10   high school.  He worked there for 16 and-a-half years,

11   almost 17 years, and he did the job of a cart pusher.

12        He got this job with the assistance of his high

13   school program.  He was hired in 1998.  And he did this

14   job with the help of a job coach or a job assistant, which

15   is somebody who can help the person to make sure they're

16   doing their job.

17        So in this case the job coach would help do things

18   such as be his eyes and ears.  As you'll hear, he's, as I

19   said, deaf and he's visually impaired, so the job coach

20   would help be his eyes and ears.  You'll hear that he

21   helped him focus.  Walmart was never in doubt that he

22   needed a job coach to do his job.

23        Would you bring up Exhibit No. 18, please?

24        You'll see this is the form that you will see in

25   evidence.  It's a form that was submitted to Walmart on

 1 | January 26th, 1999.  And you will see that one of the
 2 | accommodations, one of the changes in how the work is done
 3 | there that was requested.  And what was told is he was
 4 | unable to work in the parking lot without assistance.  And
 5 | one of the things that Walmart agreed to do was to allow
 6 | Paul to work and to have an aide to work in the parking
 7 | lot.  So Walmart knew that he needed a job aide, job
 8 | coach, and Walmart agreed.  And as I said, the job coach
 9 | was not paid by Walmart.
10 |      So Paul starts in 1998, late 1998, and works as a
11 | cart pusher.  A cart pusher, you will hear, Paul's job as
12 | a cart pusher, involved keeping the parking lot free of
13 | carts.  His job was to move the carts from the parking lot
14 | into the bay, to load the carts up, to gather them
15 | together, to clean out the corrals, and to move them into
16 | the bay.  You will hear that even with regular shopping
17 | cart pushers, cart retrieval comprises 95 percent of the
18 | job.
19 |      The job coach was there to help him, help Paul keep
20 | focused, to identify carts, to help direct him to a bay.
21 | And when it was necessary to, for example, turn the corner
22 | to take the carts into the bay, the job coach would put a
23 | finger on the front of the carts to help steer it.
24 |      He did other tasks, too.  He greeted customers.  He
25 | would wave.  He would smile.  He would tell them "hello."

1  He doesn't speak, but job coaches would help communicate

2  with customers who were greeting him so he could

3  communicate back.

4      He also -- he picked up trash from the parking lot.

5  He loaded customer purchases into the trunk.  He wiped

6  down cars.  He broke down boxes.  And this was the job he

7  held for 16 and-a-half years.  He was good at this job.

8  We will be introducing into evidence all of Paul's job

9  performance evaluations and you'll have an opportunity to

10  see them.

11      You will see, for example -- if you could do the

12  2013 -- 2013, excuse me, evaluation -- you will see that

13  in the 2013 evaluation, Paul was told, "Paul does well

14  with making sure carts are full in the bay.  Paul is good

15  at making sure there are no stray carts all over and

16  making sure all carts are cleaned up around the building."

17      You will see, too, the 2014, which is the last one

18  before Mr. Reina was terminated or sent home and not

19  permitted to return.  In the 2014 it states, "Paul is a

20  pleasure to work with.  Paul knows his expectations and

21  does his job well.  Paul gets along with his fellow

22  associates as well as is friendly to his customers.

23  Paul's attendance is decent, having not missed any of his

24  shifts, which shows his dedication to the job.  Paul is

25  good about making sure the carts are cleaned" -- excuse

1  me, "cleaned out of garbage."  These are typical of the

2  evaluations Paul received for 16 and-a-half years.

3      You'll also hear evidence that Walmart did not ask

4  Paul Reina to do all of the jobs in the job description.

5  Showing you, for example, the evaluation from 2008, you

6  will see that there are "NAs" written next to a number of

7  tasks that were in the job description, such as "Answers

8  all customer service calls from other associates";

9  "Communicates with other stock/cart associates to ensure

10  all calls are answered"; "Helps keep restroom, vestibules

11  and trash cans clean."  There were "NAs" next to this.

12  Paul was evaluated for these tasks because Paul was

13  expected to do them.

14      Paul loved his job at Walmart.  And from the job

15  descriptions, you'll see that, at least then, Walmart

16  liked Paul a great deal.  You will also hear that Paul --

17  or excuse me, that Walmart never told Paul or his job

18  coaches that they were doing things incorrectly or wrong.

19      For example, you'll hear about something called a

20  cart caddy.  Now, this is a mechanized buggy that's

21  used -- it can be used at Target -- excuse me, Walmart

22  where the cart attendant would gather all the carts from

23  around the parking lot, put it in the buggy and then that

24  buggy would be remote-controlled driven into the bay.  And

25  as part of this, Paul's job, he would gather all the carts

1    and he would put them in the buggy.  But the cart --

2    excuse me, his job coach would actually control the remote

3    control.

4         The job coach and Mr. Reina were never told that this

5    was the wrong way to do things.  They were never told that

6    the job coach should not be operating the cart caddy.  If

7    they had been told, you will hear that they could have

8    just pushed the carts.  Paul could have just pushed the

9    carts manually.

10        You'll hear testimony through a deposition expert of

11   a manager who says there was no obligation that they had

12   to use the cart caddy.  They could have chosen the option

13   of just pushing the carts manually.

14        Similarly, you'll hear testimony that a couple times

15   a month a customer might leave a scooter in the parking

16   lot, but this didn't happen regularly and it was a minor,

17   irregular duty.  There could have been other things that

18   could have been done had there ever been criticism with

19   how it was being done by Mr. Reina and his job coach.

20        But that is what Paul did.  That is how we will show

21   that Paul was doing -- the evidence will reflect his good

22   performance.  But Paul no longer works at Walmart.  So

23   let's talk about the evidence of what happened.

24        Paul lost the job that he loved and worked at for

25   almost 17 years.  On June 10th, 2015, a new store manager

1-P-10

1  started at Walmart.  On that day, the manager learned

2  about an incident that had occurred three years earlier.

3  In this instance, in 2012, Paul was upset and his job

4  coach tried to calm him down by giving him a bear hug and

5  by signing to him.  It was misinterpreted by customers who

6  complained.  The assistant manager of the store sent

7  someone out to look and all was fine.  But she was

8  concerned.

9      She reviewed a videotape and she called the police.

10 The police investigated and found that the concern of

11 abuse was unfounded.  This was just an issue of

12 communication that was misinterpreted.  Walmart knew about

13 the incident.  Walmart was told the concern was unfounded

14 and Walmart took no action.

15     Now, you may hear testimony from Walmart about a

16 supposed 2015 incident where they say that this occurred

17 again.  What you should listen for here is what the

18 evidence doesn't show.  The evidence doesn't show that

19 anyone witnessed it.  There is no interviews of anyone

20 about a 2015 incident.  There's no record of the supposed

21 customer complaints.  There are no police reports.

22 There's no videotape.  Both Ms. Slaght and Mr. Coppernoll,

23 the job coach, will be testifying and will tell you there

24 was no 2015 incident.

25     What happens is that there's this regurgitation of

1   the 2012 incident.  And after that, Mr. Scheuerell, the

2   store manager; and Julie Repka, a human resources

3   professional; decide to conduct a surveillance of

4   Mr. Reina.  They, without telling Mr. Reina, without

5   telling his job coach, they -- without notifying the

6   guardian, they sit in a car and they watch Paul with his

7   job coach doing the job.

8       Now, they said, and I expect they shall testify, that

9   the job coach was doing 95 percent of the work.  You will

10  hear from Ms. Slaght and Mr. Coppernoll; as well as

11  another job coach, Marge Polizzi; that that just didn't

12  occur.  Mr. Coppernoll will testify, who was the regular

13  coach in question here, that he couldn't physically do 95

14  percent of Paul's job.

15      So after this, this is June 10th or 11th, Rose Slaght

16  is called into a meeting with the new manager.  Rose, I

17  can remind you, is Paul's foster mother and guardian.  She

18  expects the meeting to be a meet-and-greet: young new

19  manager, 16 and-a-half year employee.  She is in fact

20  dismayed, as she will tell you, to have Mr. Scheuerell,

21  the store manager, tell them that they had no paperwork on

22  Paul Reina and that they needed to submit new medical

23  proof that he had a disability and he deserved an

24  accommodation.  Roseann will testify that she was shocked,

25  because he had worked there almost 17 years.

 1        During this conversation Mr. Scheuerell also said

 2   that Mr. Coppernoll, the job coach, was doing 95 percent

 3   of the job.  Both Ms. Slaght and Mr. Coppernoll

 4   immediately denied that that could have occurred.

 5        So Mr. Scheuerell is now asking for proof, paperwork,

 6   that Mr. Reina had a disability and Mr. Reina deserved an

 7   accommodation.  Roseann will say she was unhappy about

 8   this, but that she agreed to provide it.

 9        She went to the doctor, the family practice that

10   Mr. Reina usually goes to, and she asked them to fill it

11   out.  His doctor was gone, but another doctor in the

12   service filled it out.  She got the form and she returned

13   it on July 9th.  And you will see that this form actually

14   answered the questions.

15        It shows that Mr. Reina has deaf-mutism, a

16   developmental delay, visual loss, and an anxiety state.

17   As far as the accommodations, it shows that he needed a

18   job coach to do the hearing and the seeing.

19        Having gotten the form that they wanted, having

20   filled out the form that they wanted, Ms. Slaght took it

21   back to Jeff Scheuerell, the store manager, and she gave

22   it to him.  She got the form he had asked for.

23        Mr. Scheuerell takes the form from her, asks no

24   questions about it, and says, "Don't call us; we'll call

25   you."  At that point he doesn't, as I said, ask Ms. Slaght

1  about any questions about it, doesn't call her doctor,

2  doesn't call any advocacy group.

3       So Mr. Scheuerell tells her, "Don't call us; we'll

4  call you."  So Roseann Slaght is not in a position, and

5  she will testify, to call.  She has been told not to.  But

6  somebody else does call Walmart on behalf of Mr. Reina, a

7  man by the name of Matt Matheny, who you will also hear

8  testify.

9       Matt Matheny works for an organization called "Arc."

10 Arc, in this case, served as a service facilitator for

11 Mr. Reina.  Among other things, what he did was he oversaw

12 things such as the background checks for the job coaches,

13 the fingerprinting, the FBI checks, and he was involved in

14 visiting Mr. Reina every couple of months.

15      Mr. Matheny tried calling the store manager on

16 multiple occasions to try to get Mr. Reina back at work.

17 You will see his contemporaneous notes of his efforts to

18 call.  As you will see, there are notes from various days

19 in June and July of 2015 that say "Called Walmart to speak

20 to store manager.  No answer.  Left message."

21      And on each of these occasions, Mr. Matheny attempted

22 to try to talk to the store manager to try to work things

23 out.  He will testify that he didn't just call these three

24 times; these are the three times he left messages.  He, in

25 fact, called on multiple occasions and he didn't get an

1-P-14

 1   answer.

 2        So still trying to get Mr. Reina back to work,

 3   Ms. Slaght then goes on the Walmart internal employee

 4   webline, which is called "Walmart One."  This is an

 5   internal, I don't know if it's called, "intranet."  It's

 6   something for Walmart employees that they can access and

 7   check their schedules and other communications with

 8   Walmart.

 9        So Ms. Slaght would go on to check whether Paul was

10   being scheduled to work, because she had given the form to

11   them, but he was never being scheduled to work.  So she

12   filed internally, through the hotline, the Walmart hotline

13   that's in Walmart One, a complaint.  She said that Paul

14   needed help because they believed he was being

15   discriminated against.  And what do they hear?  Nothing.

16        So in the end, Ms. Slaght went to the EEOC, my

17   employer.  They are -- the EEOC is the federal agency

18   responsible for enforcing workplace discrimination laws,

19   including the ADA.  Ultimately, a meeting was held by the

20   EEOC that had representatives from Walmart there,

21   Ms. Slaght, Marge Polizzi -- as we said, his job coach is

22   also Ms. Slaght's sister -- and Mr. Reina.  And at this

23   meeting Roseann Slaght learned what was the end result,

24   because there Walmart representatives told her, told them

25   all, that Walmart did not want Paul Reina back.  After

1    that, the answer to Rose was clear.

2         Walmart sent a letter to Paul several weeks later

3    where they asked for the same information that she had

4    already given them.  The letter was written by lawyers.

5    Ms. Slaght didn't answer it, because she had already had

6    her answer from Walmart: They did not want Paul back.

7         So there we are.  Paul has never worked there again.

8    He received wages for two weeks afterwards, but he's

9    received nothing else.  He has subsequently gotten

10   employment, but the loss of his job affected him a great

11   deal.

12        You'll hear that this job was a big portion of Paul's

13   life, from the time he was in high school, for the next 16

14   and-a-half years.  And you'll hear testimony about how it

15   affected his behavior, it affected his demeanor, and it

16   affected his interaction with others.

17        At the end of the case, at the end of the

18   presentation of the evidence, we're going to ask you to

19   return a verdict for the EEOC on Paul's behalf, finding

20   that Walmart had failed to accommodate Paul Reina by

21   denying him the job coach and that they ended his

22   employment because of his disability.

23        We will be asking for damages for the emotional

24   distress he suffered and because of Walmart's failure to

25   care about Paul's right to be free from discrimination.

 1        Thank you.

 2            THE COURT:  And we will hear from Walmart.

 3            MR. BULIOX:  Good afternoon.  That was kind of

 4   loud, wasn't it?  Let me back it up a little bit.  Good

 5   afternoon, ladies and gentlemen.

 6        Let me just take a few moments to reintroduce myself.

 7   My name is Warren Buliox.  I'm one of the lawyers for

 8   Walmart in this case.  I work in a law firm and I'm part

 9   of a legal team.

10        Here with me, as you heard before, is Emery Harlan.

11   And then we have Tracy Tompkins.  Both Emery and I are

12   lawyers and Tracy is a paralegal and together we are

13   Walmart's legal team.

14        In here we also have a representative from Walmart's

15   legal department, a Walmart internal lawyer, Kimberly

16   Royal.  And we have at our table as well, Julie Repka.

17   Now, Julie is a senior leader in HR and she's also a

18   person you're going to hear from a little bit later on.

19        Good afternoon again.  And good afternoon, Judge, and

20   counsel.

21        Now, given what we've just heard, I'm going to start

22   off by telling a little story.  Long, long ago, back

23   before there were roads and highways, and so forth, when

24   people traveled from settlement to settlement, from town

25   to town, from village to village, they traveled down

1  trails.  Those trails were through wooded areas.  They

2  were through the forest.  The problem was that, in that

3  forest, in those forests, there were wild and dangerous

4  animals.  There were wolves and there were bears and so

5  forth.

6      So what people did is that they took fish and they

7  smothered that fish in seasoning and spices to the point

8  where it turned red.  And then they smoked it and it made

9  the fish very very smelly.  They would then take these

10  smelly fish out and go into the forest and put them in

11  places away from the trail so that when they would walk

12  down those trails, the wild animals, the bears and the

13  wolves and everything else, will be attracted to those

14  fish which were off the trail.

15      Do you know what those red fish became known as?

16  "Red herrings."  So to this day, a red herring is

17  something that you throw out there to throw people off the

18  trail.  A true story.

19      We believe that the evidence in this case will show

20  that a lot of what the EEOC just said and will present are

21  red herrings.  The central issue in this case, ladies and

22  gentlemen, is whether or not Mr. Reina is a qualified

23  individual with a disability, because if he's not, the

24  case is over.

25      We anticipate that the Court will instruct you on the

1  law.  You've already received some preliminary

2  instructions.  We anticipate that the Court will instruct

3  you that a qualified individual with a disability is

4  someone who can perform the essential functions of the job

5  with or without a reasonable accommodation.  We also

6  anticipate that the Court will instruct you that a

7  reasonable accommodation is not a job aide or a job helper

8  or a job coach who performs the essential functions of a

9  person's job.  But we'll talk more about that later.

10      In order to understand this issue, we have to

11  understand who this case is all about, and that's Mr. Paul

12  Reina.  Now, as you've just heard, Mr. Reina has been

13  dealt a very very hard hand in life.  The evidence will

14  show he's deaf, he's blind.  I'm sorry, he's legally

15  blind.  He can see.  He's cognitively delayed and he's

16  autistic.  And the evidence in this case will not show

17  that he was incapable of doing anything.

18      You're going to see video evidence of him doing

19  household chores, I'm sure, of taking medicine, eating

20  breakfast.  You may even see some video evidence of him

21  going on a paper route.  But the paper route, household

22  chores, eating breakfast, the evidence will show that

23  those are all red herrings, ladies and gentlemen.

24      You will hear testimony, on the other hand, from

25  manager after manager, and even by some of his job

 1  coaches, that he was simply unable to do his job.  For

 2  example, he was unable to steer carts by himself.  He

 3  could push, but he was unable to steer.  So he was,

 4  therefore, unable, by himself, to navigate the parking

 5  lot, and he's a cart pusher.

 6       You will hear testimony that Mr. Reina needed the

 7  24-7 assistance, physical hands-on assistance, of another

 8  human being to do his job.  And you will hear that from

 9  the beginning, he was not qualified to do his job.

10       There are two documents in particular, and we'll get

11  into those later.  But one of those documents he signed,

12  indicating, as clear as day, that he was unable to perform

13  the essential functions of his job.  And he signed it, and

14  that was back in 1999, so at the very beginning of his

15  employment.

16       And over the course of this case you're going to hear

17  testimony about how manager after manager came in.  They

18  noticed that Mr. Reina had a job aide with him.  They

19  noticed that this job aide was performing the duties of

20  Mr. Reina.  And they either assumed it was okay, because

21  it was there and in place before they got there, or they

22  had empathy for Mr. Reina.  You know, here's a gentleman

23  who had a series of severe impairments and he had a job,

24  so they don't want to put it out of whack, they don't want

25  to mess that up.

1        And then you'll hear testimony from a few managers

2    that will say that, "Hey, look, that arrangement, you

3    know, was okay at the end of the day," even though they

4    disagreed with it, because Mr. Reina's job coach was doing

5    the work and, at the end of the day, the work was getting

6    done.

7        We believe the evidence will show that this was not

8    reasonable and that when a new manager the EEOC just spoke

9    about came to the store, that he noted that this

10   arrangement wasn't right, reported it to corporate, and

11   the arrangement of Mr. Reina having someone else do his

12   job ended.

13       Now, the EEOC alleges that this was all unlawful.

14   Well, the evidence will show that it was not.  Let's get

15   into first the EEOC's burden of proof in this case.

16       So the EEOC is suing Walmart.  As such, they have the

17   burden, the legal obligation, to prove that Walmart

18   engaged in unlawful conduct.  In other words, Walmart does

19   not have to prove nondiscrimination.  It is the EEOC's

20   burden to show you that Walmart unlawfully acted against

21   Mr. Reina.

22          MS. VASICHEK:  Your Honor, if I could object.

23   This is argument.

24          THE COURT:  It is argumentive.

25          MR. BULIOX:  Okay.  We expect that the Court will

1-P-21

1  instruct you that if Mr. Reina is a qualified individual

2  with a disability, then the case moves on.  So what is a

3  qualified individual with a disability?  We anticipate

4  that the Court will instruct you that a qualified

5  individual with a disability meets the legitimate skill

6  sets for the position, has the requisite experience for

7  the position, has the education for the position, and can

8  perform the essential functions of the job with or without

9  reasonable accommodations.

10          MS. VASICHEK:  Your Honor, if I may object again.

11  This is a legal argument.

12          THE COURT:  It's still argumentative.  But he's

13  got the slides, so he's framing what he's now going to

14  present as the evidence that Walmart has.  So move along

15  to the evidence and preview it for us.

16          MR. BULIOX:  So to consider this issue, you have

17  to consider what a reasonable accommodation is.  So that's

18  going to require us to look at the job and it's going to

19  require us to look at what Mr. Reina could and could not

20  do.  Mr. Reina was hired in 1998 as a cart pusher.  You

21  will hear that this position is also called a courtesy

22  associate or a cart attendant.  Now, let's look at what

23  the job was all about.

24      This is a job description for Mr. Reina's job that

25  was in place during much of his employment at Walmart.

1 And here, according to the *Essential Functions*, a cart

2 pusher "maintains availability of and organizes carts and

3 flatbeds, assists customers with transporting items, loads

4 merchandise into customer vehicles, and properly and

5 safely uses cart retrieval equipment."

6    And there was a customer service component of the job

7 as well.  Under the essential functions for customer

8 service, the job description provides that cart attendants

9 are to "Provide customer service by acknowledging the

10 customer, identifying customer needs, assisting with

11 purchasing decisions, locating merchandise, resolving

12 customer issues and concerns, and," of course, "promoting

13 products and services" and "maintaining a safe shopping

14 environment."

15    We're going to show you a matrix of central job

16 functions from 1999 that is in Mr. Reina's personnel file.

17 You'll see where it says here *Cart Pushers* and it has

18 check marks for the essential functions that they're able

19 to do, are required to do; for example, customer service,

20 carry-out assistance, sweep floors, pushing or pulling.

21    And you see here we have a signature from Mr. Reina.

22 And right above that signature, look what it says.

23 There's an X to "No, I do not have the ability to perform

24 all the above functions with or without reasonable

25 accommodations."  So will the evidence show that Mr. Reina

1    could do his job with or without reasonable

2    accommodations?  The evidence will show that Mr. Reina

3    needed an accommodation of another person to do his job.

4        Here is a 1999 accommodation request made on

5    Mr. Reina's behalf during his employment at Walmart which

6    was in place for, well, 16 years.  Now, according to this

7    form, his limitations included being, quote, "Unable to

8    work in parking lot without assistance," end quote.  And

9    as an accommodation, it was requested on this form that he

10   be allowed to -- that he be allowed an aide to work with

11   him and that he not be asked to do tasks that he was

12   incapable of performing.  The evidence will show that

13   Mr. Reina was not able to do his job from the very

14   beginning.  And this, folks, is no surprise.

15       You will hear evidence in this case that Mr. Reina is

16   and always has been deaf and legally blind and cognitively

17   delayed and autistic and that he cannot stay on focus.

18   And his long-term doctor of 30-plus years will tell you

19   that he is noncommunicative.  So how then could he have

20   performed the central functions of his job and processed

21   instructions and directions from customers and received

22   and understood training on Walmart policies?

23       We believe that the evidence will show that he could

24   not have, without the 24-hour assistance -- I hate to

25   sound like a broken record -- the 24-hour assistance of

1  somebody else doing his essential functions for him.

2      Now, over the course of this trial you will hear

3  testimony by manager after manager, and again even some of

4  his job coaches, that Mr. Reina needed another human being

5  to steer carts in the parking lot, to use the cart caddy,

6  to navigate the parking lot safely, to talk to customers,

7  to process directions from supervisors; that he needed

8  another person to make judgments about how to most

9  efficiently gather carts, to push and maneuver multiple

10  carts in the parking lot, to strap multiple carts

11  together; that he needed another person to give directions

12  to customers, to put away the motorized shopping cart

13  which we'll talk about in a little bit and which you'll

14  see some video of.  And he also needed another person to

15  actually take trainings for him on Walmart policies.  And

16  all of this makes sense, the evidence will show.

17      In this trial you will see video showing you a cart

18  pusher in action.  Here are two clips.

19      Tracy, can you play the first clip?

20      (Video played.)

21      Now, this right here is the cart caddy machine.

22  There's our cart pusher.  And you'll be able to see it a

23  little bit better further in the clip, I believe, but on

24  the left-hand side he has a remote control.  And the way

25  you operate this is that you tell the cart caddy to go up

1-P-25

1   or move forward with a remote control, to stop, and then

2   you steer the carts with your hand in the front.

3        Tracy, can you play the next clip?

4        (Video played.)

5        And here we see a cart pusher interacting with a

6   customer in real-time, spontaneously answering questions

7   as asked, and then using what's called a motorized

8   shopping cart, which is like a scooter with a basket on

9   the front.  The cart pushers were required, as you just

10  saw in the job description, to maintain and manage

11  shopping carts.  These are one of the carts.  The evidence

12  will show that this was part of their job.

13       So as you go through this evidence, ask yourself, how

14  can Mr. Reina do this with or without reasonable

15  accommodations?  Hear the evidence, apply your common

16  sense, and ask yourself, was he qualified to do the job.

17       Now, the EEOC has said a lot here, some of which

18  either does not make much sense when looked at in the full

19  context of the evidence in the case and some of which are

20  red herrings.  For example, they may try to suggest that

21  customer service was not important or that Mr. Reina was

22  only required to engage in limited customer service, such

23  as saying "hi."

24       The EEOC suggests -- it makes a big deal about

25  Mr. Reina working for Walmart for over 16 years.  They

1  also make a big deal about him having positive performance

2  evaluations.  And they argue that Mr. Reina was in some

3  type of special position where he wasn't required to do

4  his job.  But these are distractions designed to throw you

5  off the trail.

6      One of the biggest distractions in this case has been

7  that customer service was either not a part of Mr. Reina's

8  job or that he could perform a customer service function.

9  But let's look at the evidence and let's look at what the

10 evidence will show and let's look at customer service.

11     Do you remember the job description that we showed

12 you earlier and its reference to the essential function of

13 customer service?  Answering questions and helping

14 customers and acknowledging customers and identifying

15 customer needs and locating merchandise.

16     As a starting point, you will receive testimony from

17 multiple managers who will tell you that in all of the

18 years that they worked around Mr. Reina, they not once saw

19 him make eye contact with them or even say "hello" or "hi"

20 after they greeted him.  They will tell you that in all

21 the years that they worked with Mr. Reina and observed him

22 and had interactions with him, he did not once say

23 anything or even sign anything, use sign language in any

24 way.  And you will hear testimony about how, in all those

25 years, Mr. Reina never, not once, acknowledged them.

 1          And the evidence will also show that he did not

 2   acknowledge or interact with customers.  Also, to do the

 3   customer service job, Mr. Reina would have needed to be

 4   able to not only communicate with customers, but he would

 5   have needed to be able to process information and answer

 6   customer questions and respond accordingly.  For instance,

 7   you will receive testimony that any number of questions

 8   could have been asked of Mr. Reina by customers.

 9          You'll hear testimony during this trial that cart

10   attendants are sometimes asked questions from customers

11   like "What time does the store close?" and "Are there any

12   good sales?" and "Can you help me carry this to my care?"

13   and "What door, what entryway, is closest to the rest

14   room?"  Review the evidence and ask yourself whether

15   Mr. Reina could do this.

16          The evidence will show that he cannot answer customer

17   questions, that he cannot identify customer issues,

18   without somebody processing that information for him and

19   answering those questions for him.  In other words, he

20   needed somebody else to do his job.

21          For example, Mr. Reina's longest serving job coach,

22   we anticipate, will testify that in the ten years that he

23   worked as Mr. Reina's job coach, that's from 2005 to 2015,

24   that in those ten years he never personally -- "he" being

25   Mr. Reina -- never personally communicated a products

1  location to a customer, nor gave direction to the

2  bathrooms, and that those requests were handled by him.

3  This is Mr. Coppernoll.  You heard about him a little

4  earlier.  And in the ten years that he worked as

5  Mr. Reina's job coach, we anticipate he will also testify

6  that Mr. Reina could not communicate with or assist

7  customers and that he had to do it.

8       Another red herring from the EEOC is this concept

9  that Mr. Reina needed somebody to be his, quote, "ears and

10  eyes" when it came to cart retrieval activities.  Well, as

11  I indicated earlier, Mr. Reina could physically push a

12  cart.  That wasn't a problem for him.

13       But the evidence will show that he cannot steer the

14  cart by himself, that somebody had to be in the front of

15  carts, when he pushed multiple carts, steering.  The

16  evidence will show that he was unable to navigate the

17  parking lot safely by himself or use the cart caddy, that

18  cart retrieval equipment you just saw, or use or put away

19  the motorized shopping cart you saw.  Instead, the

20  evidence will show that his job aides did that for him.

21       Again, Mr. Reina's longest serving job coach of ten

22  years pushed carts for Mr. Reina.  And the evidence will

23  show that he had back problems and that he still pushed

24  carts.  The evidence will show that he needed to do that

25  and he did it.

1       The evidence will show that Mr. Reina needed far more

2   than just ears and eyes.  He needed, the evidence will

3   show, hands, thinking, processing information, answering

4   questions, communicating with customers, providing

5   customer service, and so on.

6       So apparently acknowledging all of this, the agency

7   argues or is taking the position that Mr. Reina was in

8   some type of special job, a job that may not have required

9   all of the functions that a cart attendant position

10  requires, such as customer service or using the cart

11  caddy.

12      But the evidence will show that that does not make

13  any sense.  For example, the evidence will show that

14  Mr. Reina worked from 8 a.m. to noon and that at 10 a.m.

15  another cart pusher was scheduled.  So at that point there

16  would be two cart pushers in Walmart's parking lot.  But

17  between the hours of 8 a.m. and 10 a.m., Mr. Reina and his

18  job coach were the only ones in the parking lot.

19      The evidence will show that the expectation at

20  Walmart was that cart attendants be locked and loaded,

21  armed and ready, to perform each and every one of the

22  essential functions of the job; that if a motorized

23  shopping cart needed to be moved at nine o'clock in the

24  morning, a cart attendant needed to do that.

25      The evidence will show that management needed a

1-P-30

1    fully-functioning cart attendant to do the job.  And

2    Mr. Reina was able to do that, but through his job coach

3    performing those duties.

4        So 17 years -- well, it was almost 17 years, it was

5    about 16 and-a-half years -- 17 years of Mr. Reina working

6    for Walmart.  17 years of good performance evaluations.

7    One of the biggest red herrings from the EEOC is the

8    notion that this somehow shows that he was qualified for

9    the position, that he could do the job, but the evidence

10   will show quite the opposite.

11       For example, and as I mentioned earlier, you will

12   hear testimony about how Mr. Reina needed help in every

13   aspect of his job.  And as for the performance

14   evaluations, those are worth taking a look at.

15       One, you will hear testimony that the evaluations

16   were not based on Mr. Reina alone, but they were based

17   upon what Mr. Reina and his job aide were able to achieve

18   collectively.  In other words, they were based on what the

19   job aide did, in a lot of situations.

20       And you will see the actual performance evaluations

21   in this case.  And there's one.  This is Mr. Reina's 2007

22   performance evaluation.  Here you will note that he

23   received a *Meets Expectation* rating for using a ladder.

24   But neither Mr. Reina's long-term job coach nor his foster

25   mother believed that Mr. Reina ever used the ladder at

1    Walmart.

2         Also -- and it's a little hard to see, but you will

3    be able to look at it later -- Mr. Reina received a,

4    quote, *Meets Expectations* for "ensuring OSHA," OSHA

5    regulations and guidelines are being properly followed,

6    OSHA.  The evidence will show that given Mr. Reina's

7    impairments, it just doesn't make such sense.  Let's go to

8    the next evaluation.

9         Here's a 2011 evaluation.  Here you will see that he

10   received a *Solid Performance* rating on, quote, "Judgment:

11   Makes Effective Choices," which says, "Uses policies,

12   procedures and/or guides to make good choices" -- "uses

13   policies, procedures and guides to make good choices."

14        You will hear testimony from his long-term job coach

15   again that the job coach actually took the training for

16   Mr. Reina.  He put on head phones, took the online or

17   computer-based training for Mr. Reina and did the training

18   for himself, and that Mr. Reina didn't do that training.

19        Also, on this performance evaluation, under *Customer*

20   *Service*, it says, "Asks questions."  And then it says,

21   under *Influence and Communicate*, "Communicate the right

22   information."  As I previewed earlier, the evidence will

23   show that his long-term doctor of 30-plus years will tell

24   you that he is noncommunicative.

25        Let's look at his 2014 evaluation.  On here there's a

1  line that says, quote, "Paul also needs to be aware that

2  when he is not using the cart caddy, only 10 carts can be

3  pushed at a time," "when he is not using the cart caddy."

4  But the cart caddy, you will see from the evidence,

5  requires manipulation of a remote control, as you saw

6  earlier.

7      And you will hear testimony from Mr. Reina's

8  long-term job aide that Mr. Reina could not, "could not,"

9  operate that cart caddy.  He tried to show him how to do

10  it, but Mr. Reina could not, and that this job aide used

11  the cart caddy instead.

12      You will hear testimony that the cart caddy is needed

13  often when there's a lot of carts, because the cart caddy

14  can push up to 20 carts at a time, versus somebody pushing

15  manually 10 carts at a time and that at busy times that is

16  very much needed and expected of cart attendants.

17      So, yes, Mr. Reina did report to work at Walmart for

18  over 16 years.  And, yes, he did receive positive

19  evaluations.  But the evidence will show that this was

20  because someone else was doing the work for him.  It was

21  allowed for a very very long time.  But the question for

22  you is going to be whether or not the accommodation was

23  reasonable in the first place.  So let's explore briefly

24  why it went on so long and the evidence you will hear

25  around that.

1          You will hear testimony, as I indicated earlier, that

2     when some managers came to the store, the work arrangement

3     between Mr. Reina and the job helper was already in place.

4     So they just assumed that it was okay; that again, some

5     people were empathetic to him; and that some people were

6     fine with it because the job was getting done at the end

7     of the day through his job helper.

8          And then you will hear testimony about how, when

9     Mr. Reina -- I'm sorry, how, when the new store manager

10    came to the store, how he received a report that Mr. Reina

11    had been physically assaulted by his job aide.  Now, you

12    may receive evidence that Mr. Reina sometimes has

13    outbursts and that his job aide needs to control him

14    physically.

15         But this new manager came to the store, heard a

16    report that his job aide was physically abusive to him,

17    looked into it; went to the parking lot, observed

18    Mr. Reina and his job aide at work; saw that the job aide

19    was doing most of the job, 85 percent at least of the job;

20    said to himself, "This doesn't seem right"; and reported

21    everything up to corporate.  And afterwards, that's when

22    the arrangement of Mr. Reina having another person do his

23    job stopped.

24         Now, the EEOC claims that the new manager, you know,

25    or suggested the new manager had a problem with Mr. Reina

1-P-34

1  because of his disability and that this work arrangement

2  stopped because of his disability and that all of this was

3  unlawful discrimination.  But there will be evidence that

4  the store manager or the decision-maker had no issue with

5  Mr. Reina because of his disabilities.

6      For example, there will be no evidence of the new

7  store manager or anyone else making jokes about Mr. Reina,

8  there will be no evidence of inappropriate or disparaging

9  emails or texts concerning Mr. Reina by management, and

10  there will be no evidence of the new store manager or

11  anyone making unprofessional or disparaging remarks about

12  Mr. Reina.

13      What the evidence will show, folks, is that a manager

14  came in, was concerned about an associate.  Associates are

15  Walmart employees.  At Walmart, employees are called

16  "associates."  But that a new manager came in, was

17  concerned about an associate being abused by somebody else

18  and looked into it.  There was no discrimination here, the

19  evidence will show.  There was no ill will against

20  Mr. Reina because he's disabled.

21      Now, I'm almost done.  The agency claims that the new

22  manager or may suggest that the new manager messed up or

23  disrupted a good thing that Mr. Reina had going on and

24  that the provision of a job aide is a reasonable

25  accommodation.  Let's examine that.

1          THE COURT:  This is going to be a good thing for

2   your closing argument, but let's stick to what the

3   evidence is going to show rather than diving into the

4   instructions.  Next slide.

5          MR. BULIOX:  Okay.  The evidence will show this

6   is not, ladies and gentlemen, the situation of a person

7   needing a stool next to their workstation because they

8   cannot stand for too long or needing time off to go to a

9   therapy session or needing a daily reminder because they

10  have an intellectual disability.  And this is not the case

11  of a person --

12         THE COURT:  Would you take the slide down,

13  please?

14         MR. BULIOX:  -- and this is not the case of a

15  person in a wheelchair needing a device in the workplace.

16  Rather, Mr. Reina, the evidence will show, needed another

17  human being to do his job.

18      And did I mention that the evidence will show that

19  these job aides were not employees of Walmart?  So was it

20  reasonable to have someone who is not employed by Walmart

21  having, as the evidence will show, unrestricted access to

22  Walmart's parking lot; to its back room, the evidence will

23  show; to customers while wearing a Walmart vest and

24  masquerading around as a Walmart employee, when he wasn't?

25  Ask yourself, is this reasonable?

1        As I mentioned earlier, you have to determine, you

2   have to be the judge, of whether or not Mr. Reina was a

3   qualified individual with a disability and whether or not

4   he was discriminated against on account of that

5   disability.

6        We look forward to presenting evidence to you in this

7   case and talking to you at the end of the case.  Thank

8   you.

9            THE COURT:  All right.  Let's -- we can deal with

10  the podium there.  It's not blocking your view of the jury

11  or anything.  So why don't we just -- we will move the

12  podium at the next break.  So let's just begin by having

13  the EEOC call its first witness.

14            MS. VANCE:  Thank you, Your Honor.  And I did

15  have a question about use of an exhibit that's been

16  stipulated to.

17            THE COURT:  Okay.

18            MS. VANCE:  May I move Exhibit 22 into evidence,

19  pursuant to a stipulation of the parties, at this time?

20            MR. BULIOX:  One second.

21            THE COURT:  Is there any objection to 22?  That's

22  the job description?

23            MR. HARLAN:  Oh, yes.

24            THE COURT:  Okay.  That's admitted.

25       **MARGARET POLIZZI, PLAINTIFF'S WITNESS, SWORN**

MARGARET POLIZZI - DIRECT

1-P-37

```
 1         THE COURT:  May I make a suggestion on the
 2  microphone?  If you tilt it down -- there you go.  Even
 3  further.  No, just the bottom part.  You've got to bend it
 4  sort of where it attaches to the table and then bend that
 5  part up.  There you go.  That should work a little bit
 6  better.  It shouldn't distort it.
 7         THE WITNESS:  Thank you.
 8         THE COURT:  Keep it down out of your way and it
 9  should be just fine.  Go ahead.
10                   DIRECT EXAMINATION
11  BY MS. VANCE:
12  Q.   Good afternoon.
13  A.   Good afternoon.
14  Q.   Would you please state your full name for the record?
15  A.   My name is Margaret Theresa Fallon Polizzi.
16         MS. VANCE:  Has the witness been sworn in?
17         THE COURT:  No -- yes.  I got distracted.
18         MS. VANCE:  I'm sorry.
19         THE COURT:  Yes, the witness has been sworn in.
20         MS. VANCE:  Thank you.
21  BY MS. VANCE:
22  Q.   Ms. Polizzi, where do you live?
23  A.   I live in Bayfield, Colorado currently.
24  Q.   And during the duration of Paul Reina's employment at
25  Walmart, where did you live?
```

MARGARET POLIZZI - DIRECT

1-P-38

1   A.    I lived in Beloit, Wisconsin at that time.

2   Q.    What is your current occupation?

3   A.    Currently I work for Comfort Keepers of Durango.

4   Q.    What does that work entail?

5   A.    We help people to stay in their homes.  We're

6   nonmedical support for people who want to stay in their

7   homes who have recent injury or long-term diseases like MS

8   or Parkinson's.

9   Q.    What is your relationship to Paul Reina?

10  A.    I am Paul's proud foster aunt, they call me.

11  Q.    How long have you known Mr. Reina?

12  A.    I've known Paul since he was about four years old.

13  Q.    And so would you please tell us about your history

14  working with Paul?

15  A.    Throughout his entire life?

16  Q.    The times when you've been employed to work with him.

17  A.    Oh.  I started probably in my early 20s as a respite

18  worker for Access.  And in that being a respite worker,

19  that means that I would take my sister, in their

20  caregiver's place, in whatever they were doing.

21        So it first started when Paul went to high school and

22  there was a need for like a teacher's aide or an aide with

23  him.  And I would be, instead of doing the respite at

24  home, I would go with him to school and assist him in

25  whatever they were doing there.

 1       And I also worked with Paul's brother, or foster

 2  brother, Donny.  That was actually my main person that I

 3  worked with and occasionally I would work with Paul.

 4  Q.   And can you just explain for us, so we understand,

 5  Mr. Reina's foster brother, Donny, he also has

 6  disabilities?

 7  A.   He does have disabilities.  He's deaf, also.

 8  Q.   And what are Paul Reina's limitations?

 9  A.   The only thing we absolutely know about Paul is that

10  he's deaf.  Everything else has changed.  I was told that

11  there was some brain damage early in his life and there

12  was some emotional needs, but it's never been specified or

13  we never really had a diagnosis of any kind of syndrome.

14  Mostly we just dealt with his deafness.

15  Q.   Can you describe for us a little bit about the visual

16  abilities or limitation that Paul has?

17  A.   It was fleeting.  Sometimes he wouldn't see things.

18  Other times he had great vision.  So you could never

19  really tell.  But it was mostly I think getting him to

20  attend.  And then if you wanted him to see something far

21  away, he actually seemed like he saw it.  And with the

22  feedback Paul gave, it was hard to tell exactly what kind

23  of vision he did have, because he was capable of doing

24  almost anything you asked him to do if you got his

25  attention and showed him.

1  Q.   Well, can you give us an example?  Like how far would

2  you estimate Paul could see if you pointed to a shopping

3  cart far away from you?

4  A.   He went towards shopping carts that I gestured over,

5  I'd say, 50 yards away, 50 to a hundred yards away.

6  Q.   Okay.  And would you tell us a little bit about how

7  you communicate with Paul?

8  A.   We use a mix of home sign and ASL.

9  Q.   Can you show the jury so we can get an idea of how

10  you would greet Paul in the morning?

11  A.   I would say "Hi" and usually "How are you?"  And then

12  I would say "We're going to go to work today," which is

13  all ASL.  But occasionally, like for the shopping carts,

14  we would use this symbol, which is more of the action we

15  use to push the carts, than the actual cart symbol, which

16  I don't even really know.

17  Q.   And how did you come to learn about how to

18  communicate with Paul and to learn the signs he knew?

19  A.   Well, all through Paul's life it was kind of like we

20  had to teach him to sign.  So you would have the activity.

21  Like if I wanted Paul to cut some wood, I would show him

22  and then I would sign the cut and then the wood sign and

23  then cut the wood and that's how we paired things.  So

24  that's how Paul understood them.  Then when we came back

25  to do that activity, you could sign those and he would

1-P-41

1  know exactly what you were talking about.

2  Q.   Please describe for us the process for getting hired

3  to be a personal aide for Mr. Reina.

4  A.   Access did like background checks quarterly.  And

5  then I had like a fingerprint check done like every two or

6  three years, so it was a background check mostly.

7       The training that I did do the work with Donny and

8  Paul was mostly brought about by my sister offering

9  trainings.  And a lot of times they were autism trainings

10 or trainings on communication or nonverbal communication,

11 things that would relate to Donny and Paul.  It just so

12 happens that autism, a lot of trainings have sensory

13 deprivation, which you can see the parallel with Paul and

14 Donny might need with being deaf.

15 Q.   And you mentioned Access as the agency that monitored

16 your fingerprints and took the background checks?

17 A.   Exactly.

18 Q.   How were you paid?  Was it also with this agency?

19 A.   Yes, through Access.

20 Q.   And was that hourly?  How were you paid for your

21 time?

22 A.   Hourly.

23 Q.   And then let's focus to Paul's employment, Paul's

24 time at Walmart.  And can you describe for us the early

25 days that you remember of Paul's employment with Walmart?

1  A.   When paul first started at Walmart, it was really fun

2  to go there with him because he -- you'd take him and he

3  had a routine.  You just kind of led him, you know.  And

4  he'd go and punch in.

5       And by the time I had worked with him, he had already

6  established the routine, which was good because the people

7  who first started with him probably had to do a lot more

8  training.  So I was able to just go in, help Paul get to

9  the back to punch in.  And we'd immediately go out to the

10 parking lot and we would start collecting carts.

11      And that was really a great thing because Paul seemed

12 to be -- you know, he was a good cart pusher.  He was able

13 to do the job with very minimal intervention from me, no

14 hand or nothing like that.  I could gesture and sign to

15 him and he could follow through with this set of routines.

16 So by the time I actually worked with Paul at Walmart, he

17 was able to do those things already.  And we started to

18 teach him --

19 Q.   Let me jump in for one second, because I heard you

20 say the people who started with him had trained him.  Can

21 you tell us a little bit about what you know about how

22 Paul found the job and the people that started with him?

23 A.   Well, I think when he was still in high school,

24 because his caregiver, my sister Rose, was very adamant

25 that the boys -- she didn't want them to just sit and have

```
 1  nothing and collect dust aside.  So it had always been a
 2  life plan for them to get something gainful to do after
 3  they went to high school.  You want your family and your
 4  children to have the best life possible.
 5      And so we knew that Paul was much more capable than
 6  Donny of probably getting an outside job and keeping it.
 7  So the emphasis that his job coach took at that time was
 8  finding him a job that he could really learn to do
 9  independently and probably do it himself.
10      So I'm sure that, I think it was Ann and Shelley went
11  to the Walmart interview, that she talked with them and
12  asked them, this is something they can do, I'm sure
13  that --
14          MR. HARLAN:  I'm going to object, Your Honor.  It
15  appears the witness doesn't have the foundation to speak
16  to what happened in the interview process.
17          THE COURT:  Yeah.  How do you know about that?
18          THE WITNESS:  Just by hearsay from being around
19  my sisters.
20          THE COURT:  All right.  She can go into that.
21  Just put a little timeline on it for how you would know
22  about it.  So when did Paul complete his high school?
23          THE WITNESS:  '98 or '99.
24          THE COURT:  That's about when he started working
25  for Walmart; is that right?
```

1-P-44

 1            THE WITNESS:  Yes.

 2            THE COURT:  When did you first take him to

 3  Walmart?

 4            THE WITNESS:  I probably didn't work with Paul at

 5  Walmart until '99, 2000, for the first time.  And I was a

 6  substitute job coach.  I wasn't Paul's permanent job coach

 7  at that time.

 8            THE COURT:  Okay.  Go ahead.

 9  BY MS. VANCE:

10  Q.   All right.  So I would like to ask you to give us

11  some context about your work.  You said you weren't the

12  main job coach; you were a substitute job coach?

13  A.   Right.

14  Q.   Can you also tell us, did you work any hours as

15  Paul's personal aide outside of the time he spent at

16  Walmart?

17  A.   Yes, I did.

18  Q.   And I'm asking about this time frame of when he's

19  coming out of high school.

20  A.   Yeah.  During that time I worked -- if I wasn't

21  working at my regular job, I would almost -- most likely

22  be working with Donny.  And so I would have been at the

23  house early to help Paul get up, get ready for work, have

24  breakfast.  So I saw him just about every day even when I

25  wasn't his job coach.

                    MARGARET POLIZZI - DIRECT

1  Q.   And then generally, we'll get into specifics after

2  you give us kind of a general framework, but I would like

3  to ask generally, what were the job duties Mr. Reina

4  performed in his job at Walmart?

5            MR. HARLAN:   Just objection, time frame.

6            THE COURT:   We're just talking about the time

7  when you were there with him at Walmart.

8  A.   Okay.   When I first worked with Paul at Walmart, it

9  was my understanding that just cart collection was enough

10 because he was the only one there at the times he was

11 there from eight to -- or 8:30 to 12.   Until ten o'clock

12 we, never saw another cart pusher, so we knew that

13 collecting the carts was a priority.   And usually there

14 was a lot of stray carts early in the morning because

15 that's when the store opened.

16      So we would go punch in, come right out to the

17 parking lot and start sweeping the parking lot collecting

18 carts.   Paul also picked garbage out of the carts, like

19 actually cleaning the carts out, which I thought was

20 overkill.   But if he wanted to be a good employee, I was

21 going to let him.   So he did that.

22      At that time, too, He was supposed to collect garbage

23 from the garbage cans, which were always way overflowing.

24 That was probably the hardest job for Paul because he

25 couldn't stand the smell.   He would always (witness

```
 1   pinching nose).  But he'd do it anyways if he was directed

 2   to do so.  Those were the main jobs that we did at first.

 3        Of course if they had like the plant carts or the

 4   flatbeds, we would take those in special.  They had some

 5   toddler carts.  We'd take those in special into the store.

 6   And that, of the three and-a-half hours we were there,

 7   that's about all we ever got done.

 8   Q.   Then when you consider the role you played as job

 9   coach when you were the substitute, describe for us how

10   you saw your role.

11   A.   I felt that I needed to help Paul to be a super-duper

12   good employee and work continuously.  So we worked

13   together.  A lot of times we would start to sweep the

14   parking lot.  And as Paul got better at the job and didn't

15   need me to lead him, we would actually split up and get

16   more work done.

17        So Paul would parallel.  Paul would collect the carts

18   from his side of the aisle.  I'd collect a few from that

19   side.  We'd get together and take them to the building.

20   And I didn't always do that, but I did that when the need

21   was there.  When they were really low on carts, then I

22   would step up and do some of the work also in a parallel

23   fashion to Paul.

24        And as far as getting the carts and taking them, what

25   Paul expected for me usually was I was the strategist.  I
```

1-P-47

1  would decide which path we were going to take through the

2  parking lot, when I looked at how many carts were there,

3  and Paul was the tactics guy.  He'd get all the carts.

4      And then I'd tell him when we'd go up to the

5  building.  When we got about 10 or 15 carts and they got

6  kind of long, we'd head back to the building.  And then

7  all I'd have to say is "Let's go get more carts" and he'd

8  be right out the door.  He knew exactly what was expected.

9          THE COURT:  Again for time frame purposes, so '99

10  or 2000, when you served as a substitute job coach for

11  him, when were you actually his job coach, what years?

12          THE WITNESS:  I became his job coach in the end

13  of '16 through '18 I think.  But I was Paul's job coach

14  for the paper route, which was the job after Walmart.

15          THE COURT:  I got it.  Okay.

16  BY MS. VANCE:

17  Q.   To give a little more context to that, Ms. Polizzi,

18  estimate for us how many times in total throughout the 16

19  and-a-half years do you think you ended up being called in

20  to be a substitute job coach?

21  A.   I would guess it was about 30 to 50.  I can't guess.

22  40, something like that.  It wasn't all that often.

23  Sometimes it would be like for a week at a time, but

24  otherwise it was very sporadic.

25  Q.   And I'll direct your attention to what's been

 1  admitted into evidence as Plaintiff's Exhibit 22 and draw

 2  your attention to some of these job functions in the list.

 3  I see --

 4          THE COURT:  Just for the benefit of the --

 5          THE WITNESS:  Thank you.

 6          THE COURT:  -- for the benefit of the jury, if

 7  you would just tell them what the document is that we're

 8  looking at here.

 9          MS. VANCE:  Yes.  Thank you.

10  BY MS. VANCE:

11  Q.   And Exhibit 22 is a job description of the cart

12  attendant job issued by Walmart.  So I'll read the -- I'll

13  start in on some of this list of job duties.  "Maintains

14  availability of and organizes carts/flatbeds."  Please

15  take a minute to describe how Paul performed that job task

16  when you were his job coach.

17  A.   Well, I think I kind of already explained that that

18  was our main job, we thought, was to sweep the parking lot

19  and collect carts.  We took care of the carts great.

20          As far as assisting customers with transporting items

21  and loading merchandise into customer vehicles, every

22  opportunity that we had for Paul to interact with

23  customers, at least when I was the job coach, at least

24  once a day, when I was job coaching, we would find someone

25  that was about to empty their cart and had a big bag of

MARGARET POLIZZI - DIRECT

1  dog food or water or something, and we wanted to get the

2  cart anyways, so we would go and assist them.  And I made

3  sure that Paul tried to do things like that so he would be

4  visible.

5  Q.   Could you show us any of the signs you would use for

6  that?

7  A.   Oh, like I would tell Paul, "We're going to wait for

8  that cart," and so then he knew that we were waiting.  And

9  I would say, "Let's get the big dog food," and he'd know

10  that.  Or I would say, "Water, let's move the water," and

11  he would be able to do that for the customer.

12  Q.   So as far as the actual process of the work of taking

13  the purchases into the trunk, explain how that was

14  performed.

15  A.   Once you tell Paul to get something and you start to

16  show the gesture, he'll do it right away.  As long as he

17  knows it's okay, that's -- usually he's waiting for

18  permission.  He understands what to do.  He's just waiting

19  for permission.  That's what it is.

20  Q.   All right.  Then I see down the list we have -- no,

21  in the same section -- "properly and safely utilizes cart

22  retrieval equipment."  Ms. Polizzi, in the times you

23  served as a substitute job coach, did you ever utilize

24  cart retrieval equipment?

25  A.   We did not.

MARGARET POLIZZI - DIRECT

1-P-50

1  Q.   And that's the motorized -- the electric cart caddy

2  that we've been talking about; is that right?

3  A.   Correct.

4  Q.   Okay.  And if you weren't using -- what were you

5  doing if you weren't using that cart retrieval equipment?

6  A.   We actually felt that it was important that Paul

7  pushed the carts to do work, because he isn't -- you know,

8  that's his job and we wanted him to actually do the

9  physical work of pushing the carts and it didn't seem to

10  be too much for him and he actually enjoyed it, so we

11  continued that.

12  Q.   Did you ever, for any reason, believe you should be

13  using the electric cart caddy?

14  A.   No.  I felt that we were even more productive than

15  the people who used the cart caddy with our system.

16  Q.   Can you explain that?  What do you mean?

17  A.   I felt that me and Paul, we did a method of

18  continuously sweeping the parking lot back and forth

19  taking smaller loads rather than waiting until they hung

20  out in between the cars to get the cart -- electric cart

21  thing and bring in 30.  I thought we did a better job of

22  keeping the parking lot moving the way we did it

23  collecting the carts when there was four or five instead

24  of when there was 30.

25  Q.   And when we -- let's go to the next paragraph that

MARGARET POLIZZI - DIRECT

1  starts "Provides customer service."

2  A.   Can you make it big for me again?  Thank you.

3  Q.   We're working on it.  Thank you.  "Provides customer

4  service by acknowledging the customer, identifying

5  customer needs, assisting with purchasing decisions,

6  locating merchandise, resolving customer issues and

7  concerns, and promoting products and services, while

8  maintaining a safe shopping environment."  So can you tell

9  us about how Paul performed any of the tasks he did or did

10 not perform in that list?

11 A.   Well, I will tell you what, Paul was the best steward

12 of Walmart's parking lot they ever had.  He cleaned out

13 the carts.  He picked up the garbage.  He'd keep the carts

14 clean.  We got feedback from customers that saw us working

15 together.  And it was obvious I guess that Paul has a

16 disability and many people were like really pretty proud

17 that -- felt proud of Walmart that they would hire someone

18 like Paul.  And he was happy and productive.

19      And whenever I received comments from the customers,

20 and they'd see Paul sweating and stuff, and I'd say, "Oh,

21 he loves his job," they felt like that was really a good

22 thing.  I think that was a good reflection on Paul.  Even

23 though he didn't directly talk to some customers, that was

24 a good reflection on Walmart.  And the parking lot was

25 clean.

MARGARET POLIZZI - DIRECT

1-P-52

1    And as far as when we went by and waited for someone

2 or helped someone put a heavy item or even just waited for

3 them to get their cart so they didn't have to take it to

4 the cart caddy, people liked that.  We got lots of

5 positive feedback from customers about the things we did

6 like that that a lot of other cart pushers might not have

7 taken the time to do.

8 Q.    Do you have any memories of specific instances with

9 customers?

10 A.    Yeah.  A lot of times we would see someone -- if me

11 and Paul saw that, even if it was a couple aisles away, if

12 we saw it was an older person and they would have to walk

13 their cart way back to the cart caddy, we would make an

14 effort to go over there.  And they would always be

15 grateful and say thank you and acknowledge that we went

16 out of our way to do that.  They knew we did.

17 Q.    Did anyone at Walmart ever tell you anything about

18 whether or not Paul was expected to perform the duty of

19 locating merchandise for customers?

20 A.    Never.

21 Q.    Did you ever -- we've heard you testify about

22 positive interactions.  Did you ever remember any negative

23 interactions with customers during your times when you

24 served as a substitute job coach?

25 A.    I really don't.

MARGARET POLIZZI - DIRECT

1  Q.   Now, we saw "assisting customers with purchasing

2  decisions and promoting products and services" as some of

3  those customer service duties in the cart attendant job

4  description.  Did you have the opportunity to observe in

5  the parking lot any Walmart employees who were assisting

6  purchasing decisions or locating merchandise for

7  customers?

8  A.   No.  The only other -- like I said, Paul was the only

9  one there for the first few hours.  And once Andy came

10 in -- he was their first full-time person that worked with

11 Paul and he was there almost every day that Paul was

12 because he was the weekly full-time guy -- he didn't -- I

13 never saw him helping customers with purchases.  He did

14 have a walkie talkie where he could talk to other staff.

15 Q.   Okay.  Did you ever see whether Walmart ever had

16 anybody who could assist customers with purchasing

17 decisions?

18 A.   I did.  And me and Paul assumed that the greeters

19 that were there when we first started, they kind of kept

20 track of the carts and made sure that the carts were full

21 and they took merchandise and tagged it when it was

22 returned.  They were asked those questions all the time.

23 And we figured they were in a better position to answer

24 those things than we would be, so I never stood there and

25 waited to do that.  We were almost always in the parking

MARGARET POLIZZI - DIRECT

1-P-54

```
 1   lot working.
 2   Q.   What, if any, feedback did you receive from Walmart
 3   managers about job performance?
 4   A.   None.
 5   Q.   What, if any, feedback did you receive from other
 6   employees or coworkers at Walmart?
 7   A.   The other employees I met at Walmart, they really
 8   liked Paul.  They thought he was a very hard worker and
 9   did a good job.
10        I am a smoker.  So when I worked with Paul, just
11   before Paul's break, I'd take a break myself.  And I
12   talked to some of the people that were smokers --
13           THE COURT:  If we get an objection, I've got to
14   deal with that before you go on.
15           THE WITNESS:  I didn't hear it.  Sorry.
16           THE COURT:  Go ahead.  What's your objection?
17           MR. HARLAN:  Just briefly, relevance.  She's
18   talking about what other employees thought of Mr. Reina's
19   performance.
20           THE COURT:  Overruled.  Go ahead.  You can be
21   brief.
22   BY MS. VANCE:
23   Q.   Yes.  You may answer the question.
24   A.   And they all thought that it was great and they said
25   Paul works very hard.
```

1  Q.   Were you ever asked by a Walmart manager to change

2  anything about the way you and Paul were working?

3  A.   Never.

4  Q.   Were you ever asked by a Walmart managers or

5  management to change Paul's job performance in any way?

6  A.   Never.

7  Q.   If you had ever been asked by Walmart to change

8  something about the way you were working, what would you

9  have done?

10  A.   We would have changed it.

11  Q.   If you had been told by Walmart managers that Paul

12  Reina should perform the cart pusher job differently than

13  the way he performed it, what would you have done?

14  A.   We would have changed it.  We valued Paul's job at

15  Walmart.  We knew how important it was to his life.

16  Q.   Now, I want to ask you to -- well, I want to ask you,

17  you had the opportunity to observe -- excuse me, observe

18  other cart attendants performing the cart attendant job,

19  correct?

20  A.   Yes.

21  Q.   And how would you compare Mr. Reina's work

22  performance as a cart attendant to what you observed of

23  the other cart attendants at Walmart?

24  A.   I felt that Paul was constantly in the parking lot

25  and diligent about the carts; whereas the other cart

1  pushers would go away and then come back, and go away and

2  then come back, and I don't know what they were doing.

3  Q.   Okay.  And how would you compare Mr. Reina's work in

4  customer service as a cart attendant to what you observed

5  other cart attendants?

6  A.   I didn't see too many other cart pushers that would

7  wait at someone's car to collect the cart.  As far as that

8  goes, I think Paul was the only one that did that.

9  Q.   Moving on, I'd like to ask you, you testified that

10 you were his primary job coach later during the

11 newspaper -- when he had to take a new job as a

12 newspaper --

13 A.   Right.

14 Q.   -- deliverer?

15 A.   Yes.

16 Q.   In general, how would you describe Paul's attitude

17 about learning new tasks?

18 A.   It's pretty good.  He's reluctant at first.  But if

19 he trusts you like he trusts people he knows, he'd do

20 anything for you.

21 Q.   And when you eventually did start a new job, did you

22 have that opportunity?

23 A.   Yes, I did.

24 Q.   Okay.

25 A.   And Paul surprised me at how much he can do.

1-P-57

1   Q.    What do you mean by that?

2   A.    He only had like the same task at Walmart, you know,

3   pushing the carts.  And he had that routine pretty well

4   down.  And even though the weather changes, that was the

5   biggest factor in pushing the carts was the weather

6   basically.

7         The paper route was a lot more difficult.  We had

8   to -- he had to learn, you know, individual houses, which

9   ones to deliver to, which ones not to deliver to.  He had

10  to cross more streets.  We had to deal with dogs and

11  people and the cars backing out.  And Paul just blew me

12  away with how capable he actually was in learning all

13  those things.

14  Q.    Turning your attention to these years since

15  Mr. Reina's employment with Walmart ended, did you -- what

16  role did you have in the search for a new job for

17  Mr. Reina?

18  A.    Well, after -- his regular job coach actually was

19  working with him keeping him busy when he wasn't working

20  at Walmart, because we found that if we didn't fill that

21  void in Paul's life that it was causing some anxiety.  So

22  his regular job coach Matt I think had gone to a

23  Woodman's, Piggly Wiggly, other stores that had carts so

24  we could find Paul a job that was similar.  And I tried --

25  I actually tried Woodman's and Piggly Wiggly and I think

MARGARET POLIZZI - DIRECT

1  Matt went to some other places and they would turn him

2  down.

3  Q.    In general terms, the level of compensation for the

4  job you did find, can you compare that to the Walmart job?

5  A.    Paul made like -- I think he makes like 4 cents a

6  paper and so that was very difficult.  Even with 200

7  papers, he made nothing, almost nothing.

8  Q.    Okay.  And a little later today we will be watching a

9  video and we will be seeing you and Paul, you as his job

10 coach, doing the paper deliveries.  And I want to just ask

11 you kind of to help give us some context and some preview.

12 Are there similarities to how you were -- how you coached

13 Paul the way we'll see in the paper route to how you coach

14 or, you know, interacted as the job assistant at Walmart?

15 A.    Right.  Because when Paul first started a job, you

16 actually kind of had to show him and then you have to pair

17 sign with it.  I mean, because the paper route was so

18 repetitive, I didn't have to show him how to deliver a

19 paper at 200 houses.  But he did have to learn the route,

20 which was these houses yes, this one no, and then there's

21 a street, and so that took a while.

22        And the similarity to that and Walmart is the best

23 way to show Paul is to model, to model skill and to pair

24 it with some sign, then you ask him to do it.  And then

25 you model, pair it again, and then when you sign it, then

MARGARET POLIZZI - DIRECT

1  he can do the skill.  So it was pretty much we use the

2  same method to teach him the paper route.

3  Q.   Now, turning your attention specifically to the

4  summer of 2015, at that time were you working as personal

5  aide for Mr. Reina or his foster brother?

6  A.   Yes.

7  Q.   And in that capacity were you in the home?

8  A.   Yes.

9  Q.   Okay.  Once Paul was no longer scheduled to work at

10  Walmart, what did you observe about how his life was

11  different?

12  A.   Well, breaking Paul's routine, like a long-term

13  routine like getting up every day, getting ready for work,

14  going to work, I was there in the mornings then.  He'd get

15  up, take his bath, and then there's no work.  And it

16  was really -- I tried to -- because I also was concerned

17  about Donny, and Donny needs more like therapy, so me and

18  Donny have a regular routine of going swimming, stuff like

19  that, and we would take Paul with us.  But those were not

20  the activities that he was used to, so it caused quite a

21  bit of anxiety.

22       And even if we just stayed home and did nothing, Paul

23  really missed that block of work in the morning and going

24  with the job coach and getting out in the community.  And

25  even though I tried to fill that void with things that

 1  were more better to work with Donny and Paul together,

 2  like they both like to swim, it didn't fill the void for

 3  Paul.

 4       And I saw increased anxiety.  Even, you know, even at

 5  one time he even lashed out at me.  But he didn't hurt me.

 6  He was just anxious and he didn't know what to do with it.

 7  Q.   Well, can you maybe demonstrate or give us a better

 8  idea or some more details of what would happen in the

 9  morning when Paul didn't have work?

10  A.   You can tell Paul has a lot of like outward physical

11  signs of his anxiety and it will begin with noises.

12  You'll hear the noises.  And you can go and intervene

13  sometimes and that would work.  And then the next thing

14  will be you will actually see an increase in his heart

15  rate, because I take his pulse.  But you can see him

16  sweating and start turning his hands.  And it will

17  escalate from there if you don't make an intervention

18  there.

19       So I had a lot more of that before Paul found the

20  paper route.  There was a lot of that because of just the

21  break in his routine.  Even though we tried to fill that

22  with other activities, it wasn't the work that he was

23  doing before.  So nothing that I did with Paul before I

24  got the paper route was considered work.  We went

25  swimming, we went walking, we'd do stuff in the house, but

MARGARET POLIZZI - DIRECT

1-P-61

1  it wasn't work.

2  Q.   Okay.  Did Paul continue to wake up in the morning

3  and expect?

4  A.   Paul woke up in the morning.  Matt would never show

5  up to pick him up because he didn't have the job.  And

6  Matt didn't come, so we tried to like fill the routine.

7  But it wasn't the work, you know.

8       I mean, so Paul would get up, take a bath.  Even

9  though Matt would come to take him to do some activity or

10 look for a job, he wasn't getting the work.  And I think

11 that physical exercise was really good for him.

12 Q.   And how do you know that he was expecting to go to

13 work?

14 A.   It was his routine.

15 Q.   And in general, I want to ask you, what did the loss

16 of Paul's job at Walmart mean for your whole family?

17 A.   It was devastating, because even though it seemed

18 like it was only a Walmart job, for Paul this was a kid

19 who was actually thrown away as a kid, taken in, given

20 school, training.  We had all these plans for what he

21 would do later in life.  And the main part of it was just

22 to be a productive member of society and have a job and

23 have something to do and be a part of a community and do

24 things.  And Walmart gave all that to Paul.

25      He was with a bunch of his peers, which, you know, if

MARGARET POLIZZI - DIRECT

1-P-62

1  he was sitting at home, he wouldn't get to see anybody.

2  He got to meet and see different people.  And losing that

3  job kind of took that all away.

4     I think the only thing that my sister wanted for Paul

5  that would be lasting would be to get him his own home.

6  That's about the only thing you can own if you're on SSI.

7  And so she wanted to make sure that Paul would have his

8  own home.  If something were to happen to her or her

9  husband, Paul would have his own place.

10     And Paul is independent.  He's not like her son.  Her

11  son could inherit her things.  Paul is on his own.  And

12  she really worked hard to make a life for him so he could

13  be as independent as he could.  And with the loss of the

14  job at Walmart, just the whole dream kind of crumbled,

15  everything that we had hoped for.

16          MS. VANCE:  I tender the witness.  I have no

17  further questions at this time.

18          THE COURT:  Cross-examination.

19          MR. HARLAN:  Thank you, Your Honor.

20                   CROSS-EXAMINATION

21  BY MR. HARLAN:

22  Q.   Good morning -- good afternoon.  I'm sorry.  How are

23  you?

24  A.   I'm good.

25  Q.   We had a chance to meet last year.

MARGARET POLIZZI - DIRECT/CROSS

1-P-63

1  A.    Yep.  I remember you from Milwaukee.

2  Q.    So I'm going to ask you a few questions.  Let me know

3  if you're not able to hear any of the questions or

4  understand them and I'll try to be clearer.

5            THE COURT:  Mr. Harlan, pull the microphone down

6  so it won't be in your face.  Push it down, then tip it up

7  at the end.  There you go.

8            MR. HARLAN:  Thank you, Your Honor.

9  BY MR. HARLAN:

10 Q.    So I want to start by just talking about how often

11 you actually worked with Paul as his job coach at Walmart.

12 So is it fair to say you think that's about 30 or 40

13 times?

14 A.    Something like that.

15 Q.    Okay.  And you believed you only worked once after

16 Mr. Coppernoll returned from his health-related issues,

17 correct?

18 A.    I think so, yeah.

19 Q.    Okay.

20 A.    After he got healthy from one health issue, he was

21 usually good for a long time.

22 Q.    Right.  So you think you just worked one time after

23 that?

24 A.    Yeah.

25 Q.    All right.  And you really never had any discussion

MARGARET POLIZZI - CROSS

1   with anyone at management at Walmart in terms of what the

2   full range of his job duties were, correct?

3   A.   No.   No one ever approached me or talked to me.   We

4   just went and worked there all day and no one ever said a

5   word.

6   Q.   All right.   And at no point did you go and talk to

7   anyone in management?

8   A.   I wasn't his main job coach.

9   Q.   Right.   But the question --

10  A.   So I didn't want to cause any trouble when I was

11  there one day.

12  Q.   Sure.   I understand that.   But just to be clear, you

13  never went to anybody in management?

14  A.   No.   I guess I felt like most employees, that if

15  you're doing the job and they don't come to you that

16  you're doing a good job.

17  Q.   Right.

18          THE COURT:   Let's just -- you'll get a chance to

19  elaborate if the EEOC counsel wants to come and clarify

20  some things.   But at this point, just try to listen to

21  Mr. Harlan's questions and then just answer what he asks.

22          THE WITNESS:   Okay.

23  BY MR. HARLAN:

24  Q.   So the answer is no, you never went to anyone in

25  management to ask what the full scope of Mr. Reina's

MARGARET POLIZZI - CROSS

1-P-65

1  duties were?

2  A.   No, I did not.

3  Q.   Okay.  All right.  Now, when you began serving as

4  Mr. Reina's job coach at Walmart, your sister, Ms. Slaght,

5  was very clear about what her expectations were in terms

6  of what you were supposed to be doing, correct?

7  A.   Yeah, what she wanted Paul to accomplish.

8  Q.   Right.  And specifically what she told you your role

9  was, was to be his eyes and ears, correct?

10  A.   Exactly.

11  Q.   And by being his eyes and ears, that meant the job is

12  Paul's.  You are there, because of his impairments, to be

13  his eyes and ears, to be able to give him guidance in

14  terms of "Hey, watch out for this," or if he hears

15  something coming to alert him to it, but it's not to do

16  his job, fair?

17  A.   It was to assist Paul to get the job done.

18  Q.   Right.

19  A.   Whatever it took to assist Paul to get the job done.

20  Q.   And so you understood your sister's directive to be

21  his eyes and ears to entail doing his job for him?

22  A.   No, I didn't understand that to be the case.

23  Q.   All right.  So your understanding was you weren't

24  supposed to be doing his job for him, correct?

25  A.   I was to assist Paul to do the job, do "the job."

MARGARET POLIZZI - CROSS

1  Q.   Okay.  And so did I take it, when you say "assist

2  Paul doing the job," you thought it would be appropriate

3  then to take on some of his job duties, fair?

4  A.   Yep.  I only did that when it was necessary to keep

5  the parking lot clear.  Like when, you know, when the

6  parking lot was super full of carts, then I might assist

7  Paul in collecting some.

8  Q.   Well, isn't it true that every shift that you worked

9  with Mr. Reina, you actually did part of his job by going

10  yourself to get carts and bringing them to a central

11  location?

12  A.   Actually, probably not every shift that I worked with

13  him.  A couple of times, if it was very slow in the

14  parking lot, then I made Paul do everything.

15  Q.   So your testimony is that you weren't getting carts

16  every shift; is that what you're saying?

17  A.   Yes.

18  Q.   Tracy, are you able to pull up 130, lines 18 through

19  23?  And if not, then I will do it the old-fashioned way.

20  Your Honor, with your permission, I'd just like to --

21          THE COURT:  I understand.  Why don't you just

22  read it to her and see how far that gets you.

23          MR. HARLAN:  All right.

24          THE COURT:  In other words, do it the

25  old-fashioned way.

1  BY MR. HARLAN:

2  Q.   All right.  So, Ms. Polizzi, you remember coming to

3  my office in Milwaukee to have your deposition taken?

4  A.   Sure.

5  Q.   And on that occasion -- you swore to tell the truth

6  on that occasion, right?

7  A.   Yes, I did.

8  Q.   And you did that, right?  Is that yes?

9  A.   Yes.

10 Q.   Okay.  So I think I asked you this question at your

11 deposition at that time:

12      "But your testimony is that every shift, throughout

13 the shift, you assisted Paul by yourself going to get

14 carts out of the corral and then bringing them to a

15 central location where you could consolidate them?

16      "ANSWER: I did."

17      Does that refresh your recollection now in terms of

18 whether every shift you were going to gather carts

19 yourself for --

20 A.   Could you read that, what you said, again to me?

21 Q.   Okay.  "But your testimony is that every shift,

22 throughout the shift, you assisted Paul by yourself going

23 to get carts out of the corral and then bringing them to a

24 central location where you could consolidate them?

25      "ANSWER: I did."

MARGARET POLIZZI - CROSS

1   A.   Okay.  But the "yourself" part, I guess I did say

2   that.  But there was shifts that I made Paul do all the

3   carts and I just steered them, so to speak.  So I'd have

4   my finger in the beginning of the carts to steer them.

5   But there was actually shifts where it was slow at Walmart

6   and I wasn't needed to help.  I would let Paul do all of

7   it.

8   Q.   Okay.  But my question then wasn't --

9   A.   I guess I didn't understand when you questioned me in

10  Milwaukee that you meant, oh, I did work every time.

11  That's not what I thought you meant by that question.

12  Q.   Would you like to give us an estimate then how many

13  of the occasions that you worked with him that you

14  actually did cart --

15  A.   I could say there was probably only a couple days

16  that I didn't assist.  But there was two or three times

17  where I didn't assist Paul where it was slow enough that I

18  could let him do everything.

19  Q.   So on a typical day, fair?

20  A.   On a typical day.

21  Q.   And on a typical day, what you would do is you would

22  take part of the parking lot that Mr. Reina was

23  responsible for and you would go gather up carts and bring

24  them to a central location?

25  A.   We would gather carts.  I never would leave Paul

1  alone.  We were always together and we gathered the carts

2  together.  I don't believe that Paul would let me do the

3  job and just stand there.  That would be awkward and cause

4  anxiety for him.  So he had to -- I mean, I could work

5  alongside Paul, but I couldn't do work and have him not do

6  it or he -- that would be uncomfortable for him.  Like I

7  said, I just -- I felt that when I did assist Paul with

8  carts, it was because of the need.

9           MR. HARLAN:  Why don't we go to page 111, lines 3

10  through 17.

11       Can we try to play that, Your Honor?

12           THE COURT:  If you can get it up there fast

13  enough so that the witness can see it, that would be

14  great.  Maybe you can make that window a little bigger.

15           MS. TOMPKINS:  I can.

16           THE COURT:  Ms. Polizzi, can you read that?

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.  If it's good enough for the

19  witness, it's good enough for me.

20           MS. TOMPKINS:  I can make it bigger for you.

21           MR. HARLAN:  It's not up on the screen.

22  BY MR. HARLAN:

23  Q.   So we're looking at page 111, lines 3 through 17.  So

24  this is from your deposition again.

25  A.   Okay.

MARGARET POLIZZI - CROSS

1-P-70

 1          MS. TOMPKINS:  I apologize.

 2          MR. HARLAN:  And if you can't get to it quickly,

 3   we'll just read the transcript.  Page 111, lines 3 through

 4   17.

 5       (Video deposition testimony of Margaret Polizzi

 6   played.)

 7   BY MR. HARLAN:

 8   Q.   All right.  So that sounds to me like what you're

 9   saying is Mr. Reina is somewhere to the left and you're to

10   the right and then you're gathering carts separately and

11   then meeting in the middle.  Did I misunderstand your

12   testimony?

13   A.   That is what we would do if it was busy, when it was

14   busy and we both needed to.  Like the biggest thing was

15   when we got to Walmart, we just wanted to make sure that

16   the department store and the grocery cart things were

17   filled.  So all day that was our goal.

18       So if Paul was doing well and there wasn't a lot of

19   cars and I could let him work beside me and I could go on

20   the other side, that was great.  If it was busy and tight

21   spaces, me and Paul would have to work as a team close

22   together in one thing.  And if it was not very busy, there

23   very few cars and very few carts, then I could direct Paul

24   to do the entire job himself.  That's what we were working

25   toward.  All three different things like that were to

1  teach Paul to do the job independently.

2  Q.    But Mr. Reina had been at Walmart doing this same

3  position since 1999, right?

4  A.    But our expectations of him had changed.  Once he

5  learned to do the job pretty well by himself, then we can

6  expect more independence from him.  So that parallel

7  working and having him go to get carts way on the other

8  side of the parking lot, those were all different types of

9  training and trust and trust building and learning to see

10  what Paul's capabilities were.  Even after 17 years,

11  people can still learn.

12  Q.    Thank you, Ms. Polizzi.  I'm still confused because

13  if he had been there for 10 or 15 years at the point you

14  start working with him, it's the same parking lot, right?

15  Is that yes?

16  A.    Yes.

17  Q.    And so the parking lot hasn't changed; the

18  configuration of the parking lot is the same, right?

19  A.    Yes.

20  Q.    They don't have new aerodynamic carts or anything

21  that's special about the carts, right?

22  A.    No.

23  Q.    So why would you need to model behavior if he's been

24  doing the position for 10 or 15 years when you start

25  working with him?

1-P-72

```
 1  A.    As I said, we can -- if Paul gets to a certain level

 2  and he -- if we can trust that he won't need eyes and ears

 3  in the parking lot, there's an area of the parking lot

 4  that didn't have a lot of cars, we would take the

 5  opportunity to let Paul be more independent.  Do you

 6  understand how that might happen?

 7  Q.    So you had testified that you never would send Paul

 8  to a different part of the lot separate from you?

 9  A.    Where I couldn't see him.

10  Q.    Okay.  So you would send him to other areas of the

11  parking lot, but he would be within your line of sight?

12  A.    Where I could see him, correct.

13  Q.    All right.  All right.  And you would agree with me,

14  would you not, that the activity you describe where you

15  are going to one part of the lot to physically move carts

16  somewhere to help Paul do his job is completely

17  inconsistent with what your sister told you your job was

18  to do, which is you're the eyes and ears?  She didn't say

19  eyes, ears, hands and arms, did she?

20  A.    No.  She did want Paul to be successful at Walmart

21  and be a good employee and have Walmart value him, so

22  that's what we did.  Instead of standing there twiddling

23  my thumbs, I assisted him to make him a better employee.

24  That was my only sin.

25  Q.    Ms. Polizzi, I'm not here to cast dispersions on you.
```

1  I'm just trying to understand what the facts are.  So you

2  felt it was necessary for purposes of enabling Paul to do

3  his job, to have to do that to model the behavior for him,

4  correct?

5  A.   No.  Just if the parking lot was full, we wanted to

6  make sure it got swept.  So if Paul was doing his upmost

7  to get it and I was able to, I would collect more carts so

8  Paul could get his job accomplished quicker.

9  Q.   And so you said that there were occasions when the

10  parking lot was busy that you would help out by doing part

11  of it and Mr. Reina would do part?

12  A.   Correct.  We would get both sides of the aisle in one

13  swoop so we could get the parking lot cleared quicker.

14  Q.   Because in that particular situation it was important

15  to get the carts to the store, right?

16  A.   Exactly.

17  Q.   Wouldn't that be an optimal situation for that cart

18  caddy?

19  A.   I don't think so, because it's hard when there's more

20  traffic and more people.  It's harder to move a longer

21  line of carts.

22  Q.   Okay.  So now one of the things counsel for the EEOC

23  didn't ask you about is your personal observations of

24  Mr. Coppernoll.  You know Mr. Coppernoll, right?

25  A.   Yes.

1-P-74

1  Q.   And one of the things you mentioned to me in the

2  deposition was that when you were at the Walmart store on

3  your regular job, which is you're a paramedic with the

4  Beloit Fire Department, correct?

5  A.   Correct.

6  Q.   There were several occasions when you saw, with your

7  own eyes, Mr. Coppernoll using the cart caddy, operating

8  the cart caddy, with Mr. Reina trailing behind him, fair?

9  A.   On two occasions I saw that.

10 Q.   Okay.  And your sister had given an expressed

11 directive that that was not to be done, correct?

12 A.   Correct, because she actually wanted Paul to do the

13 physical work.  We felt that was important for him.

14 Q.   So what does it say to you that his -- and you would

15 agree Mr. Coppernoll is his primary job coach, right?

16 A.   Correct.

17 Q.   So what does it say to you that the primary job

18 coach, in direct opposition to what his boss essentially

19 told him, felt it necessary to use a cart caddy to do the

20 job?

21 A.   I didn't question it because I didn't know if he was

22 training Paul to use it or what he was doing with it, so I

23 wasn't sure.

24 Q.   Okay.  And the reason you didn't use the cart caddy

25 is not because you felt that was a problem; it was because

MARGARET POLIZZI - CROSS

1-P-75

1  your sister told you not to use it?

2  A.    It was because she felt, and I agreed, it was

3  important for Paul to get the physical activity --

4  Q.    Right.

5  A.    -- of pushing the carts.

6  Q.    But you would agree with me that as an employee, or

7  as an associate of Walmart, that the principle concern is

8  what's best for Walmart, not a concern about he needs to

9  get physical activity while at work; you would agree with

10  that, right?

11  A.    Right.  But as the job coach, we should be concerned

12  about everything that has to do with Paul, including his

13  wellness.

14  Q.    And I apologize.  I'm going to jump around a few

15  places here.  I remember from your testimony you mentioned

16  helping Mr. Reina punch in.  Is that something you did

17  every time you were working with him as his job coach?

18  A.    Yeah.  Part of his routine was actually to follow us

19  through the store.  We would pick the best path for Paul,

20  like the one with least customers, and take him to the

21  back and he would punch in himself.

22  Q.    You said you would pick the path --

23  A.    Mm-mm.

24  Q.    -- to go back to the area where are the time clock

25  is?

1-P-76

1  A.    Yep.

2  Q.    Why did you have to do that?

3  A.    Because a lot of times the aisles were crowded.  So

4  we would pick the quickest, easiest way, like most people

5  would on their way to work, probably pick the best path

6  with the least people, and then Paul would follow us.

7  Q.    And is that because, based on your experience, that

8  Mr. Reina couldn't make those choices, that he needed you

9  to make them?

10 A.    No.  It was just routine and he'd just follow the

11 routine.

12 Q.    Okay.  And so where was the time clock located when

13 you were serving as Mr. Reina's job coach?

14 A.    Behind -- there's a bathroom and a customer service

15 and you go in the back hallway.  I guess it's across from

16 the manager's room, from what I remember.

17 Q.    But it's in a noncustomer area, right?

18 A.    Correct.

19 Q.    And the reason that you went with Mr. Reina, because

20 this is not in the parking lot, right, this inside the

21 store?

22 A.    This is inside the store in the back.

23 Q.    There's no cars buzzing around in the store, right?

24 A.    No.

25 Q.    But the reason that you went with Mr. Reina to help

1-P-77

 1  to get him to clock in and clock out is because that's

 2  something he couldn't do on his own, fair?

 3  A.   No.   It's because of Paul's routine, because unless

 4  you give him permission, he wouldn't -- I mean, we would

 5  have had to go in and tell him he was expected to go by

 6  himself, otherwise he's going to wait for someone to lead

 7  him because that's how he was trained.

 8  Q.   Okay.  But why wouldn't you train him?  If he was

 9  capable of being able to punch in and punch out, why isn't

10  that something that you would want him to know how to do?

11  A.   I'm not sure.

12  Q.   Well, did Ms. Slaght tell you that you weren't

13  supposed to let him --

14  A.   I don't think we thought that was a big deal for us

15  to go in back with Paul.  I didn't think that was a

16  problem.

17  Q.   Was there ever any occasion when you were his job

18  coach where he was able to punch in, pouch out for lunch,

19  punch out for the day?

20  A.   Yes, there was, because I stopped at the bathroom and

21  he went in himself and punched in.

22  Q.   Okay.  So you don't what happened, whether it was

23  somebody else who punched him in and punched him out?

24  A.   I don't know.  It was one occasion.

25  Q.   So you think this would happen, right?

MARGARET POLIZZI - CROSS

1-P-78

1  A.   He got punched in somehow.  I assume he did it.

2  Q.   Am I correct that that clock is fairly easy to

3  navigate, right?

4  A.   Yes.

5  Q.   It has pictures -- well, strike that.  It has

6  labels -- *Punch In*, *Punch Out*, *Clock In*, *Clock Out* --

7  right?

8  A.   Correct, but you have to hit the right time.

9  Q.   Right.  And that's pretty straightforward, right?

10  A.   Yes.

11  Q.   Okay.  Now, when you were working the parking lot

12  you, would dawn a Walmart vest, right?

13  A.   I didn't at first.

14  Q.   But ultimately, in serving as Mr. Reina's job coach,

15  you put on a vest?

16  A.   A high-visibility vest, yes.

17  Q.   With *Walmart* on it, right?

18  A.   I don't believe mine said *Walmart*.  It was just a

19  high-visibility vest.

20  Q.   Similar to what the other cart pushers had?

21  A.   Exactly.

22  Q.   As a result of having that on, customers would, from

23  time to time, would approach you because they assumed you

24  worked at Walmart, right?

25  A.   Correct.

MARGARET POLIZZI - CROSS

1-P-79

1  Q.   And so because of the role you were in, you in effect

2  were engaging with Walmart's customers as if you were a

3  Walmart associate, right?

4  A.   Yep.

5  Q.   And what kind of customer service training had you

6  gone through in order to be able to communicate with

7  Walmart's customers in a manner that they wanted you to

8  communicate with them?

9  A.   I did not have any training from Walmart on customer

10  service.

11  Q.   So as a result of you being in a position that you

12  were in, we had a situation where somebody who had not

13  been trained -- by the way, do you know what the 10-foot

14  rule is?

15  A.   No.

16  Q.   Okay.  So as a result of you being Mr. Reina's

17  full-time job coach on the occasions that worked with

18  him --

19  A.   I wasn't his full-time job coach.

20  Q.   I misspoke.  So on the occasions that you were his

21  job coach, there would be some aerials where you were

22  engaging with Walmart customers and having no clue in

23  terms of how Walmart wanted you to engage with their

24  customers?

25  A.   I did not.

MARGARET POLIZZI - CROSS

1-P-80

1   Q.   So you mentioned that on the occasions you worked

2   with Mr. Reina, that from eight or 8:30 to ten, it would

3   be just be you and Mr. Reina in the parking lot?

4   A.   Correct.

5   Q.   So on those occasions, to the extent a customer came

6   into the parking lot and that customer had a question,

7   even a basic question like "Hey, where's the bathroom?"

8   The only person they could get an answer to to that

9   question in the parking lot would be you, right?

10  A.   Well, in the parking lot I can anecdotally tell you

11  that when people asked us for something, it would normally

12  be they wanted a cart so they could lean on it to get into

13  the store and we did that quite often.

14  Q.   Right.

15  A.   We would have carts and someone wanted one, we'd give

16  them one.  It didn't take but a gesture to do that.  We'd

17  go and give them a cart.  Paul was successful at that.

18  Q.   And we're anticipating evidence that from time to

19  time customers do ask questions.  And my question is

20  simply if that were to happen -- a customer, you know, has

21  a kid running late to a soccer match or something; wants

22  to know, "Hey, what's the best way to get in to get

23  Gatorade?" -- the only person who could give that

24  information to them in the parking lot, on weekdays from

25  eight to ten, would be you, right?

MARGARET POLIZZI - CROSS

1-P-81

1   A.    Yes.

2   Q.    Now, I think one of the things you said when

3   Ms. Vance was asking you questions during direct

4   examination is that another role you played in Mr. Reina's

5   performance of his job duties -- and let me stop.  You

6   would agree that pushing carts from the parking lot to the

7   store is, without question, an essential function of his

8   job, right?

9   A.    Correct.

10  Q.    All right.  So I think what I heard you say is that

11  your role in that activity with Mr. Reina when you were

12  his job coach would be to steer the cart with one finger

13  left or right --

14  A.    Yep.

15  Q.    -- when there were these rows of carts that he's

16  gathered them up in the parking lot and moving them to the

17  store, right?

18  A.    Yep.

19  Q.    Okay.  Can you play clip G from the cart pusher

20  video?

21        So what I'm going to show you is a row of carts in a

22  Walmart parking lot.  And I'm going to first ask you, does

23  that look like a row of carts like you and Mr. Reina would

24  be dealing with when you were his job coach.

25        (Video played.)

MARGARET POLIZZI - CROSS

```
 1              THE WITNESS:  That's not Paul.

 2              MR. HARLAN:  Can you stop it for one second?

 3              THE WITNESS:  That's not Paul.

 4              MR. HARLAN:  Put it on pause.

 5   BY MR. HARLAN:

 6   Q.   So does that look like a row of carts that you and

 7   Mr. Reina would push into the store from the parking lot?

 8   A.   Yes.

 9   Q.   Okay.

10   A.   It looks like them.

11   Q.   So first of all, you're not disputing that that's one

12   person doing the job, right?

13   A.   Mm-mm.

14   Q.   Is that yes?

15   A.   Yes.

16   Q.   Okay.  And you want this jury to believe that you

17   could manipulate a row of carts like that with one finger

18   left or right?

19   A.   You must have misunderstood me.  I said Paul pushed

20   and I steered.  So Paul is just like the guy in the back

21   and all I did was walk in the front.

22   Q.   Right.  And I think your testimony was that you used

23   one finger to move the carts left or right, depending on

24   the direction you want them to go in, right?

25   A.   Right.  As long as Paul was pushing, I could steer
```

 1   with one finger or I could stop him if a car was coming.

 2   That's why I took the position in the front.

 3   Q.   So just so I'm clear, and I'll move on, your

 4   testimony is that you could manipulate those carts left or

 5   right just with one finger?

 6   A.   Yes.

 7   Q.   We're done with that.  So in addition to the carts,

 8   you also helped Mr. Reina perform his job by pushing

 9   flatbed carts, right?

10   A.   On occasion.

11   Q.   And again that's doing something that's part of his

12   job, right?

13   A.   Correct.

14   Q.   And you also saw other cart pushers doing that

15   activity, right?

16   A.   Occasionally.  Like I said, there was only one other

17   guy most of the time when we worked, one full-time guy,

18   unless it was slated to be a busier day.

19   Q.   Is it fair that based on your observations that

20   customer service is an important aspect of what cart

21   pushers do?

22   A.   I don't believe it is.

23   Q.   Okay.  Would you agree with me the whole purpose of

24   even having carts available for customers is to facilitate

25   the shopping experience with the customer, right?

1-P-84

 1  A.   Correct, and to keep the parking lot clear for

 2  safety.

 3            THE WITNESS:  I wish this was coffee.  Sorry.

 4            MR. HARLAN:  I'm not that bad, am I?

 5            THE WITNESS:  I'm sorry.

 6            MR. HARLAN:  I'm going to try to move through

 7  this.

 8            THE COURT:  I will take note.  Maybe we'll put

 9  that in the suggestion box.

10  BY MR. HARLAN:

11  Q.   So I think you testified that you would be in a

12  parking lot helping Mr. Reina put items in customers'

13  cars, too, right?

14  A.   Occasionally we would take the opportunity to do

15  that.

16  Q.   Do you have any reason to believe, as a

17  nonemployee -- and you never were employed by Walmart,

18  right?

19  A.   Never.

20  Q.   Do you have any understanding that you would be

21  covered by Walmart insurance for what you're doing in

22  their parking lot in accessing customer cars?

23  A.   I felt we were doing good --

24  Q.   Yeah, but my question is --

25  A.   -- helping people.  I never worried about the

MARGARET POLIZZI - CROSS

1-P-85

1  liability.  I knew if I was injured helping Paul, my

2  sister would probably compensate me for that.

3  Q.   And did you think also you might be able to have a

4  claim against Walmart?

5  A.   Never.  All we wanted from Walmart was a job.

6  Q.   And he got that for 16 years, right?

7  A.   That's right.

8  Q.   Going back to the cart caddy, you would agree with me

9  that on the occasions that you were on the job with

10 Mr. Reina, you saw the other cart pushers using the cart

11 caddy?

12 A.   Occasionally, yes.

13 Q.   Okay.

14 A.   When Paul first started, they didn't even have cart

15 caddies and the carts were different.  They were plastic

16 and they didn't steer as well.

17 Q.   But in the latter part --

18 A.   A lot of times the cart caddy is broken as well.  It

19 hardly ever works in the winter.

20 Q.   So you're saying it was only occasionally that you

21 would see other cart pushers, once the cart caddies

22 arrived, using it?

23 A.   Probably because they used the cart caddies when they

24 have a lot of carts.  And when me and Paul would work the

25 morning, there would be no carts in the parking lot.

MARGARET POLIZZI - CROSS

1-P-86

1           THE COURT:  You know, our objective in the sound

2    system is not require people to lean into it.  But if you

3    keep your chair so you're about a foot away from the

4    microphone, we should be able to hear you just fine if you

5    just talk.  Scoot up.

6           THE WITNESS:  I apologize to everyone.

7           THE COURT:  That's all right.  Scoot up a little

8    bit.  A little more.  There, that should be just right.

9    BY MR. HARLAN:

10   Q.   All right.  So again, just so I'm clear, your

11   testimony today is that it was only occasionally used; it

12   wasn't something on a regular basis?

13   A.   You asked me how often I observed it --

14   Q.   Yes.

15   A.   -- didn't you?  Well, like I said, me and Paul would

16   be there first thing in the morning.  Then there was no

17   line of carts in order for them to use the cart caddy, so

18   we rarely saw it.

19   Q.   And it wasn't used with regularity?

20   A.   Like I said, that was what I saw.

21   Q.   Right.  Why don't we revisit your testimony in your

22   deposition.  So if we could go to page 82, line 23 to page

23   83, line 6 to see if that refreshes your recollection.

24   A.   I just see a big flower.

25           THE COURT:  We'll give them a minute to get it

MARGARET POLIZZI - CROSS

1-P-87

```
 1  up.

 2          MR. HARLAN:  And if we don't get it in a minute,

 3  we're going to move along and I will just read it.

 4      So, Tracy, again it's 82, line 23 to page 83, line 6.

 5          MS. TOMPKINS:  83, line 6?

 6          MR. HARLAN:  Yes.  Page 82, line 23 to page 83,

 7  line 6.

 8          THE COURT:  Now, you said you were using this to

 9  refresh her recollection, which means she can just look it

10  over and see if that reminds her of what her testimony is.

11          MR. HARLAN:  Thank you for pointing that out,

12  Your Honor.  Actually, I'm using it for impeachment

13  purposes.

14          THE COURT:  That's different.  Okay.  Go ahead

15  and play the clip then.

16      (Video deposition testimony of Margaret Polizzi

17  played.)

18  BY MR. HARLAN:

19  Q.   Do you recall that testimony?

20  A.   I do.

21  Q.   Now, you talked about communicating with Mr. Reina

22  using American Sign Language, ASL?

23  A.   Correct.

24  Q.   And would you characterize his ASL abilities as being

25  rather primitive?
```

MARGARET POLIZZI - CROSS

1-P-88

```
 1  A.   He's learned every -- he knows most of the vocabulary
 2  that we have been able to teach him.
 3  Q.   So you wouldn't characterize his ASL abilities as
 4  primitive?  Shall I play that portion of your deposition?
 5  A.   I'm not sure what "primitive" means.  It almost
 6  sounds evil.  I mean, he knows very few words.  But even
 7  to learn one sign is difficult.  It's not primitive.
 8           THE COURT:  We don't need the deposition for
 9  this.  So he has a -- it seems like it's pretty fair to
10  say he has a pretty basic --
11           THE WITNESS:  He has a limited vocabulary.  Could
12  we say that, limited?
13  BY MR. HARLAN:
14  Q.   Okay.  So it would be difficult, for instance, if
15  there was a customer in the parking lot who happened to
16  know ASL to be able to ask him questions directly through
17  ASL to get an answer to something, right?
18  A.   It depended on what they asked him.
19  Q.   So what kind of questions could he answer from a
20  customer using ASL?
21  A.   It depends on what they asked him.  If they asked him
22  where the bathroom is, maybe he could point.
23  Q.   Did you ever see him do that?
24  A.   No one asked him.
25  Q.   So it would be utter speculation to say that he would
```

 1  be able to communicate with a customer through ASL about

 2  pointing to the bathroom, fair?

 3          THE COURT:  You've asked and she gave the answer,

 4  so you can move on.

 5  BY MR. HARLAN:

 6  Q.   Now, you don't have any specialized training as a job

 7  coach, right?

 8  A.   I do not.

 9  Q.   No training in job placement force, right?

10  A.   Nope.  I have had a lot of practice though.

11  Q.   And you didn't participate in any of the training

12  Mr. Reina received at Walmart, correct?

13  A.   No.

14  Q.   Yes, you did?

15  A.   No, I did not.

16  Q.   Okay.  And based on your knowledge of Mr. Reina, he

17  has some issues with his peripheral vision, correct?

18  A.   Like I said, it depends on if he's paying attention.

19  I'm not really quite sure about Paul's vision.  What I

20  learned from doing the paper route after working at

21  Walmart was that Paul had much better vision than I

22  assumed.

23  Q.   Okay.  At your deposition you characterized his

24  peripheral vision as not being adequate.  Do you recall

25  that?

MARGARET POLIZZI - CROSS

1-P-90

```
 1  A.   I said if you stand in his peripheral vision, he

 2  won't see your sign.  If I remember right, that's what we

 3  were talking about in context, about whether he could see

 4  me signing.  And I said if I stand to the side of him, he

 5  would not be able to see me.

 6  Q.   And why is it he wouldn't be able to see you, from

 7  your perspective?

 8  A.   He won't know I'm talking to him unless I get his

 9  attention.

10  Q.   Focus was an issue for Mr. Reina in terms of staying

11  on task, correct?

12  A.   Occasionally.

13  Q.   Okay.  And in addition to that, there would also

14  occasions, unfortunately, when he would be banging his

15  head against the wall, right?

16  A.   He did have anxieties at times.

17  Q.   And those anxiety issues and the head banging

18  occurred long before he stopped reporting to work at

19  Walmart, correct?

20  A.   I think we did see some of it, but that was kind of

21  the -- that would be a high point of an anxiety attack for

22  him to do that kind of action.  He was pretty predictable

23  in how his anxiety came.  You could always count on the --

24  like I said, it started with noises and the hand wringing.

25  And if you didn't make intervention, the last part of his
```

MARGARET POLIZZI - CROSS

 1  anxiety would be him hitting his head and then usually the

 2  anxiety would stop.

 3  Q.   So just to be clear though, these problems with

 4  anxiety preexisted any of the issues he had at Walmart,

 5  correct?

 6  A.   They actually didn't start until he was an adult.

 7  But, yeah, we did see it before the end of Walmart.

 8  Q.   And I think you talked about Mr. Reina having a good

 9  relationship with other people at Walmart.  You never --

10  A.   I think I said that they thought he was a good

11  worker.

12          THE COURT:  Hold on.  Kind of wait for the

13  question and then you'll find out what you really need to

14  answer.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  It will go much more efficient if we

17  just get your question and get your answer.  Go ahead,

18  Mr. Harlan.

19  BY MR. HARLAN:

20  Q.   And there was an occasion where you heard any

21  inappropriate comments made about Mr. Reina while you were

22  his job coach, right?

23  A.   No.

24  Q.   So the answer is no, you never heard any

25  inappropriate comments about him, right?

MARGARET POLIZZI - CROSS

```
 1  A.   The answer is no, I did not hear any inappropriate
 2  comments about him.
 3  Q.   Thank you.  Can we go -- Your Honor, I'd like to just
 4  play a part of the clip that the EEOC prepared, just very
 5  briefly, clip 5.
 6           THE COURT:  Is that clip of the cart pusher
 7  video?
 8           MR. HARLAN:  No.  It's the EEOC's video and just
 9  ask -- it's during the paper route.
10           THE COURT:  Okay.  All right.  Yeah, go ahead.
11           MS. TOMPKINS:  Which clip?
12       (Discussion held off the record.)
13           MR. HARLAN:  So can you stop it?
14  BY MR. HARLAN:
15  Q.   And so maybe start it again.  So I really just want
16  to have you describe for the jury what you're
17  communicating to Mr. Reina and what response he's giving
18  other than moving his hand up and down.  That's really all
19  I'm showing you.
20           THE COURT:  Okay.  And before we do that, this
21  clip is 31 seconds, right?  Yes, 31 seconds.  Just play it
22  once --
23           MR. HARLAN:  Yes, sir.
24           THE COURT:  -- and then we'll get the questions.
25           MR. HARLAN:  Why don't you go ahead, Tracy.
```

MARGARET POLIZZI - CROSS

1-P-93

 1        (Video played.)

 2    BY MR. HARLAN:

 3    Q.    So if you could just describe, because I think you

 4    described for the EEOC some of the signs, what did he do

 5    that would indicate that -- for instance, when you asked

 6    him how he was doing -- that he gave you a response to

 7    that question?

 8    A.    A lot of my interaction with Paul is nonverbal.   And

 9    just that Paul was attending to me, I know he was

10    listening to me.

11    Q.    When you say attending to you --

12    A.    He's looking at me --

13    Q.    Okay.

14    A.    -- he's watching my sign, because he'll close his

15    eyes on you if he isn't willing to listen to you.   I mean,

16    Paul has things like -- this is cooperative.   If he

17    doesn't want -- if he doesn't want anything to do with me,

18    he'd actually go like this so he can't see you.   It's like

19    telling me to shut up, but only not.   He just closes his

20    eyes and he won't pay attention to you, even though he's

21    not -- but it was part of his routine that I would

22    probably come today.   He knew he -- to expect me and that

23    we would probably go swimming and he'd deliver papers, so

24    he's waiting for me.

25    Q.    So the question is what did he communicate back to

MARGARET POLIZZI - CROSS

1-P-94

 1  you?  We know he's looking at you.

 2  A.   When he -- he did the sign "fine."  So, okay, I said

 3  all that to him and he said "fine" and he's looking at me.

 4  To me, that's Paul's -- he's ready to go.

 5  Q.   So the movement of his hand?

 6  A.   He repeated "fine," that's what he did.  That was

 7  "fine."

 8  Q.   So that movement means "fine"?

 9  A.   Yeah.  I said, "Are you fine?"

10       He said, "Yeah, I'm fine."

11  Q.   Okay.  Did he communicate anything else to you during

12  that clip?

13  A.   No.

14  Q.   Okay.

15            THE COURT:  Just for the record, because this

16  isn't going to show up in the transcript, you're making a

17  sign that involves raising your hand and putting your

18  thumb toward your torso.  And that means "fine" in

19  American Sign Language?

20            THE WITNESS:  I think so.  That's what I've been

21  using.

22            THE COURT:  Okay.  It means "fine" to Mr. Reina?

23            MR. HARLAN:  And, Judge, I'm sure you will be

24  happy about what I'm about to say.  I just have one final

25  thing.

MARGARET POLIZZI - CROSS

```
 1              THE COURT:  I would be happy if I believed you.

 2              MR. HARLAN:  So just another piece of the clip,

 3   Tracy, if you could go to one hour, 23 minutes, 34

 4   seconds.  It's during the paper route.

 5              THE WITNESS:  Oscar for the cheer.

 6       (Video played.)

 7   BY MR. HARLAN:

 8   Q.   Now, before we play the clip, Ms. Polizzi, so this is

 9   a video that was filmed at the EEOC's direction in

10   connection with this case, correct?

11   A.   Correct.

12   Q.   And by the time this video was taken, you had already

13   had your deposition taken, correct?

14   A.   I don't remember, to be exact.  I don't know.

15   Q.   At the time that the video was taken and you appeared

16   in it, you certainly understood what the case was about?

17   A.   Sure.

18   Q.   And you understood that part of the case, from

19   Mr. Reina and the EEOC's perspective, was showing that

20   Mr. Reina was able to do things himself, correct?

21   A.   To show what Paul is capable of.

22   Q.   And that he could do job functions himself?

23   A.   Correct.

24              MR. HARLAN:  Okay.  Tracy, can you play that

25   part?
```

MARGARET POLIZZI - CROSS

1        (Video played.)

2    BY MR. HARLAN:

3    Q.    Stop it right there I mean, Tracy.

4        So you would agree with me in that clip that we just

5    presented, despite knowing that the case was about showing

6    Mr. Reina's ability to do job functions himself, even in

7    this new position you're helping him do the work in order

8    to deliver those papers, right?

9    A.    If I could explain that in context.

10   Q.    Could you answer the question first though?

11   A.    Sure.   Yes.

12   Q.    Okay.   Go ahead.

13   A.    When I needed to show him something new, I would show

14   him how to do something new, which is putting a sticker on

15   the paper.   They only did that like twice a year, so that

16   was a new thing that day.   Normally the papers don't have

17   a sticker and he could just fold them.

18   Q.    And am I correct that if the video were to play

19   longer, it would show you taking the papers that had been

20   folded up and putting it in a delivery bag to go out on a

21   route?

22   A.    Occasionally I did that so we could get going faster.

23   When Paul needed -- when we had to be quicker,

24   occasionally I would have to help Paul.

25            MS. VANCE:   Ms. Polizzi, thank you, very much.

MARGARET POLIZZI - CROSS

1-P-97

 1        THE COURT:  How long do you think your redirect

 2   will be?

 3        MS. VANCE:  Less than five minutes.

 4        THE COURT:  All right.  Very good.  So we'll take

 5   our afternoon break after we do the redirect.

 6                    REDIRECT EXAMINATION

 7   BY MS. VANCE:

 8   Q.   Ms. Polizzi, you were asked about the occasions when

 9   you observed, in your capacity as a firefighter, the

10   occasions when you observed Paul at work when Matt

11   Coppernoll, his primary job coach, was using the cart

12   caddy.  And I just want to know, on those occasions did

13   you have the opportunity to observe the entire process or

14   just the trip?

15   A.   No.  All I saw was one small piece of what he was

16   doing out of context.  I didn't know what Matt was doing

17   with him.

18   Q.   All right.  Now, I want to know, did anyone ever tell

19   you that it was inappropriate -- anyone at Walmart tell

20   you that it was inappropriate to push carts alongside

21   Paul?

22   A.   No.

23   Q.   If Walmart had said, Ms. Polizzi, we don't want job

24   coach pushing carts with Paul, we want Paul performing the

25   job, what would you have done?

                    MARGARET POLIZZI - REDIRECT

1  A.    We would have trained Paul to do it himself.

2  Q.    Were you ever told you should be using the electric

3  cart caddy?

4  A.    No.  I felt that the cart caddy was a convenience for

5  the other cart pushers.  And we actually wanted Paul to do

6  the work, so we made him work.  We felt that that was good

7  for him.  And we thought that Walmart wouldn't care as

8  long as the job got done.  I didn't realize it was such a

9  big deal to them or we would have changed it.  We could

10  have made that change easily probably.

11  Q.    Now, Attorney Harlan had asked you about what

12  customer service training you had from Walmart.  And I

13  recall your testimony was "I didn't."  And so I'll ask if

14  Walmart had asked you to attend the new-hire orientation

15  to learn how to provide customer service in the Walmart

16  way, what would you have done?

17  A.    I would have gone.

18  Q.    We saw the video clip of the cart attendant who was

19  manually pushing a train, a line, of several carts.  And I

20  think it's fair to say Attorney Harlan expressed some

21  skepticism about your testimony of steering a line of

22  carts with one finger.  And I just want to ask you, how

23  often would you estimate that that's what you did is steer

24  carts with one finger?

25  A.    All the time.

MARGARET POLIZZI - REDIRECT

1-P-99

1   Q.    More than ten times?

2   A.    Yes.

3   Q.    More than ten times per day?

4   A.    Sure, because we were, for three and-a-half hours, we

5   were out in the parking lot the entire time most days.

6   Q.    And then turning your attention back to the clip we

7   saw of you communicating to Paul.  And I believe you

8   testified he gave you the sign for "fine."  Can you show

9   us, help the jury kind understand, how Paul answers a

10  "yes" or a "no" question?

11  A.    This would be "yes" and that would be "no."  He does

12  "no" very well, but "yes" is kind of fleeting.

13  Q.    When you showing me that, I see that up there.

14  A.    Yes.

15  Q.    Does Paul answer a "yes" or "no" question?

16  A.    No.

17  Q.    What does he do?

18  A.    He doesn't make an out big gesture.  He just does it

19  low.  He does everything like in the center of his chest,

20  all of the signing.  Occasionally he'll be out here, but

21  most of the time it's right directly in front of him and

22  low.  Most people will sign up and away so others can see

23  it.  Paul kind of signs back to you just in his mid area.

24          MS. VANCE:  Thank you.  No further questions at

25  this time.

MARGARET POLIZZI - REDIRECT

 1          THE COURT:  Thank you, Mr. Polizzi.  Now we'll

 2   take our afternoon break.  We'll reconvene at 4:15 and at

 3   that point we'll hear the next witness.

 4       (Jury out at 3:58 p.m.)

 5          THE COURT:  Who will your next witness be?

 6          MS. VANCE:  Matthew Coppernoll, the primary job

 7   coach.  Between now and then, Your Honor, we did want to

 8   show our 12 minutes of the *Day in the Life* video.

 9          THE COURT:  Okay.

10          MS. VASICHEK:  And following that we will do the

11   performance evaluations, a selected number of them.

12          THE COURT:  So before we call Mr. Coppernoll, you

13   say?

14          MS. VANCE:  Yes.

15          THE COURT:  Okay.  So when we come back, we're

16   going to see the video and then we're going to talk about

17   some of the --

18          MS. VASICHEK:  Performance evaluations.

19          THE COURT:  -- performance evaluations.  Okay.

20          MR. HARLAN:  I didn't get a chance to ask any

21   follow-ups to her questions.  I ran out my clock, huh?

22          THE COURT:  Not if you don't ask.  All right.

23   We'll see you in 15 minutes.

24          MR. HARLAN:  Thank you.

25       (Recess at 4 p.m. until 4:15 p.m.)

1             THE COURT:  All right.  Sit down for just a

2    second.  I want to clarify a couple of things.  First of

3    all, on the question of the recross, normal procedure here

4    is you get a direct, cross, and a redirect.  And unless

5    something surprising comes up in the redirect, you've had

6    your chance on cross-examination.  But if something does

7    come up, then ask.  But the default is going to be direct,

8    cross, redirect, and we're done.

9             MR. HARLAN:  Your Honor, it was a poor attempt

10   to --

11            THE COURT:  All right.  Just so you know.  So

12   occasionally I will do it if something new comes up in

13   redirect.  The redirect should only be responsive to the

14   cross anyway, so it should be rare.

15        Then on the next things we're going to see, so we're

16   going to come back.  Before we see the next witness, we're

17   going to watch the video.  That's fine.  We've already

18   worked that out.  Do you need me to introduce the video at

19   all?  You're just going to tell us what the video is?

20            MS. VANCE:  Your Honor, we had simply intended to

21   move for the admission of Exhibit 59, the video, into

22   evidence.

23            THE COURT:  Obviously I'll receive it.  So

24   there's no need to --

25            MS. VASICHEK:  No need to do that.

 1            THE COURT:  We'll just it's Exhibit 59, that will

 2    be in, and then we should just tell the jury what it is.

 3            MS. VANCE:  All right.

 4            THE COURT:  So you're willing to do that.  Great.

 5    Then we have the 17 performance evaluations.

 6            MS. VASICHEK:  Yes.  We've pared it down, Your

 7    Honor.  We'll be moving in the performance evaluations --

 8    Exhibit 63, 64 and 66, but we'll only be showing -- and I

 9    can tell you which ones we're showing, if defendants want,

10    in advance.

11            THE COURT:  So Exhibit 63, 64 and 66?

12            MS. VASICHEK:  And 1 through 18.

13            THE COURT:  Okay.  And 1 through 18.  And what

14    are 63, 64 and 66?

15            MS. VASICHEK:  63, it's a *Pre-Screening*

16    *Questionnaire* from his personnel file.

17            THE COURT:  Okay.

18            MS. VASICHEK:  64 is the 1999 *Reasonable*

19    *Accommodation* form that both of us referred to in opening.

20    And 66 is an early performance evaluation.

21            THE COURT:  Okay.

22            MS. VASICHEK:  And the ones I will actually be

23    asking permission to highlight portions of will be 18 and

24    64 -- 64 simply the signature --

25            THE COURT:  Okay.

 1            MS. VASICHEK:  -- 66, 11, 13, 14, 16 and 17, and

 2    I will go quickly.

 3            THE COURT:  Okay.  So what I will tell the --

 4    first of all, I've already ruled on the performance

 5    evaluations --

 6            MS. VASICHEK:  Right.

 7            THE COURT:  -- so those will be admitted.  Then

 8    the other documents -- 63, 64, 66 -- I gather both sides

 9    are going to use them.

10            MR. HARLAN:  Yes.  No objection.

11            THE COURT:  No objections on those, so those will

12    be admitted.  So 63, 64, 66 are in.  Exhibits 1 through 18

13    are in.  And so I'll just tell the jury that I've already

14    ruled these documents are admissible, they'll have them

15    during deliberations, but you will briefly highlight some

16    aspects of these documents, so you can just highlight them

17    and show them.

18            MR. HARLAN:  Your Honor --

19            THE COURT:  Go ahead.

20            MR. HARLAN:  -- so two questions.  How are we

21    handling our clip?

22        Are you going to play our clip?

23            MS. VANCE:  So what we have is our 12-minute

24    portion of the *Day in the Life*.  And then, as we emailed,

25    we weren't sure if you wanted us to just say "And now

```
1   defendant is playing some counter-designations"?  "Now

2   I'll play three minutes of counter-designations"?

3           THE COURT:  It's just all in there as one group?

4           MS. VANCE:  We kept it as two separate files, not

5   knowing how the presentation should be.  It's repetitive

6   of some of the --

7           MR. HARLAN:  Carrie, are you going to just play

8   it?

9           MS. VANCE:  Yeah.

10          MR. HARLAN:  Yeah, that's fine.  We don't have a

11  problem with it.

12          THE COURT:  So we've got 12 minutes, then we've

13  got three minutes, but that's redundant with certain

14  portions of the 12 minutes.

15          MS. VASICHEK:  Not -- not -- I mean, there are

16  differences.

17          THE COURT:  Minor overlap.

18          MR. BULIOX:  Yeah, minor overlap.

19          THE COURT:  Okay.  All right.  We won't lose any

20  sleep over that.

21          MR. HARLAN:  If you could just identify it as

22  ours.  That's the only --

23          MS. VANCE:  Yeah.

24          THE COURT:  I'll take your input.  Do you want me

25  to say, "Okay.  This is the parts" --
```

1          MR. HARLAN:  That would be great, if you don't

2     mind.

3          THE COURT:  Okay.  All right.  So I'll introduce

4     it that way then.

5          MR. HARLAN:  Your Honor, one other question.  The

6     stipulation we worked out in terms of Mr. Reina not

7     testifying, you were going to tell the jury about that.

8          THE COURT:  Yes.

9          MR. HARLAN:  When do you contemplate doing that?

10          THE COURT:  I'll take your input.  Should we do

11     it now?

12          MS. VASICHEK:  Or at the time when the video

13     deposition comes in, the clips from the deposition,

14     because what it relates to and it seems to me that would

15     make more sense.

16          THE COURT:  Please remind me though so I don't

17     forget.

18          MS. VASICHEK:  I'm sure Mr. Harlan will.

19          MR. HARLAN:  Okay.

20          THE COURT:  Very good.  Let's bring the jury

21     back.

22          (Jury in at 4:25 p.m.)

23          THE COURT:  All right.  Welcome back.  Before we

24     hear from our next live witness, we've got some evidence

25     that we're going to present to you in another way, partly

1    for efficiency sake and partly because of the nature of

2    the evidence.  So we're going to see some video and then

3    we're going to look at some documents that the parties

4    have stipulated can be admitted.

5        And so the first thing we're going to have is a

6    video.  And the first chunk of this video is going to be

7    selections of the video.  Well, I'll let you introduce it.

8    The plaintiffs would like to show you some video and

9    they're going to tell you what it is.

10            MS. VANCE:  Thank you, Your Honor.  At this time

11   the plaintiff moves Exhibit 59, the *Day in the Life of*

12   *Paul Reina* video, into evidence to be admitted into

13   evidence.

14            THE COURT:  We've already covered all that, so

15   the evidence is already in.

16            MS. VANCE:  Thank you.

17            THE COURT:  So you can just tell what it is and

18   then we'll play it.

19            MS. VANCE:  Yes.  Members of the jury, the EEOC

20   arranged for a day in Paul Reina's life to be videoed for

21   the purposes of letting you see Mr. Reina kind of go

22   through his day.  And this is going to be a 12-minute

23   video summarizing a day in Paul's life with a camera

24   following him throughout the day.

25            THE COURT:  Very good.  Let's have a look at it.

1           (Video played at 4:27 p.m.)

2               MS. VANCE:  Can we have volume, please?

3               MS. VASICHEK:  I'm sorry, Your Honor.  We're

4    having some technical difficulties.

5               MS. VANCE:  This problem, Your Honor, this

6    problem this morning with the system, was solved by a

7    reboot.  Could we take three minutes?

8               THE COURT:  I'll have to get somebody over to

9    restart the system.

10              MR. HARLAN:  Do you want us to play our version,

11   Your Honor?

12              THE COURT:  Do you have the same file?

13              MR. HARLAN:  Yes, sir.

14              THE COURT:  We'll see if the other side works.

15              MS. VANCE:  Oh.  Thank you.

16              MR. HARLAN:  Okay.  Sorry.  We actually don't

17   have it.

18              MS. VANCE:  I think the record should actually

19   reflect that I think the film was sped up a little bit

20   in --

21              THE COURT:  I think that's just -- because the

22   audio was fine, so I think it was just the frame rate.  I

23   mean, it looks a little faster, but it's playing at the

24   right speed, or the sound would be off.  We'll have some

25   help here in a moment.

1        We're having trouble playing the video.  The

2   suggestion was rebooting took care of the situation this

3   morning.

4              THE CLERK:  Rebooting the laptop?

5              MS. VANCE:  Rebooting the laptop.

6              THE COURT:  Okay.

7              MS. VANCE:  And then we would ask to play from

8   the beginning.

9              THE COURT:  Go ahead.

10              MS. VANCE:  Thank you.

11              MR. HARLAN:  I think we actually do have it, Your

12   Honor.

13              THE COURT:  How far are we from completing the

14   reboot on the laptop?  Are we rebooting our system now?

15              THE CLERK:  We are not.

16              THE COURT:  Well, it's just I've lost my screen.

17              MR. BULIOX:  All right.  Your Honor, we have it.

18              MS. TOMPKINS:  But now the system is --

19              THE COURT:  Just give it a second here.

20         (Discussion held off the record.)

21              THE COURT:  Is it ready?  All right.

22              MR. HARLAN:  We have no objection if they want to

23   start from the beginning.

24              THE COURT:  It sounds like we have audio, but I

25   don't see any video.

1              MS. VASICHEK:  The video is playing on the

2     laptop, but it's not coming up on the display.

3              THE COURT:  There we go.

4          (Video played at 4:35 p.m. until 4:50 p.m.)

5              MS. VANCE:  Next, what you will be seeing are

6     three minutes that the defendant has designated to show

7     you from the raw footage of that video.

8          (Video played at 4:50 p.m. until 4:53 p.m.)

9              THE COURT:  All right.  Next I believe we're

10    going to see some documents that I've already ruled have

11    been admitted.  And so for efficiency sake, counsel will

12    describe the documents to you, show you some reflections

13    of them.  Either side can make reference to the documents

14    in their closing arguments and you will have all of them

15    with you when you go to deliberate.  So with that, let's

16    look at the documents.

17             MS. VASICHEK:  This is selected documents from

18    the personnel file and the performance reviews.  We will

19    start with what is marked as Exhibit 18.  Exhibit 18 is

20    the *Reasonable Accommodation Reimbursement* for Paul Reina

21    for the cart pusher job in January 26th, 1999.  This is

22    the form that says that under that, under *Essential*

23    *Functions*, he's unable to work in the parking lot without

24    assistance.  And then below that, in the next section, it

25    says, "Will allow aide to work with Paul."

1      Next we're going to go to Exhibit 64.  64 is the same

2  form.  But if you focus at the bottom of it, you will see

3  the signature of the store manager, Brian West, of January

4  26th, 1999.

5      Next, a select of documents of the performance

6  evaluation, we go to Exhibit 66, which is a document from

7  2000, February 2000.  And it states, "This form is to be

8  used to recognize any action for which the associate

9  should become commended."  It states underneath that,

10  "Paul gives his best effort in every task that is

11  assigned."

12      Going to Exhibit 11, Exhibit 11 is an evaluation from

13  2008.  Focusing on the first page, "NA" has been written

14  next to the following tasks: "Answers all customer service

15  calls from other associates"; "Communicates with other

16  stock/cart associates to ensure all calls are answered";

17  "Helps customers find what they need"; "Assists in

18  layaway"; "Provides customer carry-outs when needed";

19  "Helps keep rest room, vestibule, and trash cans clean";

20  "Helps keep fixture room organized"; "Is knowledgeable

21  about emergency procedures"; "Follows equipment

22  guidelines"; "Properly uses ladders"; and "Makes bales in

23  a timely manner."

24      On the last page of this document, under *Strengths*,

25  you will see it states that "Does a good job keeping carts

1  filled inside the building.  Works well with other cart

2  pushers.  Does anything asked from the CSMs."

3       Next we're going to look at Exhibit 13, which is a

4  *Performance Evaluation* from 2010.  Under *Strengths* it

5  states, "Help where is needed.  Friendly with customers.

6  Works well with fellow associates."

7       14.  14 is a *Performance Evaluation* from 2011.  Under

8  *Strengths* -- under *Comments* it states, "Paul follows

9  proper procedures when coming in from the lot" -- "when

10 bringing carts in from the lot.  He does a good job

11 keeping the cart corral full consistently.  He listens to

12 his supervisors and follows directions well."  Under

13 *Strengths* it states, "Paul is courteous with the

14 customers.  He follows direction and continually gets

15 carts in from the lot."

16      Turning to Exhibit 16, this is an evaluation from

17 2013.  Going to the page where it talks about *Strengths*,

18 it states, "Paul does well with making sure carts are full

19 in the bay.  Paul is good at making sure there are no

20 stray carts all over and makes sure all carts are cleaned

21 up around the building."

22      And our final one that we will point out here is

23 No. 17, which is from 2014.  Under *Strengths* it states,

24 "Paul is a pleasure to work with.  Paul knows his

25 expectations and does his job well.  Paul gets along with

1   his fellow associates as well as is friendly with his

2   customers.  Paul's attendance is decent, having not missed

3   any of his shifts, which shows his dedication to his job.

4   Paul is good about making sure the carts are cleaned out

5   of garbage."

6       "Development for Paul would be to communicate with

7   management when he is taking his break and to watch his

8   tardies.  Paul also needs to be aware that when he is not

9   using the cart caddy, only 10 carts can be pushed at a

10  time."

11      That is all we'll point out at this point, Your

12  Honor.

13          THE COURT:  Very good.  And let's get started

14  with your next witness.

15          MS. VANCE:  Plaintiff calls Matthew Coppernoll.

16  Your Honor, while we're waiting, EEOC moves for admission

17  of Exhibit 28.

18          THE COURT:  What is Exhibit 28?

19          MS. VANCE:  It is some certifications and

20  trainings completed by Matthew Coppernoll.

21          MR. HARLAN:  No objection, Your Honor.

22          THE COURT:  Very good.  It will be admitted.

23          MS. VANCE:  Thank you.

24          THE COURT:  Come on up here, Mr. Coppernoll.  We

25  will swear you in right behind the witness stand if you

1   come in around the back there.

2          THE WITNESS:  Okay.

3      **MATTHEW COPPERNOLL, PLAINTIFF'S WITNESS, SWORN**

4          THE COURT:  All right.  Mr. Coppernoll, you don't

5   need to lean into the microphone when you speak.  But if

6   you keep your chair so you are about one foot away from

7   the microphone, we should be able to hear just fine.

8          THE WITNESS:  About right here?

9          THE COURT:  That would be fine.  If you need to

10  scoot around, I will tell you.  Go ahead.

11                     DIRECT EXAMINATION

12  BY MS. VANCE:

13  Q.   Good afternoon.

14  A.   Good afternoon.

15  Q.   Would you please state your full name for the record?

16  A.   Matthew A. Coppernoll.

17  Q.   Mr. Coppernoll, where do you live?

18  A.   In Beloit, Wisconsin.

19  Q.   And currently do you work?

20  A.   No.

21  Q.   Are you retired, sir?

22  A.   Semiretired because of my disability.

23  Q.   How do you know Paul Reina?

24  A.   He's been a family friend for about 35 years and I

25  also work as his job coach.

                    MATTHEW COPPERNOLL - DIRECT

1  Q.   And did you know the family of Paul Reina before you

2  met Paul himself?

3  A.   Yes.

4  Q.   How long have you known Paul Reina's foster family?

5  A.   Probably since 1975.

6  Q.   Mr. Coppernoll, can you give us an idea of your work

7  background, your professional background?

8  A.   I have worked as a job coach, a personal care worker

9  with a number of -- a couple of residential programs in

10  the Beloit and Janesville area.  I've worked as a night

11  services supervisor at Rock Valley Community Programs,

12  which is a halfway house.  I've worked at Geneva Lakes

13  Kennel Club Greyhound Racetrack as program sales and

14  customer service.  I worked as a district manager for the

15  *Beloit Daily News* and *Janesville Gazette*.

16  Q.   And I'd like to ask you, before you started working

17  as an aide with Paul Reina, had you worked with people who

18  had disabilities?

19  A.   Yes.

20  Q.   Can you tell us some of those jobs, please?

21  A.   Personal care worker, I worked basically doing the

22  personnel care duties: helping them prepare for work in

23  the mornings, assisting with their meal preparations,

24  cleaning, hygiene, transportation, and appointments.

25  Q.   All right.  And I'd like to have us look at what's

MATTHEW COPPERNOLL - DIRECT

 1   been admitted into evidence as Plaintiff Exhibit 28.  Now,

 2   and we'll just kind of scroll through so that we can get a

 3   sense of how many pages -- the contents of Exhibit 28.

 4   And if we could go back to the first page.

 5       So, Mr. Coppernoll, do you recognize these pages?

 6   A.   Yes, I do.

 7   Q.   And what are they, please?

 8   A.   They're certificates that I've received in the course

 9   of training at various programs and seminars that I've

10   undertaken.

11   Q.   Are all these certificates or recognitions in Exhibit

12   28 from work experiences prior to your employment with

13   Mr. Reina?

14   A.   Yes.

15   Q.   Okay.  And I want to ask you, let's look at this

16   first page, *Keys to Preventing Workplace Violence*.  And

17   the next one is *Conflict Management and Confrontation*

18   *Skills*.  Were those courses you took for your job?

19   A.   Yes.

20   Q.   Were there any skills that you learned in these

21   courses that affected the way you worked with Mr. Reina?

22   A.   I mean, I think all of the classes that I took, in

23   one way or another, affected many parts of my life.  These

24   classes might have -- I mean, they help me identify

25   problem areas that could escalate and how to avoid them.

MATTHEW COPPERNOLL - DIRECT

1  Q.   All right.  And let's scroll to a few pages into

2  *Challenging Behaviors*.  In 2002 you took -- you completed

3  the requirements for a *Challenging Behaviors* course.  Can

4  you recall some of the things you learned in this course?

5  A.   Yeah.  Some of the things were to identify --

6  identify how people might escalate, depending on their

7  mood or problems that they have, and how to de-escalate or

8  avoid escalating problems.

9  Q.   And on the next page I see -- I should look here --

10  *Certificate of Completion*.  Can we zoom in on this maybe,

11  *Certificate of Completion*?  And see under your name, "For

12  successful completion of the Dungarvin Wisconsin 40-hour

13  Personal Care Worker Training Course" -- yeah, "40-hour

14  Personal Care Worker Training Course"?  Can you describe

15  for us the kind of duties that the Personal Care Worker

16  Training Course prepared you for?

17  A.   Yeah.  This training program was required to be

18  completed before you would be allowed to work with a

19  person in our program on an individual basis, otherwise

20  you would have to have another staff member with you at

21  all times.  These would be situations and the proper

22  administration of medications, and especially that was a

23  big one.  Resident rights, resident are certain rights

24  that you have to follow and respect.  Abuse and neglect, I

25  mean, that kind of goes along with everything.  As

MATTHEW COPPERNOLL - DIRECT

1   mandatory reporters, we had to be able to identify what

2   abuse was and what neglect was and the steps that would be

3   taken if you observed that.

4   Q.   Can I interrupt you for a second and ask you to give

5   us a little more context about the population you're

6   learning to be a personal care worker for --

7   A.   Right.

8   Q.   -- training?

9   A.   This would be developmentally disabled individuals

10  and they would be various types of disabilities from

11  learning impaired, visually and hearing impaired.  Some

12  had autism and others had, besides their developmental

13  disabled disabilities, they might have physical

14  disabilities as well.

15  Q.   Thank you.  I'll ask Mandie to show the next two

16  pages.  We'll go bang bang.

17       You have a certificate in a *Caregiver Course*.  This

18  was three hours.  And, let's see, the next page is an

19  eight-hour course.  Can you describe what skills that or,

20  if any, of the skills there prepared you for work with

21  Paul Reina?

22  A.   Well, this class was primarily in the area of

23  community-based residential facilities.  So many of these

24  things would not apply directly to Paul.  But in the

25  aggregate, you can see that things that you learned in

1  this area would apply to other areas as well.

2  Q.   Okay.  And could you describe for us, just to give us

3  some background, how did you first come to work with Paul

4  Reina at Walmart?

5  A.   Well, as I remember, it seems like I was down

6  visiting Rose one day and I think her sister Margie was

7  there.  And they were looking for a replacement for the

8  fellow that was -- that had been working with Paul but was

9  leaving.

10       And I think I kind of asked them about it, what was

11  it about.  And I think Margie said, "I don't know why we

12  never considered Matt for it."  So then I found out a

13  little bit more about it and gave it a try, really liked

14  working with Paul.

15  Q.   And can you kind of walk us through the process for

16  getting the job?

17  A.   Well, when we found I was interested in it, Rose

18  asked me some questions about it and told me a little bit

19  about what the job was and asked me if I would like to

20  shadow the fellow that had been working with him.  I can't

21  remember his name.  But I went to work with him, saw what

22  he and Paul did and decided that I would like to do that

23  with Paul.

24  Q.   Now, when you did start recording hours, how were

25  your hours paid?

MATTHEW COPPERNOLL - DIRECT

1-P-119

1   A.   How were they paid?  I turned in a time sheet to, I

2   believe it was, Arc.  Well, I gave it to Rose and she

3   would typically send it into Arc, back to them.  And the

4   State of Illinois would send us -- send me a check for the

5   hours worked.

6   Q.   And was there any kind of a screening process

7   through -- in the hiring process?

8   A.   Yeah.  I believe I had to go through a background

9   check.  But that was so long ago, I don't really remember

10  a great deal about it.

11          THE COURT:  Actually, maybe this would be good

12  time to put a timeline on it, if you would.  When was this

13  that you started working with Paul?

14          THE WITNESS:  I believe it was in like 2005,

15  during that time frame.

16          THE COURT:  Thank you.

17  BY MS. VANCE:

18  Q.   And so to give some more context to that, it sounds

19  like Paul had been performing the job for over six years

20  at that point.  Does that sound right to you?

21  A.   Correct.  I think he got that job just after he had

22  finished high school or shortly before he finished high

23  school.

24  Q.   And then if you started in 2005, what is the year

25  that you stopped working at Walmart with Paul?

MATTHEW COPPERNOLL - DIRECT

```
 1  A.    That would have been about the time he was no longer
 2  employed there.  That would have been 2015.
 3  Q.    So you had about ten years?
 4  A.    Right.
 5  Q.    Okay.  And can you give us a sense of how you
 6  communicated with Paul?
 7  A.    Well, basically sign language and facial expressions
 8  was the main way.
 9  Q.    Would you gesture with Paul?
10  A.    Yes.
11  Q.    And how would you understand what he was
12  communicating to you?
13  A.    Just by observing his facial expressions or, if he
14  didn't want to do something he would -- and he was adamant
15  about it, he would sign "no."  If he wanted to do
16  something that I asked him to do, he would either do it or
17  he would say "yes."
18  Q.    And how did you learn -- how did you learn these
19  methods and learn to communicate with Mr. Reina?
20  A.    Just, I don't know, being with him and with his
21  previous worker I learned some.  I learned some, you know,
22  from Rose and Margie.
23  Q.    Did you work as Paul's personal aide and have your
24  hours paid in settings other than being his job coach in
25  the cart pusher job at Walmart?
```

MATTHEW COPPERNOLL - DIRECT

1  A.   Yes.  I assisted him with a little job, I guess you

2  would call it, making bird houses.  He would build the

3  bird houses; paint them; and sell them to friends,

4  neighbors, family members, things like that.

5  Q.   Now, was that in a home setting?

6  A.   Yes.  We would typically do it over at his aunt's

7  house.

8  Q.   And as far as the job aide at Walmart, tell us --

9  that involved more than just -- tell us, when you would

10  start your day, would you go to Paul's house?

11  A.   Yes.  I would leave my home and drive over, pick up

12  Paul and, you know, make sure he was dressed appropriate

13  for the weather.  And we would leave his home and he

14  would -- I would drive to Walmart.  As we would go into

15  Walmart, entering the parking lot, we would look around,

16  observe the condition of the lot and park my vehicle.

17       And we would go inside.  Paul would clock in.  And we

18  would go back out into the parking lot and start gathering

19  up carts and bringing them to the bay doors where they

20  would come into the building.

21  Q.   And then did part of your work also involve later

22  bringing Paul home?

23  A.   Right.

24  Q.   How would you -- so then I will direct your attention

25  to kind of the job performance and we'll start asking you

MATTHEW COPPERNOLL - DIRECT

1-P-122

 1  to give us some details there.  Would you describe how

 2  Paul Reina performed the cart attendant job when you were

 3  his job coach?

 4          MR. HARLAN:  Objection, Your Honor.  Vague as to

 5  time.  I don't know what time frame we're talking about,

 6  the whole period or --

 7          THE COURT:  Did it change much over the course of

 8  the ten years you worked with him?

 9          THE WITNESS:  Not really.  I mean, there were

10  variations.  For a period of time Paul did not have --

11  well, Walmart did not have a cart caddy for Paul to

12  utilize.  But basically the job pretty much stayed the

13  same.

14          THE COURT:  All right.  I'll overrule the

15  objection, but if you would clarify if there were any

16  changes during the course of his employment.

17          MS. VANCE:  Thank you.

18  BY MS. VANCE:

19  Q.   Mr. Coppernoll, I'll direct your attention to when

20  you first began in the 2005 time frame working with Paul.

21  Describe, before there was a change, like the introduction

22  of a cart caddy, describe, please, how Paul -- how

23  Mr. Reina performed the cart attendant job when you were

24  his job coach in that time frame.

25  A.   Okay.  We would go out into the lot together and Paul

MATTHEW COPPERNOLL - DIRECT

1   would gather -- we would walk down -- walk out in the

2   parking lot and Paul would gather up the carts.

3        Sometimes there were what we call "stray carts."

4   Those were carts that were not in the designated cart

5   corral where you typically return your cart after

6   shopping.  We would gather up those and kind of nest them

7   together, stack them together.

8        And then we would move down to where the cart corral

9   was where most of the carts were contained.  And Paul

10  would stack together approximately 10 or 12 carts and then

11  we would push them up to the bay doors.

12  Q.   So I'll ask you to give us a little more detail.

13  You're saying "we."  Are there -- sometimes you're saying

14  "we" and sometimes you're saying "Paul."  Can you tell us,

15  did you kind of have defined parts of the job that Paul

16  did?

17  A.   Paul would gather the carts and I would hold like one

18  of the carts.  If it was facing downhill, I would hold the

19  front cart so that it wouldn't roll down.  If it was

20  facing uphill, I might hold the rear of the carts so that

21  it wouldn't slide back down the hill.

22       Walmart parking lot is on kind of a slanted area

23  where it's kind of uphill in some spots and downhill in

24  others, and especially depending on the direction.  So

25  Paul would basically gather the parts and put them

MATTHEW COPPERNOLL - DIRECT

1-P-124

```
 1  together and I would hold them so they wouldn't roll.
 2  Q.   Then when it comes time to move a train or a line of
 3  carts that you gather or Paul gathered to the store, what
 4  would happen?
 5  A.   Paul would push the carts from the rear and I would
 6  steer them from the front.
 7  Q.   How did you understand your role in this process as
 8  job coach?
 9  A.   Well, I was Paul's eyes and ears.  I was there to
10  keep him on track and, you know, keep him so that he -- he
11  couldn't see very well and so I would make sure that he
12  wasn't steering -- you know, pushing the carts into an
13  area where they shouldn't be.
14  Q.   Now, would you describe interactions with customers
15  that you and Mr. Reina had at Walmart?
16          MR. HARLAN:  I'm going to object.  Leading, Your
17  Honor.
18          THE COURT:  Overruled.  Go ahead.
19  A.   Interactions?  I'm not sure not sure how to answer
20  that.
21  Q.   Well, let me ask, were customers in the parking lot
22  returning to their cars usually?
23  A.   Yes.
24  Q.   Did you have interactions with customers returning
25  purchases to their cars with Paul --
```

MATTHEW COPPERNOLL - DIRECT

1    A.    Oh, returning purchases, yes.

2    Q.    -- or taking home -- leaving the store with their

3    purchases?

4    A.    Right.  Paul did assist customers taking groceries

5    out to their vehicle, unloading them from his -- from

6    their cart into the customer's vehicle.  He did do that.

7    He would push the cart.  I would kind of steer it unless

8    the customer was pushing it.  But then he would unload it

9    and put the groceries in either the trunk or the door of

10   the vehicle.

11   Q.    How often would you estimate that Mr. Reina helped

12   customers put their purchases into the trunk, as you just

13   described?

14   A.    It was rare, maybe a couple times a month.

15   Q.    What interactions did you have with other cart

16   attendants?

17   A.    I would just maybe talk to them --

18   Q.    Okay.

19   A.    -- but that was about it.

20   Q.    All right.  And did Walmart ever give you any way to

21   know if a customer needed assistance getting purchases out

22   to their trunk?

23   A.    Yes.  One of the cashiers or the customer service

24   manager would typically either motion to us or come over

25   and ask Paul to take the cart and items out to the

MATTHEW COPPERNOLL - DIRECT

1  vehicle.

2  Q.   Were you ever asked by a Walmart manager to change

3  anything about the way you and Mr. Reina were working?

4  A.   I don't think so, no.

5  Q.   Were you ever asked by a Walmart manager to change

6  Paul's job performance in any way?

7  A.   Not that I remember, no.

8  Q.   If you had been asked by a Walmart manager to change

9  something about the way you were working or the way Paul

10 was working, what would you have done?

11 A.   I would have changed it as long as it wasn't

12 something that was, you know, improper.  I mean, Paul

13 would go beyond what was required many times to complete

14 any task that was asked.  I don't think Paul ever refused

15 to do a job that he was asked to do.

16 Q.   And are you saying in your personal experience, he

17 never refused a job that you asked him to do?

18 A.   He never -- right.  Well, I would interpret what

19 somebody else asked him to do.  I would tell it -- tell

20 Paul what they wanted done or what he should do.  And I

21 don't remember him ever denying doing a job.

22 Q.   Can you give us a specific example of something

23 you're thinking of?

24 A.   I mean, for instance, like picking up trash in the

25 parking lot and bringing it back to the dumpster or the

MATTHEW COPPERNOLL - DIRECT

1  recycler or the cardboard bundler, things like that.  He

2  would -- no problem.  He would do anything that he was

3  asked to.

4  Q.   Now, were you present for the meetings that were the

5  performance reviews of Paul Reina?

6  A.   For many of them, I think probably at least half a

7  dozen, maybe more.

8  Q.   We'll get into just a couple of them in detail, but

9  first I want you to just, in general, let us know what

10  feedback generally did you receive from Walmart managers

11  in the performance reviews about Paul's job performance.

12  A.   Paul's job performance reviews were always good.  I

13  mean, he always received successfully completed each task

14  that he was required to do.  I think I only -- in the

15  entire time that he had his reviews, I think I only saw an

16  item mentioned his attendance on one progress report.

17  Other than that, he had completely I think marvelous input

18  from his supervisors.

19  Q.   I'll ask for what's been admitted into evidence as

20  Plaintiff's Exhibit 9.  This is a 2006 evaluation, so this

21  would be the first evaluation meeting that you had.  Does

22  that sound right to you, Mr. Coppernoll?

23  A.   Yes, I think so.

24  Q.   And if we're looking down this column, I see for the

25  *Meets Expectations*, every check is in the *Meets*

1-P-128

```
 1   Expectations column, right?
 2   A.    Correct.
 3   Q.    And I'll ask to scroll down to "Attendance and
 4   punctuality."  I see how many days absent this year.  Do
 5   you see the zero?
 6   A.    Zero.
 7   Q.    Okay.  Do you see how many days tardy this year?
 8   A.    Zero.
 9   Q.    Now, I want to ask about I see some "NAs" in this
10   third section.  Can we blow that up, please?
11        "Helps keep restroom, vestibule, and trash cans
12   clean," "NA."  Mr. Coppernoll, do you know what that
13   means?
14   A.    I don't, because when he needs to, he did pull the
15   trash cans.  But as far as keeping the rest room clean and
16   I'm not sure what "vestibule" is.
17   Q.    And then if we -- the next "NA" is next to "Helps
18   keep fixture room organized."  Was Mr. Reina ever asked to
19   keep the fixture room organized?
20   A.    No.  I don't even know what that is.
21   Q.    And we'll scroll down to "Properly uses all ladders."
22   Did you -- did Mr. Reina ever use a ladder?
23   A.    Never.
24   Q.    Were you ever asked to use a ladder?
25   A.    No.
```

MATTHEW COPPERNOLL - DIRECT

1-P-129

```
 1   Q.   Okay.  And when we turn the page and look at
 2   Strengths, I see "Paul is a good worker.  He consistently
 3   stays productive and keeps up on adequate supply of
 4   carts."
 5        And then under for Areas For Improvement, "Look for
 6   carts throughout the store as well as outside.  Empty
 7   carts with trash and maintain a clean outside appearance."
 8        Now, following this performance review, this first
 9   one that you had, did Paul pick up trash in the lot?
10   A.   Yes.
11   Q.   Did he do anything to maintain a clean outside
12   appearance?
13   A.   I'm assuming they mean outside the building.  Yeah, I
14   mean, picking up the trash I think is probably the main
15   thing where he contributed in that area.
16   Q.   All right.  And when we scroll up we see the main
17   general rating for this performance is Meets Expectations,
18   right --
19   A.   Yeah.
20   Q.   -- that's what's indicated?
21   A.   Right.
22   Q.   All right.  And I'd like to go now to 10.
23        THE COURT:  Before you move on, we're right at
24   5:30 now, 5:31 in fact.  So how much longer do you have on
25   the performance evaluations?
```

MATTHEW COPPERNOLL - DIRECT

1          MS. VANCE:  I had two more, Your Honor, so that

2   would be five minutes, but then I do have more.

3          THE COURT:  Why don't we just call it a night

4   here.

5          MS. VANCE:  Yes, Your Honor.

6          THE COURT:  Finish up this document and we'll

7   pick up with the rest of the performance evaluations in

8   the morning.

9      So with that, we'll excuse you.  Remember not to talk

10  about the case or do any research.  And we will see you at

11  nine o'clock tomorrow morning.

12     (Jury out at 5:32 p.m.)

13         THE COURT:  Thank you, Mr. Coppernoll.  You can

14  step down.  Is there anything that we need to address

15  either tonight or tomorrow morning before we begin trial?

16         MS. VASICHEK:  I anticipate there's going to be

17  some objections to documents that the defendants may use

18  to cross-examine one of the witnesses.

19         THE COURT:  Okay.

20         MS. VASICHEK:  And Ms. Vance is going to handle

21  that.

22         THE COURT:  Okay.  Should we try to address it

23  right now or should we do it tomorrow morning?

24         MR. HARLAN:  What are you referring to?

25         MS. VASICHEK:  The medical records, some of the

1 Arc records, risk assessments, those forms.  We're going

2 to be calling Matt Matheny tomorrow.

3          MR. HARLAN:  Okay.  Yeah.  They're business

4 records and they've been certified.  I mean, our position

5 is we ought to be able to use them.  First of all, I think

6 in his deposition he certified the records as business

7 records.  And then we have a --

8          THE COURT:  Move a little closer.

9          MR. HARLAN:  I'm sorry, Your Honor.  I don't know

10 what the basis of the objection is.  I mean, I think they

11 are admissible business records.

12          THE COURT:  Why don't you tell me what the

13 exhibits are that we're dealing with here.

14          MS. VANCE:  Your Honor, I'll direct your

15 attention to Docket 134 for plaintiff's objections.  And

16 the -- starting with -- and then we also did update our

17 objections and I don't have that docket number offhand.

18          THE COURT:  Okay.  So these are --

19          MS. VANCE:  572 -- 572 through 577, we expect

20 that the defendant -- that Walmart would seek to be using

21 these on cross.  And we have, you know, objections on

22 relevance and prejudice.  Some of these documents are

23 remote in time and they are not probative of job

24 performance at Walmart.  They're psychological evaluations

25 and home assessments that also contain prejudicial

 1   information.

 2          THE COURT:  All right.  And so 572 through 577,

 3   so these are -- it looks like 572 through 574 are all

 4   Medicaid disability determinations.  Is that right?

 5          MS. VANCE:  They're redeterminations for

 6   eligibility for the Medicaid Waiver, yes.

 7          THE COURT:  Okay.

 8          MS. VANCE:  And that is the funding stream for

 9   the job coaches.  You know, the types of concerns we have

10   are, you know, some of the tools that are required by the

11   state for determining reeligibility are really kind of

12   blunt instruments that have computer-generated scores.

13   And if your score is enough, you qualify for

14   recertification -- for eligibility, you know, continued

15   eligibility.

16          THE COURT:  Sure.

17          MS. VANCE:  And I think that they're not going to

18   be probative of job performance at Walmart.

19          THE COURT:  All right.  So I'm looking at 572,

20   okay, and so it has the assessment here that is -- there's

21   some scores for tests from some assessment tool, I assume,

22   that I don't know if they're going to be explained.  But

23   then there is basically what falls under the heading of

24   *Diagnosis* and *Severe Mental Retardation, Autism, Hearing*

25   *Impaired, Vision Impaired*.  And so is that the gist of

1  the -- well, then there's the summary documentation.

2         MS. VANCE:  Right.  "Paul functions similar to an

3  individual 2 years 3 months of age," that's an estimate

4  that's spit out by a test, you know, that the social

5  worker takes and a computer generates this age

6  equivalency.  And I think it's prejudicial.  It's not --

7         THE COURT:  Okay.  So when was this done?  This

8  one, and I'm just looking at 572, this is when?

9         MS. VANCE:  This one, when we're talking about

10  572, it's 2015.

11         THE COURT:  Okay.  Let's hear from Walmart.  So

12  what do you want to do with these documents?

13         MR. HARLAN:  So we plan to -- Mr. Matheny, who

14  was I think the representative who worked with the family,

15  will testify as to some of these documents, that he

16  personally was involved with them, and the observations.

17  And certainly the one at 575 is one that he was involved

18  in.

19      These are part of -- and we think there will also be

20  testimony that basically indicates that Ms. Slaght was

21  involved in this process.  And this is part of the

22  documentation being submitted on her and Mr. Reina's

23  behalf to get benefits.

24      And so obviously his capability -- what he can do,

25  what his functioning is -- is central to this case.  The

 1   records are certified.  They're legitimate business

 2   records.

 3            THE COURT:  That's not the issue.  That's not --

 4            MR. HARLAN:  Okay.  That's really part of the

 5   challenge, too.

 6            THE COURT:  Well, it's really relevance is the

 7   gist of what was just presented to me, was that it's a

 8   relevance argument.

 9            MR. HARLAN:  So I think certainly his

10   condition -- they have talked about his level of

11   functioning, they've shown video purporting to show his

12   level of functioning -- I think we ought to be able to

13   challenge that with competing evidence, including evidence

14   that the family was involved in submitting to the state

15   for purposes of getting benefits.  So they could obviously

16   cross-examine the witness or get other witnesses to

17   dispute it, including the guardian.  I think --

18            THE COURT:  And kind of give me the broader

19   perspective about what Mr. Matheny -- is that how you

20   pronounce it?

21            MS. VANCE:  It's *Matheny*, Your Honor.

22            THE COURT:  Mr. Matheny, what is the gist of his

23   testimony going to be?

24            MS. VANCE:  Your Honor, his job was service

25   facilitator, so that he was to have periodic observations,

1  periodic reporting, on the use of the funds.  So he, from

2  time to time, observed the funds are, you know, paying the

3  job coach.  He did go to Walmart to observe, you know, to

4  be able to report there's no abuse of funds, there's --

5  you know, the use of Medicaid money is actually serving

6  its purpose of expanding opportunity, expanding Paul's

7  life into the community.

8          THE COURT:  And so it involved some assessment of

9  Mr. Reina's capacities and the risks that he poses, is

10 that -- because there's a risk assessment sheet somewhere

11 in the information, so that's part of the evaluation that

12 he was doing?

13         MS. VANCE:  That's part of the mandatory

14 reporting to the state for use of the funds.

15         THE COURT:  And so --

16         MS. VANCE:  I mean, Your Honor, we have him also

17 because he has an advocacy role.  The evidence will show

18 and my offer of proof is that he did attempt multiple

19 times to reach out to Walmart to try to have the

20 interactive --

21         THE COURT:  I remember that part.  So he's the

22 person who tried to call and follow up and left messages

23 but never got a call back.  I got that part.

24         MS. VANCE:  So we're going to be asking him about

25 the, you know, the documentation, this kind of

1  documentation part of his job.

2        THE COURT:  Here's the -- some of the assessments

3  here may be less pertinent than our actually seeing

4  Mr. Reina do certain tasks, like putting together the

5  birdhouse with some success or delivering the papers,

6  dealing with his medication.  But it's sort of hard for me

7  to say that these assessments of his capabilities are

8  irrelevant when that's part of the assessment that I think

9  we've got to make.

10     And part of the evidence that you've tried to present

11  so far is that Mr. Reina is capable of doing certain

12  things.  And if we've got evidence that says he has

13  certain limitations, I have a hard time seeing how I can

14  say that's not relevant.

15        MS. VANCE:  Well, I am concerned about the

16  prejudicial effect of, you know, an ICAP score.  I'm in

17  576.  "Paul Reina's living age equivalence is 3 years and

18  0 months."  You know, that's a score.

19        THE COURT:  So where on that document is that?

20        MS. VANCE:  Oh, I'm sorry.  I'm on R-D-002057, is

21  my Bate stamp.

22        THE COURT:  57 is the last of the Bate stamp.

23  All right.

24        MS. VANCE:  2057.  And in the middle section,

25  *Personal Care/Daily Living*.

1        THE COURT:  "Paul's Personal Living age

2   equivalence age is 3 years and 0 months."

3        MS. VANCE:  "Based on his current ICAP score."

4   And the utility of an ICAP score is minimal.  You know, it

5   is kind of just a blunt instrument where you answer 20

6   questions and then a computer -- 20 or so questions and

7   then a computer spits out a score.  I'm concerned that

8   kind of information is prejudicial.  It's not -- it's not

9   a nuanced source of information about functioning.

10        THE COURT:  Go ahead.

11        MR. HARLAN:  Your Honor, these documents have

12   been produced in discovery.  They were covered in

13   Mr. Matheny's deposition.  This is not like a surprise.

14   They knew the records that we were advancing.  If they had

15   concerns that the record --

16        THE COURT:  They're not arguing that there's any

17   sort of surprise.

18        MR. HARLAN:  No, but what they're arguing --

19        THE COURT:  They're just arguing that they're

20   unfairly prejudicial.

21        MR. HARLAN:  No, but they seem to be questioning

22   the legitimacy of the reports, which goes to --

23        THE COURT:  That goes to the unfair part.

24        MR. HARLAN:  No, but I'm saying the way to meet

25   that is they could have mounted their own evidence.  They

1  could have gotten witnesses to undermine it.

2      Now, at the 11th hour, to come in and say, "Hey, the

3  reports shouldn't come in because they're not reliable,"

4  first of all, that's counsel's statement, so that's not

5  evidence.  That's her saying that.

6      We think the evidence is reliable.  They've had

7  notice of it.  And they have certainly put Mr. Reina's

8  capacity and functioning in evidence heavily, starting

9  from the opening statement.

10          THE COURT:  Mm-mm.  I mean, I agree with you.  I

11  do think there are -- I question whether the ICAP score is

12  really relevant.  But at the same time, this is the kind

13  of assessment that Mr. Matheny makes and apparently these

14  are the tools that are provided to him.

15      I will say that my own reaction is I've seen the

16  video.  I haven't seen anything here that I think really

17  makes it plausible that in some meaningful sense he's

18  really the equivalent of a three-year-old.  So I see that

19  that is the score that he gets, but the jury has the

20  fuller picture to evaluate whether this is worth any

21  credence.

22      So I'm having a hard time finding that it's really

23  not relevant.  I think in the full context of your

24  presentation, you can rebut it with cross-examination and

25  say that the ICAP score just isn't really very telling

1    here.  But to take this and say that it's really not

2    relevant, when it's an assessment of his capacity, I'm

3    having a hard time reaching that conclusion.  And so I

4    don't know if it's particularly telling, but I have a hard

5    time saying that it's really unfair to have it before the

6    jury.

7        And it seems to me that you're capable of explaining

8    what the ICAP score.  And if it's a blunt instrument,

9    can't Mr. Matheny speak to that?

10            MS. VASICHEK:  Yes.

11            THE COURT:  So it seems to me that it's just

12   fertile ground for cross-examination.  I don't know that

13   it gets Walmart a whole lot to point to that.  I mean,

14   that's the thing that you've highlighted is the unfairly

15   prejudicial thing.  I don't know that it's terribly

16   compelling that it shows up on this form.  But I have a

17   hard time saying it's really not relevant.  It's an

18   assessment of his abilities that's done for the purpose of

19   the benefits.  I think you can put it in context.

20        So I don't know if there's anything else that you

21   want me to look at, but basically these forms I think are

22   admissible.  I think the business records exception

23   handles the *bona fides* of the report.  But I'm still

24   considering the prejudice that might come from it and I

25   just don't think it's unfairly prejudicial.  It's just an

1   assessment of Mr. Reina's abilities.

2       And it's a mixed bag.  As I look through here, it

3   describes some of the actual things that he does that are

4   not consistent with being a three-year-old.  So there is

5   that sort of assessment and it does strike me as kind of a

6   blunt assessment that's not terribly informative, but I'm

7   not going to say that it's irrelevant.

8           MR. HARLAN:  Can we move admission then at this

9   time to save time?

10          THE COURT:  I'm happy to do that.  I don't know

11  if there's any other ones that you want me to call out

12  specifically.

13          MS. VANCE:  Not on Mr. Matheny.  However, we are

14  also making a timely objection to the medical records that

15  we believe would be under Dr. Deming, the family doctor.

16          THE COURT:  And what exhibit numbers are those?

17  So what we've just been talking about are 572 through 577,

18  which I understand to be reports that Mr. Matheny used for

19  the purpose evaluating the continuation of benefits for

20  Mr. Reina.

21      And based on what I've seen, if you want to point me

22  to anything else, I would find that these are appropriate

23  to use.  They would be admissible and appropriate to use

24  in cross-examination of Mr. Matheny.  So for efficiency

25  purposes, Exhibits 572 through 577 will be admitted unless

1-P-141

1    there is some other one that you want to point me to.

2              MS. VANCE:  All right.  I think there will be

3    further challenges.  I think at this point it's better to

4    wait until the -- closer to the time when we believe the

5    defendant would be calling the witness.

6              THE COURT:  Okay.  All right.  So I'll overrule

7    the plaintiff's objection to 572 to 577 and those will be

8    admitted and you can use them with Mr. Matheny.  Okay.

9    Anything else?

10             MS. VASICHEK:  Not at this time, Your Honor.

11             THE COURT:  Okay.  Should we schedule 8:30 in

12   case there is anything?

13             MS. VASICHEK:  Sounds good.

14             MR. HARLAN:  That's fine, Your Honor.

15             THE COURT:  All right.  So 8:30.  I don't have

16   anything specifically that we'll address, but I'll be

17   available in case something comes up.  And if we can be

18   productive with some time before the jury comes back,

19   we'll use it.  So I'll just check in with you at 8:30.  If

20   there's nothing else, then I'll just go back upstairs and

21   we'll reconvene at nine then.  Okay.  But we'll see you at

22   8:30.

23             MS. VASICHEK:  Thank you.

24         (Adjourned at 5:50 p.m.)

25                              ***

1          I, CHERYL A. SEEMAN, Certified Realtime and Merit

2   Reporter, in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 7th day of October, 2019, before

5   the Honorable James D. Peterson, Chief Judge of the

6   Western District of Wisconsin, in my presence and reduced

7   to writing in accordance with my stenographic notes made

8   at said time and place.

9   Dated this 21st day of October, 2019.

10

11

12

13

14

15                         _____/s/_____

16                         Cheryl A. Seeman, RMR, CRR
                            Federal Court Reporter
17

18

19

20

21

22
    The foregoing certification of this transcript does not
23  apply to any reproduction of the same by any means unless
    under the direct control and/or direction of the
24  certifying reporter.

25