**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

              Plaintiff,

                                        Case No. 3:17-cv-739

v.

WALMART STORES, INC. and
WALMART STORES EAST, LP,

              Defendants.

---

**DEFENDANTS' BRIEF IN OPPOSITION TO THE
EEOC'S MOTION FOR EQUITABLE RELIEF**

---

Respectfully submitted by,

**MWH Law Group LLP**

By: */s/ Warren E. Buliox*

Emery K. Harlan
State Bar No. 1000240
Warren E. Buliox
State Bar No. 1056215
735 N. Water Street, Suite 610
Milwaukee, WI 53202
(414) 436-0353 Phone
(414) 436-0354 Facsimile
emery.harlan@mwhlawgroup.com
warren.buliox@mwhlawgroup.com

**COUNSEL FOR DEFENDANTS WALMART STORES, INC. and
WALMART STORES EAST, LP**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................1

A. IT WOULD NOT BE EQUITABLE TO GRANT THE BACKPAY AWARD THE EEOC SEEKS
BECAUSE MR. REINA FAILED TO MITIGATE HIS DAMAGES AND BECAUSE THE EEOC'S
PROPOSED TIME PERIOD FOR BACKPAY IS NOT CORRECT ...................................1

   1. Plaintiff's Request for Backpay Should Be Denied in its Entirety or Substantially
   Reduced Given Mr. Reina's Failure to Mitigate Damages ...........................................2

   2. The Backpay Period the EEOC Proposes is Too Expansive and Should Be Reduced ..7

   3. Mr. Reina's Monthly Wage Loss Should Be Calculated at $608.92, Less Interim
   Earnings .........................................................................................................9

   4. Mr. Reina's Maximum Backpay Award Should Be $1,807.28 ..................................10

B. THE COURT SHOULD DENY THE EEOC'S PROPOSED FRONT PAY AWARD BECAUSE
MR. REINA FAILED TO ENGAGE IN REASONABLY DILIGENT JOB SEARCH EFFORTS AND
BECAUSE THE PROPOSED AWARD IS TOO SPECULATIVE ...................................10

   1. Mr. Reina's Failure to Use Reasonable Diligence in Searching for Other Suitable
   Work Forecloses Any Entitlement to Front Pay .........................................................11

   2. The EEOC's Request for 10 Years of Front Pay is Highly Speculative and Should Be
   Rejected Consistent with Seventh Circuit Precedent ..................................................12

C. PRE-JUDGMENT INTEREST SHOULD BE REDUCED .........................................15

D. THE CIRCUMSTANCES IN THIS CASE DO NOT WARRANT A TAX CONSEQUENCE/TAX
GROSS-UP AWARD ........................................................................................16

E. THE EEOC'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DENIED AS
UNNECESSARY, IMPERMISSIBLY OVERBROAD AND AS NOT SUPPORTED BY THE TRIAL
RECORD ........................................................................................................17

   1. The EEOC's Request for "Injunctive Relief Relating to Reasonable Accommodations
   of Persons with Developmental Disabilities of Whom May Require a Job Coach" ...20

   2. The EEOC's Request for "Injunctive Relief Relating to Implementation of Walmart's
   Policies" .........................................................................................................23

3.   The EEOC's Request for "Injunctive Relief Requiring Live Training by Persons with the Authority to Make Decisions Relating to Reasonable Accommodations of Persons with Disabilities" .........................................................................................................25

4.   The EEOC's Request for Injunctive Relief "Ordering Reasonable Time Frames, Requiring Periodic Notice of Compliance, and Providing Dispute Resolution Procedures to Enable the Parties to Address Issues without Court Involvement" ......27

**CONCLUSION** ..........................................................................................................................**27**

## INTRODUCTION

Plaintiff's Motion for Equitable Relief should be denied. Paul Reina had ample opportunity to mitigate his damages and find comparable work. He did not do so, and as a result, the EEOC's request for backpay should be denied in its entirety. The backpay period requested by the EEOC is too generous and is not consistent with the trial record and should be reduced. As for front pay, the 10 years sought by the agency is too speculative and should be denied. If not denied, it should be reduced so as to avoid the inequities of a windfall to Mr. Reina. For pre-judgment interest, while courts in the Seventh Circuit ordinarily order as much as a form of relief in employment cases, the requested time period for this interest is too expansive and should be reduced. In addition, the EEOC's request for a tax-gross up/"tax consequences" award should be denied because the circumstances in this case are far from the extreme circumstances in other cases in which tax gross-ups have been awarded. Finally, the injunctive relief the EEOC seeks is gratuitous, overly broad, unnecessary and not reasonably measured to prevent discrimination. The agency's requests here should be rejected as well.

### ARGUMENT

### A. IT WOULD NOT BE EQUITABLE TO GRANT THE BACKPAY AWARD THE EEOC SEEKS BECAUSE MR. REINA FAILED TO MITIGATE HIS DAMAGES AND BECAUSE THE EEOC'S PROPOSED TIME PERIOD FOR BACKPAY IS NOT CORRECT

District courts have discretion to fashion backpay awards to make victims of unlawful employment discrimination whole. *See e.g. EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997). The Seventh Circuit has instructed that a "plaintiff has the burden of proving the damages caused [to] her [and that backpay] damages are determined by 'measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant.' " *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir. 1985) (*quoting*

*Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 786 (7th Cir. 1979)). Interim earnings, such as wages from interim employment or compensation from other activities, operate to reduce backpay awards. *See e.g. Chesser v. State of Ill.*, 895 F.2d 330, 337 (7th Cir. 1990).

### 1. Plaintiff's Request for Backpay Should Be Denied in its Entirety or Substantially Reduced Given Mr. Reina's Failure to Mitigate Damages

Walmart disputes the correctness of the jury's verdict and will ask the Court to vacate the same in subsequent filings. If the jury's verdict stands, a full backpay award is not warranted because Mr. Reina failed to mitigate his damages.

A discharged associate[1] has a duty to mitigate damages by using reasonable diligence in finding other suitable employment and, if he/she fails in this regard, faces a reduction in or denial of backpay. *See* 42 U.S.C. 2000e-5(g)(1); *see also e.g.  Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1427-28 (7th Cir. 1986) (reducing the maximum backpay period from five years to three years given plaintiff's failure to use reasonable diligence in finding new employment). Indeed, a discharged associate cannot simply stand on the sidelines, not diligently search for suitable work and expect to be made whole by a judgment at law. *See Hunter*, 797 F.2d at 1428.

Although the duty to mitigate rests with a discharged associate, it is the employer's burden to establish that its former associate failed to mitigate his/her damages. *See Hutchison v. Amateur Elec. Supply,* 42 F.3d 1037, 1044 (7th Cir. 1994). To meet this burden, an employer "must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Id.*

In considering this issue, the Court may take judicial notice of publicly available labor statistics. *See e.g. Tuttle v. Educ. Credit Mgmt. Corp.*, 600 B.R. 783, 806 (Bankr. E.D. Wis. 2019)

---

[1] Walmart refers to its employees as "associates."

(relying on data from the Bureau of Labor Statistics in finding that in 2018 Wisconsin employers were looking for workers and noting that "[b]eyond Mr. Tuttle's lack of evidence about his job search, the Court can take judicial notice of publicly available data, such as labor statistics . . ."); *citing U.S. v. United Broth. of Carpenters and Joiners of America, Local 169*, 457 F.2d 210 (7th Cir. 1972) (for taking judicial notice of statistical data from the Bureau of Census) and *Jackson v. Nassau County Civil Serv. Comm'n*, 424 F. Supp. 1162, 1166, n.6 (E.D.N.Y. 1976) (for taking judicial notice of local job market conditions); *also see Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (taking judicial notice for information gathered from government agency website); *Trundle v. Astrue*, 2010 U.S. Dist. LEXIS 138322, at *31, n.10 (E.D. Cal. Dec. 20, 2010) (taking judicial notice of Department of Labor statistics) (citing cases). And, in the specific context of a failure to mitigate analysis, courts have considered data on the reasonable likelihood of finding comparable work issue. *See e.g. Allen v. Int'l Truck & Engine Corp.*, 2017 U.S. Dist. LEXIS 58781 at *19 (S.D. Ind. Apr. 18, 2017) (holding that "based on a rational extrapolation of the data, there is a reasonable likelihood that he might have found comparable work if he had exercised reasonable diligence" and reducing backpay given the lack of mitigation efforts).[2]

Here, Mr. Reina last reported to work at Walmart over 4½ years ago and he has yet to secure comparable employment despite having worked 16 plus years at Walmart. The failure to mitigate his damages is a reflection of a lack of diligence in seeking new work. At trial, Roseann Slaght (Mr. Reina's legal guardian and occasional job coach), Margaret Polizzi (an occasional job coach for Mr. Reina) and Matt Coppernoll (Mr. Reina's primary job coach) testified about efforts to find other work for Mr. Reina after Walmart. Ms. Slaght testified that Mr. Reina applied to "a

---

[2] To the extent the EEOC objects to the use of information outside the trial record, the EEOC references outside material in connection with their Motion for Equitable Relief, such as but not limited to, a new declaration from Ms. Slaght, a Tax Table from the IRS, a news article, blank IRS 1040 forms, and a declaration from an attorney for a trust to be established for Mr. Reina.

3

lot of positions" but noted that she never took him to look for jobs and deferred to Ms. Polizzi and Mr. Coppernoll, as they were the ones who assisted Mr. Reina in applying for jobs. (ECF No. 205 at pp. 112-14.)  Ms. Polizzi testified that she tried to secure employment for Mr. Reina at two places – Piggy Wiggly and Woodman's – and that she "thinks" that Mr. Coppernoll tried other stores. (ECF No. 204 at pp. 57-58.) Mr. Coppernoll, in turn, testified that they went to "Piggly Wiggly, Woodman's grocery store, the Salvation Army, Goodwill, and a number of the Dollar Stores" in search for new work for Mr. Reina and that, in total, they likely went to eight or ten places. (ECF No. 202 at pp. 75-76.) At most, then, Mr. Reina applied to a total of twelve positions within a four-plus year period (ten with Mr. Coppernoll and two with Ms. Polizzi). That is an average of approximately **0.0576** job applications for per week, or **0.25** job applications per month.[3] This is dismal and certainly not consistent with a reasonably diligent job search effort. *Hunter*, 797 F.2d at 1427-28 (finding that applying to 16 employers (other than the four temporary jobs the plaintiff secured) over a five year period "not good enough" for mitigation purposes).

Given this, the question becomes whether there was a reasonable chance Mr. Reina could have secured suitable employment had he, with reasonable diligence, searched for other jobs. *Hutchison,* 42 F.3d at 1044.In light of the availability of jobs in Mr. Reina's area, the answer is yes. (Declaration of Warren E. Buliox, at Exs. A-F.)

Mr. Coppernoll testified that he and Mr. Reina searched for jobs in the Beloit and South Beloit area after Walmart, and that employers were placing ads for jobs after June of 2015. (ECF No. 202 at pp. 34 and 76). Based on job data from the Bureau of Labor Statistics, there were 2,240 jobs as of May 2016 in the Beloit/Janesville area alone for Janitors and Cleaners, Groundskeeping

---

[3] Walmart's calculation is based on the start date for the EEOC's proposed back pay period (July 9, 2015) to the first day of trial (October 7, 2019).

Workers and Stock Clerks, jobs Mr. Reina could purportedly perform given trial testimony from job coaches about the work he performed at Walmart. (Buliox Decl. at Ex. A.)[4]

If just Janitors and Cleaners are used, there were 1000 positions as of May 2016, 930 jobs as of May 2017 and 960 positions as of May 2018 for the Beloit/Janesville area. Yet, Mr. Reina applied to just 12 jobs, which means that *he applied to less than 1% of the jobs* in his market for which he was arguably qualified for (according to EEOC witnesses). (*Id*. at Exs. A, C and E; *see also e.g.* ECF No. 202 at pp. 19, 48-49; ECF No. 204 at pp. 45-46, 48-49.) This percentage goes down even further if additional jobs are included in the equation (i.e. Groundskeeping Workers and Stock Clerks) and if the number of jobs in the Rockford area (which includes South Beloit) is included. (Buliox Decl. at Exs. B, D and F.)

Given the voluminous number of suitable jobs in Mr. Reina's area, Walmart has met its burden of showing that there was a reasonable likelihood Mr. Reina would have found comparable work had he engaged in diligent job search efforts. *See Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1257 (N.D. Ill. 2015) (holding that the employer "could have introduced Bureau of Labor Statistics studies for manufacturing jobs in Illinois for the relevant time period" to meet its burden of showing that there was a reasonable chance the plaintiff could have found comparable work). Mr. Reina did not engage in reasonably diligent job search efforts, failed to mitigate his damages and is not entitled to backpay. *See e.g. Williams v. Imperial Eastman Acquisition Corp.*, 994 F. Supp. 926, 932 (N.D. Ill. 1998) (denying back pay upon a failure to mitigate); *Oden v. S. R. Co.*,

---

[4] "Janitors and Cleaners, Except Maids and Housekeeping Cleaners" are defined by the US Bureau of Labor Statistics as persons who keep buildings in clean and orderly condition. (Buliox Decl. at Ex. G.) "Landscaping and Groundskeeping Workers" are defined as persons who landscape or maintain property grounds using hand and power tools or equipment. (*Id*. at Ex. H.) "Stock Clerks and Order Fillers" are defined as persons who receive, store and issue sales floor merchandise. (*Id*. at Ex. I.) The trial record is that Mr. Reina, with his job coach, maintained Walmart's grounds/parking lot, kept Walmart's parking lot in clean and orderly condition by collecting shopping carts (ECF No. 202 at pp. 48-49; ECF No. 204 at pp. 45-46) and removing debris (ECF No. 202 at p. 19; ECF No. 204 at p. 45), and handled sales floor merchandise by helping customers transport the same from shopping carts to customer vehicles (ECF No. 202 at p. 49; ECF No. 204 at pp. 48-49).

1984 U.S. Dist. LEXIS 15358, at *11-12 (N.D. Ga. June 29, 1984) (referencing the "many hundreds" of comparable jobs detailed in Area Wage Surveys prepared by the Department of Labor, Bureau of Labor Statistics and holding that because plaintiff failed to attempt to secure a replacement position he failed to mitigate damages and was not entitled to backpay).

While Mr. Reina did engage in/find some minimal work wholly unrelated to any of his job duties at Walmart (building birdhouses and picking up a paper route for $100 per month – ECF No. 202 at p. 34; ECF No. 205 at p. 59), this is not enough to satisfy his duty to mitigate. *See e.g. Hunter*, 797 F.2d at 1427-28 (holding that four temporary or seasonal jobs over a five-year period were insufficient to conclude that the plaintiff used reasonable diligence in finding new work); *Imperial*, 994 F. Supp. at 932 (noting that "although a decision to enter self-employment can satisfy a duty to mitigate, the self-employment must be a reasonable alternative to finding other comparable work" and holding that the plaintiff was not entitled to damages for backpay or front pay because engaging in work wholly unrelated to his lost job or the skills used in his last job was not a "reasonable alternative") (internal quotation and citation omitted); *Hansard v. Pepsi-Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1468 (5th Cir. 1989) (while self-employment alone does not indicate a lack of reasonable diligence in searching for other work, merely engaging in a part-time enterprise while being fully capable of continuing a job search does).

Mr. Reina had over four years to find comparable employment. He did not engage in reasonably meaningful and diligent job search efforts despite the hundreds of jobs in his area and has failed to mitigate his damages. As such, the backpay award the EEOC seeks should be denied in its entirety.

In the alternative, any backpay award to Mr. Reina should be significantly reduced. The EEOC asserts in its Brief in support of its Motion for Equitable Relief that: "***After these efforts***

6

*were unsuccessful* [referring to Mr. Reina's job search efforts], Reina began work as an independent contractor delivering newspapers door-to-door." (ECF No. 214 at p. 4.) (Emphasis added.)  In other words, Mr. Reina worked delivering papers *after exhausting his job search efforts*, meaning his job search efforts ended upon starting work as a newspaper delivery person.  Any backpay period should not include periods in which he was not searching for work. *See Hunter,* 797 F.2d at 1427-28; *see also Allen*, 2017 U.S. Dist. LEXIS 58781 at *19 and *24 (deducting average salaries for 2005 ($50,560) and 2006 ($49,830) in light of failures to use reasonable diligence in attempting to find employment during those periods).

　　According to material offered by the EEOC in support of the instant motion, Mr. Reina signed a contract to deliver newspapers on June 24, 2016. This is consistent with trial testimony that Mr. Reina started his paper route about a year after he stopped reporting to work at Walmart. (ECF No. 202 at pp. 34-35.) Using the EEOC's starting point for backpay (July 9, 2015), this results in a backpay period that runs for a little over eleven months, from July 9, 2015 to June 24, 2016. If, however, the more appropriate start date for backpay is applied (explained below), Mr. Reina's backpay period is and should be approximately **three months** – from March 18, 2016 (when Ms. Slaght was allegedly informed that Mr. Reina would not be coming back to work at Walmart) to June 24, 2016.

### 2.  The Backpay Period the EEOC Proposes is Too Expansive and Should Be Reduced

　　To the extent the Court finds that Mr. Reina is entitled to an award of backpay, the backpay period should run from March 18, 2016, at the earliest. While the EEOC proposes that the period begin on July 9, 2015, this is not consistent with the record. Generally, backpay should begin on the date of the adverse employment action. Here, the jury found that Walmart "violate[d] the ADA by *ending* Paul Reina's *employment* because of his disability."  (ECF No. 197 at p. 1.) (Emphasis

added.) It is entirely unclear as to what the jury considered Mr. Reina's end-date at Walmart to be, as there is no reference on the Special Verdict Form regarding an end-date, or even a specific event triggering the end of Mr. Reina's employment (i.e. being taken off the schedule, being suspended at some point, being placed on leave at some point, being denied the opportunity to come back to work after the parties completed exchanges over potential accommodations, etc.)

The EEOC's proposal of July 9, 2015 as the start date for a backpay period suggests that the agency interprets that day as the day Walmart ended Mr. Reina's employment. It argues that July 9, 2015 is an appropriate starting point because it is the day Ms. Slaght returned the medical questionnaire form to Walmart and because it was after the two weeks of paid leave Walmart provided to Mr. Reina. (ECF No. 214 at p. 2.) But, there is no evidence in the trial record to suggest that Mr. Reina's employment ended on that date. Rather, Ms. Slaght testified as follows in discussing what happened when she handed the medical questionnaire form to Store Manager Jeff Scheuerell:

> Q.   And what did you do with that form?
>
> A.   I handed that form directly to Jeff and said, "Here's what you're looking for. When can we expect to see Paul on the schedule?"
>
> Q.   And what did he say?
>
> A.   "Don't call me; I'll call you."
>      And I said, "Okay, I understand you need a little time, but this really feels like you're trying to get rid of my kid."
>      And he said, "No, I'm not trying to get rid of your kid."

(ECF No. 205 at pp. 43-44.) Accordingly, at the time Ms. Slaght handed Mr. Scheuerell the questionnaire form Mr. Reina had not been terminated. Moreover, on or about March 25, 2016, Walmart's Accommodation Service Center sent Mr. Reina a letter requesting additional information to explore possible reasonable accommodations which would allow Mr. Reina to

perform the duties of his job. (*See* Tr. Ex. 27.) His employment clearly had not been terminated at that point either.

However, Ms. Slaght alleged during trial that, in a March 18, 2016 meeting with Walmart, a representative of Walmart told her that the store "don't want him back."  (ECF No. 205 at pp. 50-52.)  While Walmart disputed this during trial and maintains that Mr. Reina was not terminated at or around this time, for backpay purposes, it proposes as a compromise that Mr. Reina's backpay period start on March 18, 2016, when Ms. Slaght was allegedly told Mr. Reina was not welcomed back. Given the Parties' conflicting positions about when Mr. Reina's employment ended and the complete lack of clarity in the jury's verdict as to when it considered Mr. Reina's employment "end[ed]," this is a fair compromise.

### 3. Mr. Reina's Monthly Wage Loss Should Be Calculated at $608.92, Less Interim Earnings

The EEOC calculates Mr. Reina's monthly wage loss, before making deductions for interim earnings, at $815.17 per month. The agency's estimates are based entirely on 2014, and do not include the six months in 2015 in which Mr. Reina reported to work at Walmart. (Vance Decl. (ECF No. 216-3) at Ex. 3.) It would be inequitable to use the EEOC's monthly wage loss number to calculate backpay.

Instead, the Court should use the average of Mr. Reina's actual, regular biweekly earnings for 2015. This is equitable because it includes over six months of pay and reflects Mr. Reina's earnings during the last year he reported to work at Walmart, which more fairly captures actual earning patterns/hours worked and wages. *See Gracia v.*, 130 F. Supp. 3d at 1258 (holding that while plaintiff preferred 2007 for backpay calculations "because she made more that year," 2008 was the appropriate year to use because it was "a year that better reflect[ed] [plaintiff's] projected work hours and pay going forward than a previous year").  Based on these actual earnings, which

9

are taken from his "Earnings History Report" at Walmart, Mr. Reina made an average of $281.04 every two weeks in regular pay. (Buliox Decl. at Ex. J.)  Multiplying this by 26 pay periods, Mr. Reina would have had annual earnings of $7,307.04. (*Id.*)

Taking Mr. Reina's 2015 projected annual earnings and dividing that by 12 results in an estimated monthly average wage of $608.92. Walmart asks that the Court use this monthly wage, less interim earnings, to calculate any backpay award.

4. **Mr. Reina's Maximum Backpay Award Should Be $1,807.28.**

In summary, the Court should deny in its entirety Plaintiff's request for backpay given Mr. Reina's failures to engage in reasonably diligent job search efforts and mitigate his damages. If it does not, the Court should at the very least limit the backpay period to start March 18, 2016 (when Mr. Reina's mother states that she was informed Mr. Reina would no longer work for Walmart) and end June 24, 2016 (when Mr. Reina began work as a newspaper delivery person and stopped searching for other suitable work). This results in 3 months and 6 days (excluding the end date) of backpay, which equals $1,967.28 before deductions for interim earnings are made when using an estimated monthly average wage of $608.92. Subtracting Mr. Reina's interim earnings during this period ($160.00) results in a final backpay amount of: $1,807.28.[5]

**B. THE COURT SHOULD DENY THE EEOC'S PROPOSED FRONT PAY AWARD BECAUSE MR. REINA FAILED TO ENGAGE IN REASONABLY DILIGENT JOB SEARCH EFFORTS AND BECAUSE THE PROPOSED AWARD IS TOO SPECULATIVE**

Walmart agrees with the EEOC that reinstatement is not an option in this case and that the Court may therefore consider front pay as an equitable remedy. *See e.g. Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951-52 (7th Cir. 1998). The EEOC seeks 10 years in front pay but front pay is not appropriate at all in this case and, in any event, should be substantially reduced to offset the

---

[5] Walmart does not object to the EEOC's reporting of Mr. Reina's interim income during this period, as reflected in Exhibit 5 of the Declaration of Carrie Vance. (ECF No. 216-5).

speculative nature of the EEOC's decade-long request and to prevent an inequitable windfall to Mr. Reina.

Front pay awards "must be grounded in available facts, acceptable to a reasonable person and not highly speculative." *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994) (citations omitted). Further, front pay is only appropriate for "a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Ward v. Tipton County Sheriff Dep't*, 937 F. Supp. 791, 796 (S.D. Ind. 1996) (quoted in *Pharmacia*, 137 F.3d at 954). Accordingly, front pay is often limited in duration. *See Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 832 (N.D. Ill. 2015).

### 1. Mr. Reina's Failure to Use Reasonable Diligence in Searching for Other Suitable Work Forecloses Any Entitlement to Front Pay

In this case, Mr. Reina is not entitled to front pay at all. He has had years to mitigate his damages and find comparable employment and has not done so. The Seventh Circuit has instructed that "[f]ront pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination." *Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004). When, as here, an associate has years to find a job and stops looking for work or otherwise opts to forgo reasonably diligent job search efforts, front pay is denied by courts. For instance, in *Stragapede,* a case out of the Northern District of Illinois, the plaintiff (who was 52 years old) asked for a front pay award through the day he would have retired (at either age 60 or 65). *Stragapede*, 125 F. Supp. 3d at 833. However, he had been out of work for nearly five years and had not been diligent in his job search efforts for several of those years despite being capable of working. Under these circumstances, the plaintiff's claim for front pay was denied. *Id*. at 834; *see also Payne v. Security Saving and Loan Assoc.*, 924 F.2d 109, 110-111 (7th Cir. 1991) (holding that a plaintiff who was terminated in 1985 was not entitled to several years of backpay or any

11

front pay because he "sent out 'substantially all' of his resumes by the end of May 1986, and … by the beginning of 1987, his job search had slowed to a trickle"); *Imperial*, 994 F. Supp. at 932 (plaintiffs were not entitled to backpay or front pay when they made next to no serious efforts to find comparable employment after their termination).

 According to Ms. Slaght, Mr. Reina was "capable" of doing "a lot of things [jobs]." (ECF No. 205 at p. 114). Yet, he stopped looking for comparable work about a year after his last day at work at Walmart. Awarding Mr. Reina front pay under such circumstance would be rewarding his years of lackluster or nonexistent job search efforts with a windfall of cash, which would be inequitable. Like the plaintiffs in the cases referenced above, Mr. Reina is not entitled to front pay.

### 2. The EEOC's Request for 10 Years of Front Pay is Highly Speculative and Should Be Rejected Consistent with Seventh Circuit Precedent

Should the Court determine that some front pay award is appropriate, that award should be limited and much lower than the wholly speculative and unsupported 10 years of front pay the EEOC requests. Here, citing *Bruso v. United Airlines, Inc.,* 239 F.3d 848, 862 (7th Cir. 2001), the only argument the agency advances in support of its request for 10 years of front pay is that Mr. Reina purportedly "expected" to continue working for Walmart for 10 years. (ECF No. 214 at p. 8.) As support for the requested award, the agency argues that "his future was mapped out for him" and that "[t]he plan was for Reina to buy a house" with money earned working at Walmart. There are several flaws with the EEOC's analysis.

First, a front pay award "cannot be based simply on a plaintiff's own stated intentions with regard to how long he or she would have worked." *Ward*, 937 F. Supp. at 797.

Second, the Seventh Circuit has expressly instructed that front pay is "not intended to insure a plaintiff's future financial success." *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992).

Third, whether or not a plaintiff provides information on how long he or she expects to work in a position is just one factor a court considers. As the Seventh Circuit has held, front pay, if any, is only awarded for such time as is reasonably necessary to find comparable work using reasonable diligence. *See e.g. Biondo*, 382 F.3d at 691 (centering the front pay analysis on how long a reasonable person needs to find an equivalent position); *Hutchison*, 42 F.3d at 1045 (denial of front pay reasonable when the jury "may reasonably have set a date between termination and judgment by which [the employee], using reasonable diligence, should have found 'comparable' employment"); *see also Ward*, 937 F. Supp. at 799 ("Front pay is to be awarded, if at all, for a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment.") (citation omitted). The EEOC's request for 10 years of front pay contains no analysis whatsoever on how long it would take Mr. Reina to find suitable work using reasonable diligence. *See Ward*, 937 F. Supp. at 799 (rejecting plaintiff's request for 10 years of front pay as unreasonable, noting that she "offered no evidence to support a finding that she will be unable to obtain comparable employment during that period of time, which is the standard applied in this Circuit").

Finally, 10 years of front pay is a very long period of time and by virtue of the lengthy time period the demand becomes highly speculative. *See e.g. McKnight*, 973 F.2d at 1372 ("The longer a proposed front pay period, the more speculative the damages become.") (citation omitted); *Phillips v. City of S. Bend*, 2018 U.S. Dist. LEXIS 74203 at *30 (N.D. Ind. May 1, 2018) ("[T]he longer the award the more speculative it becomes.") (citation omitted).

Given Mr. Reina's purported qualifications and abilities (especially with the use of a "job coach"), there is no plausible scenario in which he does not find suitable work, using reasonable diligence, in the next year or two, let alone 10 years. Unless, of course, <u>every single</u> prospective

employer he ever applies to discriminates against him on the basis of his disabilities. To assume, though, that he cannot secure comparable employment over the course of 10 years because every employer would discriminate against him is grossly speculative.  Front pay "must be based on events more likely than not to occur, and the existence of future uncertainties have led courts to act cautiously when considering awards of front pay for lengthy periods." *Williams v. Pharmacia Opthalmics, Inc.*, 926 F. Supp. 791, 796 (N.D. Ind. 1996), *aff'd*, 137 F.3d 944 (7th Cir. 1998).

In light of all of the above, Walmart proposes that front pay, if awarded at all, be limited to one year. This would have the effect of affording Mr. Reina a total of at least five years (four-plus years pre-judgment and one-year post-judgement) to find comparable work, which is a generous amount of time (given his purported capabilities) to find other work if reasonable diligence is used in searching for work. And, given the factual circumstances at hand, such a reduction in the requested front pay relief would be consistent with cases in this Circuit. *See e.g. Barry v. Ill. Dep't of Corr.*, 2018 U.S. Dist. LEXIS 193810, at *8 (C.D. Ill. Nov. 14, 2018) (noting that the plaintiff had "already had a substantial amount of time to find comparable employment" in light of her discharge and reducing the front pay requested from four years to two years); *Phillips*, 2018 U.S. Dist. LEXIS 74203, at *30 (N.D. Ind. May 1, 2018) (holding that awarding front pay for 14 years "would be highly speculative and could not possibly account for all of the future uncertainties," and that an "award for three years properly balances the need to compensate [plaintiff] with the difficulty inherent in predicting the future"); *Arroyo v. Volvo Grp. N. Am., LLC*, 2017 U.S. Dist. LEXIS 108507, *39–41 (N.D. Ill. July 13, 2017) (reducing an award of front pay from four years to two years after rejecting the plaintiff's assertion that she would not obtain the same or equivalent employment unless and until she pursued and received a four-year college degree).

14

Using a monthly wage loss of $608.92 (see above) minus $105.73 for interim earnings (see Vance Decl., Ex. 5), Mr. Reina's yearly wage for one year is $6,038.40. When the EEOC's proposed discount rate is applied (3.892%), the result is a front pay award of $5,924.

## C.  PRE-JUDGMENT INTEREST SHOULD BE REDUCED

While pre-judgment interest is a normal part of an award in federal cases, district courts have discretion in calculating such awards (i.e. compounding interest monthly or annually) and determining the period for over which pre-judgment interest should be applied. *See e.g. Am. Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys.,* 325 F.3d 924, 937 (7th Cir. 2003) (noting that as a general rule the decision of whether to use compound or simple interest is within the discretion of the court); *Martyne v. Parkside Med. Servs.*, 2000 U.S. Dist. LEXIS 8019, at *36-37 (N.D. Ill. June 7, 2000) (reducing the pre-judgment interest period). In *Martyne*, the district court declined to award interest for the period of time prior to the filing of suit, noting:

> The Court agrees with Martyne that some amount of prejudgment interest is appropriate.
>
> However, the four year delay that occurred prior to the filing of Martyne's complaint in this case is completely unattributable to Parkside. Martyne filed her administrative charge of discrimination in May 1993. She did not file this lawsuit until September 1997. Though the lawsuit was timely filed within 90 days after Martyne received a "right to sue" letter from the EEOC, she could have requested a right to sue letter at any time after 180 days had passed from the filing of her charge. See 29 C.F.R. § 1601.28(a)(1). The Court therefore will not award interest for the period of time prior to the filing of this suit.

*Martyne*, 2000 U.S. Dist. LEXIS 8019 at *36-37.

Here, Mr. Reina's EEOC Charge of Discrimination was filed on September 20, 2015, but this lawsuit was not commenced until September 26, 2017. (Tr. Ex. 47; ECF No. 1.) The two-year delay in the filing of a lawsuit cannot be attributable to Walmart and, in the interest of equity, Walmart requests that any pre-judgment interest awarded in this case exclude the period of time prior to the filing of this lawsuit.

15

### D. THE CIRCUMSTANCES IN THIS CASE DO NOT WARRANT A TAX CONSEQUENCES/TAX GROSS-UP AWARD

Awarding relief to offset the increased tax burden of a lump sum wage payment, sometimes referred to as a tax gross-up, has only been recognized as an appropriate remedy in some employment discrimination cases in a few circuits. From Walmart's review, the Seventh Circuit (and a few other courts) have affirmed tax gross-up relief, but others have not. *EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898 (7th Cir. 2015); *Eshelman v. Agere Sys., Inc.*, 554 F. 3d. 426, 443 (3d Cir. 2009); *Sears v. Atchison, Topeka & Santa Fe Railways*, 749 F.2d 1451, 1456 (10th Cir. 1984) (tax gross-gross warranted in light of "special circumstances"); *Dashnaw v. Pena*, 12 F.3d 1112, 1116 (D.C. Cir. 1994) (in an age discrimination case, rejecting a tax gross-up award). There are no special circumstances in this case warranting a tax gross-up.

Notably, in jurisdictions in which tax gross-ups have been awarded and upheld, circuits have noted that litigants are not presumptively entitled to such awards. *See e.g. Eshelman., Inc.*, 554 F. 3d. at 443; *Sears*, 749 F.2d at 1456. In joining the Third and Tenth Circuits in holding that a tax burden offset/gross-up may be an appropriate form of relief for a Title VII plaintiff, the Seventh Circuit in *Northern Star* cited to *Sears* and *Eshelman* as support. *Northern Star Hospitality, Inc.*, 777 F.3d at 904-05.  In *Sears*, the Tenth Circuit affirmed a tax gross-up but cautioned that a "tax component may not be appropriate in a typical Title VII case." *Sears*, 749 F.2d at 1456. Indeed, in that case, the Tenth Circuit noted special circumstances warranting a tax component award, including the protracted nature of the litigation and the fact that the backpay awarded spanned 17 years and would have likely placed each plaintiff into the highest tax bracket. *Id*.

There are no such special circumstances in this case. If the Court declines to award or limits backpay as argued above, Mr. Reina would not suffer a tangible tax consequence at all. Even if

the Court grants the relief the EEOC seeks, however, Mr. Reina would not be placed in the highest tax bracket. Further, the 2-plus years of litigation in this case does not compare to the years of litigation in *Sears*. The circumstances attendant in this case are not special or extreme, and do not warrant an additional award for tax consequences.

At any rate, and quite significantly, the EEOC uses both its proposals for backpay <u>and</u> front pay (over $100,000 in total) in calculating a tax consequence offset/gross-up. However, the Seventh Circuit decision in *Northern Star* allowing for tax component awards (upon which the EEOC solely relies in its request for a tax component award) only applies to lump-sum backpay awards. At the very least, then, the Court should only apply a tax gross-up to whatever backpay amount, if any, it awards.

### E.  THE EEOC'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DENIED AS UNNECESSARY, IMPERMISSIBLY OVERBROAD AND AS NOT SUPPORTED BY THE TRIAL RECORD

The EEOC requests injunctive relief in three general categories: (i) relief relating to discrimination and reasonable accommodations; (ii) relief relating to implementation of Walmart's policies, and (iii) relief related to training for decisionmakers. (ECF No. 214 at p. 13). These general categories of relief are detailed into four specific requests, all of which are either unduly burdensome, not narrowly tailored to the facts of this case, duplicative of programs Walmart already has in place, or are otherwise unwarranted and unnecessary.

After an employer is found to have engaged in a discriminatory practice, a district court "may enjoin [the employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . equitable relief as the court deems appropriate." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013); *quoting* 42 U.S.C. § 2000e-5(g)(1) and 42 U.S.C. § 12117(a) (internal quotations omitted).  Significantly, injunctive relief is not mandatory, as "the statute is phrased in the subjunctive," meaning the Court *may* enjoin

the employer or *may* order equitable relief.  *Williams v. Gen. Foods Corp.*, 492 F.2d 399, 407 (7th Cir. 1974). "In determining whether to grant relief, the lower court . . . must balance the various equities between the parties and decide upon a result which is consistent with the purposes of [the law] and the fundamental concepts of fairness." *Id*. (Internal quotation and citation omitted.)

The determinative factor in granting injunctive relief is whether the employer's discriminatory conduct could persist into the future. *See e.g. AutoZone*, 707 F.3d at 840; *Ilona of Hung.*, 108 F.3d at 1578-79. If not, then injunctive relief is not warranted. *See e.g. United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding that the "purpose of an injunction is to prevent future violations" and that the "necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive"); *EEOC v. Illinois Dep't of Rehabilitation Services*, 1989 U.S. Dist. LEXIS 16706 at *7 (C.D. Ill. 1989) (denying injunctive relief when there was no evidence further violations would occur because the offending employees were no longer with the employer and when future violations could be resolved through a new lawsuit).

Here, there is no risk that future violations would occur, and the relief the EEOC seeks is unnecessary. Indeed, the key figure in this controversy, Mr. Scheuerell (the Store Manager), is no longer with Walmart. (Repka Decl. at ¶ 3.)  And, there is no evidence of anyone in leadership at the Beloit store in which Mr. Reina worked harboring any type of discriminatory animus against persons with disabilities, yet alone being motivated by the same in connection with any adverse employment action.

Further, the actions complained of in this action occurred over four years ago and a review of the Western District of Wisconsin's case docket has yielded not a single ADA lawsuit against the Beloit store from January 1, 2015 to the present outside of the instant action. *See Williams*, 492

18

F.2d at 407 (denying injunctive relief when there was evidence that the discriminatory practices at issue ceased three years ago). In addition, Walmart has robust policies in place covering ADA-related issues, including providing reasonable accommodations. (Tr. Ex. 38, 39, 44, 62, 533, 534, 536, 537, 538.) And, it has an accommodation center, where a team of associates work on accommodation issues. (ECF No. 203 at pp. 84-85.)

In *EEOC v. Clayton Residential Home*, 874 F. Supp. 212 (N.D. Ill. 1995), a district court faced a largely similar set of circumstances and denied the EEOC's request for injunctive relief. *Clayton*, 874 F. Supp. at 215-16. There, the employee had not worked for the employer for three years and the supervisors no longer worked for the company either. *Id*. In addition, the employer had in place an anti-discrimination policy and, in the almost four years since the date of the alleged unlawful employment action, there had been no other discrimination complaints against the employer (outside of a pending EEOC Charge of Discrimination, which the Court did not consider because there had been no determination on it). *Id*.  In light of these facts and in rejecting the EEOC's request for injunctive relief, the court held:

> Clayton has shown by the dearth of complaints against it in the last four years that there is little likelihood of recurrent violations. Thus, the purpose of Title VII will not be advanced further by enjoining Clayton from doing what it is already not doing, engaging in unlawful employment practices.

*Id* at 216. In so holding, the district court followed guidance from the Seventh Circuit providing that "[w]here . . . the proscribed discriminatory practice has been terminated and there is little likelihood of recurrence, it would not be an abuse of discretion for a lower court to deny injunctive relief." *Id*. (*quoting Williams*, 492 F.2d at 407) (internal quotations omitted). The absence of the person at the center of the EEOC's allegations of a failure to manage the accommodation/ communication process appropriately with Mr. Reina along with the absence of any evidence of additional ADA discrimination lawsuits against the Beloit store over the years dims the likelihood

19

of reoccurrence and compels a denial of the injunctive relief sought in this action. *See Miles v. Indiana*, 387 F.3d 591, 601-02 (7th Cir. 2004) (holding that the district court properly acted within its discretion in denying the EEOC's request for injunctive relief where defendant had an anti-retaliation policy in place that appeared sufficient and different individuals were now in charge of the agency).[6]

Given all of this, what the EEOC seeks here is injunctive relief for injunction-sake, but there is no basis for an injunction because there is no reasonable likelihood of recurrent violations. Accordingly, the agency's request for the same should be denied in its entirety without a need to explore its individual specific requests. That said, and as outlined in turn below, each of its individual requests for injunctive relief are unnecessary and inappropriate and should be rejected:

1. **The EEOC's Request for "Injunctive Relief Relating to Reasonable Accommodations of Persons with Developmental Disabilities of Whom May Require a Job Coach"**

With this request, the EEOC seeks an order in which Walmart is required to: (i) not discriminate against "employees or applicants with developmental disabilities or cognitive disabilities" nor fail to provide them with reasonable accommodations; (ii) engage in an interactive process with these individuals; (iii) involve the person's representative "in any discussions relating to work performance, discipline or reasonable accommodations;" and (iv) consider the provision of a job coach or aid as a reasonable accommodation where needed. There are a host of issues with these requests.

---

[6] Additionally, there has been negative press against Walmart following the jury's verdict in this case, and courts have found that such press operates against the likelihood of a repeat event. *See EEOC v. CEC Entertainment, Inc.*, 2000 U.S. Dist. LEXIS 13934 at *79-80 (W.D. Wis. Mar. 14, 2000) (Magistrate Judge Crocker) (finding the discriminatory conduct unlikely to persist in part because the employer "suffered immeasurable damage to its reputation as a result of the publicity generated by the case and the jury's enormous award of punitive damages"); *EEOC v. Castillo*, 2017 U.S. Dist. LEXIS 217365, at *20-28 (N.D. Ill. May 15, 2017) (finding that "the unfortunate series of events underlying this lawsuit is unlikely to be repeated" because the employee "has been personally compensated for her injuries, and [because the employer] has suffered a public blow to its reputation as a result of the verdict," citing the EEOC's press release and an article in the Chicago Tribune).

First, there is no geographic limitation at all to any of these requests, and they are not grounded to the facts in this case. Walmart is the second largest employer in the United States, with approximately 2.3 million associates. (Repka Decl. at ¶ 2). This case involves an isolated, unique incident at a single store in Beloit, Wisconsin. It would be patently inequitable, overly broad and unreasonable to have an Order in which Walmart could be held in contempt in this case if one of its millions of associates or hundreds of thousands of supervisors violate in any way the requested order sought here. *See e.g. AutoZone*, 707 F.3d at 844. This demand is not tailored to the facts of this case, as the Seventh Circuit has instructed injunctive relief must be. *See e.g. Id.; Downes*, 41 F.3d at 1142.

Second, the initial two requests are in essence "obey-the-law" requests. In the Seventh Circuit, such requests are routinely found to be overbroad, vague and contrary to traditional principles of equity. *See AutoZone*, 707 F.3d at 841 (citing cases). Accordingly, the Seventh Circuit has advised that particular care must be given when considering this form of relief and that:

> . . . this type of injunction will be an "appropriate" form of equitable relief under § 2000e-5(g)(1) only where the evidence suggests that the proven illegal conduct may be resumed. Thus, for example, we have upheld obey-the-law injunctions when the victorious employee remains at the company or has been reinstated; where the particular employees or supervisors responsible for the illegal conduct remain at the company; and/or where the employer has taken some particular action—like withdrawing an accommodation policy—that convinces the court that voluntary compliance with the law will not be forthcoming.

*Id*. at 842-43 (citations omitted). There is no evidence that any of these fact scenarios are present in this case or that, as discussed above, illegal conduct is likely to occur.

Third, the EEOC's request mandating that Walmart provide potential permanent job coaches or aides as a reasonable accommodation (so long as it does not create an undue burden) goes beyond the obey-the-law paradigm and into the domain of requiring Walmart to adhere to EEOC constructs, as opposed to actual law. As this Court noted in summary judgment, the Seventh Circuit has not adopted a rule regarding the provision of a permanent job coach as a reasonable

accommodation and the district courts which have considered the issue have held that "the permanent or indefinite use of a job coach is not a reasonable accommodation." (ECF No. 65 at pp. at 16 and 18.)  Requiring Walmart to do something it is not required to do under the law in this Circuit, and thus subjecting it to contempt proceedings, would be wholly inappropriate and inequitable.

Fourth, the EEOC's requested relief includes "applicants," but this is not an applicant/ refusal to hire case. As the Western District of Wisconsin noted in rejecting a request for injunctive relief for unlawful hiring when the case concerned instead unlawful termination, "Plaintiff's victory in this lawsuit does not grant the EEOC an unfettered license to correct any and all perceived evils on its list of CEC's alleged shortcomings."  *CEC Entertainment,* 2000 U.S. Dist. LEXIS 13934 at *81; *see also Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989) (vacating an obey-the-law injunction because it was "too broad" and "impermissibly subject[ed] the defendants to contempt proceedings for conduct "unlike and unrelated to the violation with which [the defendants were] originally charged.") (internal quotation and citation omitted).

Fifth, and similarly, the EEOC seeks relief requiring Walmart to involve an associate's or applicant's representatives in any employment related discussions if the associate or applicant has developmental or cognitive disabilities. However, the evidence at trial was that supervisors routinely communicated with Mr. Reina's job coaches about work related matters and that, in connection with the reasonable accommodation issue and Mr. Reina's ability to perform his job, the store manager communicated directly with Ms. Slaght. (*See e.g.* ECF No. 202 at pp. 69-70, 72; ECF No. 203 a pp. 31, 40 and 91.) Involvement, or lack thereof, of a representative in matters pertaining to Mr. Reina was not a liability issue in this case, and certainly not a part of the jury's verdict. (ECF No. 197). Walmart is not alleged here to have refused to provide Mr. Reina the

accommodation of a representative to speak or advocate on his behalf. This issue goes beyond the scope of this litigation and the injunctive relief sought in connection with the same should be denied. *See supra*.

Finally, to the extent the relief sought intends to obligate Walmart to engage in an interactive process, reasonably accommodate individuals with disabilities and/or not discriminate against individuals with disabilities who are not "qualified individuals with disabilities" as defined by the law, the relief sought seeks an order from the Court which would be contrary to the law and should be denied. *See e.g.* 42 USC § 12112(a); 42 USC § 12111(8); *Basith v. Cook Cty*, 241 F.3d 919, 927 (7th Cir. 2001).

For all these reasons, the Court should deny the EEOC's request for injunctive relief relating to reasonable accommodations.[7]

## 2. The EEOC's Request for "Injunctive Relief Relating to Implementation of Walmart's Policies"

This request is overly broad, incredibly burdensome, unnecessary and not grounded in the facts of the case. Here, the EEOC requests that Walmart adopt and maintain Checklists for associates involved in making decisions relative to reasonable accommodations to ensure Walmart's policies are followed. As with the requests above, this request has no geographic limitation and could apply to tens of thousands of associates who in no way, shape or form were connected to this case. It is not grounded to the facts in this case as the Seventh Circuit has instructed (*see supra*), and is quite the overreach.

---

[7] If the Court decides to grant in whole or in part the agency's injunctive relief request with respect to job coaches or aides, those terms are vague, ambiguous and undefined in the EEOC's brief. Walmart proposes that the Court use the definition of "job coach" articulated in published EEOC guidelines, defining a job coach as "a professional who assists individuals with severe disabilities with job placement and job training." *EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, EEOC Notice No. 915.002 (March 25, 1997).The Court should also include language that provides that a job coach is not a reasonable accommodation, and is not required, if the coach needs to perform some or all of the essential functions of the disabled individual's job.

Further, Walmart's disability-related policies are not the law, and actually go far beyond what the ADA requires. For instance, its ADA Management Guidelines provide that an existing accommodation should not be removed from an associate, and there is no express language which allows for the removal of an accommodation that the employer was not obligated to provide in the first place. (Tr. Ex. 537.)  Similarly, its Wisconsin-specific Management Guidelines require that associates be given an accommodation packet and that within 24 hours of the form being complete the manager who receives the packet must forward the same to a leader in human resources. (Tr. Ex. 538.)   Not providing a 24-hour follow-up on accommodation requests and revoking an accommodation that was not required in the first place is not against the law, and injunctive relief requiring as much does nothing to prevent future unlawful conduct. Requiring tens of thousands of Walmart associates to strictly follow steps in policies that go above what the law requires, or have the company face contempt proceedings, is excessive and not equitable.

Moreover, the request is duplicative of systems Walmart already has in place and thus is unnecessary. Indeed, there is no dispute that Walmart has substantial company policies and procedures covering disability related matters (Tr. Exs., 536, 537 and 538). Nor is there a dispute that Walmart provides extensive management training on ADA-related matters. (Tr. Exs. 539-544). In *CEC Entertainment*, the court rejected a somewhat similar request regarding the reporting of complaints when there were procedures for handling complaints and when there was no evidence of widespread failures to follow those procedures. There, Magistrate Judge Crocker held that:

> The EEOC's proposed judgment contains a requirement that, every six months for the next three years, CEC shall provide the EEOC with all complaints of disability discrimination reported to CEC's human resources department. I am not inclined to require this because the substantial burden outweighs the marginal benefit. True, CEC screwed up its handling of Wittwer's faxed complaint in this case, but CEC is now painfully aware of the costs resulting from such mistakes and has committed to correcting its procedures to prevent similar problems in the future.

24

> This is not a situation where there was an absence of institutional procedures for handling complaints, or a widespread pattern of neglect in implementing those procedures.

*CEC Entertainment,* 2000 U.S. Dist. LEXIS 13934 at *77. One, two or three people not following every step of a detailed policy is not evidence of widespread neglect, and there is otherwise no pattern evidence of purported failures to follow internal procedures resulting in qualified individuals with disabilities being denied reasonable accommodations or being discriminated against. Further, like the employer in *CEC Entertainment*, Walmart has policies in place covering the issues at hand and, as noted above, even has a separate accommodation department (the Accommodations Service Center) that works on accommodation requests. Of note, the accommodation center keeps a running log of activity, further obviating the need for the Checklists the EEOC seeks. (*See* Tr. Ex. 45.)

For the same reasons the *CEC Entertainment* court rejected the EEOC's injunctive relief request and for the additional reasons discuss herein, the EEOC's request here should be denied.

### 3. The EEOC's Request for "Injunctive Relief Requiring Live Training by Persons with the Authority to Make Decisions Relating to Reasonable Accommodations of Persons with Disabilities"

The EEOC requests here that Walmart provide live training, introduced by a senior leader, to a large number of stores. As with its other requests, this request is not grounded in case facts and is burdensome, duplicative of systems currently in place and unnecessary. For instance, Walmart already has training programs in place and the EEOC makes no case as to why "live" training is needed over Walmart's existing computer-based, interactive training. Further, the agency has not demonstrated that Walmart's current training is deficient, or that additional training is needed for Market 263, which covers stores not involved, at all, in this litigation.[8] While a jury

---

[8] Market 263 includes two stores in Wisconsin (in Beloit and Monroe, Wisconsin) and eight stores in Illinois. (Repka Decl. at ¶ 4, Ex. A.) Within this market, there are thousands of associates (employees). (*Id*. at ¶ 4.)

did find the Beloit store's response to Mr. Reina's accommodation request deficient, that was <u>one</u> incident at <u>one</u> store and there is no justification for the far-reaching, multi-store, multi-state injunction the EEOC seeks here. *See Castillo*, 2017 U.S. Dist. LEXIS 217365 at *22-23 (finding relief requested by EEOC broad and inappropriate because it sought injunctive relief covering thousands of individuals "based on an isolated incident that occurred between two people at one . . . warehouse more than six years ago").

Instructively, the EEOC neither provides analysis nor case law justifying why live training introduced by a high-ranking "manager from [Walmart's] home office" (which is in Bentonville, Arkansas) is needed or appropriate, especially when that person would be speaking to people who had no involvement in the matters at hand. Requiring additional live training for potentially hundreds of people who had no involvement in this case is too broad and burdensome. The EEOC's arbitrary, taxing and unnecessary request here is overkill and should be denied in its entirety.

If the Court finds that injunctive relief is warranted, Walmart proposes that the Court limit the training to salaried members of management at the Beloit store, any human resource personnel at the Beloit store, the Market Human Resource Manager responsible for the Beloit store and any salaried members of management for Walmart who testified at trial and are still employed by the company.[9] Walmart also proposes that the training consist of training already in place for salaried members of management and that the associates noted above be required, within 150 days of entry of an injunction, to retake that training and do so once every year the injunction is in place while they remain employed by Walmart.

---

[9] As mentioned above, Mr. Scheuerell is no longer employed by Walmart.

**4. The EEOC's Request for Injunctive Relief "Ordering Reasonable Time Frames, Requiring Periodic Notice of Compliance, and Providing Dispute Resolution Procedures to Enable the Parties to Address Issues without Court Involvement"**

As injunctive relief is not required or appropriate in this case, there is no need for the relief sought here. At any rate, courts generally frown upon injunctive relief seeking continued court monitoring as costly and unnecessary, especially when institutional procedures are in place for addressing unlawful behavior. *See e.g. CEC Entertainment,* 2000 U.S. Dist. LEXIS  at *77-78 (finding oversight of the employer's procedures not necessary because, in part, facts in the case were not such where there was an "absence of institutional procedures for handling complaints"); *see also Clayton*, 874 F. Supp. at 216 (*citing Walgreen Co. v. Sara Creek Property Co., B.V.*, 966 F.2d 273, 276 (7th Cir. 1992)). Here, there is no dispute that Walmart has in place detailed policies covering unlawful discrimination and accommodations for disabilities.

Also, while it is appropriate to apply temporal limits to injunctions, the EEOC provides no factual basis or case support for why three years is necessary. Walmart submits that if the Court is inclined to order some form of monitoring, one year is a reasonable time period. In addition, should a "dispute resolution process" be ordered, Walmart requests that it have at least 30 calendar days to address any alleged violations of an injunctive order and, should application to the Court be made by the EEOC for relief, that the EEOC bear the burden of showing substantial non-compliance and that Walmart be afforded the opportunity to respond and be heard.

## CONCLUSION

For all the reasons discussed above, Walmart requests that the Court deny or, in the alternative, substantially limit the monetary award the EEOC seeks, and that it deny the EEOC's request for injunctive relief in full.

Dated at Milwaukee, Wisconsin this 4th day of December 2019.

27