IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                        Plaintiff,

  v.

WAL-MART STORES, INC. and
WAL-MART STORES EAST, L.P.,,

                        Defendant.

OPINION and ORDER

17-cv-739-jdp

---

This is an Americans with Disabilities Act suit brought by plaintiff Equal Employment Opportunity Commission (EEOC) on behalf of charging party Paul Reina. A jury found that defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, LLP (Walmart) failed to provide Paul Reina with a reasonable accommodation and ended his employment because of his disability. Dkt. 197. The jury awarded $200,000 in compensatory damages and $5,000,000 in punitive damages. The case is now before the court on EEOC's request for equitable and injunctive relief for Reina, Dkt. 213, which is determined by the court rather than the jury.

For the reasons explained below, the court will award Reina $41,224.07 in back pay, $58,124.53 in front pay, $4,495.72 in prejudgment interest, and $19,097.14 for tax consequences. The court is denying EEOC's request for a permanent injunction.

## BACKGROUND

Paul Reina, an individual with a disability, worked as a cart-pusher at a Walmart store in Beloit from 1998 to 2015. Reina always worked with a job coach. His coaches included his guardian, Rose Slaght, Matt Coppernoll, Margie Polizzi, and Mike Fallon. Coppernoll was

Reina's primary job coach from 2005 to 2015; the others filled in for Coppernoll on a substitute basis.

In early June 2015, the new manager of the Beloit store, Jeff Scheuerell, looked into Reina's work relationship with Coppernoll. Scheuerell met with Slaght, Coppernoll, and Reina on June 12, 2015, to discuss the role of Reina's job coach. At the meeting, Scheuerell gave Slaght an "Accommodation Medical Questionnaire" for Reina's physician to complete. Walmart did not place Reina on the schedule after June 12, 2015, but it provided him with two weeks of paid leave. On July 9, 2015, Slaght returned the medical questionnaire to Scheuerell, whom she alleges told her, "Don't call us. We'll call you." Slaght testified that a Walmart representative told her during a March 18, 2016 meeting that the store did not want Reina back. On or about March 25, 2016, Walmart's Accommodation Service Center sent Reina a letter requesting additional information about possible reasonable accommodations. Reina never returned to work at Walmart.

After June 2015, Polizzi tried to secure employment for Reina at Piggy Wiggly and Woodman's. Coppernoll also took Reina to eight to 10 places in search of new work, including Piggly Wiggly, Woodman's grocery store, the Salvation Army, Goodwill, and a number of Dollar Stores. Reina began to build birdhouses with Coppernoll to sell. And about a year later, Reina began working as an independent contractor, delivering newspapers for the Beloit Shopping News. He earns about $100 a month.

ANALYSIS

A. Back Pay

Employees who have proven employment discrimination are presumptively entitled to full relief, including back pay. *Albarmarle Paper Co. v. Moody*, 422 U.S. 405, 421-22 (1975) ("It follows that, given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."); *Stragapede v. City of Evanston, Ill.*, 865 F.3d 861, 868 (7th Cir. 2017) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003)) ("A plaintiff who wins a favorable verdict on an ADA claim is presumptively entitled to backpay."); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir. 1985) (back pay must be awarded absent special factors).

As the plaintiff, EEOC has the initial burden of establishing the back pay amount, and then the burden "shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d at 1044. Back pay does not have to be calculated with unrealistic exactitude, and all uncertainties in the calculations are resolved against the discriminating employer. *Stewart v. General Motors Corp.* 542 F.2d 445, 452 (7th Cir. 1976); *Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1092-93 (N.D. Ill. 2017).

EEOC seeks back pay for Reina from July 9, 2015, through December 31, 2019, in the amount of $39,095.75, plus $709.44 per month until judgment is entered. Walmart contends that Reina failed to mitigate his damages and that EEOC's wage rate and time period for back pay are not correct. I address these three arguments separately.

1. **Mitigation**

To establish the affirmative defense of failure to mitigate damages, Walmart must show both that: (1) Reina failed to exercise reasonable diligence to mitigate his damages, and (2) there was a reasonable likelihood that Reina might have found comparable work by exercising reasonable diligence. *Stragepede*, 865 F.3d at 868-69; *Hutchinson*, 42 F.3d at 1044. Walmart argues that Reina has failed to exercise reasonable diligence because he applied for only 12 positions since he last worked at Walmart four and a half years ago, and he has yet to secure comparable employment despite having worked 16 plus years at Walmart.

In support of its argument that Reina likely would have found comparable work had he conducted a more extensive job search, Walmart relies on Occupational Employment Statistics from the Bureau of Labor Statistics showing that 2,240 people were employed in the Beloit/Janesville area as janitors, cleaners, groundskeeping workers, and store clerks as of May 2016. Dkt. 218-1. However, as EEOC points out, these statistics do not represent the actual number of job openings in these fields or include any information about the applicant pool, hours, wages, job duties, or locations of any available positions. *See NLRB v. Midwestern Personnel Services, Inc.*, 508 F.3d 418, 427 (7th Cir. 2007) (excluding expert testimony on mitigation because data had overbroad geographic scope and did not include information about applicant pool, hours, wages, and locations of available positions, or whether aggrieved individuals would have gotten positions if they applied); *Smith v. Rosebud Farmstand*, No. 11-cv-9147, 2016 WL 5912886, at *20 (N.D. Ill. Oct. 11, 2016) (expert report relying on generalized labor market data unhelpful because it said very little about whether plaintiff had legitimate opportunity to secure those jobs). Walmart has made no effort to show that the janitor, cleaning, or other positions cited in the Bureau of Labor Statistics report are

substantially equivalent to Reina's former cart pusher position, that Reina has the ability to perform them, or that he could have secured such positions. Accordingly, even though Reina may have applied for only 12 positions in the past four and a half years, Walmart has failed to meet its burden of showing that there was a reasonable likelihood that Reina might have found comparable work by exercising more reasonable diligence in searching for a position.

2. **Wage rate**

EEOC uses an average monthly wage rate of $815.17, which it bases on Reina's 2014 annual earnings of $9,782, minus Reina's interim earnings from delivering newspapers and selling birdhouses. Walmart argues that Reina's monthly wage loss should be calculated based on his biweekly earnings for the six months that he worked in 2015 instead of his 2014 earnings. In support of its argument, Walmart cites *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1258 (N.D. Ill. 2015), *aff'd*, 842 F.3d 1010 (7th Cir. 2016), in which the court rejected plaintiff's proposed use of 2007 rather than 2008 earnings on the ground that the more current wage information "better reflects Garcia's projected work hours and pay going forward than a previous year." However, unlike the plaintiff in *Garcia*, where plaintiff's wage information was available for "virtually all of 2008," *id.*, Reina worked only a partial year in 2015. Reina's 2015 Earnings History Report shows that he received only 13 pay checks totaling $3,970.15 in regular pay in 2015.[1] *See* Dkt. 218-10 at 2. (Neither party submitted Reina's earnings history report for 2014, but the parties do not dispute that Reina worked all of 2014.)

---

[1] Walmart says that Reina made an average of $281.04 every two weeks in regular pay for the first six months of 2015, which would have led to annual earnings of $7,307.04 and an average monthly wage of $608.92. Walmart's calculations are off. When divided by 13, Reina's earnings of $3,970.15 average $305.40 every two weeks rather than $281.04. Multiplying the higher average monthly wage of $305.40 by 26 pay periods results in projected earnings of $7,940.40 annually and $661.70 monthly.

5

As EEOC points out, Reina's 2015 earnings report shows that his biweekly paycheck varied significantly—from $239.24 to $380.52—and did not include earnings for November and December, which is a busier period for retail stores.

The court agrees with EEOC that Reina's full-year earnings for 2014 provide a more accurate base for Reina's projected earnings. Therefore, the court will use EEOC's proposed wage rate of $815.17 per month, minus $105.73 in interim monthly wages from Reina's alternative employment, for a net of $709.44 per month.

3. **Time period**

EEOC argues that the correct starting point for the calculation of back pay is July 9, 2015, which is after Reina's paid leave ended and the date on which Slaght returned Reina's medical form to Scheuerrell, who allegedly told Slaght not to call him. Walmart argues that it is unclear what date the jury considered to be the end of Reina's employment and maintains that it never terminated Reina. As a compromise, Walmart proposes that back pay be calculated from March 18, 2016, which is the date on which a Walmart representative allegedly told Slaght that the store did not want Reina back.

The parties generally agree that the purpose of back pay is to make an employee whole for injuries suffered through past discrimination and that back pay typically represents the wages the employee would have earned had Walmart not ended his employment. *Albemarle Paper*, 422 U.S. at 418-21 ("The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed."); *Ortega*, 280 F. Supp. 3d at 1078. In this case, the evidence adduced at trial shows that Walmart did not place Reina on the schedule after June 12, 2015, and paid him for two weeks of leave. Reina's employment effectively ended after that point because he was never placed back on the store

6

schedule and began incurring an economic loss after the completion of his paid leave. Therefore, the court finds EEOC's proposal that back pay be calculated beginning on July 9, 2015, which is almost four weeks after Reina's last day of work, to be reasonable and supported by the evidence. Accordingly, the court will award Reina the full amount that EEOC requests for lost wages, $39,095.75 through December 31, 2019, plus $709.44 per month prorated through the date of this order ($2,128.32), resulting in a total back pay award of $41,224.07.

**B. Prejudgment Interest**

The decision to award interest is a matter within the district court's discretion, but it is presumptively available for violations of federal law. *Pickett v. Sheridan Health Care Ctr.*, 813 F.3d 640, 646 (7th Cir. 2016). EEOC calculates prejudgment interest to be $4,486.84 as of December 31, 2019, with additional interest accruing at an average of $2.96 per month. It bases its calculation on the IRS adjusted prime rate for calculating interest on unpaid taxes, compounded monthly. 26 U.S.C. §6621 (defining IRS adjusted rates); *Frey v. Coleman,* 903 F.3d 671, 682 (7th Cir. 2018) ("[W]e have instructed district courts to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in refined rate-setting directed at determining a more accurate market rate for interest.") (internal quotations omitted)).

Walmart does not object to an award of prejudgment interest as a general matter or EEOC's use of the prime rate to calculate it, but it contends that the court should exclude the two-year period between Reina's filing of his EEOC charge and the filing of this lawsuit. (Reina filed his EEOC charge on September 20, 2015, but EEOC did not file this lawsuit on his behalf until September 26, 2017.) In support of its position, Walmart cites *Martyne v. Parkside Medical Services,* No. 97-C-8295, 2000 WL 748096, *12 (N.D. Ill. June 11, 2000), in which the district

7

court declined to award the plaintiff prejudgment interest during the four-year period between plaintiff's filing of an administrative charge and the filing of his federal lawsuit because plaintiff could have requested a right to sue letter 180 days after filing his charge. However, the Northern District of Illinois later rejected that reasoning in *Ortega*, 280 F. Supp. 3d at 1096, noting that the court in *Martyne* did not cite any authority for penalizing plaintiff for filing a lawsuit within the deadline. Here, as in *Ortega*, EEOC issued its right to sue notice and filed suit after only two years. *Id.* Walmart does not present any evidence suggesting that Reina, his guardian, or EEOC violated a deadline or unreasonably delayed the filing of this lawsuit.

Accordingly, the court will award $4,486.84 in prejudgment interest through December 31, 2019, with additional interest accruing at an average of $2.96 per month through the date of this order ($8.88), resulting in a total prejudgment interest award of $4,495.72.

**C. Front Pay**

The parties agree that reinstatement is not an option for Reina and that the court may award front pay as an equitable remedy. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 862 (7th Cir. 2001) ("When reinstating a successful Title VII plaintiff is not feasible, front pay is usually available as an alternative remedy."); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998) ("[F]ront pay is the functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated.").

EEOC seeks front pay for Reina for a period of ten years, arguing that Slaght had planned for Reina to continue working at Walmart for at least that period of time so that he could buy a house in which he and his brother could live with the assistance of support workers. To calculate front pay, EEOC uses a discount rate of 3.892 percent, which is the reported

8

Treasury Bond Rate as of September 30, 2019. *See Bruso*, 239 F.3d at 861-62 (holding that plaintiff must provide court with appropriate discount rate for front pay).

Walmart objects to awarding any front pay on the ground that Reina failed to use reasonable diligence in searching for other positions, but I already have determined that Walmart failed to make this showing. Reina obtained alternative employment, and there is no evidence that there is a comparable job for which Reina is qualified and could have been hired. Walmart also argues that EEOC's request for 10 years of front pay is speculative and unreasonable given front pay is only appropriate for "a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Ward v. Tipton County Sheriff Dep't*, 937 F. Supp. 791, 796 (S.D. Ind. 1996); *see also Williams*, 137 F.3d at 954 (front pay awards are limited in duration "until such time that the employee can reasonably be expected to have moved on to similar or superior employment"); *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994) (front pay awards "must be grounded in available facts, acceptable to a reasonable person and not highly speculative"). Walmart proposes limiting any front pay award to one year, arguing that this period of time is sufficient to allow Reina to find other comparable work.

Although 10 years is a significant amount of time, "courts have made front pay awards for lengthy periods of time, through retirement age in certain cases, where the evidence supported it." *Ortega*, 280 F. Supp. 3d at 1111 (summarizing cases). Here, Reina worked for Walmart for most of his adult life (a total of 16 years), planned to continue working in the same position for at least 10 years to save for a house, and has severe disabilities that likely would prevent him from securing similar or superior employment. Although Walmart is correct that "the longer the award the more speculative it becomes," *Phillips v. City of S. Bend*, No.

9

3:15CV527-PPS, 2018 WL 2041798, at *10 (N.D. Ind. May 1, 2018) (citing *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir. 1990)), awarding Reina front pay for a period of 10 years, or until he reaches his 50s, seems reasonable under the circumstances of this case. *Cf. id.* (limiting front pay award to 3 years instead of 14 because plaintiff had been promoted to superior position and would be entitled to pay increase).

Reina's annual net lost income of $709.44 per month ($815.17 in average monthly Walmart wages minus $105.73 in interim monthly wages) for ten years amounts to $85,132.80. Discounted to present value using a discount rate of 3.892 percent, the amount is $58,124.53, which the court will award as front pay.

## D. Tax Consequences

EEOC seeks an award to offset the additional tax burden that Reina will pay because he will receive more than $100,000 in wage-replacement income (back pay, interest, and front pay) in one lump sum rather than spread over time as regular paychecks. To calculate the tax consequence, EEOC uses the 2019 tax table published by the IRS, which results in a tax of $19,097.14 on a pecuniary award of at least $100,000 and up to $160,725. *See* Dkt. 216-9 at 17 (The total award of $103,844.32 is multiplied by .24 for a total of $24,922.64, which is reduced by $5,825.50, resulting in a total tax consequence of $19,097.14). Because Reina's annual wages of $9,782 do not amount to earnings higher than the standard deduction of $12,000 for tax year 2018, he would incur an additional tax burden of $19,097.14 as a result of the wage-replacement award.

The Seventh Circuit has affirmed tax consequence or "gross-up" awards in Title VII cases. *EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) (joining Third and Tenth Circuits in affirming such awards). Although Walmart objects on the grounds that

10

there are no special or extreme circumstances warranting such an award and that tax consequence awards apply only to back pay, the Seventh Circuit did not impose these requirements in *Northern Star Hospitality*. *See Wescher v. Chem-Tech Int'l*, No. 13-CV-229-PP, 2016 WL 7441655, at *6 (E.D. Wis. Dec. 27, 2016) ("The court does not agree that a plaintiff should receive a tax offset only in extreme circumstances. *Northern Star* set a clear standard. A tax offset is necessary to make the plaintiff whole."). Accordingly, the court will award Reina $19,097.14 to offset the additional tax burden he will incur.

### E. Permanent Injunction

After a finding that an employer has "intentionally engaged in . . . an unlawful employment practice," the court "may enjoin [the employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1); *see also* 42 U.S.C. § 12117(a) (making § 2000e–5(g) applicable to the ADA). To grant an injunction, a court must consider "whether the employer's discriminatory conduct could possibly persist in the future." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840-41 (7th Cir. 2013) (quoting *Bruso*, 239 F.3d at 864). "[I]njunctive relief is appropriate even where the [EEOC] has produced no evidence of discrimination going beyond the particular claimant's case." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997). Walmart has the burden of proving that the discrimination is unlikely to continue. *AutoZone*, 707 F.3d at 840.

EEOC requests detailed injunctive relief in three broad categories for a period of three years:

1. Discrimination and reasonable accommodations.

a. Walmart shall not discriminate against employees or applicants with developmental disabilities or cognitive disabilities that affect mental functioning, nor fail to provide them with reasonable accommodation.

b. Walmart shall engage in the interactive process with employees or applicants with developmental disabilities or cognitive disabilities that affect mental functioning when Walmart knows or has reason to know that the employee or applicant may need a reasonable accommodation.

c. Where Walmart knows, or has reason to know that an employee or applicant with developmental disabilities or cognitive disabilities that affect mental function may need a reasonable accommodation, Walmart shall involve the employee or applicant's representatives, if known, in any discussions relating to work performance, discipline, or reasonable accommodations, including the interactive process.

d. Walmart will consider the provision of a job coach or aide as a reasonable accommodation where needed to permit an employee who has developmental or cognitive disabilities that affect mental functioning to perform the essential functions of his or her job and where it does not impose an undue hardship on Walmart.

2. Implementation of Walmart's policies.

    a. Within 30 days, Walmart shall adopt the following "checklist" for its employees who are involved in determining whether an employee should receive a reasonable accommodation:

        i. Has an employee (or the representative of an employee) indicated in any way that an accommodation, exception, or modification may be beneficial?
        ii. Was the request for accommodation granted at the store level?
        iii. If not, was the request for accommodation sent to the Accommodations Service Center within 24 hours of its receipt?
        iv. Was Walmart's policy on reasonable accommodation clearly communicated to the employee, applicant, or representative?

    b. Walmart shall maintain copies of the Checklists for the duration of the order, and longer if required by the governing recordkeeping regulations.

    c. Walmart shall review the Checklists before the performance evaluations of any employees required to complete the evaluations and shall consider the adherence to its policies relating to reasonable accommodation in the performance evaluation.

3. Training for decisionmakers.

a. Within 150 days, Walmart will provide all employees in Market 263 who are responsible for receiving and/or reviewing requests for reasonable accommodation with no fewer than two hours of live training on the requirements and prohibitions of the ADA.

b. Each year thereafter, Walmart will provide the employees identified in paragraph a with one hour of refresher training on the requirements and prohibitions of the ADA.

c. The training must be introduced by a manager from the home office who is in a position superior to the highest-ranking person being trained. The manager introducing the training will emphasize the importance of the training and compliance with the ADA and will make clear that Walmart expects that its employees adhere to the ADA and to Walmart's policies regarding reasonable accommodation of applicants and employees with disabilities.

Walmart contends that EEOC's requests are unduly burdensome, not narrowly tailored to the facts of this case, redundant with programs that Walmart already has in place, and otherwise unwarranted and unnecessary. It argues that there is little risk that similar violations will occur in the future because Scheuerell is no longer with Walmart and there is no evidence that anyone in leadership at the Beloit store (including Repka, who still remains employed with Walmart) harbors any type of discriminatory animus against persons with disabilities. Walmart also points out that the actions complained of in this lawsuit occurred more than four years ago and there have been no similar ADA claims filed in this court since that time. Walmart's points are well-taken. *See EEOC v. Clayton Residential Home, Inc.*, 874 F. Supp. 212, 216 (N.D. Ill. 1995) (denying permanent injunction as unnecessary and overly costly where plaintiff and supervisors no longer worked for employer, there were no other complaints in 3.5 years, and employer already had anti-discrimination policy in place).

EEOC's first two requests related to discrimination and reasonable accommodation (*see* 1.a and b above) merely seek to have Walmart obey the law with respect to individuals with developmental or cognitive disabilities without imposing any geographic limitations. These type of requests are generally disfavored as being overly broad and vague. *AutoZone*, 707 F.3d at 841 ("An obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation."). Although EEOC's request that Walmart "involve" the representative of an employee with a cognitive or developmental disability in the accommodations or interactive process (*see* 1.c) may be a good idea in some cases, Walmart did not act inappropriately in this regard in failing to provide Reina with a reasonable accommodation. (Although EEOC says that some of Walmart's managers did not approach Reina about his performance issues, that conduct was not the subject of this lawsuit.) Moreover, whether Walmart should communicate with an employee's representative versus the employees themselves or "consider" the provision of a job coach as a reasonable accommodation (*see* 1.c and d) depend on an employee's specific circumstances and would not be appropriate to require for all employees with cognitive or developmental disabilities.

EEOC's requests requiring the use of a detailed checklist in approving accommodations and training staff on the ADA's requirements and prohibitions (*see* 2 and 3) are overly broad and appear redundant with systems that Walmart already has in place. Walmart has policies and procedures regarding disability discrimination and accommodations, operates a separate department devoted to accommodation requests, and provides management training. Although two individual managers in this case did not follow Walmart's procedures, there is no evidence of widespread neglect or a pattern and practice of Walmart managers failing to follow the

14

company's internal procedures. Therefore, I agree with Walmart that even though the Beloit store's response to Reina's accommodation request was deficient, this incident at one store involved unique circumstances that do not justify the far-reaching injunction that EEOC seeks. Accordingly, the court declines to enter injunctive relief.

**F. Summary of Relief Awarded**

The court will award Reina the following equitable relief:

(1) $41,224.07 in back pay ($39,095.75 through December 31, 2019, plus $709.44 per month for January 1 through March 31, 2020);

(2) $58,124.53 in front pay;

(3) $4,495.72 in prejudgment interest ($4,486.84 through December 31, 2019, plus $2.96 per month for January 1 through March 31, 2020); and

(4) $19,097.14 for tax consequences.

No permanent injunction will be issued. The court's award of equitable relief will be in addition to the jury's award of compensatory damages.[2]

However, the jury's award of $200,000 in compensatory damages and $5,000,000 in punitive damages is subject to a cap under 42 U.S.C. § 1981a(b)(3)(D). The cap is $300,000 for employers with more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year. *AutoZone*, 707 F.3d at 831 (applying § 1981(a)(b)(3) to ADA claims); *see also* Repka decl., Dkt. 219 at ¶ 2 ("Walmart is the second largest employer in

---

[2] Although compensatory damages include damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, they do "not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964." 42 U.S.C. § 1981a(b)(2); *see also Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499 (7th Cir. 2000) ("Neither back nor front pay counts against a maximum award of compensatory damages under § 1981a(b)(2).").

15

the United States, with approximately 2.3 million associates."). Section 1981(b)(3) does not prescribe a method for making this adjustment, but the Seventh Circuit has held that "in a normal suit punitive damages are something added on by the jury after it determines the plaintiff's compensatory damages, [so] probably the sensible thing for the judge to do is not to make a pro rata reduction . . . but instead to determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages." *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004); *see also Arroyo v. Volvo Grp. N. Am., LLC*, No. 12-CV-6859, 2017 WL 2985649, at *4 (N.D. Ill. July 13, 2017) (summarizing cases and finding that more common approach is to take entire cut from punitive damages). Therefore, the court will apply the jury's compensatory award toward the $300,000 statutory cap and reduce the punitive damages award to $100,000. The clerk of court will be directed to enter judgment on this relief as well as the equitable relief.

ORDER

IT IS ORDERED that:

1. Plaintiff Equal Employment Opportunity Commission's motion for equitable relief, Dkt. 213, is GRANTED in part and DENIED in part. Paul Reina is awarded the following monetary relief: $41,224.07 in back pay, $58,124.53 in front pay, $4,495.72 in prejudgment interest, and $19,097.14 for tax consequences. Plaintiff's motion is DENIED in all other respects.

2. Pursuant to 42 U.S.C. § 1981a(b)(3), the jury's $5 million punitive damages award is reduced to $100,000.

3. The clerk of court is directed to enter judgment on the jury's award of $200,000 in compensatory damages and $100,000 in punitive damages, as well as the equitable relief awarded by the court.

Entered March 31, 2020.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge