IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                                    Plaintiff,

        v.                                                          OPINION and ORDER

WAL-MART STORES, INC. and                                           17-cv-739-jdp
WAL-MART STORES EAST, L.P.,

                                    Defendants.

---

This is a case under the Americans with Disabilities Act, brought by plaintiff Equal Employment Opportunity Commission (EEOC) on behalf of charging party Paul Reina. A jury awarded $200,000 in compensatory damages and $5,000,000 in punitive damages against defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, LLP (Walmart) for failing to provide Reina with a reasonable accommodation and ending his employment because of his disability. Dkt. 197. The court decided EEOC's requests for equitable and injunctive relief, denying EEOC's request for a permanent injunction and awarding Reina $41,224.07 in back pay, $58,124.53 in front pay, $4,495.72 in prejudgment interest, and $19,097.14 for tax consequences. Dkt. 224.

Now before the court is a three-part motion by Walmart, seeking judgment as a matter of law, a new trial, and a reduction in compensatory damages. Dkt. 231. Reina is profoundly disabled, and the case presented close questions, particularly about whether Reina could perform the essential functions of his job as a cart attendant with reasonable accommodations and whether a full-time job coach was a reasonable accommodation. But the court concludes, for reasons explained more fully below, that the close questions were ultimately factual ones

within the purview of the jury, and that the jury reached a verdict adequately supported by the evidence. The court will deny all parts of Walmart's motion.

BACKGROUND

A summary of background facts is sufficient at this point; more details are provided in the analysis section. Paul Reina, at the time of the trial, was 40 years old. He is deaf with serious developmental, visual, and intellectual impairments. He spent the first six years of his life in an institution, after which Rose Slaght and her husband became his foster parents. Slaght is Reina's legal guardian. Reina is nonverbal, but his family and job coaches communicate with him using different forms of sign language. His receptive skills are better than his expressive skills.

Reina worked as a cart attendant (or "cart pusher") at a Walmart store in Beloit from 1998 to 2015. Reina always worked with a job coach. His coaches included Slaght, Matt Coppernoll, Margie Polizzi, and Mike Fallon. Coppernoll was Reina's primary job coach from 2005 to 2015; the others filled in for Coppernoll.

Jeff Scheuerell became manager of the Beloit Walmart store in early June 2015. Scheuerell and Human Resources Manager Julie Repka looked into Reina's work relationship with Coppernoll. Scheuerell met with Slaght, Coppernoll, and Reina on June 12, 2015, to discuss the role of Reina's job coach. At the meeting, Scheuerell gave Slaght an "Accommodation Medical Questionnaire" for Reina's physician to complete. Walmart did not place Reina on the schedule after June 12, 2015, but it provided him with two weeks of paid leave. Reina never returned to work at Walmart.

ANALYSIS

## A.  Motion for judgment as a matter of law

Walmart asks for judgment as a matter of law under Rule 50. The standard for a Rule 50 motion is essentially the same as for a motion for summary judgment: whether a reasonable jury would have a legally sufficient evidentiary basis to find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). "Only if no rational jury could have found for the nonmovant may we disturb the jury's verdict." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). In applying this standard, the court does not weigh the evidence and it draws all reasonable inferences in favor of the nonmoving party. *Id.*

The EEOC brought both failure-to-accommodate and termination claims on behalf of Paul Reina under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A)-(B). Walmart seeks judgment on both claims on the following grounds: (1) the evidence failed to prove that Reina is a qualified individual who could perform the essential functions of his cart attendant position without his job coach doing some of the work; (2) providing Reina a full-time job coach would impose an undue hardship on Walmart; (3) Walmart did not act with the discriminatory intent necessary to support EEOC's claims for discriminatory termination and punitive damages; and (4) the EEOC's "novel" theory of liability does not entitle Reina to punitive damages. Walmart arguments are addressed in the sections below.

### 1.  Qualified individual, essential functions, and reasonable accommodation

To prevail on both its failure-to-accommodate and discrimination claims, the EEOC was required to adduce evidence that would allow a reasonable jury to conclude that Reina was a "qualified individual," who with or without "reasonable accommodation," could perform the

"essential functions" of his cart attendant position. *See* 42 U.S.C. §§ 12111(8) and 12112; *Felix v. Wisconsin Dept. of Transportation*, 828 F.3d 560, 568 (7th Cir. 2016); *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852-53 (7th Cir. 2015); *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014).

Walmart does not object to the court's jury instructions on required elements. The court instructed the jury that essential functions are a job's "fundamental duties" and that not all job functions are "essential." Dkt. 196 at 6. The jury was told that they may consider a number of factors in deciding whether a function was essential: the reasons the job exists; the number of employees Walmart has to do that kind of work; the degree of specialization the job requires; Walmart's judgment about what is required; the consequences of not requiring an employee to satisfy that function; and the amount of job time spent on a function, though some functions may be essential even if they do not take a great deal of time. *Id.*

The court instructed the jury that a reasonable accommodation "may include changing such things as ordinary work rules, facilities, conditions, or schedules, or having someone else perform the nonessential functions of the employee's job. But it is not a reasonable accommodation to require the employer to eliminate or change the essential functions of the job, to have someone else perform the essential functions of the job, or to lower productivity standards. A job coach would not be a reasonable accommodation if the coach has to perform any of the essential functions of the job for the employee." *Id.* at 7. The jury was told that it may "also consider Walmart's actual work practices with Reina and other cart attendants in deciding which job functions are essential and whether an accommodation is reasonable. But Walmart is not required to provide any accommodation that is not a reasonable accommodation, even if Walmart may have done so in the past." *Id.*

4

Walmart contends that Reina was unable to perform the essential cart attendant functions of retrieving, organizing, and managing carts and customer service because he was unable to drive motorized carts (electric wheelchairs or scooters with a basket) from the parking lot to the store, steer a line of traditional shopping carts by himself, or respond to customer questions. The EEOC counters that these tasks were nonessential or ones that Reina could perform with reasonable accommodation.

Before addressing the parties core arguments, I begin with a preliminary matter.

In a footnote to its argument that Reina was not a qualified individual, Dkt. 232 at 7 n.3, Walmart reasserts its summary judgment argument that a permanent job coach is never a reasonable accommodation as a matter of law, relying on some district court cases. *See Kleiber v. Honda Am. Mfg.*, 420 F. Supp. 2d 809, 822-23 (S.D. Ohio 2006); *EEOC v. Dollar Gen. Corp.*, 252 F. Supp. 2d 277, 290 and 293 (M.D.N.C. 2003); *EEOC v. Hertz Corp.*, No. 96-72421, 1998 WL 5694, at *5 (E.D. Mich. Jan. 6, 1998); *Davis v. Wal-Mart Stores, Inc.*, No. CV-09-1488, 2011 WL 2729238, at *19 (D. Or. May 3, 2011). But Walmart has forfeited the argument at this point for two reasons. First, it failed to raise this issue in its Rule 50(a) motion. *Passanti v. Cook County*, 689 F. 3d 655, 660 (7th Cir. 2012) (A Rule 50(b) motion "is only a renewal of the preverdict [50(a)] motion, [and] it can be granted only on grounds advanced in the preverdict motion."). Although Walmart argued that there was no basis for the EEOC's punitive damages claim because the notion that a permanent job coach is a reasonable accommodation is a "novel theory" and not settled law, it did not argue that such an accommodation was unreasonable per se. Dkt. 203 at 112, 114-15; Dkt. 208 at 66. Second, Walmart relegated its argument to a footnote and failed to develop it properly in the main body of its brief. *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory

or undeveloped arguments are waived."); *Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2015 WL 7776807, at *4 (N.D. Ill. Dec. 3, 2015) (defendant "waived any timeliness argument by making only a token effort to address it in its Rule 50(b) brief, relegating the argument to a two-sentence footnote").

Even if not forfeited, the argument fails on merits for same reasons explained in the court's orders denying Walmart's motion for summary judgment and its motion for reconsideration. Dkt. 65 at 16-20; Dkt. 76 at 2-3.

I turn now to the parties' arguments concerning whether the essential functions of a cart attendant include the tasks of driving motorized carts, steering traditional carts, and answering customer questions.

### a. Motorized carts

The parties agree, and the evidence showed, that an essential function of Reina's job was to retrieve and organize shopping carts in the parking lot and return them to the store. Walmart argues that this essential function included retrieving motorized carts, which Reina was not able to drive back to the store on his own.[1] But none of the evidence cited by Walmart establishes that the specific task of driving motorized carts was an essential function of the cart attendant position. *See* Dkt. 187 at 73 (deposition testimony of assistant manager Amanda Fellows that 95% of job is *pushing* carts back to the store); Dkt. 203 at 39 (same testimony at trial); Dkt. 204 at 45 (Polizzi's testimony that collecting carts was priority for first two hours

---

[1] Walmart also argues—in a footnote—that Reina could not operate the cart caddy, Dkt. 232 at 12 n.3, but it has forfeited that argument by failing to develop it. *Dieter*, 395 F.3d at 759. In any event, EEOC adduced evidence that Walmart's managers did not require cart attendants to operate the cart caddy, so a reasonable jury could conclude that operating the cart caddy was not an essential function of the job. *See* Dkt. 191 at 72; Dkt. 203 at 19-20.

of Reina's shift); Dkt. 205 at 64-65 (Slaght's testimony that gathering carts is main purpose of job).

There was scant evidence regarding motorized carts at trial. Leah Stroh, one of Walmart's shift managers, testified that associates "*may* drive the motorized cart to a customer or back to its parking spot to charge," and that she has seen them do so. Dkt. 205 at 125 and 131. Assistant manager Sheila Rae Martin was less equivocal, testifying that cart pushers were expected to retrieve the motorized carts. Dkt. 203 at 54. But neither witness discussed the frequency or essential nature of that particular task.

Coppernoll admitted that even though he had driven a motorized cart back to the store while Reina walked alongside, this occurred only once or twice a month. Dkt. 202 at 21-22. There was also evidence that cart attendants and other employees helped one another with the retrieval of motorized carts. Coppernoll testified that he had observed employees in different positions return motorized carts. *Id.* at 78. Slaght testified that Reina frequently helped other cart attendants with moving carts on their side of the parking lot. Dkt. 205 at 28.

Reina worked for Walmart for almost 17 years and he was not instructed to do anything differently with respect to motorized carts. At least one of Walmart's managers, Martin, knew that Coppernoll drove the motorized carts for Reina, Dkt. 203 at 53, but there is no evidence that she or anyone else ever instructed them that this was inappropriate. To the contrary, Reina regularly received positive performance evaluations, *see* Tr. Exhs. 1-17, and Slaght and Coppernoll both testified that they were never told that Reina was not doing his job appropriately. Dkt. 204 at 126; Dkt. 205 at 28. Walmart cites the testimony of two assistant managers, Martin and Amanda Fellows, that the work being judged in the performance evaluations was actually that of Reina and his job coach. *See* Dkt. 203 at 37 and 54-57, but

both witnesses admitted that they never questioned Reina's work arrangement or his use of a job coach. *Id.* Reina's performance reviews included no qualification that his "strong performer" ratings were based only his use of a job coach.

A reasonable jury could conclude from the above testimony that driving a motorized cart was a marginal, infrequent function of Reina's job and that this task could be performed by someone else when necessary. Tasks that are infrequently required are not typically essential functions. *See EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016) (quoting 29 C.F.R. § 1630.2(n)(1)) ("[E]ssential functions are the 'fundamental job duties' of the position, as opposed to the 'marginal functions.'"); *Shell v. Smith*, 789 F.3d 715, 718-19 (7th Cir. 2015) (jury could discount significance of job description for mechanic's helper that qualified bus driving duty as "may" and "occasionally," particularly where driving buses was not regular part of plaintiff's duties for 12 years); *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2014) (pushing wheelchairs wouldn't be essential function of beautician's job in nursing home if it "was so small a part that it could be reassigned to other employees at a negligible cost to the employer"); *Sullivan v. Spee-Dee Delivery Serv., Inc.*, 138 F. Supp. 3d 1050, 1054-55 (W.D. Wis. 2015) (denying summary judgment as to essential nature of driving heavy vans where plaintiff asserted it was 5% of his job, employer's past practices showed it was capable of making small adjustments to routes when needed, and no evidence that accommodation had adverse effects on business). The jury had sufficient evidentiary basis to conclude that driving motorized carts was too infrequent a task to constitute an essential job duty.

### b.  Steering

Walmart also says that Reina could not perform the essential cart retrieval and organization function of his job because even though he could push the carts in a straight line, his job coaches testified that he could not steer a group of nested carts by himself because he could not see oncoming hazards. *See* Dkt. 202 at 23, 40-42; Dkt. 204 at 72, 124; Dkt. 205 at 25-26, 84. Reina is visually impaired, and Reina's job coaches kept him focused and served as his eyes and ears by helping make sure that he avoided vehicles and pedestrians. But there was evidence that Reina could gather and push loose or stray carts on his own, nest them together, and physically push the weight of the nested carts. *See* Dkt. 202 at 26-27; Dkt. 204 at 42; Dkt. 205 at 25. Coppernoll recounted one situation in which Reina was able to independently push a line of carts without steering assistance while Coppernoll was operating a cart caddy with another line of carts alongside Reina. *Id.* at 83. At other times, Reina's job coaches used a different method, such as signs and gestures, to alert him to surrounding conditions or to keep him on task. *See* Dkt. 204 at 42; Dkt. 205 at 17-18.

Based on this evidence, particularly Coppernoll's testimony, and contrary to Walmart's contention, a rational jury could conclude that steering a line of carts is not in itself an essential function of Reina's job, but rather one method by which Reina could perform the essential function of cart retrieval. *See Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 280 (3d Cir. 2001) (although job description listed climbing as requirement, climbing might simply be "useful skill or method to perform the essential function of the job but . . . not itself an essential function"); *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 593 (E.D. Pa. 2017) (record could support conclusion that lifting objects over fifty pounds may be means for carrying out essential function of maintenance worker position rather than essential function itself).

Alternatively, a rational jury could conclude from the above evidence that having a job coach to provide Reina assistance by keeping him focused or acting as his eyes and ears to avoid hazards is a reasonable accommodation. *See Shell*, 789 F.3d at 719 (modification to manner in which employee carries out job—such as driving own vehicle rather than bus that required a commercial driver's license—may be permissible accommodation). As discussed above, Reina received consistently positive performance evaluations and was not told that the methods that he used to perform his job were inefficient or otherwise problematic. In fact, Coppernoll testified that one former manager had observed him in the parking lot with Reina and remarked on the efficiency of the arrangement. Dkt. 202 at 27-28. Even if other cart attendants commonly steered lines of carts by themselves, the law requires an employer to rethink its preferred practices or established methods of operation in providing a reasonable accommodation. *Miller v. Illinois Dep't of Trans.*, 643 F.3d 190, 199 (7th Cir. 2011) ("Employers must, at a minimum, consider possible modifications of jobs, processes, or tasks so as to allow an employee with a disability to work, even where established practices or methods seem to be the most efficient or serve otherwise legitimate purposes in the workplace.").

The jury had sufficient evidence for it to find that steering a line of shopping carts was not itself an essential function of Reina's job or that the assistance the job coach provided was a reasonable accommodation.

c. **Customer service**

Walmart's job description for cart attendant includes customer service as an essential function, which it defines to require acknowledging the customer, identifying customer needs, and resolving customer concerns. *See* Dkt. 205 at 123 (citing Tr. Exh. 22); Dkt. 29-1. Walmart concedes that witnesses at trial disagreed about what types of customer service Walmart

10

actually required of cart attendants. But Walmart contends that, at a minimum, answering customer questions was an essential function, which Reina was unable to do on his own. *See* Dkt. 204 at 80-81 (Polizzi's testimony that Reina could not respond to a customer's request for specific information). In support, Walmart points to the language of the job description and witness testimony that Walmart had a "10-foot rule" requiring all associates to greet and assist any customer coming within 10 feet of them. Dkt. 205 at 126-27 (Stroh's testimony); Dkt. 202 at 54 (Coppernoll's testimony).

However, there is sufficient evidence to support a reasonable jury finding that answering customer's questions was a non-essential or marginal function of Reina's job and that it was a task that could be performed by another employee if necessary. Witnesses testified that customer service was not a large part of a cart pusher's job. Dkt. 187 at 73 (Fellows's testimony that 95% of job was pushing carts); Dkt. 204 at 80 and 83 (Polizzi's testimony that customer service was not important part of cart pusher's job and usually customers only asked for a cart to push into the store). Although Reina could not verbally respond to customer questions, there is evidence that he performed many customer service activities, such as getting carts for customers who asked for them, helping customers transport items and load merchandise into their vehicles, and retrieving customers' carts at their vehicles when they were done with them. Dkt. 202 at 49 and 58; Dkt. 204 at 48-49, 125; Dkt. 205 at 30.

As with other aspects of his work, Reina's yearly performance evaluations showed that he performed customer service duties to Walmart's satisfaction. In fact, Walmart expressly evaluated him favorably on his customer interaction, writing in his 2011 evaluation that he was "courteous with the customers, Tr. Exh. 14, and in his 2010 and 2014 evaluations that he was "friendly to the customers." Tr. Exhs. 13 and 17. It praised him several times for adhering

11

to the 10-foot rule. *See* Tr. Exhs. 1-5 and 8-11. There also is evidence that customers thanked Reina for his assistance with their carts and gave positive feedback about Reina's work. Dkt. 204 at 52; Dkt. 205 at 30. Walmart never told Reina or his job coaches that he should be doing anything more or differently with respect to customer service. Dkt. 186 at 26-27; Dkt. 204 at 52-53, 126; Dkt. 205 at 30-31.

Finally, Stroh testified that Walmart included the same general customer service requirements in every employee's job description and agreed that any other employee would be available to answer customer questions. Dkt. 203 at 20-21. Walmart also had a greeter position whose specific role was to greet customers entering the store and respond to their inquiries. Dkt. 203 at 108; Dkt. 205 at 115-116.

The jury had a sufficient evidentiary basis to find the Reina was able to perform the essential customer-service functions of the cart attendant position.

## 2. Undue hardship

An employer is not required to provide an accommodation under the ADA if it can prove that doing so would impose an "undue hardship." 29 C.F.R. § 1630.9(a); *see also Majors*, 714 F.3d at 535 (undue hardship is affirmative defense that employer must prove). "An undue hardship is something that is too costly or so disruptive that it would fundamentally change the nature of Walmart's business or how Walmart runs its business." Dkt. 196 at 8.

Again, Walmart does not challenge the court's instruction on the issue. The court instructed the jury to consider the following factors in considering Walmart's claims of an undue hardship: (1) the nature and cost of the accommodation; (2) Walmart's overall financial resources, including the size of its business, the number of people it employs, and the types of facilities it runs; (3) the financial resources of the facility where the accommodation would be

12

made, including the number of people who work there and the impact that the accommodation would have on its operations and costs; and (4) the way that Walmart conducts its operations, including its workforce structure, the location of its facility where the accommodation would be made compared to Walmart's other facilities, and the relationship between these facilities. *Id.* at 8-9.

Walmart challenges the jury's finding of no undue hardship on two grounds. First, Walmart says that the evidence establishes that it faced "serious legal risks associated with having a non-associate regularly perform work for Reina." Dkt. 232 at 20. But the cited evidence consists solely of Scheuerell's testimony that he questioned whether Walmart's insurance would cover an accident caused by a non-associate job coach. Dkt. 203 at 100-01. Walmart did not adduce evidence showing the actual nature or likelihood of such a risk, its potential costs to a large company such as Walmart, or whether Walmart had previously investigated the risk during Reina's 17 years with the company.[2] Accordingly, the jury was entitled to dismiss Scheuerell's concerns about insurance coverage as mere speculation and to find instead that any potential risk was not so costly or disruptive as to fundamentally change the nature of Walmart's business.

Second, Walmart contends that the evidence shows that Reina's proposed accommodation "*would* require it to make fundamental changes to numerous workplace policies." Dkt. 232 at 20. It points out that that the cart attendant position is intended to be

---

[2] Walmart mentions that there were "specific reasons for it to worry about Mr. Coppernoll's legal risk as it relates to his interactions with Mr. Reina, including Coppernoll giving Reina a "bear hug" to stop an outburst. *See* Dkt. 232 at 20 (citing Tr. Exh. 37; Dkt. 202 at 31 and 67). But again Walmart has forfeited this argument by failing to develop it in any meaningful way. *Dieter*, 395 F.3d at 759.

a one-person job performed by a Walmart associate. But the evidence shows that Walmart allowed Reina to perform his position for more than 16 years and never actually changed its policies or stopped Reina's job coaches from using Walmart's cart caddy or motorized carts, handling merchandise, or interacting with customers. Walmart also points to its 10-foot rule as a core policy, but it has not shown that it had to make fundamental changes to this policy. As discussed above, Walmart praised Reina in his performance reviews for adhering to the 10-foot rule, Reina was able to perform several forms of customer service, and other employees greeted customers and responded to their questions.

Walmart has failed to show that the jury acted irrationally in finding that it faced no undue hardship by allowing Reina to work full-time with his job coach.

### 3. Discriminatory intent

Walmart says that the EEOC failed to present sufficient evidence of intentional discrimination by Walmart to support its discriminatory discharge and punitive damages claims. At trial the court instructed the jury that to succeed on its discriminatory termination claim, the EEOC had to prove that Walmart "would not have ended Reina's work if Reina had not had a disability, but everything else had been the same." Dkt. 196 at 9. The court also instructed the jury that they may award punitive damages if "the EEOC has proven that Walmart's conduct was malicious or in reckless disregard of Reina's rights." *Id.* at 11. With respect to punitive damages, the jury was told that relevant factors to consider included "the reprehensibility of Walmart's conduct; the impact of Walmart's conduct on Reina; the relationship between Reina and Walmart; the likelihood that Walmart would repeat the conduct if an award of punitive damages is not made; the relationship of any award of punitive damages to the amount of actual harm Reina suffered." *Id.* at 12.

14

Walmart makes only a few points with respect to the evidence of intent, none of which call the jury's verdict into question. First, it says that there was no evidence that any Walmart associate ever made a derogatory comment about Reina or people with disabilities. This is true, but the absence of direct evidence of discriminatory animus does not mean that Walmart did not end Reina's position because of his disability or that it did not act maliciously or in reckless disregard of Reina's rights. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683-84 (7th Cir. 2014) (tying adverse employment action to discriminatory animus can be proved with either direct or circumstantial evidence, but direct evidence is "understandably rare in ADA cases").

Second, Walmart points to evidence that it had policies prohibiting disability and other types of discrimination, Tr. Exhs. 533-34; management guidelines on how to respond to requests for accommodation, Tr. Exhs. 537-38; an Accommodation Center to work with management associates, Dkt. 203 at 84-85; and training for all associates on anti-discrimination policies, Dkt. 208 at 30-31, 34-35; Tr. Exh. 566. But a reasonable jury could conclude that Walmart took adverse action against Reina despite its existing policies and resources.

Third, Walmart contends, without explanation, that Scheuerell and Repka took the action they did because they believed that Reina could not perform several essential functions of his job by himself. Dkt. 232 at 22-23. The argument misses the point. Scheuerell and Repka may well have believed that Reina was not qualified because he had to rely on his job coach to perform his job for him. But the belief that a disabled employee is incapable of work does not insulate an employer from liability. To the contrary, that belief is a hallmark of disability discrimination. Scheuerell's and Repka's belief that Reina was incapable does not mean that Walmart did not end Reina's employment because Reina had a disability, or that it did not act

with reckless disregard of Reina's rights. As discussed above, the jury had sufficient evidence from which to conclude that Scheuerell and Repka were wrong and that Reina was a qualified individual.

As the EEOC points out, Walmart adduced evidence at trial to attempt to explain why Scheuerell and Repka decided to look into Reina's ability to perform the essential functions of his job even though he had 17 years of successful employment. However, a reasonable jury could have rejected the proffered reasons. Soon after Scheuerell started as the new store manager, Stroh told Scheuerell and Repka that she had "heard" that Coppernoll had used violence against Reina in the parking lot on June 10, 2015. Dkt. 203 at 17, 87-90. But there is no evidence that this incident ever occurred. Stroh did not see any incident or interview any witnesses about it, and there was no videotape or police call concerning such an incident. *Id.*; Dkt. 208 at 37-39. Stroh also told Scheuerell and Repka that she previously had made a police report in 2012 about a physical altercation that occurred between Coppernoll and Reina in the parking lot, but the police determined that the incident was "unfounded." *Id.* at 17-18. Finally, Scheuerell testified that he and Repka conducted surveillance in the parking lot during which they observed Reina hanging onto Coppernoll's belt while Coppernoll pushed a line of carts. Dkt. 203 at 90. But the EEOC adduced evidence that Reina had an aversion to being touched, Dkt. 205 at 36, and that Coppernoll made clear to Scheuerell that he was not able to push the carts for Reina because it was too physically strenuous, Dkt. 202 at 23-24, 33-34. The jury was entitled to reject Scheuerell's testimony about what he learned during the surveillance in favor of other evidence showing that Reina performed the essential functions of his job with minimal assistance from his job coach.

16

A rational jury also could find that the way that Walmart handled Reina's need for an accommodation reflected discriminatory intent. Slaght testified that in June 2015, Scheuerell claimed to be an expert on disability law, asked her to fill out a "new-hire packet," and told her to submit proof that Reina had a disability that deserved an accommodation, even though Reina had worked at Walmart for 17 years, his disability was readily apparent, and he submitted accommodation paperwork when he was hired. Dkt. 205 at 40-41; Tr. Exh. 18. According to Slaght, when she handed Scheuerell the completed ADA paperwork in July 2015, he said "Don't call me. I'll call you." Dkt. 205 at 43-44; Tr. Exh. 19. Matthew Matheny, Reina's service facilitator for the Medicaid waiver program, testified that he attempted to call Scheuerell several times through what appeared to be a direct dial number and left messages, but no one at Walmart ever responded. Dkt. 202 at 92-93, 100-02; Dkt. 205 at 47-48. Slaght testified that she also never heard back from Walmart until Reina filed a charge of discrimination. Dkt. 205 at 48-50. She also said that a Walmart representative told her at a meeting on March 18, 2016, that they did not want Reina back. *Id.* at 50-51.

The jury had evidence to support a reasonable finding that Walmart harbored discriminatory intent, malice, or reckless indifference to Reina's rights.

### 4. Novel theory of discrimination

Relying on *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536-37 (1999), and *EEOC v. Flambeau, Inc.*, 846 F.3d 941, 947 (7th Cir. 2017), Walmart contends that punitive damages are categorically unavailable where the underlying theory of discrimination is novel or otherwise poorly recognized. In *Kolstad*, the Supreme Court recognized that "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability" because "the employer discriminates with the distinct belief that its discrimination is lawful,"

such as where the "underlying theory of discrimination may be novel or otherwise poorly recognized." 527 U.S. at 536-37. Citing this statement, the Seventh Circuit found in *Flambeau* that "the EEOC's theory of discrimination assumed that the ADA's insurance safe harbor provision [limiting the ban on involuntary medical examinations, 42 U.S.C. § 12201(c),] does not cover at least some wellness plans." 846 F.3d at 945-47. The court of appeals explained that "[w]hether that is true, and for what kinds of wellness plans it might be true, were open questions." *Id.* at 947.

Resurrecting arguments that it made in support of its motion for summary judgment, Walmart says that there is room for disagreement about whether a permanent job coach is a reasonable accommodation as a matter of law. But as discussed at length in the court's orders denying Walmart's motion for summary judgment, Dkt. 65 at 16-18, and motion for reconsideration of the denial of summary judgment, Dkt. 76 at 2-3, the case law shows that the issue turns not on the distinction between permanent and temporary job coaching, but rather on the type and amount of assistance provided by the job coach and the abilities of the employee in question.

There is no question about the legal theory behind the EEOC's case against Walmart: an employer must provide reasonable accommodations to a qualified individual with a disability, absent undue hardship, and must engage in an interactive process to determine that accommodation. As discussed above, this case turned on the application of well-settled legal standards and definitions regarding reasonable accommodations, including that a job coach would not be a reasonable accommodation if the coach has to perform any of the essential functions of the job for the employee.

Whether a particular accommodation is reasonable or poses an undue burden are factual questions to be decided on an individualized, case-by-case basis. After hearing all of the evidence, the jury found that a job coach was a reasonable accommodation for Reina in this case. The fact that other courts have found differently based on a different set of facts does not mean that the EEOC's theory of discrimination was novel. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 405-06 (2002) (even if an accommodation is unreasonable in the usual case, an employee can still show that special circumstances exist why it is reasonable in the particular case).

The jury had a reasonable basis to find that an award of punitive damages was appropriate.

## B. Motion for a new trial

Under Rule 59(a), the court may grant a motion for a new trial if the verdict is "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Lewis v. McLean*, 941 F.3d 886, 891 (7th Cir. 2019) (quoting *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018)). "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) (internal quotation marks omitted); *see also Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (verdict will be set aside as contrary to manifest weight of evidence only if no rational jury could have rendered verdict). As with a Rule 50 motion, "the court does not make credibility determinations or weigh the evidence." *Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012).

Raising the same arguments that it made in support of its motion for judgment as a matter of law, Walmart contends that the verdict was against the manifest weight of the evidence. That contention is rejected for the reasons discussed above. For the reasons discussed below, I also reject Walmart's contention that the following five court rulings rendered the trial fundamentally unfair: (1) not allowing Walmart to call Reina as a witness; (2) excluding evidence of nondiscriminatory intent; (3) trying the liability and damages phases of trial together; (4) denying Walmart's request for the good-faith instruction under *Kolstad*, 527 U.S. 526; and (5) instructing the jury that punitive damages would go into a special needs trust for Reina.

## 1.  Calling Reina as a witness

Walmart contends that the court's decision not to allow it to call Reina as a live witness at trial was prejudicial because the jury was not allowed to decide for itself whether Reina had the ability to communicate and perform the essential functions of his job. Walmart points out that Federal Rule of Evidence 601 creates a "broad presumption of competency," *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 570 (7th Cir. 2009). But at his attempted deposition on September 12, 2018, Reina was not able to understand or communicate sufficiently to be sworn in and did not respond to simple questions about his name or address, even with four different interpreters present (2 sign language and 2 deaf interpreters). After reviewing the video of the attempted deposition and hearing from the parties, I determined that attempting to administer the oath to Reina and elicit live testimony from him at trial would only demonstrate his ability to communicate in a stressful court setting and not be very informative of his capabilities in the workplace. Dkt. 200 at 17-18.

Contrary to Walmart's contention, it had several opportunities to show that Reina had limited or no ability to communicate. I permitted Walmart to show excerpts from Reina's attempted deposition, *see* Dkt. 161 (stipulated designations of video deposition); Dkt. 203 at 79-80 (presentation of video at trial); use selections and outtakes from the EEOC's "day in the life" video of Reina during cross examination, *see* Dkt. 204 at 92-96, 109; Dkt. 205 at 62, 106-109; question their witnesses and cross examine the EEOC's witnesses about Reina's communication skills, Dkt. 202 at 51; Dkt. 203 at 31; Dkt. 204 at 93; and argue in closing that this evidence showed Reina's lack of communication skills and inability to work independently, Dkt. 209 at 41-42, 65-66. Walmart also argued that the jurors should draw an adverse inference from the fact that Reina was not called to testify. *Id*. at 63.

Accordingly, the court's exclusion of Reina's live trial testimony was not unfair to Walmart and does not warrant a new trial.

## 2.  Evidence of intent

Walmart argues that its punitive damages defense was unfairly prejudiced by the court's motion in limine decision to exclude testimony from Repka and Scheuerell that they initially were concerned that Walmart may face wage and hour issues if they allowed Reina to work with an unpaid job coach. *See EEOC v. Indiana Bell Telephone Company*, 256 F.3d 516, 527 (7th Cir. 2001) (finding that many circumstances bear on issue of intent and may persuade jury not to award punitive damages or to reduce the size of punitive damages award). Specifically, Walmart sought to introduce Scheurell's testimony that he contacted Walmart's global ethics hotline about an unpaid job coach performing Reina's duties, *see* Dkt. 35 at 55-58, and Repka's testimony that she contacted her supervisor about a potential wage and hour issue, *see* Dkt. 36 at 48-50. But neither witness said that they discovered any actual wage and hour compliance

problem. Accordingly, the court excluded the testimony on the ground that the witnesses' fears or concerns were speculative, not probative of whether potential wage and hour issues posed an undue hardship for Walmart, and likely to cause confusion for the jury. Dkt. 168 at 5; Dkt. 199 at 74-75. Although the testimony, emails, and documents listing possible wage and hour issues to be investigated may provide background information about Walmart's initial investigation into Reina's work arrangement, they are not highly probative of Walmart's stated reasons for finding Reina's requested accommodation unreasonable or for terminating Reina, and may have improperly led the jury to speculate about risks that were not proven.

Walmart says that it was not allowed to present evidence related to one of the non-discriminatory reasons that it found Reina's job coach arrangement problematic, but Walmart offered others. Walmart adduced evidence at trial that Stroh told Scheuerell and Repka about alleged altercations between Coppernoll and Reina and that Coppernoll was doing all of Reina's work; Scheuerell contacted the global ethics hotline, which advised him to work with Repka; Repka and Scheuerell observed Coppernoll doing Reina's job tasks in the parking lot; and Repka sent a letter to Coppernoll expressing a concern about him assisting an associate in the performance of their job duties and asking for a description of the work performed. *See* Dkt. 202 at 65-66; Dkt. 203 at 88-90; Dkt. 208 at 25-29.

Walmart has failed to show that the ruling regarding speculative evidence of wage and hour issues was fundamentally unfair.

### 3. No bifurcation

Magistrate Judge Crocker ordered the trial bifurcated at the outset of this case, Dkt. 8 at 5, which is this court's default approach. But after hearing from the parties at the final pretrial conference, I determined that the efficiency of trying liability and damages together

outweighed any potential prejudice to Walmart because the evidence related to damages would be minimal given Reina's life was quite limited to begin with. Dkt. 168 at 1; Dkt. 199 at 5-8. Walmart now challenges that decision, arguing that it was prejudiced by "substantial" damages testimony about how distraught Reina was about not returning to his job at Walmart.

The default rule under the Federal Rules of Civil Procedure is that issues of liability and damages are tried together. But "[u]nder Federal Rule of Civil Procedure 42(b), a district judge may separate claims or issues for trial if the separation would prevent prejudice to a party or promote judicial economy." *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007). The decision whether to bifurcate is discretionary. *Volkman v. Ryker,* 736 F.3d 1084, 1088–89 (7th Cir. 2013). Cases such as *Chlopek* and *Volkman* involved challenges to a decision to bifurcate, not a denial of such a request. Walmart does not cite any cases in which a court found that a party had a right to bifurcation.

Bifurcation may be necessary to avoid serious unfair prejudice in some cases. But Walmart has not shown that this is such a case. Walmart argues that bifurcation was necessary because the damages evidence created a "deeply emotional impact that could not help but improperly sway the jury on liability." Dkt. 232 at 33. But that's not enough to show unfair prejudice. If it were, it would require the court to bifurcate any case involving a plaintiff with substantial damages. Walmart cites no authority for such a far-reaching conclusion.[3] This argument does not provide a basis for a new trial.

---

[3] Although Walmart cites *United States v. Miles*, 207 F.3d 988, 993 (7th Cir. 2000), in which the court of appeals generally defined "unfairly prejudicial" as that which will "induce the jury to decide the case on an improper basis," the court of appeals did not address bifurcation in that case.

### 4. *Kolstad* instruction

Walmart argues that it was entitled to a good-faith instruction under *Kolstad*, 527 U.S. at 545-46, which provides that an employer may avoid liability for punitive damages by proving "good faith efforts" to comply with anti-discrimination laws if the employee establishes malicious or reckless conduct and a basis for employer liability. After hearing from the parties at the final pretrial conference, I declined to include the instruction, finding that Walmart had waived the affirmative defense by failing to plead it in its answer or litigate it. Dkt. 168 at 10-11; *see also* Fed. Civ. P. 8(c)(1) (party must affirmatively state any affirmative defense in its answer); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir. 1991) (affirmative defense waived if not pleaded and parties did not actually litigate the matter). Walmart argues that each of these conclusions was in error and that waiver was inappropriate because EEOC suffered no prejudice.

The Court of Appeals for the Seventh Circuit has not ruled expressly that the *Kolstad* good faith defense is an affirmative defense. But an affirmative defense is one on which defendant bears the burden of proof. *Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012). The court of appeals has interpreted *Kolstad* as placing the burden of proof on the defendant to show good faith and not making it an element of a punitive damages claim. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858-59 (7th Cir. 2001) ("[E]mployer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy."); *see also* Fed. Civ. Jury Instr. 7th Cir. 3.13 (2017 rev.) ("You should not, however, award Plaintiff punitive damages if Defendant *proves* that it made a good faith effort to implement an antidiscrimination policy.") (emphasis added). Several other courts of appeals have relied on similar reasoning in holding that the *Kolstad* defense is an

affirmative defense. *See e.g.*, *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1075 (6th Cir. 2015); *White v. BFI Waste Servs., LLC*, 198 F. App'x 283, 287 (4th Cir. 2006); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001); *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000); *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999). Walmart has not shown that the court erred in treating the *Kolstad* good faith defense as an affirmative defense.

As it did at the final pretrial conference, Walmart argues that it did not waive the affirmative defense because it adequately contested EEOC's right to recover punitive damages in its answer and contested the matter on summary judgment. But as I explained in the final pretrial conference order, Walmart's pleading, Dkt. 4, ¶ 9, asserts only the generic denial that the EEOC is not entitled to any relief or damages, "including punitive damages, compensatory damages, prejudgment interest, costs, penalties, or attorney's fees." Dkt. 168 at 10-11. Walmart's answer did not provide notice that Walmart would assert good-faith compliance with a non-discrimination policy.

The summary judgment briefing does not save Walmart either. Walmart moved for summary judgment on the ground that the evidence of record could not support a jury finding of malicious or reckless conduct. Dkt. 22 at 41-42 (Walmart summary judgment brief). In response, the EEOC argued in part that Walmart had waived any argument that it had acted in good faith, to which Walmart replied that it was not required to plead "lack of entitlement to punitive damages as an affirmative defense." Dkt. 57 at 32. Judge Crabb's summary judgment decision cited the law on punitive damages, including the good faith defense. But the decision denied Walmart's motion for summary judgment because the facts about Walmart's

conduct were disputed; it did not reach the waiver question. Dkt. 65 at 28-29. None of this shows that the parties actually litigated Walmart's good-faith defense to punitive damages. Walmart waived the *Kolstad* good faith defense by not pleading it, asserting it at summary judgment, or seeking to amend its answer to assert the defense after the EEOC raised the issue.

Finally, Walmart says that it was prejudiced because it was not allowed to show that Scheuerell and Repka acted in compliance with its nondiscrimination policies. But the court allowed Walmart to contest the EEOC's evidence that its conduct was malicious or in reckless disregard of Reina's rights and specifically instructed Walmart that it could introduce whatever evidence it had to make that showing, including policies that Walmart made a good faith effort to comply with. Dkt. 201 at 9-10. At trial, Walmart argued that it goes well beyond the bare legal requirement to train its employees about the ADA and accommodation issues, and that Reina's reasonable accommodations were denied because they were not consistent with Walmart's policies. Dkt. 209 at 59-60. It also emphasized that employers are not required to have specific policies and the question of liability turns on whether Walmart violated the ADA, not whether it followed its own policies. *Id*. at 49-50.

The court's exclusion of the *Kolstad* instruction was not unfair to Walmart and does not warrant a new trial.

### 5.  Jury instruction regarding the special needs trust

The jury asked the court the following questions during deliberations: "Where does the money from the punitive damages awarded go? Who gets it in other words?" Dkt. 198 at 1. The court responded that "[a]ny award of damages, including punitive damages, would be paid into a special needs trust for the benefit of Paul Reina. I remind you that the purpose of punitive damages is not compensation to Mr. Reina." *Id.* at 2.

26

A special needs trust "allows individuals with disabilities to avoid losing eligibility for Medicaid, which is means-tested." *Nat'l Found. for Special Needs Integrity, Inc. v. Reese*, 881 F.3d 1023, 1026 (7th Cir. 2018) (citing 42 U.S.C. § 1396p(d)(4)(C)). Although a special needs trust was not yet established for Reina at that time, the EEOC represented that one would be created before any damages were paid.

A district court must answer a jury question with "concrete accuracy" and provide supplemental instructions that fairly and adequately treat the issues, correctly state the law, and answer the question specifically. *United States v. Franco*, 874 F.2d 1136, 1143 (7th Cir. 1989). Here, the court provided an accurate answer and instructed the jury not to consider a punitive damages award as compensation for Reina. Had the court not answered or avoided the jury's question, the jury would have been left guessing and could have made an incorrect assumption.

Walmart says the court's response was prejudicial. But the only evidence of prejudice cited by Walmart is the size of the $5,000,000 punitive damages award, which the court reduced to $100,000 to comply with the statutory cap, 42 U.S.C. § 1981a(b). That's not enough to show unfair prejudice. "[T]he size of a punitive award reflects the jury's assessment of the defendant's blameworthiness." *EEOC v. Indiana Bell Tel. Co.*, 256 F.3d 516, 527 (7th Cir. 2001). As discussed above, there was substantial evidence from which the jury could find discriminatory intent and assess punitive damages.

Walmart has not shown that the court's response to the jury's question regarding the payment of punitive damages made the trial unfair.

## C.  Motion to remit compensatory damages

When reviewing an award of compensatory damages, the court asks whether the award is "monstrously excessive," whether there is a rational connection between the evidence and the award, and whether the award is roughly comparable to awards made in similar cases. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015); *Tullis v. Townley Engineering & Mfg. Co.*, 243 F.3d 1058, 1066 (7th Cir. 2001). The first two considerations focus on whether the award was irrational. *Adams*, 798 F.3d at 543. To determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. *Id.* As for the third consideration, the Seventh Circuit has instructed that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive." *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1008 (7th Cir. 2020) (quoting *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006)).

Walmart contends that the court should remit the jury's $200,000 compensatory damages award to $20,000 because the evidence showed that Reina experienced only "some level of additional anxiety beyond his baseline." Dkt. 232 at 41 (citing Dkt. 202 at 35; Dkt. 204 at 59-61; Dkt. 205 at 55-57). It also points out that Reina did not see a psychologist or psychiatrist for his increased anxiety, which had abated before trial. *See* Dkt. 203 at 70-71; Dkt. 205 at 111-12. But as Walmart admits in other sections of its brief, Dkt. 232 at 33, several witnesses testified how distraught Reina was after being taken off the schedule at Walmart, so much so that he would sit and pour water into an imaginary hole in the floor. Dkt. 204 at 60-61; Dkt. 205 at 55-56. Polizzi testified that Walmart's employment actions

caused Reina increased anxiety that made him lash out at her. Dkt. 204 at 60-61 ("increase [in] his heart rate," "sweating and start turning his hands"). Further, there was evidence that his loss of work was "devastating" to the "whole family," since "everything that [the family] had hoped for" for Mr. Reina—"who was actually thrown away as a kid"—"kind of crumbled" after Walmart's actions. Dkt. 204 at 61-62.

Walmart argues that a $200,000 compensatory damages award is not comparable to awards in similar cases. It points to *Marion County Coroner's Office v. EEOC*, 612 F.3d 924, 931 (7th Cir. 2010), in which the Seventh Circuit concluded that a white chief deputy coroner, who alleged that he was terminated on the basis of his race and in retaliation for filing an internal complaint after a few verbal altercations with his superior, was entitled to only $20,000 in compensatory damages. But contrary to the facts in this case, the court of appeals found the testimony regarding plaintiff's suffering in *Marion County* was extremely brief and only showed that he had undergone weekly therapy sessions for several months for situational depression. *Id.*

Walmart also cites three other cases in which large compensatory damage awards were remitted to no more than $30,000. But like *Marion County*, all of those cases involved non-severe conduct and a minimal evidence of nonpecuniary damages. In *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 389-91 (7th Cir. 2011), the court of appeals remitted a $200,000 compensatory damages award to $30,000 in a racial-discrimination case in which plaintiff was subjected to two racist rants and terminated. Although the court of appeals noted that the incidents were understandably offensive and disturbing, they were isolated and the plaintiff did not have any lasting physical or emotional effects and found a new job 10 days later. *Id.* at 389. In *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004), the court of appeals upheld the

29

reduction of a compensatory damage award from $100,000 to $27,000 in a sex discrimination case where the plaintiff was passed over for a promotion but was offered a replacement position two months later. In *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227-28 (7th Cir. 1995), the court of appeals remitted a $21,000 compensatory damages award to $10,500, finding that plaintiff had presented "so minimalist a case of nonpecuniary loss—a case so modest, so lacking in detail or structure" because his testimony consisted of a response to one question in which he stated that he felt speechless and was crying on the day he was fired and could still feel the loss several years after he had been fired. *Id.* at 1228-29. The EEOC's evidence in this case provides a much stronger case for a $200,000 award.

EEOC has cited several cases in which large compensatory damage awards were upheld on appeal. *See Vega*, 954 F.3d at 1008-09 (upholding $300,000 award for Title VII national origin discrimination claim where plaintiff testified about emotional, mental, and physical distress and financial worries associated with being unemployed for a year); *Farfaras*, 433 F.3d at 563 and 566-67 (upholding $200,000 award supported by testimony that plaintiff suffered lost self-esteem, weight gain, and problems sleeping as result of sexual harassment and discrimination); *Deloughery v. City of Chicago*, 422 F.3d 611, 619-21 (7th Cir. 2005) (affirming $175,000 award for Title VII retaliation claim regarding failure to promote, despite plaintiff never seeing professional help for emotional distress and defendant's evidence that plaintiff's stress stemmed from her divorce); *Martyne v. Parkside Med. Servs.*, No. 97C8295, 2000 WL 748096, at *8 (N.D. Ill. June 8, 2000) (upholding $302,000 award for ADA claim that employer failed to accommodate plaintiff's depression, observing that plaintiff's work was very large part of her life from which she was cut off). As the court of appeals has recognized, "[t]he higher damage awards affirmed in these cases were supported with first- and third-person

30

testimony regarding ongoing emotional and physical effects of the discrimination suffered by the plaintiffs." *Schandelmeier-Bartels*, 634 F.3d at 390. Similar evidence supported the jury's award in this case.

Although another jury might have evaluated Reina's damages more modestly, that is not the standard. *Adams*, 798 F.3d at 543. There is ample evidence to support the jury's verdict.

## ORDER

IT IS ORDERED that the motion filed by defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, LLP for judgment as a matter of law, a new trial, and to remit compensatory damages, Dkt. 231, is DENIED.

Entered November 25, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge